UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATTI JO CAHOO, KRISTEN MENDYK,
and KHADIJA COLE, HYON PAK, and
MICHELLE DAVISON,
individually and on behalf of
similarly situated persons,

Civil Action No. 17-10657

Hon: David M. Larson

        Plaintiffs

-vs-

SAS INSTITUTE INC.,
FAST ENTERPRISES, LLC,
GOVERNMENT SOLUTIONS, INC. CSG
STEVE GESKEY in his individual capacity,
SHEMIN BLUDELL, in her individual capacity,
DORRIS MITCHELL, in her individual capacity,
DEBRA SINGLETON, in her individual capacity,
JULIE A. McMURTRY, in her individual capacity, and
SHARON MOFFET-MASSEY, in her individual capacity,
jointly and severally,

        Defendants.

---

| | |
|---|---|
| Kevin S. Ernst (P-44223)<br>Ernst & Marko Law, PLC<br>Attorney for Plaintiffs<br>645 Griswold, Suite 4100<br>Detroit, MI 48226-4209<br>P: 313-965-5555 F: 313-965-5556<br>kevin@ernstmarkolaw.com | Andrew M. Harris (P-62265)<br>Kitch, Drutchas, Wagner, Valitutti &<br>Sherbrook,<br>Attorney for Defendant CSG<br>One Woodward Avenue, Suite 2400<br>Detroit, MI 48226<br>P: 313-965-7991 F:313-965-7403<br>andrew.harris@kitch.com |
| Craig E. Hilborn<br>Hilborn & Hilborn<br>Attorney for Plaintiffs<br>999 Haynes, Suite 205<br>Birmingham, MI 48009<br>248-642-8350<br>Craig@hilbornlaw.com | Walter J. Piszczatowski<br>Hertz, Schram, (Bloomfield Hills)<br>Attorney for Defendant FAST ENT.<br>1760 S. Telegraph Rd., Suite 300<br>Bloomfield Hills, MI 48302-0183<br>248-335-5000<br>wallyp@hertzschram.com |

John C. Philo
Sugar Law Center
Attorney for Plaintiff
4605 Cass Avenue
Detroit, MI 48201
P: 313-993-4505 F: 313-887-8470
johnphilo1@comcast.net

Gregory I. Thomas
Thomas, DeGrood,
Attorney for Defendant FAST
400 Galleria Officentre, Suite 550
Southfield, MI 48034
248-353-4450
248-353-4451 (fax)
gthomas@thomasdegrood.com

Stephen J. Rosenfeld
Mandell Menkes LLC
Attorney for Defendant CSG
1 N. Franklin ,Suite 3600
Chicago, IL 60606
312-251-1000
srosenfeld@mandellmenkes.com

Craig E. Stewart
Holland & Hart LLP
Attorney for Defendant FAST
555 17th St., Suite 3200
Denver, CO 80202
P: 303-295-8478 F: 303-713-6307
cstewart@hollandhart.com

## FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

1.    The State of Michigan's Unemployment Insurance Agency ("Agency") administers unemployment insurance through an automated system called MiDAS which was defectively designed, implemented, and/or maintained by Defendants SAS, Fast and CSG and the individual Defendants. Using the defective MiDAS system, Defendants deprived Plaintiffs, and thousands of Michigan's unemployment insurance claimants like them, of fundamental rights under the United States Constitution, federal law and under Michigan law.

2.    MiDAS was designed, implemented and maintained to make automated determinations of unemployment insurance fraud without any factual basis or weighing of the evidence, without any reasonable notice or opportunity for hearing, and without any human involvement. The system was so defectively designed, implemented and maintained that it had a margin of error of over 93% when making the automated fraud determinations.

3.      Once MiDAS became operational, it subjected previous beneficiary payments to renewed, automated, fraud scrutiny going back six years after benefits were paid, and "robo-adjudication" of fraud for past benefits paid. Often, if not the majority of the time, these robo-adjudications were default-based.

4.      Under this robo-adjudication system, once the defective fraud determination was made, the right to receive benefits were immediately terminated, restitution and penalties were assessed, and there was no meaningful way to challenge it.

5.      This system resulted in tens of thousands of unemployment insurance claimants being accused of fraud and being forced to pay "restitution" and penalties, even though they did nothing wrong. The fraud finding automatically results in a determination that restitution is owed and a penalty equal to five times the benefits received (the maximum allowed under the state statute). These punitive assessments regularly total $10,000-$50,000, and some exceed $187,000.

6.      One or more of Defendants engaged in the following wrongful practices related to the fraud determinations, denial of benefits, and imposition of restitution and penalties:

a.      Sending "fraud questionnaires" to beneficiaries without any explanation of the factual basis for the Agency's fraud allegations or sufficient information that would provide claimants with notice of the basis for the fraud allegations and an opportunity to rebut them. The questionnaires asked the claimant whether he made any misrepresentation, allowing for a binary yes/no response, and then asks why he believed he was entitled to benefits, followed by a multiple choice of nonsensical, unresponsive, loaded, incriminating and confusing answers and the choice of "other". If a claimant checked one of the answers, it resulted in MiDAS

making an automatic robo-adjudications of fraud;

b.    Failing to send the fraud questionnaires to claimants, or sending them only to a claimant's long dormant, electronic "MiWAM" account, and then making default-based robo-adjudications of fraud based on a failure to respond within 10 days without any basis to believe that the questionnaires were actually received;

c.    Making default-based, robo-adjudications of fraud when a claimant did receive the questionnaire but failed or refused to respond to the loaded, incriminating questions within 10 days;

d.    Making robo-determinations of fraud for a claimant's purported failure to report income based on the use of "income spreading", a formula by which MiDAS would calculate a claimant's total income in one quarter, divide it by 13, and then allocate that average amount of "earnings" to each week of the quarter, regardless of whether the claimant actually earned that amount in each week. MiDAS would make a robo-determination of fraud regardless of whether a claimant truthfully reported no income in one or more weeks in the quarter and was lawfully entitled to benefits for those weeks in which he had no income;

e.    Making robo-determinations of fraud by the claimant-employee whenever there was a discrepancy between what the claimant reported and what the employer reported as to the reason for employment separation, without any investigation into whether the discrepancy was the result of administrative error, good faith dispute, or misrepresentation by the employer;

f.    Once fraud was determined, sending confusing and defective fraud determination

notices that did not inform claimants of the factual basis of the Agency's determination of fraud and did not provide any information to allow claimants to evaluate or respond to the Agency's determination;

g.  Automatically assessing the maximum penalty allowed by statute—five times overpayment—without any factual basis to determine intent, all done by computerized robo-determination;

h.  Sending fraud determinations to addresses that were not current, without making any attempt to get current addresses.

i.  Instructing Agency employees to falsely and illegally advise claimants that they had no right to appeal because more than 30 days passed since the fraud determination (i.e., to give erroneous legal advice), even when the claimants never received notice and had the right to appeal.

j.  Making unauthorized and warrantless seizures of federal tax refunds without the specific due process guarantees provided by 26 USC § 6402(f)(3), seizing state tax refunds and garnishing wages, all without any evidentiary basis, hearing or factual finding that would permit the conclusion that fraud occurred, further depriving claimants of their property without due process of law;

k.  Using unsupported fraud determinations as a basis for indefinite payment plans with the State (often for $250 per month, forever) when the claimant is financially unable to pay the lump sum judgment of restitution, penalty and interest;

l.  Pursuing the penalties and restitution based solely on a claimant's default despite the knowledge that the underlying fraud determination was invalid and false;

and/or

m.      Opposing the discharge of a claimant's restitution and penalty debt in bankruptcy based on these invalid and false fraud determinations through the use of adversary complaints, with full knowledge that the underlying fraud determinations were invalid and false.

7.      The class Plaintiffs herein are claimants who have been affected by one or more of these unlawful practices.

## JURISDICTION

8.      Jurisdiction in this Court over the Plaintiffs' claims brought pursuant to 42 U.S.C . § 1983 is provided by 28 U.S.C. §§ 1331 and 1343(3). The declaratory and injunctive relief sought is authorized by 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §1983, and Rule 57 of the Federal Rules of Civil Procedure. Diversity jurisdiction is proper under 28 U.S.C. §§ 1332.

9.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) as a substantial part of the events giving rise to this action occurred therein.

## PARTIES

**Defendants**

10.      Defendant SAS Institute Inc., upon information and belief, is headquartered at 100 SAS Campus Drive, Cary, North Carolina 27513-2414, and does business with the State of Michigan's Unemployment Insurance Agency (Agency) through the procurement process overseen by the Michigan Department of Technology, Management and Budget ("DTMB"), and designed, created, implemented, maintained and/or controlled the "Enterprise Fraud Detection System" ("EDFS").  At all material times, it performed exclusive and traditional state functions

through its agents, it acted together and cooperated with the State in a concert of activity through its agents, it was, through its agents, endowed by the State with powers or functions governmental in nature, it was, through its agents, pervasively intertwined with state officials and received significant encouragement from the State, when it designed, implemented and/or maintained the defective and unconstitutional fraud detection systems.

    a.    John Doe 1, an individual, was one of these agents of SAS.

    b.    John Doe 2, an individual, was one of these agents of SAS

    11.    Defendant FAST Enterprises, LLC, (Fast) upon information and belief, is headquartered at 7229 South Alton Way, Centennial, CO 80112, and does business with the Agency through the procurement process overseen by the Michigan DTMB, and designed, created, implemented and/or maintained the Michigan Integrated Data Automated System ("MiDAS"). At all material times, it performed exclusive and traditional state functions through its agents, it acted together and cooperated with the State in a concert of activity through its agents, it was, through its agents, endowed by the State with powers or functions governmental in nature, it was, through its agents, pervasively intertwined with state officials and received significant encouragement from the State, when it designed, implemented and/or maintained the defective and unconstitutional fraud detection systems.

    a.    Jeremy Gragg, an individual, was one of these agents of FAST and was a lead implementation consultant who worked on determination and compliance systems.

    b.    Jon Eads, an individual, was one of these agents of FAST and was the project manager.

12.    Defendant Government Sollutions Inc., CSG ("CSG"), upon information and belief, is headquartered at 180 N. Stetson Ave., Suite 3200, Chicago, IL 60601, and does business with the State of Michigan's Unemployment Insurance Agency through the procurement process overseen by the Michigan DTMB, through a Procurement Contracting Officer position, and in conjunction with the Agency and DTMB continues to provide full-time, on-site management to oversee MiDAS production support and additional initiatives including:

      a.     Public Act 138 and 241 of 2014 compliance;

      b.     Integrity initiative for the ongoing Enterprise Fraud Detection System (EFDS) Project;

      c.     Implementation of the Interstate Reciprocal Overpayment Recovery Agreement (IRORA);

      d.     UIA and Michigan Administrative Hearing System (MAHS) appeals improvements; and

      e.     Development of Standard Operating Procedures for the UIA Tax Office.

13.    At all material times, CSG performed exclusive and traditional state functions through its agents, it acted together and cooperated with the State in a concert of activity through its agents, it was, through its agents, endowed by the State with powers or functions governmental in nature, it was, through its agents, pervasively intertwined with state officials and received significant encouragement from the State, when it designed, implemented and/or maintained the defective and unconstitutional fraud detection systems.

      a.     John Doe 3, an individual, was one of these agents of CSG.

b.      John Doe 4, an individual, was one of these agents of CSG

14.     Defendant Geskey was at all material times a high ranking supervisor at the Agency.  He implemented and oversaw the MiDAS automated system.  He set policy and continued to direct subordinates to pursue the invalid and false fraud claims against claimants despite the knowledge that the fraud claims were invalid and false.  He is sued in his individual capacity.

15.     Defendant Blundell was at all material times the head of the Fraud Unit within the Agency.  She continued to direct subordinates to pursue the invalid and false fraud claims against claimants despite the knowledge that the fraud claims were invalid and false.  She is sued in her individual capacity.

16.     Defendant Mitchell was at all material times head of the Friend of the Court and Bankruptcy Unit within the Agency.  She continued to direct subordinates to oppose discharge of claimants' debt in bankruptcy proceedings that was based on the invalid and false fraud claim despite the knowledge that the fraud claims were invalid and false.  She is sued in her individual capacity.

17.     Each Defendant's actions were undertaken under color of state law. The term "Defendants" hereafter refers to all Defendants unless otherwise indicated.

**Plaintiffs**

18.     Plaintiff and Class Representative Patti Jo Cahoo ("Cahoo") is a resident of Michigan and was falsely charged with filing a fraudulent claim in 2014 after filing for unemployment benefits.

19.     Plaintiff and Class Representative Kristen Mendyk ("Mendyk") filed for unemployment in December 2009 after being fired from her job in April 2008.  Plaintiff Mendyk received unemployment benefits for one year and was falsely accused of making a fraudulent claim in November of 2016.

20.     Plaintiff and Class Representative Khadija Cole ('Cole") applied for unemployment benefits after being laid off from her position as a mortgage closer in 2014.  One year after receiving unemployment benefits, she received a statement indicating that she had made a fraudulent claim and owed approximately $29,000 based on a false fraud determination. The collection letter was the first time she was ever notified of the Agency's fraud claim.

21.     Plaintiff and Class Representative Michelle Davison had her state and federal income taxes seized from 2015 through 2016 based on an invalid and false fraud determination. She was not even aware a fraud determination had been made until she received a letter from the IRS that her tax refund was being seized.  She was not given any notice prior to the seizure, was not given 60 days to present evidence to oppose the seizure, and no consideration was given prior to the seizure, all in violation of 26 USC §6402(f)(3).

22.     Plaintiff and Class Representative Hyon Pak had his federal income taxes seized from 2012 through 2014 based on an invalid and false fraud determination.  He was not even aware a fraud determination had been made until he received a letter from the IRS that his tax refund was being seized. He was not given any notice prior to the seizure, was not given 60 days to present evidence to oppose the seizure, and no consideration was given prior to the seizure, all in violation of 26 USC §6402(f)(3).

## CLASS ACTION ALLEGATIONS

23.     Plaintiffs bring this class action under Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of Plaintiffs and all other persons who have been wrongfully accused of fraudulent activity and/or denied benefits they are rightfully entitled to and/or had their income tax overpayments seized without the due process requirements in 26 USC §6402(f)(3).

24.     The class is so numerous that joinder of all members is impracticable as there are thousands of plaintiffs.

25.     Plaintiffs' claims are typical of the claims of the other members of the Class, as Plaintiff and other members of the Class were injured by being accused of fraudulent activity and assessed egregious fines and/or being denied benefits that they were rightfully entitled to and had their income tax overpayments seized without due process.

26.     Defendants acted wrongfully in the same basic manner to the entire class.

27.     Plaintiffs will fairly and adequately represent the interests of the Class and have retained competent and experienced counsel.

28.     Plaintiffs have no interests that are contrary to or in conflict with those of the class.

## COMMON FACTUAL ALLEGATIONS

29.     Pursuant to federal and state laws, the Agency  collects state payroll taxes from covered employers in Michigan and pays UI benefits to eligible claimants.

30.     To qualify for benefits individuals must establish that they were employed by a covered employer and meet certain wage and work eligibility requirements.  Claimants must also establish they were not separated from employment due to misconduct connected to the work and

did not voluntarily leave employment without good cause.  Once these eligibility requirements are met, the individuals are entitled to receive benefits under state and federal law.

31.     Eligible claimants, including the individual Plaintiffs herein, have property interests created by state and federal law in receiving UI benefits, which are protected by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and the constitutional rights incorporated therein.

32.     The federal government, through the Department of Labor, provides monetary grants to states, including Michigan's Unemployment Insurance Agency, in support of state unemployment insurance programs.

33.     To receive certification for such grants, states must assess penalties of no less than fifteen (15) percent of the amount of the erroneous payments, if the state "determines an erroneous payment...was made to an individual due to fraud committed by such individual." 42 U.S.C. §503(a)(11)(A).

34.     Assessments collected as a penalty for fraud must be deposited into the unemployment fund of the state.  §503(a)(11)(B).

35.     To receive federal grants, federal law establishes the minimum due process requirements states must provide to unemployment beneficiaries, including those accused of fraud, before the states can discontinue benefits or recover overpayments.

36.     The State of Michigan received the federal grants and subjected itself to these requirements.

37.     These requirements included: conducting an investigation, including promptly contacting the individual involved and giving him a reasonable amount of time to be heard;

independently verifying information received from a computer cross-match before taking any adverse action against a claiant; obtaining information and providing the affected claimant an opportunity to be heard when information is received from a computer cross-match; providing a written determination with enough information to understand its basis, when/how to appeal, the facts on which the determination was based, the reason for denying benefits and the legal basis for the determination; providing an opportunity to appeal; and continuing payments until a final determination is made.  See Unemployment Insurance Program Letter No. 1-16, and law cited therein (Exhibit 1.)

38.     Federal law allows states to recover overpayments by deducting them from future unemployment benefits, subject to the due process requirement that "[a]ny such deduction shall be made only in accordance with the same procedures relating to notice and opportunity for a hearing as apply to the recovery of overpayments of regular unemployment compensation paid by such State." 42 U.S.C. §503 (g)(1).

39.     Federal law also allows states to recover overpayments and penalties through the interception of federal income tax refunds, subject to minimum due process requirements.

40.     Accordingly, states accepting federal grants, like Michigan, are barred from pursuing collection of unemployment compensation debts, including penalties, through collections actions and the interception of federal income tax refunds, unless specific steps are taken with regard to notice, consideration of evidence, and a fair opportunity to be heard.

41.     26 U.S.C. §6402(f)(3) governs the seizure of federal income tax refunds and requires states to provide specific notice and hearing requirements before a refund can be seized: (3) Notice; consideration of evidence.  No State may take action under this subsection until such

State –

    a.    notifies the person owing the covered unemployment compensation debt that the State proposes to take action pursuant to this section;

    b.    provides such person at least 60 days to present evidence that all or part of such liability is not legally enforceable or is not a covered unemployment compensation debt;

    c.    considers any evidence presented by such person and determines that an amount of such debt is legally enforceable and is a covered unemployment compensation debt; and

    d.    satisfies such other conditions as the Secretary may prescribe to ensure that the determination made under subparagraph (C) is valid and that the State has made reasonable efforts to obtain payment of such covered unemployment compensation debt.

42.    The minimum due process requirements listed above apply to the following types of unemployment compensation debt: past-due debt due to the claimant's alleged failure to report earnings; contributions to the state's unemployment fund for which the person is alleged to be liable; and any penalties and interest assessed on such alleged debt. 26 U.S.C. §6402(f)(4).

43.    These minimum due process requirements must be afforded to all claimants, regardless of whether or not the claimants are ultimately determined to be "guilty" or "innocent" of receiving or trying to obtain UIA benefits through fraud or other improper means.

44.    Michigan accepts federal funds in furtherance of its unemployment benefits program, imposes penalties for unemployment fraud, and is therefore obligated to comply with

the minimum due process requirements mandated by federal law.

45.     The Agency has applied a computer application which was designed, created, implemented, installed, and/or maintained by the entity Defendants and their agents named herein, in concert with various state officials, to search for discrepancies in the records of individuals who were receiving, or previously received, unemployment insurance (UI) benefits.

46.     This decision-making system, known as MiDAS, was created in part to detect and control alleged UI fraud.

47.     The Agency coordinates collection procedures with employers, other state agencies and the federal government and uses electronic "cross-checking" that alerts the Agency's automated system when income is reported for UI claimants, or when other activity regarding the claimant occurs that might have some bearing on their qualification for benefits.

48.     When such income is detected, or when other information or discrepancies regarding the claimant are "flagged", MiDAS initiates an automated process that can result in disqualification from benefits, the imposition of restitution and penalties, and criminal prosecution.

49.     MiDAS does not provide claimants with specific notice of the basis for the Agency's suspicion of fraud or other culpable conduct  or provide any information which would allow the claimant to rebut the fraud charge.

50.     MiDAS does not include or allow for an actual fact-based adjudication of whether the claimant engaged in culpable disqualifying conduct.

51.     MiDAS does not allow for a minimum of sixty days in which claimants can present evidence;

52.     MiDAS does not include or allow for the presentation of any evidence by the claimant.

53.     MiDAS does not include or allow for consideration of evidence by the Agency.

54.     Instead of providing for meaningful notice, an opportunity to present evidence and a meaningful determination process for consideration of evidence, the Agency automatically sends questionnaires to Agency claimants asking them to respond, in ten days, to the potential disqualification.   The questionnaire contains multiple choice answers, all of which are loaded, and incriminating and would result in a robo-determination of fraud if checked.  It provides:

> Did you intentionally provide false information to
> obtain benefits you were not entitles to receive?
> Yes              No

Why do you believe you were entitled to benefits?

1. I needed the money
2. I had not received payment when I reported for benefits
3. I reported the net dollar amount instead of the gross dollar amount paid
4. I did not understand how to report my earnings or separation reason
5. I thought my employer reported my earnings for me
6. Someone else certified (reported) for me
7. Someone else filed my claim for me
8. Other

55.     Furthermore, the fraud questionnaires were not sent to some claimants, yet MiDAS would make a default-based fraud determination when the claimant did not respond to a questionnaire that was never sent to him.

56.     When the questionnaires were actually sent, they did not inform the claimant of the basis for the agency's suspicion or grounds for potential disqualification, and thus did not allow claimants a meaningful opportunity to respond in a reasonable time and in a reasonable

manner to the underlying accusation of fraud, failure to report or other culpable conduct.

57.     The questionnaires that were actually sent were sent to claimants' online

Michigan Web Account Management System ("MiWAM") accounts without any additional

notification via e-mail, U.S. mail or otherwise, to notify claimants that they have received an

inquiry or questionnaire regarding their potential disqualification and/or potential penalty.

58.     In many cases, these MiWAM accounts had been dormant for years, since the

questionnaires were sent well after the claimants' benefits had expired, because when MiDAS

became operational, it reviewed claims going back as far as six years.  Claimants therefore had

no reason to check their MiWAM accounts for messages or other activity.

59.     In such cases, the Agency did not make any further effort to notify claimants or

former claimants that there was a questionnaire or correspondence in their MiWAM account that

might affect their property interests, liberty interests or other rights, but instead made a default-

based determination of fraud when no response was received.

60.     A default-based determination of fraud was made if the Agency did not receive a

reply to the questionnaire within ten calendar days or if it received a response MiDAS deemed

unsatisfactory, such as by checking one of the multiple choice answers.  In either event, MiDAS

robo-adjudicated the fraud issue and automatically determined that the claimant knowingly and

intentionally misrepresented or concealed information to unlawfully receive benefits.

61.     Between October 2013 and August 2015, the fraud determination was entirely

automated and made by MiDAS without the benefit of any investigatory review, or human input

or evaluation of any kind.

62.     After August 2015, the Agency continued to use MiDAS and the same algorithms

employed by MiDAS to determine fraud, but used humans with flow charts; these humans were essentially automatons who exercised no more fact finding, investigation or discretion than their MiDAS counterpart.

63.     After an automated finding was made that the claimant engaged in disqualifying conduct, such as fraud or failure to report, many claimants, including Plaintiff Hyon Pak, attempted to assert their procedural and administrative rights by writing to the Agency and/or submitting online appeals.

64.     These appeals were ignored and claimants never received any acknowledgment from the Agency that they were received or considered by the Agency.

65.     Instead, the next step is for MiDAS to create a "statement," which is sent to the claimant, demanding that they repay benefits, plus penalties and interest.

66.     However, many times these statement letters were never sent, or were sent to an incorrect address, and no effort was made to verify that the address to which the letter was sent was the current address of the claimant.

67.     This statement from the Agency indicates that penalties for non-payment may include interception of the claimant's state income tax refund, interception of the claimant's federal income tax refund, garnishment of wages, and legal collection activity through a court of law.

68.     Under the threat of such penalties, some claimants submit payments to the Agency of $250 per month, indefinitely, to satisfy their "debts," including repayment of benefits, penalties and interests, despite the fact that there has been no due process or an actual adjudication of culpable behavior to either disqualify them from benefits or impose penalties.

69.     The methods and processes established by the Agency for the detection, determination and penalizing of alleged UI benefit fraud, including intercepting federal tax refunds, violate the standards required by federal law.

70.     Further, the fraud robo-adjudication does not result from a neutral or fair process, but one that is wholly biased against the claimant.  If a discrepancy is found between a record submitted by an employer and corresponding information reported by the claimant when applying for benefits, the Agency's computer program automatically flags the claimant's file as a potential case of claimant misrepresentation.

71.     Even though the discrepancy may also be the result of an employer error or good faith dispute, or fraud by the employer, no corresponding process is employed to flag an employer's file for potential misrepresentation.

72.     This process can occur at any time, up to six years after a claimant has stopped collecting benefits and is no longer regularly interacting with the Agency.

73.     These invalid and false fraud determinations, and the aggressive collection techniques that followed, including wage garnishments and income tax refund intercepts, caused the Agency "contingency fund" to swell from approximately $3,000,000 when MiDAS was first operational in late 2012 to over $155,000,000 in October 2016 .

74.     In August 2015, the Michigan Auditor General reviewed 22,427 of the robo-adjudications of fraud made between October 2013 nd October 2015, and determined that 20,965 of them (over 93%) did not involve fraud at all.

75.     Once a robo-adjudication occurs, the claimant is automatically ineligible for hardship waivers that would otherwise be available.

76.    The accusation of fraud alone is also enough to deprive a claimant of their right to a free advocate under Michigan's Advocacy Assistance Program operated by the Agency. MCL 421.5a.

77.    Once the computer has made this determination, the Agency sends the claimant another form letter entitled "Notice of Determination" which states "Your actions indicate you intentionally misled and/or concealed information to obtain benefits you were not entitled to receive."

78.    The "Notice of Determination" letter also does not state what these actions were, or give any information as to why the claimant is no longer eligible. The letter terminates benefits on any active claims and states that the person is required to pay the amount assessed on the determination.

79.    Enclosed with this letter is a document titled "Restitution (List of Overpayment)" which lists the amount of alleged overpayment and seeks the repayment of the actual benefits paid in addition to a statutory penalty for fraudulent misrepresentation of four times that amount, for a total assessment of five times the benefits received or sought by the claimant. The five times penalty may be assessed even if the claimant never actually received benefits from the Agency.

80.    Defendants have designed, implemented, maintained and/or administered the computer programs to assess the maximum penalty amounts against all claimants accused of misrepresentation regardless of the facts or circumstances of the case, without a showing that the conduct was reprehensible, and without regard to whether the alleged misrepresentation was intentional, negligent or merely accidental.

81.     Claimants have the opportunity to appeal this determination to an Administrative Law Judge within 30 days after the determination is made.

82.     Until a claimant makes such an appeal, an actual Agency employee has often never been involved in evaluating a fraud case, which the computer has robo-adjudicated.

83.     Due to the defective and unconstitutional notification procedure, the vast majority of claimants were unaware of any issue regarding their UI benefits until after the appeal deadline passed and assessed thousands of dollars in fines.

84.     When claimants became aware and inquired, they were told by Agency employees that there was nothing the claimants could do because the appeal deadline has passed.

85.     This system and software, including its design and implementation, is constitutionally deficient and routinely deprives individual unemployment claimants, who are some of the state's most economically vulnerable citizens, of their most basic constitutional rights.

86.     The administration of unemployment insurance benefits, which includes collecting taxes and administering benefits to unemployed citizens, the denial of benefits, making fraud and damage determinations, including restitution and penalties, and the seizure of income tax refunds are exclusive state functions that have been traditionally and exclusively performed by the State of Michigan.

87.     Defendants SAS, Fast, CSG, Eads, Gragg, and all John Does, performed at least some of these public functions traditionally and exclusively performed by the State of Michigan, including robo-adjudications of fraud, denial of beneifits and the determination of damage awards for restitution and penalties.

88.     Defendants SAS, Fast, CSG, Eads, Gragg, and all John Does were pervasively intertwined with state officials when they designed, created, implemented and/or maintained EDFS and MiDAS and State officials were intimately involved with Defendants SAS, Fast, CSG, Eads, Gragg, and all John Does at every step of the process of creating and implementing the defective and unconstitutional fraud detection system that bilked tens of thousands of legitimate unemployment insurance claimants out of hundreds of millions of dollars. There was input and feedback between Defendants SAS, Fast, CSG, Eads, Gragg, and all John Does and state officials at every stage of the process and all agreed to continue the process even after the defective and unconstitutional attributes of the fraud detection system became widely known.

89.     The State gave significant encouragement to Defendants SAS, Fast, CSG, Eads, Gragg, and all John Does to create, implement and/or maintain the defective and unconstitutional fraud detection systems and continue the defective and unconstitutional fraud determinations even after the defective and unconstitutional attributes of the fraud detection system became widely known.

90.     By and through the design, creation, implementation, instruction to State employees, supervision of the computer systems, and/or maintenance of software programs that were implemented to automate the unemployment insurance disbursement process, Defendants engaged in an activity traditionally and exclusively relegated to the State of Michigan.

91.     The injury incurred by Plaintiffs was one that could only be aggravated by the acts of governmental authority exercised by the State of Michigan.

92.     By their conduct as described herein, Defendants SAS, Fast, CSG, Eads, Gragg, and all John Does, as well as the named state officials, acted under under color of law.

## COUNT I:  NEGLIGENT DESIGN & PRODUCTS LIABILITY

93.     Plaintiff hereby restates and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

94.     The defective condition of the automated programs designed, created, implemented, and/or maintained by Defendants constitute a breach by Defendants of an implied warranty, rendering them liable for the injuries sustained by Plaintiffs and class members.

95.     Defendants knew or had reason to know the particular purposes for which the programs were to be used and potential claimant users, such as Plaintiffs and class members, would rely on Defendants' apparent expertise or judgment furnishing goods suitable for such purposes and uses.

96.     Plaintiffs and class members were unaware that the product created an unreasonable risk of injury.

97.     As a direct and proximate consequence of the breach of implied warranty by Defendants, Plaintiffs and class members have suffered and will continue to suffer in the future, the following damages: emotional anguish, lost earnings, lost earning capacity, psychological and behavioral damages, and any other damages incidental to the injuries sustained.

98.     Defendants were grossly negligent.

99.     Defendants acted with disregard of a known defect.

## COUNT II: 14TH AMENDMENT DUE PROCESS VIOLATION

100.     By law, the property interest in a person's means of livelihood is one of the paramount property interests an individual can possess.

101.     The right to receive unemployment benefits, essentially a substitute for a person's

Page 23 of 34

means of livelihood, is an equally paramount property interest.

102. Plaintiffs had a paramount property interest in their entitlement to unemployment benefits.

103. Plaintiffs also have a property interest in their income tax refunds.

104. Plaintiffs also have a property interest in the money they possess generated from sources other than their unemployment insurance benefits.

105. There was no emergency situation that would justify state actors denying benefits, making fraud determinations, or engaging in collection activities before providing claimants a pre-deprivation hearing.

106. Plaintiff's did not receive a pre-deprivation hearing that was in any way consistent with due process.

107. They did not receive adequate notice of the charges against them.

108. They did not receive an opportunity to present evidence and put the allegations in context.

109. And they did not have a neutral arbiter adjudicate the issues before a fraud determination was made, before a penalty was imposed, and before collection activities were commenced.

110. The risk of an erroneous, pre-hearing deprivation of property was extremely high, over 93%, according to the State of Michigan Auditor General.

111. The probable value of additional or substitute procedural safeguards was extremely high. Insuring that the persons accused of fraud actually received notice, adequately informing them of the reasons for the fraud allegation, giving them a meaningful opportunity to

respond and rebut the charges and providing a neutral arbiter would have a substantial likelihood of reducing the over 93% margin of error.

112. The government has no legitimate interest in a system that has a over 93% margin of error and the fiscal and administrative burdens of providing proper procedures are not overly burdensome as demonstrated by the years the Agency operated before the MiDAS system was operational.

113. Adequate pre-deprivation proceedings are not impracticable and are, in fact, required under state law.

114. The post deprivation process was inadequate.

115. In the vast majority of cases, the claimants did not learn of the fraud determination until long after their time for protest or appeal had expired.

116. Further, the state Defendants instructed rank and file Agency employees to inform claimants that they could not appeal the fraud determinations and penalty assessments after 30 days, even if the claimants did not receive notice and thus had the right to appeal.

117. The Michigan Audit General did an audit of the Agency's "Help Line" and determined that well over 90% of the calls were never answered and in fact determined that with regard to the last 50,000 calls the agency received at the time of the audit, not a single one had been answered or returned.

118. The mere allegations of fraud also meant that the claimant was ineligible to have an advocate provided by the state to navigate the complicated appellate process.

119. When the MiDAS system became operational, all the claim information was put into a "Legacy" system and hard copies were not maintained.

120.    Although the MiDAS system could access the legacy information to make a fraud determination, humans could not access the Legacy program to print the information or copy it in any way.

121.    Thus, when fraud determinations were made regarding conduct that occurred prior to MiDAS becoming operational, claimants were not provided copies of the documents and information MiDAS relied on to make the fraud determinations, making it all but impossible to rebut the charges.

122.    In fact, the Agency began a practice of sending the administrative law judges (ALJ), who heard the post deprivation appeals a "secret letter", an ex-parte communication that was not shown to the claimant or his attorney, in which the Agency set forth its position as to why there was fraud based on the inaccessible legacy information.

123.    When certain ALJs expressed concerns over the Agency's practices after becoming aware of the extremely high rate of invalid fraud determinations, some were removed from hearing fraud cases by Defendant McMurtry.

124.    Post-deprivation remedies are insufficient and inadequate because they fail to provide due process when the automated decision-making process occurs in secret and there is no available record keeping trail to determine what happened in the decision-making process.

125.    Even a temporary deprivation of wages, unemployment benefits, or tax refunds creates a substantial burden on claimants who rely upon such income to support themselves and their families.

126.    Defendants' actions and omissions constitute a deprivation of property without due process as guaranteed by the Fourteenth Amendment's Due Process Clause.

127.    This claim is cognizable under 42 USC Section 1983.

## COUNT III:  FOURTEENTH AMENDMENT EQUAL PROTECTION CLAIM.

128.    Plaintiffs and the potential class members comprise a non-suspect class.

129.    The government has a legitimate interest in protecting the health, safety and welfare of its citizens through administering unemployment insurance benefits.

130.    The use of an automated system to make fraud determinations on unemployment claims that has over a 93% margin of error, and which denies even the most basic due-process requirements, and then punishes those erroneously and wrongfully determined to have committed fraud by denying benefits and assessing restitution and punitive damages, is arbitrary and capricious and is not rationally related to administering unemployment insurance for the welfare of the citizens of the State.

131.    Defendants' actions and omissions constitute a denial of the equal protection of the law as guaranteed by the Fourteenth Amendment's Equal Protection Clause.

132.    This claim is cognizable under 42 USC Section 1983.

## COUNT IV:  SUBSTANTIVE DUE PROCESS VIOLATIONS

133.    Even before the Auditor General's investigation which determined that there was over a 93% margin of error in the fraud determinations made by the Agency, it was widely known by Defendants and others within the agency that there was a serious problem with the fraud determinations and that vast majority were invalid; after the Auditor General's investigation, it was indisputable.

134.    Various individuals within the agency and within related agencies informed Defendants of the systemic, invalid determinations.

135.   Instead of declaring a moratorium on collection activities and the invalid, robo-adjudications of fraud, Defendants changed nothing and forged ahead.

136.   On information and belief, Defendant Steve Geskey, a policy-making supervisor at the Agency, ordered deputy state attorneys general as well as other subordinates to continue to conduct business as usual, to continue to allow MiDAS to make the invalid determinations, to continue to contest claimants' protests and appeals and continue with collection activities.

137.   On information and belief, Defendant Mitchell, at relevant times the head of the Friend of the Court and Bankruptcy Unit at the agency, instructed various deputy attorneys general to continue to oppose claimants' attempts to discharge the fraud-based debt in bankruptcy proceedings by filing adversary proceedings, even when it was obvious that the underlying judgement, which often included five times the amount of unemployment insurance paid (or even claimed), plus interest, was based on an invalid fraud determination.

138.   On information and belief, Defendant Blundell, at relevant times the head of the Fraud Unit at the Agency, continued to instruct her subordinates, including the claims examiners, to pursue the invalid fraud charges.

139.   Claims examiners would oftentimes, if not the majority of the time, show up at ALJ hearings and indicate that they knew the underlying fraud charge was invalid, but that they intended to contest the claimant's appeal on the basis that the claimant had defaulted by not filing a timely appeal.

140.   The government has no legitimate interest in the finality of determinations that are based on a margin of error that exceeds 93%, determinations that penalize its citizens not only by denying the unemployment benefits to which they were entitled, but by assessing punitive

damages of five times the amount paid or claimed.

141. On information and belief, Defendant Singleton was at relevant times the head of the Benefit Overpayment Collection Unit at the Agency.

142. Despite knowing of the over 93% margin of error rate for fraud determinations, she continued to direct subordinates to pursue aggressive collection activities which included tax refund intercepts and wage garnishments.

143. Defendant Moffet-Massey was the head of the Agency at relevant times.

144. Despite her knowledge of the severe problems in the fraud determination procedures and the outrageous collection actions against innocent citizens of the State, she continued to pursue the same defective and unconstitutional policies.

145. These Defendants had actual knowledge of a breakdown in the proper workings of their departments but did nothing to remedy it.

146. These Defendants abandoned the duties of their positions and encouraged the misconduct.

147. These Defendants implicitly authorized, approved and knowingly acquiesced in the unconstitutional conduct of individuals under their control.

148. The State has no legitimate interest in collecting hundreds of millions of dollars from some of its most vulnerable citizens, innocent citizens, based on fraud determinations, when the State knows that over 93% of the determinations are invalid.

149. The Defendants' conduct was arbitrary and capricious and shocking to the conscience.

150. Further, MiDAS automatically assessed punitive damages in the amount of four

times the restitution after making a robo-adjudication that Plaintiffs and potential class members made misrepresentations without any finding of reprehensibility, or determining whether the alleged misrepresentation was intentional, negligent, accidental, or was based on good faith.

151.    Assessing punitive damages without demonstrating reprehensibility violates due process.

152.    Defendants' acts and or omissions constitute a violation of substantive due process in violation of the Fourteenth Amendment

153.    These claims are cognizable under 42 USC Section 1983.

### COUNT V:  FIFTH AMENDMENT JUST COMPENSATION CLAIM

154.    The Fifth Amendment prohibits the taking of private property for public use without just compensation.

155.    Plaintiffs had private property rights in their unemployment benefits, and their tax refunds, as well as other monetary assets.

156.    As described herein, Plaintiffs' property was taken from them due to Defendants' acts and/or omissions, and placed into the Agency's contingency fund.

157.    Thus, their property was taken for public use.

158.    Plaintiffs did not receive just compensation for the taking of their private property.

159.    Defendants' Acts and/or omissions constitute a violation of the Just
        Compensation

Clause of the Fifth Amendment.

160.    This claim is cognizable under 42 USC section 1983.

### COUNT VI:ILLEGAL SEIZURE UNDER THE FOURTH AMENDMENT

162. A seizure of property occurs when there is a meaningful interference with an individual's possessory interest in that property.

163. The protections of the Fourth Amendment are not limited to criminal proceedings.

164. Dispossessing Plaintiffs of their tax refunds, wages and unemployment benefits constituted a meaningful interference with their possessory interests in that property.

165. There was no probable cause to believe that Plaintiffs committed fraud, nor was there any other basis to establish probable cause for the seizure of Plaintiffs' property.

166. Defendants' acts and/or omissions caused an illegal seizure under the Fourth Amendment.

167. This claim is cognizable under 42 USC Section 1983.

### COUNT VII:  VIOLATION OF 26 USC SECTION 6402(f)

168. 26 USC Section 6402(f) governs intercepting federal tax refunds for the collection of unemployment compensation debt.

169. It has specific due process requirements in subsection (c) which requires that the government notify the person of the intent to take action; provide the person at least sixty days to present evidence that all or part of any liability is not legally enforceable; and requires the state to consider evidence presented by the claimant, among other things.

170. At least one of these Defendants seized the tax refunds of Plaintiffs Davison and Pak, as well as the federal tax refunds of numerous other potential class members, in a direct violation of the due process requirements of  26 USC §6402(f).

171. 26 USC §6402(g) specifically contemplates a "legal, equitable, or administrative action against the Federal agency or State" to which the amount the tax refund was paid under

subsection (f).

172.    This claim is thus cognizable under 42 USC Section 1983.

## COUNT VIII: CIVIL CONSPIRACY

173.    There was an agreement between Defendants to curtail or eliminate the traditional procedural guarantees for an unemployment fraud determination through the design, implementation, administration and maintenance of an automated system.

174.    Each Defendant, individually or through its agents, agreed with at least one other Defendant or an unnamed co-conspirator, to accomplish this objective.

175.    Each Defendant has constructive knowledge of the law.

176.    Each Defendant, individually or through its agents, committed at least one overt act in the design, implementation, administration and maintenance of the automated system.

177.    Each Defendant, individually or through its agents, engaged in a civil conspiracy that deprived Plaintiffs of their rights under the law.

WHEREFORE, Plaintiffs individually and on behalf of the above defined Class, by and through counsel, pray the Court grant the following relief:

A.      An Order certifying this action as a class action pursuant to Fed. R. Civ. P. 23;

B.      An Order appointing Cahoo, Mendyk, Cole, Pak and Davison as representatives for the Class and appointing their counsel as lead counsel for the Class;

C.      An order awarding Plaintiffs and all other Class Members compensatory damages in an amount to be determined at trial for the wrongful acts of Defendants described herein;

D.      An Order enjoining Defendants, their agents, successors, employees, and other

representatives, from engaging in or continuing to engage in the design, implementation, development and maintenance of software utilized by the Agency for unemployment benefits; and requiring Defendants to preserve all evidence relevant to this lawsuit and to notify UIA applicants, with who utilize the software to apply for unemployment benefits of the pendency of this and related litigation;

E.     Restitution as authorized by law;

F.     Payment to the Class of all damages associated with denied benefits in an amount to be proven at trial;

G.     Payment to the Class of all damages associated with delayed benefits and for damages as a result of the defective design, creation, implementation, and maintenance of the aforementioned software programs;

H.     An assessment of punitive damages, consistent with the actual harm Defendants have caused and the reprehensibility of their wanton and willful conduct, and the need to punish and deter such conduct;

I.     An order awarding attorney's fees pursuant to applicable Federal and State law;

J.     Interest as provided by law, including but not limited to pre judgment and post-judgment interest as provided by rule or statute; and

K.     Any and all other and further relief as this Court deems just, equitable, or proper.

## DEMAND FOR JURY TRIAL

Plaintiffs' respectfully demand a trial by jury on all issues so triable.


Respectfully submitted,


/s/Kevin Ernst
Jonathan R. Marko (P72450)
Kevin Ernst (P44223)
Counsel for Plaintiffs
Ernst & Marko Law, PLC
645 Griswold Street, Suite 4100
Detroit, Michigan 48226
P: (313) 965-5555 F: (313) 965-5556
kevin@ernstmarkolaw.com
jon@ernstmarkolaw.com

/s/ Craig E. Hilborn (P43661)
Counsel for Plaintiffs
Hilborn & Hilborn, P.C.
999 Haynes St., Ste. 205
Birmingham, MI 48009
(248) 642-8350
craig@hilbornlaw.com


Date:   May 23, 2017

# EXHIBIT 1

| EMPLOYMENT AND TRAINING ADMINISTRATION ADVISORY SYSTEM U.S. DEPARTMENT OF LABOR Washington, D.C. 20210 | CLASSIFICATION UI |
|---|---|
| | CORRESPONDENCE SYMBOL OUI/DL |
| | DATE October 1, 2015 |

ADVISORY:    **UNEMPLOYMENT INSURANCE PROGRAM LETTER NO. 1-16**

TO:             STATE WORKFORCE AGENCIES

FROM:        PORTIA WU /s/
                  Assistant Secretary

SUBJECT:   Federal Requirements to Protect Individual Rights in State Unemployment
                  Compensation Overpayment Prevention and Recovery Procedures

1. **Purpose**. To remind state agencies of the requirements of Federal law pertaining to protecting individual rights in state procedures to prevent or recover unemployment compensation (UC) overpayments.

2. **References**.
   - Sections 303(a)(1) and 303(a)(3), Social Security Act (SSA);
   - Computer Matching and Privacy Protection Act of 1988, as amended (CMPPA), 5 USC 552a(o)-(r);
   - Employment Security Manual Sections 6010-6014, Standard for Claim Determination— Separation Information" (*Standard for Claim Determination*, Codified as Appendix B of 20 CFR 614, 617, and 625);
   - Unemployment Insurance Program Letter (UIPL) No. 1145 ("Procedures for Implementation of the Java Decision"),
   - UIPL No. 23-80 ("Implementation of Waiver of Overpayment Provisions in State UI Laws"),
   - UIPL No. 04-01 ("Payment of Compensation and Timeliness of Determinations during a Continued Claims Series"), and
   - ET Handbook 301: *UI PERFORMS: Benefits Timeliness & Quality Nonmonetary Determinations Quality Review* (http://wdr.doleta.gov/directives/attach/ETAH/ET_Handbook_No_382_3rd_Edition.pdf).

3. **Background**. To address an unacceptably high improper payment rate for the Unemployment Insurance (UI) program, the Department of Labor (Department) has worked aggressively with states to implement new strategies to improve prevention, detection, and recovery of improper payments. The strategies to reduce improper payments include thorough fact finding, timely determinations and appeals, and use of tools such as the National Directory of New Hires (NDNH). While states have broad authority and are strongly encouraged to use a variety of

| RESCISSIONS None | EXPIRATION DATE Continuing |
|---|---|

methods to prevent, detect, and recover improper payments, states also must ensure that individuals' rights are protected. Building on existing guidance, the Federal requirements described below afford individuals protections in the overpayment prevention and recovery processes.

4. <u>Discussion</u>.

a. <u>Federal Law Requirements Overview</u>. As a condition for receiving UC administrative grants, state laws must, under Section 303(a)(1), SSA, provide for "such methods of administration…as are found by the Secretary of Labor to be reasonably calculated to insure full payment of unemployment compensation when due." In addition, Section 303(a)(3), SSA, as a condition for receipt of UC administrative grants, requires state law to provide an "opportunity for a fair hearing, before an impartial tribunal, for all individuals whose claims for unemployment compensation are denied." Thus, in order to be eligible to receive administrative grants, a state must do the following in the context of identifying and establishing improper payments, including when an improper payment is identified through the Benefit Accuracy Measurement program:

- conduct an investigation, which includes promptly contacting the individual to whom the potential overpayment was made and providing the individual a reasonable amount of time to be heard, before making an official determination that the payment is improper;
- independently verify information received from a computer cross-match with a Federal database or other automatic processes or matches before suspending, terminating, reducing, or making a final denial of UC;
- gather all relevant information and provide the individual an opportunity to be heard when information is received from a computer cross-match with any database, an outside "tip", or other source;
- for all determinations, including overpayments and fraud, the individual must be provided with a written determination which provides sufficient information to understand the basis for the determination and how/when an appeal must be filed and must also include the facts on which the determination is based, the reason for allowing or denying benefits, the legal basis for the determination, and potential penalties or consequences;
- provide the individual an opportunity to appeal the overpayment or fraud determination;
- continue to make timely UC payments (if due) and wait to commence recovery of overpayments until an official determination of ineligibility is made; and
- if state law provides for waiver of recovery of overpayments under certain circumstances, states must clearly communicate the potential availability of a waiver to individuals when establishing an overpayment and, if an individual requests a waiver, make an official determination on the waiver request before initiating overpayment recovery.

b. <u>Establishing Overpayments</u>. Potential UC overpayments may be identified through cross-matches, fraud hotlines, or a variety of other methods. States must conduct an investigation before issuing an official determination that an overpayment has been made. In so doing, states must ensure that investigators gather all relevant information, which may include supporting documents and statements from either the individual to whom the payment was

2

made or others. In addition, an individual must be given an opportunity to be heard, timely notice of the interview, and an opportunity to present evidence. In California Department of Human Resources v. Java, 402 U.S. 121 (1971), (*Java*) the U.S. Supreme Court held that a state's law and procedures must provide for paying benefits "at the earliest stage of unemployment that such payments [are] administratively feasible after giving both the worker and the employer an opportunity to be heard.". This case is further explained in UIPL No. 1145. In order to give individuals an opportunity to be heard, as required by *Java*, the state must contact the individual before an overpayment is established.  The requirements of Section 303(a)(1), SSA, as interpreted by *Java*, mean that when a state identifies a potential overpayment via a cross-match "hit," such as from a state prisoner database or other source, the state must take the initiative to gather all relevant information through fact-finding and provide the individual an opportunity to be heard before making an overpayment determination or initiating recovery. In addition, when there is a factual conflict between the information received from an individual and other information received by the agency, from any source, it is incumbent upon a state to make further contact with the individual, inform him or her of the conflict, and allow an opportunity for rebuttal. The State should determine that the conflicting information appears valid and relevant to the eligibility determination prior to contacting the individual and requesting additional information. Note that these requirements are essentially the same as the independent verification standard of the CMPPA described in Section 4.g. below.

c. Notice of Overpayment Determination. In the *Standard for Claim Determination*, the Department interprets the Federal UC requirements for providing notice to individuals. Section 6013.C.1.c. of the *Standard for Claim Determination* provides that the state agency must give each individual a written notice of any determination that adversely affects his or her rights to benefits. Footnote 1 to Section 6013 explains that a determination adversely affects an individual's right to benefits if the state agency, among other things:

> . . . (5) determines that an overpayment has been made or orders repayment or recoupment of any sum paid to him; or (6) applies a previously determined overpayment, penalty, or order for repayment or recoupment; or (7) in any other way denies claimant a right to benefits under the State law.

Section 6013.C.2 provides that this written notice of determination to individuals must furnish "sufficient information to enable them to understand the determinations, the reasons therefor, and their rights to protest, request reconsideration, or appeal." ET Handbook 301 provides a more detailed description of the information that must be included in a written determination which includes: 1) a summary statement of the material facts on which the determination is based; 2) the reason for allowing or denying benefits; and 3) the conclusion of the decision based on the state's law. A state should also include the potential penalties or consequences associated with the determination. It must also provide a statement of appeal rights that includes the individual's right to appeal, protest, or, if state law permits, to request a redetermination; the period in which the appeal, protest, or request for redetermination must be filed; the manner in which it must be filed, information on whether an extension for filing

may be available; and where the individual can obtain additional information and assistance about filing an appeal, protest, or request for redetermination.

d. <u>Recovery of Overpayments</u>. States may not initiate recovery of an overpayment until an official determination of the overpayment has been made, consistent with Federal law requirements. States should have clear written procedures that provide for appropriate fact-finding and independent verification of information as needed in the official determination process. State law may prohibit recovery of an overpayment until the overpayment determination, including any appeal, has become final under state law.

In addition, if state law provides for a waiver of recovery of an overpayment, the notice of the overpayment determination must provide enough information to enable the individual to understand under what circumstances a waiver may be granted and how to request such a waiver. (See UIPL No. 23-80.) Until the period for a waiver request has elapsed, or, if an individual applies for a waiver, the waiver determination is made, states may not commence recovery of overpayments. State law may provide that if a request for a waiver is filed the state may not commence recovery of an overpayment until the decision on the waiver request, including any appeal, has become final under state law. The Department strongly encourages states to adopt policies that permit waiver of non-fault overpayments (if permitted by state or Federal law) when recovery of the overpayment would be contrary to equity and good conscience.

e. <u>Opportunity for a fair hearing</u>. UIPL No. 23-80, section 6, defines "denials" for purposes of the Section 303(a)(3), SSA, requirement for an opportunity for a fair hearing (appeal) after the denial of a claim.  Denials occur not just when initial applications for UC are denied, but also in any case in which there is an adverse determination that places an individual in a less advantageous position with respect to UC entitlement. This includes state agency determinations that an individual has received UC to which he/she was not entitled, determinations that UC payments must stop because the individual no longer meets the eligibility requirements, and determinations that the overpayment was a result of fraud.  In such circumstances, the individual must receive a written copy of that determination and must have the right to appeal the denial. States are not required to conduct a full, formal evidentiary appeal hearing before determining that an individual was overpaid, but they must offer the individual an opportunity to know and rebut the information in fact finding before issuing a decision that the individual is not eligible and was overpaid.

f. <u>Continued Claims</u>. UIPL No. 1145 describes requirements imposed on state agencies, as a result of <u>Java</u>, regarding when UC is payable. UIPL No. 04-01 addresses payment of UC and timeliness of determinations during a continued claims series. It explains that because individuals in a continued claims series had been determined to be eligible for UC, UC payments may not be suspended or delayed pending a determination on an eligibility issue. If the state agency cannot make an eligibility determination before the date of a timely payment, the state agency "presumes the claimant's continued eligibility until it makes a determination otherwise." Additionally, a state must inform individuals that the pending eligibility issue may affect their entitlement to UC and may result in an overpayment.

g. Requirements for Independently Verifying Information from Computer Cross-Matching. For certain overpayments detected from matching with a Federal database, such as the NDNH, the Computer Matching and Privacy Protection Act (CMPPA) also applies. This law provides in part, in 5 U.S.C. 552a(p), that an agency participating in a matching program, including a non-Federal agency such as a state or local government agency, may not "suspend, terminate, reduce, or make a final denial of any financial assistance or payment under a Federal benefit program" unless three conditions are met. First, the agency must have "independently verified the information" obtained from the computer match. Second, the agency must notify the individual of the issue and provide him/her with an opportunity to contest it. Third, the individual must be provided either 30 days or, if provided by statute or regulation, another period of time to respond to the issue. The Department of Health and Human Services (HHS) under its own authority (Section 453(j)(8)(D), SSA) has mandated that state benefit programs accessing the NDNH comply with the CMPPA. Thus, states must agree to adhere to the CMPPA requirements when using the NDNH to identify state UC program overpayments.

Because it is the responsibility of the state UC agency to take the initiative to obtain information regarding an individual's claim, independent verification of the information that is the basis of the overpayment, such as an individual's return to work, must be initiated by the state agency. State agency staff must independently verify the information through the normal required fact-finding process and make the determination of eligibility base upon that verification, including for any type of cross-match hit whether subject to CMPPA or not. States may not make determinations of overpayments and/or fraud using automated systems without the input of agency staff. The individual must also be informed of the information received as a result of the match with the Federal database and given the opportunity to be heard before a determination of an overpayment may be issued.

For example, when a state gets a "hit" off of a cross-match of claim files with the NDNH, the state may not suspend or delay payment before the individual is notified of the issue and has an opportunity to be heard, and the state makes an official determination that the payment was improper. Similarly, when a state gets a "hit" off of a cross-match of claim files with the NDNH, a state may not commence overpayment recovery via offset from current eligibility or otherwise, without notifying the individual, providing him/her an opportunity to be heard, and making a formal determination that the payment was improper.

h. Requirement that Individuals Report to the Agency. When attempting to meet all of the above requirements, in addition to offering individuals the opportunity to be heard before an overpayment determination is made, states often may require individuals to report to the state agency to provide additional information about the potential overpayment, including the result of the cross-match with a Federal database. Requests for such information must be based on *bona fide* need and on reliable evidence that an issue exists. If an individual fails to report as required, the state may apply (subject to any applicable procedural protections for individuals) its law's provisions on ineligibility for UC due to failure to report until the individual complies with the reporting requirement.

5

i. Requirements for Making Determinations of Fraud.  The "when due" requirement means that all determinations require a complete investigation of the issue(s) involved, including the opportunity to rebut, before the issuance of a determination. When there is a factual conflict between the information received from an individual and other information received by the agency, from any source, it is incumbent upon a state to make further contact with the individual, inform him or her of the conflict, and allow an opportunity for rebuttal.  Because such factual conflicts require the state agency to make determinations of credibility and intent, determinations of fraud must be made by agency staff. The determination may not be made by an automated system.

After the agency has made a determination that the overpayment was a result of fraud, notice of such must be provided to the individual. The fraud notice may be included in the overpayment determination notice, but it must indicate that either or both of the determinations, the overpayment and that it was the result of fraud, are appealable.  As discussed in Section 4.c. above, a fraud determination notice must be sufficient to allow the individual to know the potential penalties or other consequences of a fraud determination as well as his or her rights with respect to an appeal. The individual must be provided additional information on the appeal process including the right to have representation; to present testimony and other evidence relative to the appeal; to subpoena witnesses and records; and to be apprised of the consequences of failing to attend an appeal if one is requested. Communications must be in plain language and using methods that ensure the communication is most likely to be successful for all populations, including individuals with limited English proficiency.

5. **Action Requested**. State Administrators are requested to:

   a. Review their state law, regulations, policies, and procedures concerning UC overpayment prevention and recovery to determine if they meet Federal requirements;

   b. Provide this guidance to appropriate staff; and

   c. Take appropriate action to ensure that their state law, regulations, policies, and procedures meet these Federal requirements, if they are not currently met.

6. **Inquiries**. Inquiries should be directed to your Regional Office.