UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATTI JO CAHOO, KRISTEN MENDYK,
and KHADIJA COLE, HYON PAK, and
MICHELLE DAVISON,
individually and  on  behalf of                                    Civil Action No. 17-10657
similarly situated persons,

                                                                   Hon: David M. Larson

             Plaintiffs

-vs-

SAS INSTITUTE INC.,
FAST ENTERPRISES, LLC,
CSG GOVERNMENT SOLUTIONS,
STEVE GESKEY in his individual capacity,
SHEMIN BLUDELL, in her individual capacity,
DORRIS MITCHELL, in her individual capacity,
DEBRA SINGLETON, in her individual capacity,
JULIE A. McMURTRY, in her individual capacity,
SHARON MOFFET-MASSEY, in her individual capacity,
CLAYTON TIERNEY, in his individual capacity,
ANDREW PHILLIPS, in his individual capacity,
JEREMY GRAGG, in his individual capacity,
JENNIFER TUVELL, in her individual capacity,
KRISTEN ARAKI-TOKUSHIGE, in her individual capacity,
MIKE PATTERSON, in his individual capacity,
ALLISON FORGIE-MCCLURG, in her individual capacity,
RICHARD STATEN, in his individual capacity,
REBECCA ROSIER, in her individual capacity,
DANA ROWE, in her individual capacity,
TIM PALMER, in his individual capacity,
STEVEN GOODHALL, in his individual capacity, and
PAUL PLUTA, in his individual capacity,

jointly and severally,

             Defendants.

**PLAINTIFFS' FIRST AMENDED
CLASS ACTION COMPLAINT AND JURY DEMAND**

1.      The State of Michigan's Unemployment Insurance Agency ("Agency") administers unemployment insurance through an automated system named MiDAS  which was defectively designed, implemented, and/or maintained by Defendants SAS, Fast and CSG and the individual Defendants.  Using the defective MiDAS system, Defendants deprived Plaintiffs, and thousands of Michigan's unemployment insurance claimants like them, of fundamental rights under the United States Constitution, federal law and under Michigan law.

2.      Michigan has administered unemployment insurance to its citizens exclusively since the inception of unemployment insurance in the State of Michigan in 1936.

3.      The unemployment insurance system is based on federal law, but administered exclusively by state employees under state law, in every state of the union since the inception of each state's UI agency.

4.      MiDAS was designed, implemented and maintained to make automated determinations of unemployment insurance fraud without any factual basis or weighing of the evidence, without any reasonable notice or opportunity for hearing, and without any, or with little, human involvement.  The system was so defectively designed, implemented and maintained that it had a margin of error of over 93% when making the automated fraud determinations with no human involvement, and a margin of error of approximately 50% with human involvement.

5.      Once MiDAS became operational, it subjected previous beneficiary payments to  renewed, automated, fraud scrutiny going back six years after benefits were paid,  and "robo-adjudication" of fraud for past benefits paid.  Often, if not the majority of the time, these robo-adjudications were default-based.

6.      Under this robo-adjudication system, once the defective fraud determination was made, the right to receive benefits were immediately terminated, restitution and penalties were assessed, and there was no meaningful way to challenge it.

7.      This system resulted in tens of thousands of unemployment insurance claimants being accused of fraud and being forced to pay "restitution" and penalties, even though they did nothing wrong. The fraud finding automatically results in a determination that restitution is owed and a penalty equal to five times the benefits received (the maximum allowed under the state statute). These punitive assessments regularly total $10,000-$50,000, and some exceed $187,000.

8.      One or more of Defendants engaged in the following  wrongful practices related to the fraud determinations, denial of benefits, and imposition of restitution and penalties:

a.      Sending "fraud questionnaires" to beneficiaries without any explanation of the factual basis for the Agency's fraud allegations or sufficient information that would provide claimants with notice of the basis for the fraud allegations and an opportunity to rebut them.  The questionnaires asked the claimant whether he made any misrepresentation, allowing for a binary yes/no response, and then asks why he believed he was entitled to benefits, followed by a multiple choice of nonsensical, unresponsive, loaded, incriminating and confusing answers and the choice of "other".  If a claimant checked one of the answers, it resulted in MiDAS making an automatic robo-adjudications of fraud;

b.      Failing to send the fraud questionnaires to claimants, or sending them only to a claimant's long dormant, electronic "MiWAM" account, and then making default-based robo-adjudications of fraud based on a failure to respond within 10 days

without any basis to believe that the questionnaires were actually received;

c.  Making default-based, robo-adjudications of fraud when a claimant did receive the questionnaire but failed or refused to respond to the loaded, incriminating questions within 10 days;

d.  Making robo-determinations of fraud for a claimant's purported failure to report income based on the use of "income spreading", a formula by which MiDAS would calculate a claimant's total income in one quarter, divide it by 13, and then allocate that average amount of "earnings" to each week of the quarter, regardless of whether the claimant actually earned that amount in each week.  MiDAS would make a robo-determination of fraud regardless of whether a claimant truthfully reported no income in one or more weeks in the quarter and was lawfully entitled to benefits for those weeks in which he had no income;

e.  Making robo-determinations of fraud by the claimant-employee whenever there was a discrepancy between what the claimant reported and what the employer reported as to the reason for employment separation, without any investigation into whether the discrepancy was the result of administrative error, good faith dispute, or misrepresentation by the employer;

f.  Once fraud was determined, sending confusing and defective fraud determination notices that did not inform claimants of the factual basis of the Agency's determination of fraud and did not provide any information to allow claimants to evaluate or respond to the Agency's determination;

g.  Automatically assessing the maximum penalty allowed by statute—five times

overpayment—without any factual basis to determine intent, all done by computerized robo-determination;

h.  Sending fraud determinations to addresses that were not current, without making any attempt to get current addresses.

i.  Instructing Agency employees to falsely and illegally advise claimants that they had no right to appeal because more than 30 days passed since the fraud determination (i.e., to give erroneous legal advice), even when the claimants never received notice and had the right to appeal.

j.  Making unauthorized and warrantless seizures of federal tax refunds without the specific due process guarantees provided by 26 USC § 6402(f)(3), seizing state tax refunds and garnishing wages, all without any evidentiary basis, hearing or factual finding that would permit the conclusion that fraud occurred, further depriving claimants of their property without due process of law;

k.  Using unsupported fraud determinations as a basis for indefinite payment plans with the State (often for $250 per month, forever) when the claimant is financially unable to pay the lump sum judgment of restitution, penalty and interest;

l.  Pursuing the penalties and restitution based solely on a claimant's default despite the knowledge that the underlying fraud determination was invalid and false; and/or

m.  Opposing the discharge of a claimant's restitution and penalty debt in bankruptcy based on these invalid and false fraud determinations through the use of adversary complaints, with full knowledge that the underlying fraud determinations were

invalid and false.

9.      The class Plaintiffs herein are claimants who have been affected by one or more of these unlawful practices.

## JURISDICTION

10.      Jurisdiction in this Court over the Plaintiffs' claims brought pursuant to 42 U.S.C. § 1983 is provided by 28 U.S.C. §§ 1331 and 1343(3). The declaratory and injunctive relief sought is authorized by 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §1983, and Rule 57 of the Federal Rules of Civil Procedure. Diversity jurisdiction is proper under 28 U.S.C. §§ 1332.

11.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) as a substantial part of the events giving rise to this action occurred therein.

## PARTIES

**Defendants**

12.      Defendant SAS Institute Inc., upon information and belief, is headquartered at 100 SAS Campus Drive, Cary, North Carolina 27513-2414, and does business with the State of Michigan's Unemployment Insurance Agency (Agency) pursuant to a contract through the procurement process overseen by the Michigan Department of Technology, Management and Budget ("DTMB").  The contact began in December, 2012 and continues until December 2017. SAS designed, created, implemented, maintained, configured and/or controlled the "Enterprise Fraud Detection System" ("EDFS") used to make unemployment insurance fraud determinations in the administration of the State's unemployment insurance.  At all material times, it performed this traditionally, exclusive state function through its agents.  It also acted together and cooperated with the State in a concert of activity through its agents, which included

collaboration, and training state agents in the use of EDFS.  SAS was, through its agents, endowed by the State with powers or functions governmental in nature, and was, through its agents, pervasively intertwined with state officials and received significant encouragement from the State, when it designed, implemented and/or maintained the defective and unconstitutional fraud detection systems.  The agents of SAS acted under the direct control of the State when carrying out the EDFS project, and their actions were under color of law.

     a.    Andrew Phillips, the SAS Project Manager, was one of these agents of SAS and is sued in his individual capacity.

     13.    Defendant FAST Enterprises, LLC, (Fast) upon information and belief, is headquartered at 7229 South Alton Way, Centennial, CO 80112, and does business with the Agency pursuant to a contract through the procurement process overseen by the Michigan DTMB. Fast designed, created, implemented, configured, controlled and/or maintained the Michigan Integrated Data Automated System ("MiDAS") which administers unemployment insurance, including fraud investigation, overpayments, collections and tax intercepts. At all material times, it performed these traditionally, exclusive  state functions through its agents, under instruction of state officials.  It also acted together and cooperated with the State in a concert of activity through its agents, which included collaboration, and training state agents in the use of MiDAS.  Its agents willfully participated in joint action with state agents, it acted together and cooperated with the State in a concert of activity through its agents, it was, through its agents, endowed by the State with powers or functions governmental in nature, it was, through its agents, pervasively intertwined with state officials and it received significant encouragement from the State, when its agents designed, implemented and/or maintained the defective and

unconstitutional and unlawful fraud detection and collection systems that are part of MiDAS.

  a. Jeremy Gragg, an individual, was one of these agents of FAST and was a lead implementation consultant who worked on determination and compliance systems; he acted under color of law and is sued in his individual capacity.

  b. Jennifer Tuvell, an individual, was one of these agents of FAST and was the senior project manager; she acted under color of law and is sued in her individual capacity.

  c. Kristen Araki-Tokushige, an individual, was one of these agents of FAST and was the senior business architect; she acted under color of law and is sued in her individual capacity.

  d. Mike Patterson, an individual, was one of these agents of FAST and was the implementation manager; he acted under color of law and is sued in his individual capacity.

  e. Allison Forgie-McClurg, an individual, was one of these agents of FAST and was a test manager; she acted under color of law and is sued in her individual capacity.

  14. Defendant Government Sollutions Inc., CSG ("CSG"), upon information and belief, is headquartered at 180 N. Stetson Ave., Suite 3200, Chicago, IL 60601, and does business with the State of Michigan's Unemployment Insurance Agency pursuant to a contract through the procurement process overseen by the Michigan DTMB. CSG ran and administered the Project Control Office, charged with responsibility for all aspects of the State's integrated system rewrite which came to be known as MiDAS. In conjunction with the Agency and DTMB, CSG continues to provide full-time, on-site management to oversee MiDAS production, support

and additional initiatives including:

      a.      Collections, recoupments and intercepts;

      b.      Integrity initiative for the ongoing Enterprise Fraud Detection System (EFDS) Project;

      c.      Implementation of the Interstate Reciprocal Overpayment Recovery Agreement (IRORA);

      d.      UIA and Michigan Administrative Hearing System (MAHS) appeals improvements; and

      e.      Development of Standard Operating Procedures for the UIA Tax Office.

      15.      At all material times, CSG performed these traditionally, exclusive traditional state functions through its agents, it acted together and cooperated with the State in a concert of activity through its agents, it was, through its agents, endowed by the State with powers or functions governmental in nature, it was, through its agents, pervasively intertwined with state officials and received significant encouragement from the State, when it implemented configured, administered and/or maintained the defective and unconstitutional fraud detection and collection systems.

      a.      Richard Staten was one of these agents of CSG and was a senior program manager; he acted under color of law is sued in his individual capacity.

      b.      Rebecca Rosier was one of these agents of CSG and was a senior program manager; she acted under color of law and is sued in her individual capacity.

      c.      Dana Rowe was one of these agents of CSG and was a senior business analyst; she acted under color of law and is sued in her individual capacity.

d.      Tim Palmer was one of these agents of CSG and was a senior project manager; he acted under color of law is sued in his individual capacity.

e.      Steven Goodhall was one of these agents of CSG and was a senior project manager; he acted under color of law is sued in his individual capacity.

f.      Paul Pluta was one of these agents of CSG and was a senior project manager; he acted under color of law is sued in his individual capacity.

16.      Defendant Geskey was at all material times a high ranking supervisor at the Agency.  He set policy and continued to direct subordinates to pursue the invalid and false fraud claims against claimants despite the knowledge that the fraud claims were invalid and false.  He is sued in his individual capacity.

17.      Defendant Blundell was at all material times the head of the Fraud Unit within the Agency.  She continued to direct subordinates to pursue the invalid and false fraud claims against claimants despite the knowledge that the fraud claims were invalid and false.  She is sued in her individual capacity.

18.      Defendant Mitchell was at all material times head of the Friend of the Court and Bankruptcy Unit within the Agency.  She continued to direct subordinates to oppose discharge of  claimants' debt in bankruptcy proceedings that was based on the invalid and false fraud claim despite the knowledge that the fraud claims were invalid and false.  She is sued in her individual capacity.

19.      Defendant Clayton Tierney was at all material times the UIA project manager for the integrated system rewrite.  He is sued in his individual capacity.

20.      Each Defendant's actions complained of herein were undertaken under color of

Page 10 of  40

law. The term "Defendants" hereafter refers to all Defendants unless otherwise indicated.

**Plaintiffs**

21.     Plaintiff and Class Representative Patti Jo Cahoo ("Cahoo") is a resident of Michigan and was falsely charged with filing a fraudulent claim in 2014 after filing for and receiving unemployment benefits.  She did not learn of the fraud determination until December 2015, when she reapplied for benefits and was denied based on this false fraud determination. She was then evicted from her home after being unable to pay her rent and suffered other emotional distress as a result.

22.     Plaintiff and Class Representative Kristen Mendyk ("Mendyk") filed for unemployment in December 2009 after being fired from her job in April 2008.  Plaintiff Mendyk received unemployment benefits for one year in 2009 and was falsely accused of making a fraudulent claim.  She was not notified of the false fraud determination until November of 2016, which caused her to file for bankruptcy.  She suffered emotional distress.

23.     Plaintiff and Class Representative Khadija Cole ('Cole") applied for unemployment benefits after being laid off from her position as a mortgage closer in 2014.  One year after receiving unemployment benefits, she received a statement indicating that she had made a fraudulent claim and owed approximately $29,000 based on a false fraud determination. The collection letter was the first time she was ever notified of the Agency's fraud claim.

24.     Plaintiff and Class Representative Michelle Davison had her state and federal income taxes seized from 2015 through 2016 based on an invalid and false fraud determination. + She was not even aware a fraud determination had been made until she received a letter from the IRS that her tax refund was being seized.  She was not given any notice prior to the seizure,

was not given 60 days to present evidence to oppose the seizure, and no consideration was given prior to the seizure, all in violation of 26 USC §6402(f)(3).

25.     Plaintiff and Class Representative Hyon Pak had his federal income taxes seized from 2012 through 2014 based on an invalid and false fraud determination.  He was not even aware a fraud determination had been made until he received a letter from the IRS that his tax refund was being seized. He was not given any notice prior to the seizure, was not given 60 days to present evidence to oppose the seizure, and no consideration was given prior to the seizure, all in violation of 26 USC §6402(f)(3).

## CLASS ACTION ALLEGATIONS

26.     Plaintiffs bring this class action under Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of Plaintiffs and all other persons who have been wrongfully accused of fraudulent activity and/or denied benefits they are rightfully entitled to and/or had their income tax overpayments seized without the due process requirements in 26 USC §6402(f)(3).

27.     The class is so numerous that joinder of all members is impracticable as there are thousands of plaintiffs.

28.     Plaintiffs' claims are typical of the claims of the other members of the Class, as Plaintiff and other members of the Class were injured by being accused of fraudulent activity and assessed egregious fines and/or being denied benefits that they were rightfully entitled to and had their income tax overpayments seized without due process.

29.     Defendants acted wrongfully in the same basic manner to the entire class.

30.     Plaintiffs will fairly and adequately represent the interests of the Class and have

retained competent and experienced counsel.

31.     Plaintiffs have no interests that are contrary to or in conflict with those of the class.

## COMMON FACTUAL ALLEGATIONS

32.     Pursuant to federal and state laws, the Agency  collects state payroll taxes from covered employers in Michigan and pays UI benefits to eligible claimants.

33.     To qualify for benefits individuals must establish that they were employed by a covered employer and meet certain wage and work eligibility requirements.  Claimants must also establish they were not separated from employment due to misconduct connected to the work and did not voluntarily leave employment without good cause.  Once these eligibility requirements are met, the individuals are entitled to receive benefits under state and federal law.

34.     Eligible claimants, including the individual Plaintiffs herein, have property interests created by state and federal law in receiving UI benefits, which are protected by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and the constitutional rights incorporated therein.

35.     The federal government, through the Department of Labor, provides monetary grants to states, including Michigan's Unemployment Insurance Agency, in support of state unemployment insurance programs.

36.     To receive certification for such grants, states must assess penalties of no less than fifteen (15) percent of the amount of the erroneous payments, if the state "determines an erroneous payment…was made to an individual due to fraud committed by such individual." 42 U.S.C. §503(a)(11)(A).

37.     Assessments collected as a penalty for fraud must be deposited into the unemployment fund of the state.  §503(a)(11)(B).

38.     To receive federal grants, federal law establishes the minimum due process requirements states must provide to unemployment beneficiaries, including those accused of fraud, before the states can discontinue benefits or recover overpayments.

39.     The State of Michigan received the federal grants and subjected itself to these requirements.

40.     These requirements included: conducting an investigation, including promptly contacting the individual involved and giving him a reasonable amount of time to be heard; independently verifying information received from a computer cross-match before taking any adverse action against a claiant; obtaining information and providing the affected claimant an opportunity to be heard when information is received from a computer cross-match; providing a written determination with enough information to understand its basis, when/how to appeal, the facts on which the determination was based, the reason for denying benefits and the legal basis for the determination; providing an opportunity to appeal; and continuing payments until a final determination is made.

41.     Federal law allows states to recover overpayments by deducting them from future unemployment benefits, subject to the due process requirement that "[a]ny such deduction shall be made only in accordance with the same procedures relating to notice and opportunity for a hearing as apply to the recovery of overpayments of regular unemployment compensation paid by such State." 42 U.S.C. §503 (g)(1).

42.     Federal law also allows states to recover overpayments and penalties through the

interception of federal income tax refunds, subject to minimum due process requirements.

43.     Accordingly, states accepting federal grants, like Michigan, are barred from pursuing collection of unemployment compensation debts, including penalties, through collections actions and the interception of federal income tax refunds, unless specific steps are taken with regard to notice, consideration of evidence, and a fair opportunity to be heard.

44.     26 U.S.C. §6402(f)(3) governs the seizure of federal income tax refunds and requires states to provide specific notice and hearing requirements before a refund can be seized: (3) Notice; consideration of evidence.  No State may take action under this subsection until such State –

    a.    notifies the person owing the covered unemployment compensation debt that the State proposes to take action pursuant to this section;

    b.    provides such person at least 60 days to present evidence that all or part of such liability is not legally enforceable or is not a covered unemployment compensation debt;

    c.    considers any evidence presented by such person and determines that an amount of such debt is legally enforceable and is a covered unemployment compensation debt; and

    d.    satisfies such other conditions as the Secretary may prescribe to ensure that the determination made under subparagraph (C) is valid and that the State has made reasonable efforts to obtain payment of such covered unemployment compensation debt.

45.     The minimum due process requirements listed above apply to the following types

of unemployment compensation debt: past-due debt due to the claimant's alleged failure to report earnings; contributions to the state's unemployment fund for which the person is alleged to be liable; and any penalties and interest assessed on such alleged debt. 26 U.S.C. §6402(f)(4).

46.     These minimum due process requirements must be afforded to all claimants, regardless of whether or not the claimants are ultimately determined to be "guilty" or "innocent" of receiving or trying to obtain UIA benefits through fraud or other improper means.

47.     Michigan accepts federal funds in furtherance of its unemployment benefits program, imposes penalties for unemployment fraud, and is therefore obligated to comply with the minimum due process requirements mandated by federal law.

48.     The Agency has applied a computer application which was designed, created, implemented, installed, and/or maintained by the entity Defendants and their agents named herein, in concert with various state officials, to search for discrepancies in the records of individuals who were receiving, or previously received, unemployment insurance (UI) benefits.

49.     This decision-making system, known as MiDAS, was created in part to detect and control alleged UI fraud.

50.     The Agency coordinates collection procedures with employers, other state agencies and the federal government and uses electronic "cross-checking" that alerts the Agency's automated system when income is reported for UI claimants, or when other activity regarding the claimant occurs that might have some bearing on their qualification for benefits.

51.     When such income is detected, or when other information or discrepancies regarding the claimant are "flagged", MiDAS initiates an automated process that can result in disqualification from benefits, the imposition of restitution and penalties, and criminal

prosecution.

52.     MiDAS does not provide claimants with specific notice of the basis for the Agency's suspicion of fraud or other culpable conduct  or provide any information which would allow the claimant to rebut the fraud charge.

53.     MiDAS does not include or allow for an actual fact-based adjudication of whether the claimant engaged in culpable disqualifying conduct.

54.     MiDAS does not allow for a minimum of sixty days in which claimants can present evidence;

55.      MiDAS does not include or allow for the presentation of any evidence by the claimant.

56.     MiDAS does not include or allow for consideration of evidence by the Agency.

57.     Instead of providing for meaningful notice, an opportunity to present evidence and a meaningful determination process for consideration of evidence, the Agency automatically sends questionnaires to Agency claimants asking them to respond, in ten days, to the potential disqualification.   The questionnaire contains multiple choice answers, all of which are loaded, and incriminating and would result in a robo-determination of fraud if checked.  It provides:

> Did you intentionally provide false information to
> obtain benefits you were not entitles to receive?
> Yes                No
>
> Why do you believe you were entitled to benefits?
>
> 1. I needed the money
> 2. I had not received payment when I reported for benefits
> 3. I reported the net dollar amount instead of the gross dollar amount paid
> 4. I did not understand how to report my earnings or separation reason
> 5. I thought my employer reported my earnings for me

6. Someone else certified (reported) for me
7. Someone else filed my claim for me
8. Other

58.     Furthermore, the fraud questionnaires were not sent to some claimants, yet
MiDAS would make a default-based fraud determination when the claimant did not respond to a
questionnaire that was never sent to him.

59.     When the questionnaires were actually sent, they did not inform the claimant of
the basis for the agency's suspicion or grounds for potential disqualification, and thus did not
allow claimants a meaningful opportunity to respond in a reasonable time and in a reasonable
manner to the underlying accusation of fraud, failure to report or other culpable conduct.

60.     The questionnaires that were actually sent were sent to claimants' online
Michigan Web Account Management System ("MiWAM") accounts without any additional
notification via e-mail, U.S. mail or otherwise, to notify claimants that they have received an
inquiry or questionnaire regarding their potential disqualification and/or potential penalty.

61.     In many cases, these MiWAM accounts had been dormant for years, since the
questionnaires were sent well after the claimants' benefits had expired, because when MiDAS
became operational, it reviewed claims going back as far as six years.  Claimants therefore had
no reason to check their MiWAM accounts for messages or other activity.

62.     In such cases, the Agency did not make any further effort to notify claimants or
former claimants that there was a questionnaire or correspondence in their MiWAM account that
might affect their property interests, liberty interests or other rights, but instead made a default-
based determination of fraud when no response was received.

63.     A default-based determination of fraud was made if the Agency did not receive a

reply to the questionnaire within ten calendar days or if it received a response MiDAS deemed
unsatisfactory, such as by checking one of the multiple choice answers.  In either event, MiDAS
robo-adjudicated the fraud issue and automatically determined that the claimant knowingly and
intentionally misrepresented or concealed information to unlawfully receive benefits.

64.     Between October 2013 and August 2015, the fraud determination was entirely
automated and made by MiDAS without the benefit of any investigatory review, or human input
or evaluation of any kind.

65.     After August 2015, the Agency continued to use MiDAS and the same algorithms
employed by MiDAS to determine fraud, but used humans with flow charts; these humans were
essentially automatons who exercised no more fact finding, investigation or discretion than their
MiDAS counterpart.

66.     After an automated finding was made that the claimant engaged in disqualifying
conduct, such as fraud or failure to report, many claimants, including Plaintiff Hyon Pak,
attempted to assert their procedural and administrative rights by writing to the Agency and/or
submitting online appeals.

67.     These appeals were ignored and claimants never received any acknowledgment
from the Agency that they were received or considered by the Agency.

68.     Instead, the next step is for MiDAS to create a "statement," which is sent to the
claimant, demanding that they repay benefits, plus penalties and interest.

69.     However, many times these statement letters were never sent, or were sent to an
incorrect address, and no effort was made to verify that the address to which the letter was sent
was the current address of the claimant.

70.    This statement from the Agency indicates that penalties for non-payment may include interception of the claimant's state income tax refund, interception of the claimant's federal income tax refund, garnishment of wages, and legal collection activity through a court of law.

71.    Under the threat of such penalties, some claimants submit payments to the Agency of $250 per month, indefinitely, to satisfy their "debts," including repayment of benefits, penalties and interests, despite the fact that there has been no due process or an actual adjudication of culpable behavior to either disqualify them from benefits or impose penalties.

72.    The methods and processes established by the Agency for the detection, determination and penalizing of alleged UI benefit fraud, including intercepting federal tax refunds, violate the standards required by federal law.

73.    Further, the fraud robo-adjudication does not result from a neutral or fair process, but one that is wholly biased against the claimant.  If a discrepancy is found between a record submitted by an employer and corresponding information reported by the claimant when applying for benefits, the Agency's computer program automatically flags the claimant's file as a potential case of claimant misrepresentation.

74.    Even though the discrepancy may also be the result of an employer error or good faith dispute, or fraud by the employer, no corresponding process is employed to flag an employer's file for potential misrepresentation.

75.    This process can occur at any time, up to six years after a claimant has stopped collecting benefits and is no longer regularly interacting with the Agency.

76.    These invalid and false fraud determinations, and the aggressive collection

techniques that followed, including wage garnishments and income tax refund intercepts, caused the Agency "contingency fund" to swell from approximately $3,000,000 when MiDAS was first operational in late 2012 to over $155,000,000 in October 2016 .

77.     In August 2015, the Michigan Auditor General reviewed 22,427 of the robo-adjudications of fraud made between October 2013 nd October 2015, and determined that 20,965 of them (over 93%) did not involve fraud at all.

78.     Once a robo-adjudication occurs, the claimant is automatically ineligible for hardship waivers that would otherwise be available.

79.     The accusation of fraud alone is also enough to deprive a claimant of their right to a free advocate under Michigan's Advocacy Assistance Program operated by the Agency. MCL 421.5a.

80.     Once the computer has made this determination, the Agency sends the claimant another form letter entitled "Notice of Determination" which states "Your actions indicate you intentionally misled and/or concealed information to obtain benefits you were not entitled to receive."

81.     The "Notice of Determination" letter also does not state what these actions were, or give any information as to why the claimant is no longer eligible.  The letter terminates benefits on any active claims and states that the person is required to pay the amount assessed on the determination.

82.     Enclosed with this letter is a document titled "Restitution (List of Overpayment)" which lists the amount of alleged overpayment and seeks the repayment of the actual benefits paid in addition to a statutory penalty for fraudulent misrepresentation of four times that amount,

for a total assessment of five times the benefits received or sought by the claimant. The five times penalty may be assessed even if the claimant never actually received benefits from the Agency.

83.     Defendants have designed, implemented, maintained, configured and/or administered the computer programs to assess the maximum penalty amounts against all claimants accused of misrepresentation regardless of the facts or circumstances of the case, without a showing that the conduct was reprehensible, and without regard to whether the alleged misrepresentation was intentional, negligent or merely accidental.

84.     Claimants have the opportunity to appeal this determination to an Administrative Law Judge within 30 days after the determination is made.

85.     Until a claimant makes such an appeal, an actual Agency employee has often never been involved in evaluating a fraud case, which the computer has robo-adjudicated.

86.     Due to the defective and unconstitutional notification procedure, the vast majority of claimants were unaware of any issue regarding their UI benefits until after the appeal deadline passed and assessed thousands of dollars in fines.

87.     When claimants became aware and inquired, they were told by Agency employees that there was nothing the claimants could do because the appeal deadline has passed.

88.     This system and software, including its design and implementation, is constitutionally deficient and routinely deprives individual unemployment claimants, who are some of the state's most economically vulnerable citizens, of their most basic constitutional rights.

89.     The administration of unemployment insurance benefits, which includes

collecting taxes and administering benefits to unemployed citizens, the denial of benefits, making fraud and damage determinations, including restitution and penalties, and the seizure of income tax refunds are state functions that have been traditionally and exclusively performed by the State of Michigan.

90.     The non-state actor Defendants, performed at least one of these public functions traditionally and exclusively performed by the State of Michigan, including robo-adjudications of fraud, denial of benefits and the determination of damage awards for restitution and penalties.

91.     The non-state actor Defendants (private Defendants) were pervasively intertwined with state officials when they designed, created, implemented and/or maintained EDFS and MiDAS and state officials were intimately involved with private Defendants at every step of the process of creating and implementing the defective and unconstitutional fraud detection system that bilked tens of thousands of legitimate unemployment insurance claimants out of hundreds of millions of dollars. There was input and feedback between all private Defendants and state officials at every stage of the process and all agreed to continue the process even after the defective and unconstitutional attributes of the fraud detection system became widely known.

92.     The State gave significant encouragement to the private Defendants to create, implement, configure, administer and/or maintain the defective and unconstitutional fraud detection systems and continue the defective and unconstitutional fraud determinations even after the defective and unconstitutional attributes of the fraud detection system became widely known.

93.     By and through the design, creation, implementation, instruction to State employees, supervision of the computer systems, and/or maintenance of software programs that were implemented to automate the unemployment insurance disbursement process, Defendants

engaged in an activity traditionally and exclusively relegated to the State of Michigan.

94.     The injury incurred by Plaintiffs was one that could only be aggravated by the acts of governmental authority exercised by the State of Michigan.

95.     By their conduct as described herein, the private Defendants as well as the named state officials, acted under under color of law.

**COUNT I:  NEGLIGENT PRODUCTION AS TO DEFENDANTS SAS AND FAST**

96.     The State of Michigan purchased and/or otherwise MiDAS and "Enterprise Fraud Detection System" (the "software systems") from Defendants.

97.     Defendants owed a duty to Plaintiffs to place reasonably safe MiDAS and/or "Enterprise Fraud Detection System" software systems into the stream of commerce free of defects.

98.     Defendants negligently designed, tested, approved, manufactured, and "produced" the aforementioned "software systems" in that they failed to exercise reasonable care to prevent the software systems from creating an unreasonable risk of harm to others.

99.     The aforementioned "software systems" were used in an expected or reasonably foreseeable manner.

100.     Defendants had a duty to exercise reasonable care in the "production" of the aforementioned "software systems" and breached that duty in one or more of the following ways:

a.     By "producing", assembling, specifying, formulating, certifying, instructing, selling, designing and/or manufacturing the aforementioned software systems that contained manufacturing, installation, assembly, specification, formulation, certification, instruction, selling design and/or "production" defects that caused the software systems to improperly

identify persons as having committed fraud.

b.     By negligently failing to adequately test and failing to use adequate quality control procedures to alert it to manufacturing and or "production" defects.

c.     Other acts of negligence that may become known through the course of discovery.

101.   Defendant(s) expected the aforementioned "software systems" to reach and the "software systems" did reach the user without substantial change to the condition in which Defendant(s) produced and sold them.

102.   Alternative production practices were available at the time the aforementioned "software systems" left the control of the defendants that would have prevented the harm without significantly impairing the usefulness or desirability of the product and without creating equal or greater risk of harm to others.

103.   That as a direct and proximate consequence of the negligent or grossly negligent acts and/or omissions of the Defendant(s), Plaintiffs have suffered and will continue to suffer in the future, the following damages: economic loss as defined in MCL 600.2945 and "non-economic loss" as defined in MCL 600.2945, including emotional distress, inconvenience, injury to reputation, humiliation and other non-economic damages.

WHEREFORE Plaintiffs pray for an award of damages to be fixed by the trier of fact in a reasonable amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) against Defendants.  Additionally, Plaintiffs ask for costs of this action, all pre-judgment and post-judgment interest as provided by law and such other relief as the Court deems appropriate.

## COUNT II – BREACH OF IMPLIED WARRANTY AS TO DEFENDANTS FAST ENTERPRISES AND SAS INSTITUTE, INC

104.    Defendant(s) knew or had reason to know the particular purposes for which the aforementioned software systems were to be used and that purchasers and users would rely on Defendant(s) skill or judgment in furnishing goods suitable for such purposes and uses.

105.    The MiDAS and Enterprise Fraud Detection systems were not fit for the particular purposes for which they were intended and for which they were used.

106.    The defective conditions of the MiDAS and Enterprise Fraud Detection systems constitutes a breach by Defendants of the implied warranty, rendering them liable for the injuries sustained by the Plaintiffs.

107.    That as a direct and proximate consequence of the breach of implied warranty by Defendants, Plaintiffs have suffered and will continue to suffer in the future, the following damages: economic loss as defined in MCL 600.2945 and "non-economic loss" as defined in MCL 600.2945, including emotional distress, inconvenience, injury to reputation, humiliation and other non-economic damages.

WHEREFORE Plaintiff prays for an award of damages to be fixed by the trier of fact in a reasonable amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) against Defendants.  Additionally, Plaintiff asks for costs of this action, all pre-judgment and post-judgment interest as provided by law and such other relief as the Court deems appropriate.

**COUNT III – GROSS NEGLIGENCE / ACTUAL KNOWLEDGE AS TO DEFENDANTS FAST ENTERPRISES AND SAS INSTITUTE, INC**

108.    The aforementioned "software systems" were defective at the time they were "produced".

109.    Defendants had actual knowledge of the defect(s) and of the substantial likelihood

that the defect(s) would cause Plaintiffs injuries.

110.   Defendants willfully disregarded that knowledge.

111.   That as a direct and proximate consequence of the negligent or grossly negligent acts and/or omissions of the Defendants and actual knowledge, Plaintiffs have suffered and will continue to suffer in the future, the following damages: economic loss as defined in MCL 600.2945 and "non-economic loss" as defined in MCL 600.2945, including emotional distress, inconvenience, injury to reputation, humiliation and other non-economic damages

WHEREFORE Plaintiffs pray for an award of damages to be fixed by the trier of fact in a reasonable amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) against Defendants.  Additionally, Plaintiff asks for costs of this action, all pre-judgment and post-judgment interest as provided by law and such other relief as the Court deems appropriate.

## COUNT IV – BREACH OF EXPRESS WARRANTY AS TO DEFENDANTS FAST ENTERPRISES AND SAS INSTITUTE, INC

112.   Defendants made representations and/or statements that the product was free from defects and/or fit for its intended purpose.

113.   Defendant breached the express warranties provided.

114.   That as a direct and proximate consequence of the breach of express warranty by Defendants, Plaintiffs have suffered and will continue to suffer in the future, the following damages: economic loss as defined in MCL 600.2945 and "non-economic loss" as defined in MCL 600.2945, including emotional distress, inconvenience, injury to reputation, humiliation and other non-economic damages.

WHEREFORE Plaintiffs pray for an award of damages to be fixed by the trier of fact in a

reasonable amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00) against

Defendants.  Additionally, Plaintiff asks for costs of this action, all pre-judgment and

post-judgment interest as provided by law and such other relief as the Court deems appropriate.

## COUNT V – FAILURE TO WARN AS TO DEFENDANTS FAST ENTERPRISES AND SAS INSTITUTE, INC

115.    Defendant knew of should have known of the risk of injury with respect to the

foreseeable use and/or misuse of its product.

116.    Defendant did not provide effective communication of adequate, accurate

information essential to safe and correct use of the product.

117.    That as a direct and proximate consequence of Defendant's failure to warn and/or

inadequate warning, Plaintiff has suffered and will continue to suffer in the future, the following

damages: economic loss as defined in MCL 600.2945 and "non-economic loss" as defined in

MCL 600.2945, including emotional distress, inconvenience, injury to reputation, humiliation

and other non-economic damages.

WHEREFORE Plaintiffs pray for an award of damages to be fixed by the trier of fact in a

reasonable amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00) against

Defendants.  Additionally, Plaintiff asks for costs of this action, all pre-judgment and

post-judgment interest as provided by law and such other relief as the Court deems appropriate.

## COUNT VI: NEGLIGENCE AS TO DEFENDANT CSG

118.    Defendant CSG ran the Project Control Office, which was responsible for all

aspects of the MiDAS project, including compliance with Michigan House Bill 4408 "Benefit

Payment Control Detection and Collection Processes", and fraud detection.

119.     Defendant CSG owed Plaintiffs, and all other Unemployment Insurance claimants, a duty to take reasonable measures to ensure that they were not falsely accused of fraud by the MiDAS system, the operation, implementation and maintenance of which CSG controlled.

120.     Defendant CSG owed Plaintiffs, and all other Unemployment Insurance claimants, a duty to take reasonable measures to ensure that they did not have their benefits wrongfully terminated, and did not have assets wrongfully seized when CSG controlled the MiDas system.

121.     Defendant CSG breached this duty when the MiDAS system made false fraud determinations at a 93% margin of error for two years while under CSG control, resulting in tens of thousands of Unemployment Insurance claimants being wrongfully denied benefits and being wrongfully subjected to monetary penalties and restitution.

122.      Defendant CSG's breach was a proximate cause of the damages suffered by Plaintiffs and similarly situated Unemployment Insurance claimants.

123.     As a result of Defendant CSG's reckless and/or negligent conduct, Plaintiffs and other claimants suffered economic and non-economic damages.

## COUNT VII: 14TH AMENDMENT DUE PROCESS VIOLATION

124.     By law, the property interest in a person's means of livelihood is one of the paramount property interests an individual can possess.

125.     The right to receive unemployment benefits, essentially a substitute for a person's means of livelihood, is an equally paramount property interest.

126.     Plaintiffs had a paramount property interest in their entitlement to unemployment

benefits.

127.    Plaintiffs also have a property interest in their income tax refunds.

128.    Plaintiffs also have a property interest in the money they possess generated from sources other than their unemployment insurance benefits.

129.    There was no emergency situation that would justify state actors denying benefits, making fraud determinations, or engaging in collection activities before providing claimants a pre-deprivation hearing.

130.    Plaintiff's did not receive a pre-deprivation hearing that was in any way consistent with due process.

131.    They did not receive adequate notice of the charges against them.

132.    They did not receive an opportunity to present evidence and put the allegations in context.

133.    And they did not have a neutral arbiter adjudicate the issues before a fraud determination was made, before a penalty was imposed, and before collection activities were commenced.

134.    The risk of an erroneous, pre-hearing deprivation of property was extremely high, over 93%, according to the State of Michigan Auditor General.

135.    The probable value of additional or substitute procedural safeguards was extremely high.  Insuring that the persons accused of fraud actually received notice, adequately informing them of the reasons for the fraud allegation, giving them a meaningful opportunity to respond and rebut the charges and providing a neutral arbiter would have a substantial likelihood of reducing the over  93% margin of error.

136.    The government has no legitimate interest in a system that has a over 93% margin of error and the fiscal and administrative burdens of providing proper procedures are not overly burdensome as demonstrated by the years the Agency operated before the MiDAS system was operational.

137.    Adequate pre-deprivation proceedings are not impracticable and are, in fact, required under state law.

138.    The post deprivation process was inadequate.

139.    In the vast majority of cases, the claimants did not learn of the fraud determination until long after their time for protest or appeal had expired.

140.    Further, the state Defendants instructed rank and file Agency employees to inform claimants that they could not appeal the fraud determinations and penalty assessments after 30 days, even if the claimants did not receive notice and thus had the right to appeal.

141.    The Michigan Audit General did an audit of the Agency's "Help Line" and determined that well over 90% of the calls were never answered and in fact determined that with regard to the last 50,000 calls the agency received at the time of the audit, not a single one had been answered or returned.

142.    The mere allegations of fraud also meant that the claimant was ineligible to have an advocate provided by the state to navigate the complicated appellate process.

143.    When the MiDAS system became operational, all the claim information was put into a "Legacy" system and hard copies were not maintained.

144.    Although the MiDAS system could access the legacy information to make a fraud determination, humans could not access the Legacy program to print the information or copy it in

any way.

145.   Thus, when fraud determinations were made regarding conduct that occurred prior to MiDAS becoming operational, claimants were often not provided copies of the documents and information MiDAS relied on to make the fraud determinations, making it all but impossible to rebut the charges.

146.   In fact, the Agency began a practice of sending the administrative law judges (ALJ), who heard the post deprivation appeals a "secret letter", an ex-parte communication that was not shown to the claimant or his attorney, in which the Agency set forth its position as to why there was fraud based on the inaccessible legacy information.

147.   When certain ALJs expressed concerns over the Agency's practices and began criticizing the Agency after witnessing the extremely high rate of invalid fraud determinations that were being appealed, often unsuccessfully because of missed deadlines, some of the ALJs were removed from hearing fraud cases by Defendant McMurtry in conjunction with other state officials.

148.   Fraud cases were not blind drawn among the ALJs, but were assigned to a limited number of judges selected by Agency officials in conjunction with other state officials.

149.   At least one Plaintiff and multiple other claimants were denied their constitutional right to a neutral arbiter.

150.   The post-deprivation remedies are insufficient and inadequate because they fail to provide due process when the automated decision-making process occurs in secret and there is no available record keeping trail to determine what happened in the decision-making process.

151.   Even a temporary deprivation of wages, unemployment benefits, or tax refunds

creates a substantial burden on claimants who rely upon such income to support themselves and their families.

152.    Defendants' actions and omissions constitute a deprivation of property without due process as guaranteed by the Fourteenth Amendment's Due Process Clause.

153.    This claim is cognizable under 42 USC Section 1983.

**COUNT VIII:  FOURTEENTH AMENDMENT EQUAL PROTECTION CLAIM.**

154.    Plaintiffs and the potential class members comprise a non-suspect class.

155.    The government has a legitimate interest in protecting the health, safety and welfare of its citizens through administering unemployment insurance benefits.

156.    The use of an automated system to make fraud determinations on unemployment claims that has over a 93% margin of error, and which denies even the most basic due-process requirements, and then punishes those erroneously and wrongfully determined to have committed fraud by denying benefits and assessing restitution and punitive damages, is arbitrary and capricious and is not rationally related to administering unemployment insurance for the welfare of the citizens of the State.

157.    Defendants' actions and omissions constitute a denial of the equal protection of the law as guaranteed by the Fourteenth Amendment's Equal Protection Clause.

158.    This claim is cognizable under 42 USC Section 1983.

**COUNT IX:  SUBSTANTIVE DUE PROCESS VIOLATIONS**

159.    Even before the Auditor General's investigation which determined that there was over a 93% margin of error in the fraud determinations made by the Agency, it was widely known by Defendants and others within the Agency that there was a serious problem with the

fraud determinations and that vast majority were invalid; after the Auditor General's investigation, it was indisputable.

160.    Various individuals within the agency and within related agencies informed Defendants of the systemic, invalid determinations.

161.    Instead of declaring a moratorium on collection activities and the invalid, robo-adjudications of fraud, Defendants changed nothing and forged ahead.

162.    On information and belief, Defendant Steve Geskey, a policy-making supervisor at the Agency, ordered deputy state attorneys general as well as other subordinates to continue to conduct business as usual, to continue to allow MiDAS to make the invalid determinations, to continue to contest claimants' protests and appeals and continue with collection activities.

163.    On information and belief, Defendant Mitchell, at relevant times the head of the Friend of the Court and Bankruptcy Unit at the agency, instructed various deputy attorneys general to continue to oppose claimants' attempts to discharge the fraud-based debt in bankruptcy proceedings by filing adversary proceedings, even when it was obvious that the underlying judgement, which often included five times the amount of unemployment insurance paid (or even claimed), plus interest, was based on an invalid fraud determination.

164.    On information and belief, Defendant Blundell, at relevant times the head of the Fraud Unit at the Agency, continued to instruct her subordinates, including the claims examiners, to pursue the invalid fraud charges.

165.    Claims examiners would oftentimes, if not the majority of the time, show up at ALJ hearings and indicate that they knew the underlying fraud charge was invalid, but that they intended to contest the claimant's appeal because the claimant had defaulted by not filing a

timely appeal.

166.    The government has no legitimate interest in the finality of determinations that are based on a margin of error that exceeds 93%, determinations that penalize its citizens not only by denying the unemployment benefits to which they were entitled, but by assessing punitive damages of five times the amount paid or claimed.

167.    On information and belief, Defendant Singleton was at relevant times the head of the Benefit Overpayment Collection Unit at the Agency.

168.    Despite knowing of the over 93% margin of error rate for fraud determinations, she continued to direct subordinates to pursue aggressive collection activities which included tax refund intercepts and wage garnishments.

169.    Defendant Moffet-Massey was the head of the Agency at relevant times.

170.    Despite her knowledge of the severe problems in the fraud determination procedures and the outrageous collection actions against innocent citizens of the State, she continued to pursue the same defective and unconstitutional policies.

171.    These Defendants had actual knowledge of a breakdown in the proper workings of their departments but did nothing to remedy it.

172.    These Defendants abandoned the duties of their positions and encouraged the misconduct.

173.    These Defendants implicitly authorized, approved and knowingly acquiesced in the unconstitutional conduct of individuals under their control.

174.    The State has no legitimate interest in collecting hundreds of millions of dollars from some of its most vulnerable, innocent citizens, based on fraud determinations, when the

State knows that over 93% of the determinations are invalid.

175.    The Defendants' conduct was arbitrary and capricious and shocking to the conscience.

176.    Further, MiDAS automatically assessed punitive damages in the amount of four times the restitution after making a robo-adjudication that Plaintiffs and potential class members made misrepresentations without any finding of reprehensibility, or determining whether the alleged misrepresentation was intentional, negligent, accidental, or was based on good faith.

177.    Assessing punitive damages without demonstrating reprehensibility violates due process.

178.    Defendants' acts and or omissions constitute a violation of substantive due process in violation of the Fourteenth Amendment

179.    These claims are cognizable under 42 USC Section 1983.

### COUNT X:  FIFTH AMENDMENT JUST COMPENSATION CLAIM

180.    The Fifth Amendment prohibits the taking of private property for public use without just compensation.

181.    Plaintiffs had private property rights in their unemployment benefits, and their tax refunds, as well as other monetary assets.

182.    As described herein, Plaintiffs' property was taken from them due to Defendants' acts and/or omissions, and placed into the Agency's contingency fund.

183.    Thus, their property was taken for public use.

184.    Plaintiffs did not receive just compensation for the taking of their private property.

185.    Defendants' Acts and/or omissions constitute a violation of the Just

Compensation Clause of the Fifth Amendment.

186.    This claim is cognizable under 42 USC section 1983.

## COUNT VI:ILLEGAL SEIZURE UNDER THE FOURTH AMENDMENT

187.    The Fourth Amendment protects citizens from unreasonably seizures.

188.    A seizure of property occurs when there is a meaningful interference with an individual's possessory interest in that property.

189.    The protections of the Fourth Amendment are not limited to criminal proceedings.

190.    Dispossessing Plaintiffs of their tax refunds, wages and unemployment benefits constituted a meaningful interference with their possessory interests in that property.

191.    There was no probable cause to believe that Plaintiffs' committed fraud, nor was there any other basis to establish probable cause for the seizure of Plaintiffs' property.

192.    Defendants' acts and/or omissions caused an illegal seizure under the Fourth Amendment.

193.    This claim is cognizable under 42 USC Section 1983.

## COUNT VII:  VIOLATION OF 26 USC SECTION 6402(f)

194.    26 USC Section 6402(f) governs intercepting federal tax refunds for the collection of unemployment compensation debt.

195.    It has specific due process requirements in subsection (c) which requires that the government notify the person of the intent to take action; provide the person at least sixty days to present evidence that all or part of any liability is not legally enforceable; and requires the state to consider evidence presented by the claimant, among other things.

196.    At least one of these Defendants participated in the seizure of the tax refunds of

Plaintiffs Davison and Pak, as well as the federal tax refunds of numerous other potential class members, in a direct violation of the due process requirements of 26 USC §6402(f).

197.    26 USC §6402(g) specifically contemplates a "legal, equitable, or administrative action against the Federal agency or State" to which the amount the tax refund was paid under subsection (f).

198.    This claim is thus cognizable under 42 USC Section 1983.

## COUNT VIII: CIVIL CONSPIRACY

199.    There was an agreement between Defendants to curtail or eliminate the traditional procedural guarantees for an unemployment fraud determination through the design, implementation, administration, configuration and/or maintenance of an automated system.

200.    Each Defendant, individually or through its agents, agreed with at least one other Defendant or an unnamed co-conspirator, to accomplish this objective.

201.    Each Defendant has constructive knowledge of the law.

202.    Each Defendant, individually or through its agents, committed at least one overt act in the design, implementation, configuration, administration and maintenance of the automated system.

203.    Each Defendant, individually or through its agents, engaged in a civil conspiracy that deprived Plaintiffs of their rights under the law.

WHEREFORE, Plaintiffs individually and on behalf of the above defined Class, by and through counsel, pray the Court grant the following relief:

A.      An Order certifying this action as a class action pursuant to Fed. R. Civ. P. 23;

B.      An Order appointing Cahoo, Mendyk, Cole, Pak and Davison as representatives

for the Class and appointing their counsel as lead counsel for the Class;

C.   An order awarding Plaintiffs and all other Class Members compensatory damages in an amount to be determined at trial for the wrongful acts of Defendants described herein;

D.   An Order requiring Defendants to preserve all evidence relevant to this lawsuit and to notify UIA claimants affected by the unlawful fraud determination and collection activity of the pendency of this litigation;

E.   Restitution as authorized by law;

F.   Payment to the Class of all damages associated with denied benefits in an amount to be proven at trial;

G.   Payment to the Class of all damages associated with delayed benefits and for damages as a result of the defective design, creation, implementation, configuration, administration and maintenance of the aforementioned software programs and MiDAS system;

H.   An assessment of punitive damages, consistent with the actual harm Defendants have caused and potentially could have caused, and the reprehensibility of their wanton and willful conduct, and the need to punish and deter such conduct;

I.   An order awarding attorney's fees pursuant to applicable Federal and State law;

J.   Interest as provided by law, including but not limited to pre judgment and post-judgment interest as provided by rule or statute; and

K.   Any and all other and further relief as this Court deems just, equitable, or proper.

## DEMAND FOR JURY TRIAL

Plaintiffs' respectfully demand a trial by jury on all issues so triable.

Respectfully submitted,

/s/Kevin Ernst                              /s/ Craig E. Hilborn (P43661)
Jonathan R. Marko (P72450)                  Counsel for Plaintiffs
Kevin Ernst (P44223)                        Hilborn & Hilborn, P.C.
Counsel for Plaintiffs                      999 Haynes St., Ste. 205
Ernst & Marko Law, PLC                      Birmingham, MI 48009
645 Griswold Street, Suite 4100             (248) 642-8350
Detroit, Michigan 48226                     craig@hilbornlaw.com
P: (313) 965-5555 F: (313) 965-5556
kevin@ernstmarkolaw.com
jon@ernstmarkolaw.com

Date:   July 7, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2017, I electronically filed the foregoing paper **PLAINTIFF'S REPLY BRIEF** with the Clerk of the Court using the ECF system which will send notification of such filing to the following: all attorneys of record.

/s/ Kevin Ernst