UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATTI JO CAHOO, KRISTEN
MENDYK, KHADIJA COLE, HYON
PAK, and MICHELLE DAVISON,

        Plaintiffs,

                                    Case Number 17-10657
v.                                   Honorable David M. Lawson

SAS INSTITUTE INC., FAST
ENTERPRISES LLC, CSG
GOVERNMENT SOLUTIONS,
STEPHEN GESKEY, SHEMIN BLUNDELL,
DORIS MITCHELL, DEBRA
SINGLETON, JULIE A. McMURTRY,
SHARON MOFFET-MASSEY, CLAYTON
TIERNEY, ANDREW PHILLIPS, JEREMY
GRAGG, JENNIFER TUVELL, KRISTEN
ARAKI-TOKUSHIGE, MIKE PATTERSON,
ALLISON FORGIE-McCLURG, RICHARD
STATEN, REBECCA ROSIER, DANA ROWE,
TIM PALMER, STEVEN GOODHALL,
and PAUL PLUTA,

        Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING
## IN PART DEFENDANTS' MOTIONS TO DISMISS
## AND SCHEDULING CASE MANAGEMENT CONFERENCE

In 2012, the State of Michigan's Unemployment Insurance Agency (UIA) implemented a new

automated system to detect and punish individuals who submitted fraudulent unemployment

insurance claims. By most accounts, the system did not work well, as it lacked human oversight, it

detected fraud by certain claimants where none existed, it provided little or no notice to the accused

claimants, it failed in many instances to allow administrative appeals, and it assessed penalties and

forfeitures against individuals who were blameless. The plaintiffs are members of a putative class

of unemployment insurance claimants who wrongfully were subjected to these false fraud determinations made by the State's automated fraud detection system. They contend that they are collateral damage in the State's war on fraud, and they have sued the companies and individuals whom they believe the State enlisted as its soldiers and officers in that battle. They have asserted a number of theories under federal and state law. In another case brought by different plaintiffs, this Court found flaws in the State's robo-fraud-detection system, and eventually approved a settlement agreement in which the State agreed, among other things, to suspend all collection activity under the automated system (and Michigan enacted new legislation that prohibits fraud determinations based solely on computer-identified discrepancies). *See Zynda v. Arwood*, 175 F. Supp. 3d 791 (E.D. Mich. 2016). That case addressed prospective relief only against the State. *Id.* at 800-01. The plaintiffs in this case seek damages for the past harm visited on them by the computer-driven fraud detection system.

All of the defendants have filed motions to dismiss, based on various theories, and the Court heard oral argument on the motions. There is no question these contracted companies and individuals, working along side State officials, played some role in implementing a defective system that placed a significant financial burden on unemployment beneficiaries, and they acted under color of state law when doing so. However, many (but not all) of the claims alleged have little basis in law or are unsupported by pleaded facts necessary to survive dismissal. For the reasons discussed below, each motion to dismiss will be granted in part and denied in part.

## I. Facts

The facts come from the amended complaint and the relevant documents referenced in it that were attached to the motion papers.

A.  The Plaintiffs

The amended complaint names five class representatives.  Patti Jo Cahoo contends that she was falsely charged with filing a fraudulent claim in 2014 after receiving unemployment benefits, but did not learn of the determination until 2015 when she was denied benefits upon reapplying.  She was subsequently evicted from her home and suffered other emotional distress as a result.

Kristen Mendyk was accused of making a fraudulent claim after receiving unemployment benefits in 2009, but was not notified of the determination until November 2016.  As a result, she filed for bankruptcy and suffered emotional distress.

Khadija Cole, a year after receiving unemployment benefits, received a letter notifying her — for the first time — of a fraud determination and assessing a penalty of $29,000.

Michelle Davison's 2015-2016 state and federal income tax refunds were seized based on false fraud determinations, which she was unaware of until she received a letter from the IRS informing her of the seizure.  She was not given prior notice, 60 days to present evidence to oppose the seizure, or consideration.

Hyon Pak's 2012-2014 federal income tax refunds also were seized based on false fraud determinations.  He similarly was deprived of notice and opportunity to present evidence.

B. The Automated Fraud Detection Systems

Sometime around 2012, the UIA implemented a "system rewrite" that was based primarily on a computer program to detect and control alleged unemployment insurance fraud.  The platform — known as the Michigan Integrated Data Automated System (MiDAS) — was created to search for discrepancies in the records of unemployment compensation recipients.  As part of the new system, the UIA coordinated collection procedures with employers, other state agencies, and the

federal government. MiDAS's electronic "cross-checking" mechanism alerted the UIA when income was reported for claimants or when some activity affected a claimant's eligibility for benefits. MiDAS, using an "income-spreading" formula, would calculate a claimant's weekly income based on an average of total income received over a quarter, and then "spread" the income over each week in the quarter, regardless of whether a claimant truthfully reported no income in one or more weeks. If the system identified a discrepancy between an employer record and corresponding information in the claimant's application, the claimant's file was flagged as a potential case of misrepresentation. MiDAS would then initiate an automated process that could have resulted in termination of benefits, the imposition of restitution and penalties, and criminal prosecution.

Once a claim was "flagged" as potentially fraudulent, the UIA's system automatically transmitted questionnaires to the claimant, seeking a response within ten days. The questionnaires posed multiple choice questions that resulted in a robo-determination of fraud if a triggering answer were selected. (E.g., "Did you intentionally provide false information to obtain benefits you were not entitled to receive? Yes/No"). Although the questionnaires were prompted by a computerized "suspicion" of fraud, the notice to the claimant did not include the UIA's basis for that suspicion or grounds for potential disqualification.

However, not every person alleged to have made a fraudulent claim received a questionnaire. The questionnaires were to be shared with claimants via their Michigan Web Account Management System (MiWAM) accounts, but in some instances, the system failed to send the questionnaires, or the questionnaires were sent to dormant MiWAM accounts. And because MiDAS reviewed claims from the six preceding years, questionnaires were sent to claimants whose benefits had expired already. The system did not provide any other means of notifying claimants of the questionnaire's

existence. Unless a questionnaire actually was sent to a claimant and that claimant regularly checked her MiWAM account, that claimant received no notice of the alleged fraud determination. Failure to respond to the questionnaire within ten calendar days as well as selecting one of the triggering answers in the questionnaire resulted in a default determination that the claimant knowingly and intentionally misrepresented or concealed information to receive benefits unlawfully.

Once a default determination was made, an initial letter demanding repayment and assessing penalties and interest was to be issued to the claimant. There was no opportunity to appeal or otherwise contest the finding at that point in the process. The statement sent to claimants indicated that penalties for non-payment may include interception of the claimant's state and federal income tax refunds, garnishment of wages, and legal collection activity through a court of law. The punitive assessments regularly totaled between $10,000 and $50,000 and sometimes exceeded $187,000. As was the case with the questionnaires, in some instances, the letters were never mailed to the claimants or were sent to incorrect addresses. The UIA did not verify that the addresses on record were the claimants' current addresses. Moreover, many attempts by claimants to appeal or assert procedural rights were ignored. Some of those claimants who tried to reach the UIA by writing received no acknowledgment that their appeals were received or considered.

In addition to the initial notification letter, the UIA sent claimants a letter entitled "Notice of Determination" that alerted them to the fraud allegation. The letter informed claimants that their actions intentionally misled or concealed information to obtain benefits that they were not entitled to receive, but did not provide any factual basis for that determination. It also announced that benefits were terminated on any active claims and required claimants to pay the amount assessed in an attached document titled "Restitution (List of Overpayment)." The amount included repayment

of actual benefits paid as well as a statutory penalty for fraudulent misrepresentation of four times that amount. The penalty could have been assessed even if the claimant never actually received benefits from the UIA and without regard to the circumstances of the case.

After the second notification letter was issued, the claimant was entitled to appeal a determination of fraud to an Administrative Law Judge (ALJ) within 30 days. But because of the errors in notifying claimants noted above, many claimants often did not become aware of their assessment until after the appeal deadline passed. When claimants received actual notice, they were told by UIA employees that the lapsed deadline foreclosed their right to appeal. It likely was not until this stage of the process that actual UIA agents took part in evaluating fraud determinations. According to the plaintiffs, the Michigan Auditor General determined that well over 90% of appeals-related calls made to the UIA were never answered, including the last 50,000 calls made to the Agency at the time of the audit.

Moreover, even if claimants were granted an appeal, the plaintiffs say that the UIA's record-keeping practices made it all but impossible to rebut the charges. For instance, when MiDAS became operational, all claim information was stored in a "legacy" system and hard copies were not maintained. Although the State, through MiDAS, could access claimant information to make automated fraud determinations, individuals had no access to the materials and were often not provided copies of the information upon which MiDAS relied to make those determinations. Furthermore, the UIA began a practice of sending *ex-parte* communications to ALJs who heard the post-deprivation appeals, in which the UIA set forth the basis for its fraud determination. When some ALJs expressed concern over those practices and over the high rate of invalid — albeit

untimely — fraud appeals, they were removed from hearing fraud cases by defendant McMurtry and other state officials.

The use of a "robo-adjudication" system had significant consequences. In the years material to this suit, the UIA largely did not employ any human review in making these automated determinations. Between October 2013 and August 2015, MiDAS made all fraud determinations. After August 2015, the UIA continued to use MiDAS, but made use of agency personnel to exercise some oversight in the process. However, those personnel exercised no more discretion than their MiDAS counterpart. Moreover, the UIA's contingency fund swelled by approximately $152,000,000 between late 2012 and October 2016. Some claimants submitted payments to the UIA of $250 per month, in perpetuity, to satisfy their assessed debts, even though the Michigan Auditor General eventually determined that of the 22,427 robo-adjudications reviewed, over 93% did not involve fraud at all. Claimants also were automatically ineligible for hardship waivers and deprived of their right to a free advocate under Michigan's Advocacy Assistance Program operated by the UIA.

## C. The Defendants

The complaint alleges that three sets of private defendants designed, created, implemented, or maintained the automated system employed by the UIA in adjudicating fraud determinations. The plaintiffs allege there was input and feedback between all private defendants and state officials at every stage of the process, and they all agreed to continue the process even after the defective attributes of the system became widely known. The plaintiffs also allege that these defendants opposed the discharge of a claimant's restitution and penalty debt in bankruptcy with full knowledge that the underlying fraud determinations were invalid and false. According to the amended complaint, the defendants, respectively, engaged in the following conduct.

## 1. FAST

FAST Enterprises, LLC is a software company with its principal place of business in Centennial, Colorado. Around August 2011, FAST contracted with the State to design, create, implement, configure, control and maintain the MiDAS software used by the Agency to administer unemployment insurance, including fraud investigation, overpayments, collections, and tax intercepts. The amended complaint names the following FAST agents, sued in their individual capacity:

    a.      Jeremy Gragg, lead implementation consultant who worked on determination and compliance;
    b.      Jennifer Tuvell, senior project manager;
    c.      Kristen Araki-Tokushige, senior business architect;
    d.      Mike Patterson, implementation manager; and
    e.      Allison Forgie-McClurg, test manager.

## 2. SAS

SAS Institute Inc. is a software company with its principal place of business in Cary, North Carolina. Around December 2012, SAS Institute Inc. contracted with the State to design, create, implement, maintain, configure and control the Enterprise Fraud Detection Software (EFDS) used by the Agency to make unemployment insurance fraud determinations. According to the contract, SAS agreed to provide a product that utilized data from the Department of Technology, Management, and Budget (DTMB)'s Data Warehouse in the development of UIA Benefit and Tax fraud detection analysis, and the results of that analysis would be integrated with MiDAS. The contract describes the scope of the project in the following categories: requirements definition, functional design, configuration, testing, implementation, warranty, and maintenance. The contract expired in December 2017. SAS Project Manager Andrew Phillips is sued in his individual capacity.

### 3. CSG

CSG is a consulting company with its principal place of business in Chicago, Illinois. Around January 2010, CSG contracted with the State to run and administer the Project Control Office, charged with oversight responsibility for all aspects of MiDAS. CSG continues to provide full-time, on-site management to oversee MiDAS production, support, and additional initiatives including:

a.    Collections, recoupments, and intercepts;
b.    Integrity initiative for EFDS;
c.    Implementation of the Interstate Reciprocal Overpayment Recovery Agreement;
d.    UIA and Michigan Administrative Hearing System appeals improvement; and
e.    Development of standard operating procedures for the UIA Tax Office.

The complaint names the following CSG agents, sued in their individual capacity:

a.    Richard Staten, senior program manager;
b.    Rebecca Rosier, senior program manager;
c.    Dana Rowe, senior business analyst;
d.    Tim Palmer, senior project manager;
e.    Steve Goodhall, senior project manager; and
f.    Paul Pluta, senior project manager.

### 4. UIA Employees

The complaint names seven UIA employees, sued in their individual capacity. Steve Geskey was a high ranking supervisor at UIA, set policy, and directed subordinates to pursue false fraud claims against claimants, the plaintiffs allege, despite knowing that those claims were invalid. Shemin Blundell was the head of the UIA's Fraud Unit where she allegedly directed subordinates to pursue false fraud claims against claimants despite knowing that those claims were invalid. Doris Mitchell was head of the UIA's Friend of the Court and Bankruptcy Unit where she directed subordinates to oppose discharge of claimants' debt in bankruptcy proceedings that were based on

allegedly false fraud claims despite knowing that the claims were invalid. Clayton Tierney was the UIA projected manager for the integrated system rewrite. Debra Singleton was the head of the Benefit Overpayment Collection Unit at the UIA, where she directed subordinates to pursue aggressive collection activities. Sharon Moffet-Massey was the head of the UIA at all relevant times and pursued the defective and unconstitutional policies alleged. The amended complaint does not state Julie McMurtry's position, but it alleges she removed some ALJs from hearing fraud appeals.

### D. The Plaintiffs' Claims

The plaintiffs filed a putative class action complaint for damages on March 2, 2017. It was amended once, and now states seven counts under state law and six counts under federal law.

The state law claims, brought against the SAS and FAST defendants, are for negligent production (Count 1), breach of implied warranty (Count 2), gross negligence/actual knowledge (Count 3), breach of express warranty (Count 4), and failure to warn (Count 5), as well as one count under state law as to the CSG defendants for negligence (Count 6) and one count under state law as to all defendants for civil conspiracy (Count 13). The federal claims are directed against all defendants. They are for denial of procedural due process (Count 7), equal protection (Count 8), and substantive due process (Count 9), and violations of the Fifth Amendment's Takings Clause (Count 10), the Fourth Amendment (Count 11), and 26 U.S.C. § 6402(f) (Count 12). In their response briefs, the plaintiffs agreed that Count 10 is not ripe for adjudication and consented to its dismissal.

### II. Discussion

The four groups of defendants each have filed motions to dismiss; many of their arguments parrot each others, and they can be categorized into attacks on jurisdiction under Federal Rule of Civil Procedure 12(b)(1), challenges to the merits under Rule 12(b)(6), and failure to join the State

as a necessary party under Rule 12(b)(7). SAS Project Manager Andrew Phillips also alleges that the Court has no personal jurisdiction over him, moving for dismissal under Rule 12(b)(2). The UIA defendants also contend that they are entitled to qualified immunity from the federal claims alleged against them.

A. Joinder of Necessary Party

The FAST, SAS, and CSG defendants all argue that the amended complaint must be dismissed under Rule 12(b)(7), because the plaintiffs failed to join the State of Michigan as a defendant, which, the defendants contend, is a necessary and indispensable party to the case. Joining the State in a suit for money damages would be problematic for the plaintiffs, of course, because the State enjoys sovereign immunity. But that problem is not presented here, because the State is neither a necessary nor indispensable party to the plaintiffs' surviving claims against those defendants.

The joinder rules compel plaintiffs to sue all persons who are necessary and indispensable to the adjudication of the case. *Local 670 v. International Union, United Rubber, Cork, Linoleum and Plastic Workers of America*, 822 F.2d 613, 618 (6th Cir. 1987). If an indispensable party cannot be added to the case because the court has no personal jurisdiction over the person, or joinder would upset subject-matter jurisdiction, joinder might be excused in some circumstances. *Ibid.* The Sixth Circuit employs a three-step analytical framework to engage a "pragmatic approach" to the question, as "'an entire suit should not be dismissed if meaningful relief can still be accorded [even in the party's absence].'" *Ibid.* (quoting *Smith v. United Brotherhood of Carpenters and Joiners of America*, 685 F.2d 164, 166 (6th Cir. 1982); *see also Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 116 n.12 (1968).

When determining whether an absent person is indispensable, courts generally look first to Rule 19(a)'s definitional language. *Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656, 666 (6th Cir. 2004) (noting that the first step in the process requires the court to "determine whether the person or entity is a necessary party under Rule 19(a)"). Indispensability means that "(1) in the person's absence complete relief cannot be accorded among existing parties," or, as relevant here, "(2) the person claims an interest relating to the subject matter of the action and is so situated that the disposition of the action in the person's absence may . . . leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." Fed. R. Civ. P. 19(a)(1)(A), (B)(ii).

The FAST, SAS, and CSG defendants all argue that the State, and the UIA in particular, is a necessary party because it is the entity with whom these defendants contracted, and it controls the system that the plaintiffs allege deprived them of their rights. They argue that in the absence of the UIA, it is impermissible to adjudicate the legality of the State's actions in administering the unemployment insurance fraud detection system, and that the UIA should be the party to defend the constitutionality of its program. The defendants also contend that the UIA's absence may subject them to multiple or inconsistent obligations.

Those arguments ignore the reality that UIA employees are parties to the case in their individual capacities, and they have ample motive to defend the constitutionality of their actions. The defendants contend that any ruling that their products and services violated the plaintiffs' constitutional rights would affect the defendants' contracts with the UIA, which has an irrevocable license to use the offending software. They believe that the Court cannot accord complete relief because the UIA would not be bound to any judgment, and it has a right to continue using the

products and services under the contracts if it so chooses. But the plaintiffs are not seeking prospective relief; they seek damages for past conduct. And, as the defendants point out, the UIA apparently has agreed to discontinue its past robo-fraud determinations.

The defendants' citation of *Downing v. Globe Direct LLC*, 806 F. Supp. 2d 461 (D. Mass. 2011), does not alter that analysis. In that case, the court held the State of Massachusetts was a necessary party to a class action against a contracting company that mailed registration renewal notices on behalf of the Registry of Motor Vehicles, which the plaintiffs alleged violated the Drivers' Privacy Protection Act (DPPA). The court noted that "a party to a contract which is the subject of the litigation is a necessary party." *Id.* at 467 (citations omitted). But it said so in the context of the plaintiff's request that the defendant be enjoined from engaging in certain future conduct called for by that contract. Because a finding that the challenged practice (using the plaintiffs' personal information to send them commercial advertisements) violated the DPPA "would effectively invalidate Massachusetts's contract," *id.* at 467, the court held that the State should have a say in that determination. *Ibid.* As noted earlier, however, the nature of the relief sought in this case is different.

The plaintiffs do not seek relief based on breach of the various software design, manufacture, or implementation contracts, or any other contract for that matter. Instead, they seek money damages for past violations of their common law and constitutional rights. Any favorable judgment rendered would not affect the State's irrevocable license to use the products under the contracts.

The defendants relatedly argue that a victory for the plaintiffs may subject the defendants to inconsistent obligations under their contracts with the State. They reason that if their software products are found to play a role in depriving the plaintiffs of their procedural rights and subject

them to erroneous fraud determinations, the defendants could be exposed to continuing liability if the UIA continues to use the products, as its contract entitles it to do. That certainly would be a problem for the defendants — although an unlikely one — but it has little to do with affording "complete relief" to the parties on the backward-looking claims the plaintiffs have pleaded.

The UIA's decision to use or discontinue use of the defendants' software products and services is largely governed by the settlement agreement in *Zynda v. Arwood*. That agreement requires, among other things, the UIA to revamp its policies to comply with federal law, including Department of Labor regulations prescribing procedures that affect fraud determinations and their consequences. Its failure to do so might provoke a new claim or an action to enforce the settlement agreement. But it would not have an impact on what's been done already. A decision on the plaintiffs' constitutional or common law tort claims here would address only the defendants' past conduct.

The SAS and FAST defendants mention in their reply brief that the plaintiffs have failed to explain how joint and several liability factors into Rule 19 analysis, and that liability here is several, not joint. Those observations are not helpful to the defendants. If liability is several, no other parties are necessary to decide an individual defendant's case. And, as the Sixth Circuit has explained, "[i]n a suit against one joint tortfeasor, a judgment for monetary relief can be completely satisfied without the presence of any other defendant." *Laethem Equip. Co. v. Deere & Co.*, 485 F. App'x 39, 44 (6th Cir. 2012). Therefore, "[a] person's status as a joint tortfeasor does not make that person a necessary party, much less an indispensable party." *PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 204 (6th Cir. 2001) (citing *Temple v. Synthes Corp.*, 498 U.S. 5, 8 (1990)).

The motion to dismiss under Rule 12(b)(7) will be denied, because the defendants have not identified a necessary or indispensable party that has not been joined in this lawsuit.

### B. Federal Claims

The plaintiffs allege that the defendants are liable for violating a variety of the plaintiffs' constitutional and federal statutory rights, which they assert via 42 U.S.C. § 1983. To state a claim under that statute, a plaintiff must plead facts that plausibly "'establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law.'" *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)). The SAS and CSG defendants attack each element (the FAST defendants have not raised the state action argument), which the Court considers in reverse order.

The defendants assert these arguments under Rule 12(b)(6). The standards under that rule are well known to the parties: the purpose of the motion is to allow a defendant to test whether, as a matter of law, the plaintiffs are entitled to legal relief if all the factual allegations in the complaint are taken as true. *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)). The complaint is viewed in the light most favorable to the plaintiffs, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiffs. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). To survive the motion, the plaintiffs "must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007). Plausibility requires showing more than the 'sheer possibility' of relief

but less than a 'probab[le]' entitlement to relief. *Ashcroft v. Iqbal*, [556 U.S. 662, 678] (2009)." *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010).

## 1. State Action

In order for liability to attach under section 1983, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). That is because the Constitution protects citizens from infringement of their rights by the government, not by private parties. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156 (1978) (recognizing that "most rights secured by the Constitution are protected only against infringement by governments") (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349 (1974); *Civil Rights Cases*, 109 U.S. 3, 17-18 (1883)). Each of the SAS and CSG defendants contends that it (or he or she) does not qualify as a state actor.

It is true that SAS and CSG are not organs of the State, and their employees do not work for the State or its agencies. Nonetheless, private action can amount to state action "when the State exercises 'coercive power' over the private entity, the State provides 'significant encouragement, either overt or covert' to the private entity, or the private actor operates as a 'willful participant in joint activity with the State or its agents.'" *Thomas v. Nationwide Children's Hosp.*, --- F.3d ---, No. 17-3631, 2018 WL 844672, at *2 (6th Cir. Feb. 14, 2018) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (citing cases)). Although the Supreme Court has acknowledged that its "cases deciding when private action might be deemed that of the state have not been a model of consistency," *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 632 (1991) (O'Connor, J., dissenting), and "no one fact can function as a necessary condition across the board for finding state action," *Brentwood Acad.*, 531 U.S. at 295, the instances where

private parties have been found to be state actors fall into "two broad categories: the 'public function exception,' and the 'entanglement exception.'" *Osler ex rel. Osler v. Huron Valley Ambulance Inc.*, 671 F. Supp. 2d 938, 942 (E.D. Mich. 2009) (citing Chemerinsky, *Constitutional Law* at 517 (3d ed. 2009)).

The Sixth Circuit has interpreted the public function category narrowly, noting only functions like holding elections, exercising eminent domain, and operating a company-owned town meet this test. *Chapman v. Higbee Co.*, 319 F.3d 825, 833-34 (6th Cir. 2003) (en banc). That category plays no role here.

The entanglement category includes cases describing "state compulsion" of a private person's conduct, and cases where a "nexus" is found between private conduct and the state, such that it "is entwined with governmental policies or when government is entwined in [its] management or control." *Chapman*, 319 F.3d at 834 (quoting *Brentwood Acad.*, 531 U.S. at 295). Private parties are deemed to be state actors when the state has affirmatively authorized, encouraged, or facilitated the private unconstitutional conduct, or otherwise permitted a private actor to "exercise[] power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (finding private physician under contract with state to provide medical services to prison inmates was a state actor) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). In fact "'[i]t is well settled that private parties that perform fundamentally public functions, or who jointly participate with a state to engage in concerted activity, are regarded as acting "under the color of state law" for the purposes of § 1983.'" *United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 478 (6th Cir. 2014) (quoting *Bartell v. Lohiser*, 215 F.3d 550, 556 (6th Cir. 2000)).

The amended complaint alleges facts that support a finding of state action as to each of the corporate defendants.

### a. CSG Government Solutions

The amended complaint alleges that CSG ran and administered the Project Control Office, charged with responsibility for all aspects of the State's integrated system rewrite. The plaintiffs also allege CSG continues to provide full-time, on-site management to oversee MiDAS production, support, and several initiatives, including collections, recoupments, and intercepts as well as appeals improvements. They believe CSG received significant encouragement from the State when it implemented, configured, administered and maintained the defective and unconstitutional fraud detection system. CSG argues that entering into a contract with the State does not mean it became a state actor or was acting under color of law. As far as that argument goes, it is correct. *Rendell–Baker v. Kohn*, 457 U.S. 830, 840 (1982) (holding that a private corporation whose business depends primarily on public contracts with the state does not become a state actor *solely* because of its "significant or even total engagement in performing public contracts").

The plaintiffs have alleged more than that, however. *First*, there is no question that the administration of unemployment benefits is a power traditionally exclusively reserved to the State. *Second*, CSG's contract suggests the State authorized CSG's allegedly unconstitutional conduct. The plaintiffs cite terms of CSG's contract to describe the managerial authority delegated to it by the State. Among the deliverables outlined in the contract, CSG's Project Management Office was required to "support the State — and the State's application development and implementation vendor — in meeting the timely delivery of quality information technology services for all stakeholders of the UI System Modernization project." It was also understood that the System Integration Project

team would be comprised of both CSG's Project Management Office and the State of Michigan DIT and UIA staff. "[CSG] is responsible for utilizing and mentoring these State staff." These terms support the plaintiffs' allegations that CSG, acting in concert with the State, was "entwined" with the UIA in administering and maintaining the robo-fraud-adjudication system that deprived the plaintiffs of their constitutional rights.

The plaintiffs adequately have pleaded state action with respect to CSG.

b. SAS Institute

The amended complaint alleges that SAS designed, created, implemented, maintained, configured and controlled the EDFS used to make unemployment insurance fraud determinations. It also alleges that SAS received significant encouragement from the State when it designed, implemented, and maintained the defective and unconstitutional fraud detection systems. SAS insists, however, that it was merely an independent contractor that provided software to the State.

But SAS's contract also provides additional facts that support the plaintiffs' allegation that SAS maintained the system used to make fraud determinations, and justify the inference that SAS's actions are fairly attributable to the State. *First*, the plaintiffs have alleged SAS implemented and maintained the system that aided in the administration of unemployment benefits. *Second*, SAS's contract suggests it was "entwined" with the State and played a non-negligible role in the automated system. The contract requires SAS to schedule, coordinate, and perform all system testing activities to validate that the product will operate in its intended environment, satisfies all user requirements, and is supported with complete and accurate operating documentation. "The State will provide assistance and input to assist [SAS] with the development of appropriate test data." But SAS was responsible for correcting defects discovered during testing and collaborating with the State to

improve the system. With respect to system maintenance, the agreement states SAS is responsible, among other obligations, for providing EDFS performance tuning and defect repair. Moreover, SAS was to carry out this project under the direction and control of DTMB and UIA Project Managers. These terms support the plaintiffs' allegations in the complaint and suggest SAS acted "under color of law."

### 2. Personal Involvement

The object of "[p]ersonal-capacity suits" is "to impose personal liability upon a [state actor] for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). To support such a claim, the plaintiffs "must plead that each [state actor] defendant, through the [person]'s own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, [556 U.S. 662, 676 (2009). The individual defendants (including UIA employees) all contend that the amended complaint falls short of that mark. As to the individual employees of SAS, FAST, and CSG, the Court agrees. Not so with the individual UIA employees, however.

### a. SAS, FAST, and CSG individual defendants

The amended complaint initially identifies the individually-named SAS, FAST, and CSG employees as agents of their companies and describes their respective positions in paragraphs 12, 13, and 15. What follows, though are merely collective references to them in Counts 7-13 — the 1983 claims — without any distinction as to what acts are attributable to whom. Paragraphs 12 and 13 of the complaint include a generic recitation that the SAS and FAST defendants "designed, created, implemented, maintained, configured and/or controlled" their respective software programs, and that general description is followed by a brief reference to one or more agents and their job titles. Paragraph 14 states that CSG continues to provide full-time, on-site management to oversee MiDAS

production, support, and additional initiatives, and similarly lists job titles of six CSG employees. And paragraph 20 clarifies that all subsequent references to "Defendants" means "all Defendants unless otherwise indicated."

Significantly, nowhere else in the complaint do the plaintiffs allege personal involvement of any of the SAS, FAST, and CSG employees or attempt to distinguish their conduct in any way with respect to the constitutional claims. Count 7 makes specific references to the State defendants, but ultimately alleges that "Defendants' actions and omissions constitute a deprivation of property without due process guaranteed by the Fourteenth Amendment's Due Process Clause." ¶ 152. Count 8 similarly makes categorical reference to "Defendants' actions and omissions" in alleging an equal protection violation. ¶ 157. Count 9, like Count 7, cites specific conduct by some of the State defendants, but ultimately categorically alleges "Defendants' conduct was arbitrary and capricious and shocking to the conscience" to support a substantive due process claim. ¶¶ 175, 178. In fact, it is not clear whether the plaintiffs, in making references to certain State defendants' conduct in Count 9, intended "Defendants" to mean only those State defendants. Moreover, Count 11 (as renumbered) collectively refers to "Defendants" in alleging an unreasonable seizure under the Fourth Amendment, without alleging facts specific to any individual defendant. ¶ 192. Count 12 states "at least one of these Defendants participated in the seizure of the tax refunds" in violation of 26 U.S.C. § 6402(f)'s due process requirements. ¶ 196. Finally, Count 13 — assuming it is brought under § 1983 — states there was an agreement between "Defendants" and "each Defendant, individually or through its agents" entered into a conspiracy to eliminate procedural guarantees. ¶¶ 199.

Collective references to the defendants by themselves does not satisfy *Iqbal*'s individualized pleading requirement. *Marcillis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012). For the SAS, FAST, and CSG employees, that is all there is.

The plaintiffs point out that personal involvement can be established in many ways, including by alleging defendants abandoned the duties of their positions. They rely on *Taylor v. Michigan Dep't of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995), where the court rejected a defendant's summary judgment challenge because of a triable question of fact on whether a prison supervisor properly discharged his duties. That case is no help to them, however, because there was evidence in that record that the supervisor failed to "adopt[] and implement[] an operating procedure that would require a review of the inmate's files before authorizing the transfers in the face of actual knowledge of a breakdown in the proper workings of the department." *Ibid.* Here at the pleading stage, no such analogous individualized facts are alleged.

The Court will grant the motions to dismiss the federal claims against the individually named SAS, FAST, and CSG employees.

### b. State defendants

The amended complaint does a better job of alleging constitutional violations against some of the State defendants. The State defendants argue that the plaintiffs fail to specify what each State defendant did or said and to whom, when the alleged action occurred, or how the alleged conduct supports any of the constitutional violations. The Court does not agree.

The complaint names seven State defendants — although the section introducing the "Defendants" only provides descriptions of four of them — and includes slightly more detail about their involvement in the fraud adjudication system:

16. Defendant Geskey was at all material times a high ranking supervisor at the Agency. He set policy and continued to direct subordinates to pursue the invalid and false fraud claims against claimants despite the knowledge that the fraud claims were invalid and false. He is sued in his individual capacity.

17. Defendant Blundell was at all material times the head of the Fraud Unit within the Agency. She continued to direct subordinates to pursue the invalid and false fraud claims against claimants despite the knowledge that the fraud claims were invalid and false. She is sued in her individual capacity.

18. Defendant Mitchell was at all material times head of the Friend of the Court and Bankruptcy Unit within the Agency. She continued to direct subordinates to oppose discharge of claimants' debt in bankruptcy proceedings that was based on the invalid and false fraud claim despite the knowledge that the fraud claims were invalid and false. She is sued in her individual capacity.

19. Defendant Clayton Tierney was at all material times the UIA project manager for the integrated system rewrite. He is sued in his individual capacity.

There are other allegations in the amended complaint that identify the individual State defendants and actions they took, exception for defendant Tierney:

140. Further, the **state Defendants** instructed rank and file Agency employees to inform claimants that they could not appeal the fraud determinations and penalty assessments after 30 days, even if the claimants did not receive notice and thus had the right to appeal.

147. When certain ALJs expressed concerns over the Agency's practices and began criticizing the Agency after witnessing the extremely high rate of invalid fraud determinations that were being appealed, often unsuccessfully because of missed deadlines, some of the ALJs were removed from hearing fraud cases by **Defendant McMurtry** in conjunction with other state officials.

162. On information and belief, **Defendant Steve Geskey**, a policy-making supervisor at the Agency, ordered deputy state attorneys general as well as other subordinates to continue to conduct business as usual, to continue to allow MiDAS to make the invalid determinations, to continue to contest claimants' protests and appeals and continue with collection activities.

163. On information and belief, **Defendant Mitchell**, at relevant times the head of the Friend of the Court and Bankruptcy Unit at the agency, instructed various deputy attorneys general to continue to oppose claimants' attempts to discharge the fraud-based debt in bankruptcy proceedings by filing adversary proceedings, even when it was obvious that the underlying judgement, which often included five times the amount of unemployment insurance paid (or even claimed), plus interest, was based on an invalid fraud determination.

164. On information and belief, **Defendant Blundell**, at relevant times the head of the Fraud Unit at the Agency, continued to instruct her subordinates, including the claims examiners, to pursue the invalid fraud charges.

167. On information and belief, **Defendant Singleton** was at relevant times the head of the Benefit Overpayment Collection Unit at the Agency.

168. Despite knowing of the over 93% margin of error rate for fraud determinations, **she** continued to direct subordinates to pursue aggressive collection activities which included tax refund intercepts and wage garnishments.

169. Defendant **Moffet-Massey** was the head of the Agency at relevant times.

170. Despite her knowledge of the severe problems in the fraud determination procedures and the outrageous collection actions against innocent citizens of the State, **she** continued to pursue the same defective and unconstitutional policies.

171. **These Defendants** had actual knowledge of a breakdown in the proper workings of their departments but did nothing to remedy it.

172. **These Defendants** abandoned the duties of their positions and encouraged the misconduct.

173. **These Defendants** implicitly authorized, approved and knowingly acquiesced in the unconstitutional conduct of individuals under their control.

The complaint alleges adequate facts against defendants Geskey, Blundell, Mitchell, Singleton, McMurtry, and Moffet-Massey which demonstrate personal involvement. These defendants' participation in the alleged constitutional violations can be inferred from the conduct

detailed in the quoted paragraphs. That is not the case for defendant Tierney, however. The amended complaint merely names him in the caption, and alleges no specifics other than his role as the UIA's project manager in paragraph 19. That is not sufficient to state a section 1983 claim against him. *Potter v. Clark*, 497 F.2d 1206, 1207 (7th Cir. 1974) (holding that "[w]here a complaint alleges no specific act or conduct on the part of the defendant and the complaint is silent as to the defendant except for his name appearing in the caption, the complaint is properly dismissed . . . .").

### 3. Procedural Due Process

Each of the defendants assert, in so many words, that the procedural due process claim in Count 7 fails because the plaintiffs have not exhausted available administrative remedies (mostly made available to them under the *Zynda* settlement agreement), and they are not entitled to the procedures they claim were denied them.

A procedural due process violation is pleaded adequately if the plaintiff plausibly alleges that (1) he has a life, liberty, or property interest protected by the Constitution; (2) he was deprived of that interest by a state actor; and (3) he was not afforded timely and adequate process under law. *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009).

Several courts have recognized that the due process clause applies to termination of unemployment compensation benefits "because they are statutorily created property interests." *See Drumright v. Padzieski*, 436 F. Supp. 310, 319 (E.D. Mich. 1977). And the amended complaint alleges the plaintiffs have a property interest in their unemployment benefits, income tax refunds, and the money they possess generated from sources other than unemployment benefits.

The plaintiffs also have stated clearly that the defendants have taken that property away from them through the automated system that labeled them fraudsters, and then assessed and collected

fines and penalties, all without notice and an opportunity to be heard. As noted above, the allegations are sufficient to support the contention that the private defendants were state actors when they designed, maintained, operated, or implemented the robo-fraud-detection and adjudication system.

The amended complaint alleges in sufficient detail the several procedures guaranteed by state and federal law that the plaintiffs were denied when their unemployment benefits were terminated and penalties were assessed. Those allegations touch the fundaments of procedural due process where the state seeks to terminate benefits. "'The fundamental requisite of due process of law is the opportunity to be heard.'" *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970); *Grannis v. Ordean*, 234 U.S. 385, 394 (1914). "The hearing must be 'at a meaningful time and in a meaningful manner.'" *Ibid.* (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The "recipient [must] have timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." *Id.* at 267-68.

Those basics are replicated in the applicable federal statutes. Like other state agencies that administer unemployment benefits, the UIA receives federal funds through the Department of Labor in support of its program. These federal grants are conditioned on Michigan's provision of minimum due process requirements to its beneficiaries, including the "[o]pportunity for a fair hearing, before an impartial tribunal, for all individuals whose claims for unemployment compensation are denied." 42 U.S.C. § 503(a)(3).

Federal law also governs how the UIA may recover overpayments made to beneficiaries. In pursuing a fraudulent claim, the UIA is permitted under 42 U.S.C. § 503(g)(1) to account for

overpayment in future benefit disbursements, once again, though, subject to notice and opportunity to be heard requirements. The UIA is also permitted under 26 U.S.C. § 6402(f)(3) to intercept federal income tax refunds as a means of recovering overpayments and penalties, also subject to certain notice and hearing requirements. Section 6402(f)(3) requires states to:

a. Notify the person owing the covered unemployment compensation debt that the State proposes to take action pursuant to this section;

b. Provide such person at least 60 days to present evidence that all or part of such liability is not legally enforceable or is not a covered unemployment compensation debt;

c. Consider any evidence presented by such person and determine that an amount of such debt is legally enforceable and is covered unemployment compensation debt; and

d. Satisfy such other conditions as the Secretary may prescribe to ensure that the determination made under subparagraph (c) is valid and that the State has made reasonable efforts to obtain payment of such covered unemployment compensation debt.

*Ibid.* These statutory requirements apply to three types of unemployment compensation debt, including overpayment induced by fraud and the resulting penalties and interest assessed, 26 U.S.C. § 6402(f)(4)(A),(C), and must be afforded to all claimants, regardless of the State's ultimate resolution of the claim.

The plaintiffs have alleged that they were denied these basic procedural guarantees before their unemployment benefits were terminated and penalties were assessed.

The defendants concede that the plaintiffs possess a property interest in their unemployment benefits, and only the State defendants cursorily challenge the plaintiffs' rights to pre-deprivation hearings, which is irrelevant at this stage of the proceedings. Instead, all four sets of defendants rest their argument on the plaintiffs' failure to exhaust administrative remedies. But plaintiffs alleging

a procedural due process violation are not required to exhaust state remedies. *Jefferson v. Jefferson County Public School System*, 360 F.3d 583, 588 (6th Cir. 2004). They are only required to demonstrate why state procedures are inadequate. *Id.* at 587 (noting that a "[p]laintiff may not seek relief under Section 1983 without first pleading and proving the inadequacy of state or administrative processes and remedies to redress her due process violations") (citing *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986)); *see also Marino v. Ameruso*, 837 F.2d 45, 47 (2d Cir. 1988) ("Although one need not exhaust state remedies before bringing a Section 1983 action claiming a violation of procedural due process, one must nevertheless prove as an element of that claim that state procedural remedies are inadequate.").

The complaint alleges that the automated system afforded no pre-deprivation process to the plaintiffs even though it was required by state law, and post-deprivation remedies were inadequate because the decision-making process lacks transparency and access to records to determine the basis for the determination. The complaint also indicates the appeals process was fraught with impropriety.

The amended complaint adequately pleads a federal claim based on a denial of procedural rights under the Fourteenth Amendment.

### 4. Substantive Due Process

The substantive due process count cannot withstand the defendants' challenges to it.

The right to substantive due process prohibits the government from infringing on "fundamental rights" without sufficient justification. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). "To state a cognizable substantive due process claim, the plaintiff must allege 'conduct intended to injure in some way unjustifiable by any government interest' and that is

'conscience-shocking' in nature." *Mitchell v. McNeil*, 487 F.3d 374, 377 (6th Cir. 2007) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). "What seems to be required is an intentional infliction of injury . . . or some other governmental action that is 'arbitrary in the constitutional sense.'" *Stemler v. City of Florence*, 126 F.3d 856, 869 (6th Cir. 1997) (quoting *Lewellen v. Metro. Gov't of Nashville & Davidson County*, 34 F.3d 345, 351 (6th Cir. 1994)).

However, substantive due process protects only against state action that is not otherwise proscribed by the plain text of other constitutional amendments. *See Ciminillo v. Streicher*, 434 F.3d 461, 465 (6th Cir. 2006) (reasoning that "[a]lleged conduct that does not implicate a constitutional right protected by another amendment will be analyzed under the substantive due process component of the Fourteenth Amendment"). Where a plaintiff has recourse to an "explicit textual source of constitutional protection," *Graham v. Connor*, 490 U.S. 386, 395 (1989), a more general claim of substantive due process is not available. *See Lewis*, 523 U.S. at 842.

The Sixth Circuit has noted there is no fundamental right to state-created benefits, including unemployment compensation. *Valot v. Southeast Local School Dist. Bd. of Educ.*, 107 F.3d 1220, 1233 (6th Cir. 1997) (Ryan, J., concurring) ("[S]tate-created employment benefits, such as unemployment compensation or the right to a government pension, are not 'fundamental' rights created by the Constitution, and therefore they do not enjoy substantive due process protection."). The court in *Valot* also explained that it is the "*procedural* component of the Due Process Clause, rather than the substantive component, which provides protection from arbitrary government actions." *Ibid.* (citing *Howard v. Grinage*, 82 F.3d 1343, 1349-50 (6th Cir. 1996)). "Substantive due process refers to government actions that cannot be undertaken regardless of the procedures used." *Ibid.* (citations omitted).

The plaintiffs attempt to clarify in their response briefs that their substantive due process claim is based on something more than denial of unemployment benefits. They say the defendants engaged in egregious conduct when they persisted in using MiDAS even after realizing its deficiencies and assessed hefty penalties on claimants. And that conduct, they say, was "arbitrary and capricious," and it "shocked the conscience." But at its core, the claim is focused on the loss of benefits, and the assessment of related penalties. And as noted, there is no fundamental right to unemployment benefits. *Valot*, 107 F.3d at 1233.

The plaintiffs have not distinguished this claim from a procedural due process violation. Like the plaintiffs in *Valot*, "their claim has to be that some arbitrary conduct in this case deprived them of 'procedural' due process." 107 F.3d at 1233. "[T]he nonarbitrary "process" guaranteed by the Due Process Clause is process suitable to vindicate the denial of an identifiable life, liberty, or property interest." *Ibid.* The substantive due process claim in Count 9 will be dismissed.

### 5. Equal Protection

The defendants contend that the equal protection claim in Count 8 must be dismissed because the plaintiffs have not alleged any unequal treatment. However, the plaintiffs have alleged that they were subject to disparate treatment as compared to other similarly situated claimants because of the "robo-adjudications." They have alleged a plausible claim for an equal protection violation.

The essence of such a claim is an allegation that a state actor treated the plaintiff differently than others who were similarly situated without proper justification. *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) The disparate treatment may be unlawful because it "'either burdens a fundamental right, targets a suspect class, or has no rational basis.'"

*Ibid.* (citing *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 299 (6th Cir. 2006).

If, as here, no fundamental right or suspect class is implicated, the plaintiff "bear[s] the burden of establishing that the [state's] policy 'is not rationally related to any legitimate public interest.'" *In re City of Detroit, Mich.*, 841 F.3d 684, 701 (6th Cir. 2016) (quoting *Ondo v. City of Cleveland*, 795 F.3d 597, 608 (6th Cir. 2015)). As the Sixth Circuit has observed, however, this is not an easy task. *Ibid.* The State's classifications enjoy a presumption of constitutionality. *Heller v. Doe*, 509 U.S. 312, 320 (1993). It is up to the plaintiff to establish that there is no "rational relationship between the disparity of treatment and some legitimate government purpose." *Ibid.* Therefore, "'[t]o survive a motion to dismiss' in the rational basis context, 'a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications.'" *In re City of Detroit, Mich.*, 841 F.3d at 701 (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992)).

The amended complaint states that the plaintiffs are claimants who were affected by the defendants' practices. They suggest that other similarly situated lawful claimants were not affected. These plaintiffs were subject to a process that flagged them as potentially fraudulent claimants, where there was no subsequent confirmation that the classification was warranted. The plaintiffs also allege that the practices were arbitrary and not rationally related to administering benefits for the welfare of the State's citizens. The amended complaint indicates that all claimants whose accounts were flagged by a defective computerized system were subject to an automated fraud determination that lacked any human oversight. The plaintiffs describe in sufficient detail how these fraud determinations were made without any factual basis or legitimate investigation by the UIA.

There is no conceivable rational basis for terminating benefits based on a defective system and continuing to do so even after discovering the defect. In alleging a complete failure by the UIA to evaluate and correct deficiencies in its system, the plaintiffs have satisfied their burden of showing the State lacked a rational basis for its actions.

The State defendants additionally argue that the plaintiffs have failed to show intentional discrimination required for a plausible equal protection claim. However, it can be inferred from the amended complaint that the defendants purposefully designed and implemented the software and other practices that accompanied the automated system to execute the fraud detection process. Moreover, they continued to use the automated system even after problems were identified. Therefore, the amended complaint alleges sufficient facts to show disparate treatment of similarly situated persons that is intentional and arbitrary, devoid of any rational basis.

### 6. Fourth Amendment Violation

The plaintiffs allege in Count 11 that the diversion of their income tax refunds, wages, and unemployment benefits in which they had a possessory interest constituted an unlawful seizure under the Fourth Amendment. The defendants argue that this claim lacks factual support.

The Fourth Amendment states that "the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated,'" and its protection applies in the civil context. *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 61-67 (1992). "Property is seized 'when there is some meaningful interference with an individual's possessory interests in that property." *Hensley v. Gassman*, 693 F.3d 681, 688 (6th Cir. 2012) (quoting *Soldal*, 506 U.S. at 61). "A constitutional violation occurs only where the seizure is objectively

unreasonable . . ., a determination that entails a 'careful balancing of governmental and private interests.'" *Ibid.* (quoting *Soldal*, 506 U.S. at 71).

In *Zynda v. Arwood*, the Court explained that government seizures of property to satisfy a fine or a debt could offend both the Due Process Clause and the Fourth Amendment's reasonableness requirement. 175 F. Supp. 3d at 811-12 (citing *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 352 n.18 (1977)). And the Court held that "[b]ecause the Fourth Amendment does govern the seizure of property in satisfaction of a debt owed to the government, dismissal of these claims, at this stage of litigation, would not be appropriate." 175 F. Supp. 3d at 812.

Here, the plaintiffs plausibly have alleged a Fourth Amendment claim. They allege that the defendants together designed, implemented, and maintained an automated system that caused a meaningful interference with plaintiffs' possessory interests in their tax refunds, wages, and unemployment benefits, which was unreasonable under the Fourth Amendment. SAS Institute, FAST Enterprises, and CSG Government Solutions argue the amended complaint fails to plead facts that demonstrate that these entities participated in the seizure of any property. However, by alleging several times that the defendants were involved in implementing and maintaining the defective system that authorized the termination of benefits, assessment of penalties, interception of tax refunds — all without human intervention — the plaintiffs have pleaded facts that suggest the defendants participated in an unreasonable seizure of property under color of law. Additionally, the amended complaint also alleges specific conduct the State defendants engaged in that ultimately led to the UIA designating the plaintiffs' claims as fraudulent and demanding payment from these individuals. At this stage of the proceedings, it would be inappropriate to dismiss this claim.

7. 26 U.S.C. § 6402

In Count 12, the plaintiffs allege that the defendants violated the procedural guarantees set out in 26 U.S.C. § 6402(f)(3), which governs the diversion of tax refunds to satisfy a debt to a state unemployment compensation system. The defendants argue that the Court has no "jurisdiction" over a claim under that statute, and even if it did, the only entity that would be subject to the statute would be the one that effected the seizure: non-party UIA.

Section 6402(f) of the Internal Revenue Code governs the practice of a State seizing income tax refunds to satisfy unemployment compensation debts. The provision requires the Treasury Secretary, upon receiving notice from a State, to offset covered unemployment compensation debt by reducing any overpayments payable to the debtor. 26 U.S.C. § 6402(f)(1). Covered unemployment compensation debt includes "past-due debt for erroneous payment of unemployment compensation due to fraud or the person's failure to report earnings which has become final under the law of a State" and "any penalties and interest assessed on such debt." 26 U.S.C. § 6402(f)(4)(A), (C). Additionally, section 6402(f)(3) requires States to notify debtors that the State intends to take action, give debtors 60 days to present evidence, and consider any evidence presented before taking action.

Section 6402(g) also limits judicial review of certain aspects of the diversion procedures. For instance, no federal court "shall have jurisdiction to hear any action, whether legal or equitable, brought to restrain or review a reduction authorized by [this statute]." 26 U.S.C. § 6402(g). However, that bar "does not preclude any legal, equitable, or administrative action against the Federal agency or State to which the amount of such reduction was paid or any such action against the Commissioner of Social Security which is otherwise available with respect to recoveries of overpayments of benefits under section 204 of the Social Security Act." *Ibid.*

That means that although Congress expressly limited federal court jurisdiction over challenges to offsets, it "reserve[d] plaintiff's ability to sue agency-claimants directly." *Dasisa v. Dep't of Treasury*, 951 F. Supp. 2d 45, 46 (D.D.C. 2013). To pursue a such a claim, "the plaintiff must sue the agency claiming his debt and not the debt collector." *Ibid*. At least one court had suggested that this provision permits an action against the recipient state agency in state court. *See Hicks v. United States*, 130 Fed. Cl. 222, 231 (2017) (noting that "nothing in 26 U.S.C. § 6402 prevents [the plaintiff] from filing suit in California state court against the state of California in order to recover the amounts that have been deducted from his refunds.").

Here, the pertinent question is whether section 6402 furnishes a basis for a private right of action that can be enforced through 42 U.S.C. § 1983. That statute does not itself create federal rights, but only provides judicial relief for the violation of rights arising under the Constitution or laws of the United States. *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). The key that determines whether legislation can be enforced privately is "whether or not Congress intended to confer individual rights upon a class of beneficiaries." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002).

In *Gonzaga University*, the Supreme Court acknowledged that confusion may have resulted from the conflation of its cases dealing with whether a statute created an implied private right of action, and those cases determining whether there were private rights enforceable under section 1983 itself. The Court held, however, that "in either case we must first determine whether Congress intended to create a federal right." *Id.* at 283 (emphasis omitted). "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefitted.'" *Id.* at 284 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 692 n.13 (1979)). The statute unambiguously must confer

"rights," not merely "benefits." *Id.* at 283. "[I]f Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms." *Id.* at 290. "[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Id.* at 286.

The Sixth Circuit articulated a three-factor test for answering the question in *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006):

> First, Congress must have intended that the provision in question benefit the plaintiff. In answering this initial inquiry, courts look for a statutory right or individual entitlement, that is unambiguously conferred, by the use of rights-creating language. An aggregate focus unconcerned with whether the needs of any particular person have been satisfied is insufficient; the statute must be phrased in terms of the persons benefitted, and use individually focused terminology. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

442 F.3d at 461 (quotation marks and citations omitted). If a plaintiff can make these three showings, "a rebuttable presumption [arises] that the right is enforceable under § 1983," *ibid.* (quoting *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005)), which the defendant can defeat by showing that the statute's comprehensive enforcement scheme is incompatible with individual enforcement.

Nothing in section 6402 generally, or subsections (f) or (g) particularly, confers a right upon a taxpayer to sue for the wrongful diversion of his or her tax refund. Subsection (g) explicitly forbids federal court review of the propriety of the diversion. At the same time, however, the statute makes clear that Congress did not intend to immunize the demanding State or its minions from suits by

taxpayers to recover wrongfully-seized refunds. To be sure, subsection (f) prescribes notice and hearing obligations on the State, which can be said to establish minimum due process requirements the State must afford the taxpayer before it can resort to diversion of tax refunds. Those obligations plainly are binding on the State. Looking only at subsection (f), one might infer that furnishing those procedural protections approaches "rights-creating language." But that inference is negated by subsection (g)'s divestment of the power to review the diversion. The State can be sued for wrongfully seizing a taxpayer's refund, but authority for that suit will be not found in section 6402; the taxpayer must look elsewhere for his legal theory, as the plaintiffs successfully have done in their amended complaint.

Section 6402 does not prevent a "legal, equitable, or administrative action against the . . . State" for wrongful diversion income tax refunds. But it does not create a stand-alone cause of action. Therefore, Count 12 of the amended complaint will be dismissed.

### 8. Qualified Immunity

### a. Contractor Immunity

The UIA-employee defendants and CSG assert that they are entitled to qualified immunity from the plaintiffs' federal claims. The UIA defendants, as employees of the State, are entitled to assert that defense. CSG, as a private contractor, may not necessarily do so, even though it was acting under color of state law. *See Richardson v. McKnight*, 521 U.S. 399, 404-12 (1997) (guards employed by a private prison corporation may not assert qualified immunity); *McCullum v. Tepe*, 693 F.3d 696, 702-04 (6th Cir. 2012) (a prison psychiatrist employed by a non-profit entity may not assert qualified immunity); *Harrison v. Ash*, 539 F.3d 510, 521-25 (6th Cir. 2008) (prison nurses employed by a private medical provider may not assert qualified immunity); *Cooper v. Parrish*, 203

F.3d 937, 952-53 (6th Cir. 2000) (private attorney working alongside a prosecutor may not assert qualified immunity).

A "fact-intensive analysis" is required, *United Pet Supply*, 768 F.3d at 479, in which the Court must answer two questions: "(1) [whether] there was a firmly rooted history of immunity for similarly situated parties at common law; and (2) whether granting immunity would be consistent with the history and purpose of § 1983," *McCullum*, 693 F.3d at 700. CSG has not attempted to answer either of these questions or to develop the argument at any length. The case law suggests a negative answer to both questions.

The Sixth Circuit has extended qualified immunity to employees of private contractors in only a few instances. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 442 F.3d 410, 438-40 (6th Cir. 2006), *rev'd on other grounds*, 551 U.S. 291 (2007), (executive director of a private high school athletics association may assert qualified immunity); *Cullinan v. Abramson*, 128 F.3d 301, 310-11 (6th Cir. 1997) (private attorneys serving as outside counsel to a city may assert qualified immunity); *Bartell v. Lohiser*, 215 F.3d 550, 556-57 (6th Cir. 2000) (employees of a private foster-care agency may assert qualified immunity). In *Brentwood*, the court gave little consideration to the first inquiry, explaining that "[t]he notion that there would be such a 'firmly rooted' history . . . is unreasonable in the first place, considering that athletic associations like the TSSAA have only recently grown in importance and stature, and litigation involving such associations has been relatively rare." *Id.* at 439. In addressing the second inquiry, the court noted that the purposes of qualified immunity were not already served by "marketplace pressures" because the TSSAA "does not have to compete with other firms for the job it does on behalf of the state." *Ibid.*

-38-

CSG has not pointed to any cases supporting "firmly rooted history" of conferring qualified immunity upon private government contractors, who compete in the marketplace for outsourced business. Because "private actors are not automatically immune," *Richardson*, 521 U.S. at 412, it is the defendant that bears the initial burden of establishing eligibility to assert the defense, *Forrester v. White*, 484 U.S. 219, 224 (1988) ("Officials who seek exemption from personal liability have the burden of showing that such an exemption is justified.").

That does not end the inquiry. *United Pet Supply*, 768 F.3d at 480 (observing that "the absence of a '"firmly rooted" history' of immunity does not preclude eligibility for qualified immunity").

An answer to the second question "hinges on three of § 1983's goals: (1) protecting the public from unwarranted timidity on the part of public officials; (2) ensur[ing] that talented candidates were not deterred by the threat of damages suits from entering public service; . . . and (3) guarding against the distraction from job duties that lawsuits inevitably create." *McCullum*, 693 F.3d at 704 (internal quotation marks and citations omitted). These factors do not favor CSG here, mainly because there was no evidence that its services are irreplaceable, and it is "subject to the sort of market pressures that obviate unwarranted timidity in the absence of qualified immunity." *United Pet Supply*, 768 F.3d at 482. Moreover, CSG appears to have bargained on equal footing with the UIA, and was free to allocate liability, seek contractual indemnity, and insure over any risk.

CSG is not entitled to assert a qualified immunity defense.

b. UIA Defendants

The UIA employee-defendants insist that the defense compels dismissal of the amended complaint against them at this early stage of the case. The Court disagrees.

The doctrine of qualified immunity insulates state actors from liability in close-call situations. *See Saucier v. Katz*, 533 U.S. 194, 206 (2001) (explaining that the defense is intended to protect state actors who must operate along the "hazy border" that divides acceptable from unreasonable conduct). But that affirmative defense protects government actors performing discretionary functions from liability for civil damages only when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of the defense is to strike a balance that "accommodates the tension between permitting litigants to recover damages, which is often the only realistic avenue for vindication of constitutional guarantees, and the social costs of such suits, including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quotation marks and citation omitted).

Once the qualified immunity defense is raised, "the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established." *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)). The plaintiff must clear both hurdles, but the Court may take up the questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (abrogating in part *Saucier*, 533 U.S. at 201). The qualified immunity defense may be raised at any stage of the case. At the motion to dismiss stage, the Court accepts all of the plaintiff's well-pleaded allegations as true. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

A state official is entitled to qualified immunity if "a reasonable officer could have believed" that his or her actions were lawful "in light of clearly established law and the information the

[officer] possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "[A] 'reasonable' belief could also be a mistaken belief, and the fact that it turned out to be mistaken does not undermine its reasonableness as considered at the time of the acts." *Davenport v. Causey*, 521 F.3d 544, 552 (6th Cir. 2008) (citing *Saucier*, 533 U.S. at 205). In other words, "[q]ualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).

The UIA employees argue that the plaintiffs have not alleged facts that show that their constitutional rights were violated. For the reasons stated earlier, that argument does not persuade. The plaintiffs have stated viable claims for deprivation of their rights to procedural due process, equal protection, and freedom from unreasonable seizures.

When assessing the clarity with which the constitutional right was established at the time of the officers' conduct, courts must guard against defining the right too broadly. *Saucier*, 533 U.S. at 201 (emphasizing that "[t]his inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition"). On the other hand, there need not be "a case directly on point, [as long as] existing precedent [has] placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). When there is no case directly on point, the court must find that definitional sweet spot, since "it defeats the qualified-immunity analysis to define the right too broadly . . . [and] it defeats the purpose of § 1983 to define the right too narrowly." *Kent v. Oakland City*, 810 F.3d 384, 396 (6th Cir. 2016).

"Each defendant's liability must be assessed individually based on his [or her] own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). According to the amended complaint, Julie McMurtry upset established appeal procedures by removing some of the ALJs from hearing fraud

cases, after some of them raised concerns over the high rate of invalid fraud determinations that were left uncorrected because of missed deadlines. Steve Geskey, a policy-making supervisor, learned of the flaws in the MiDAS system, but ordered deputy state attorneys general and other agency subordinates to continue processing faulty claims and to contest claimants' protests and appeals. He was unrelenting in collection activities.

The plaintiffs allege that Doris Mitchell, who was in charge of the UIA's Friend of the Court and Bankruptcy Unit, compromised the plaintiffs' due process rights by undermining their attempts to discharge MiDAS-generated debts. She did that by commencing bankruptcy adversary proceedings based on known invalid fraud determinations. The plaintiffs allege that Shemin Blundell, as head of the fraud unit, instructed her subordinates, including the claims examiners, to pursue the invalid fraud charges. Similarly, they allege that Debra Singleton, in her role as head of the Benefit Overpayment Collection Unit at the Agency, directed her subordinates to pursue aggressive collection activities (which included tax refund intercepts and wage garnishments), even when she learned that the error rate for robo-fraud determination exceeded 90%. And Sharon Moffet-Massey ran the UIA, knew of the flawed MiDAS-based fraud determinations, and nonetheless continued to push the rights-depriving agency practices.

Despite these allegations, the UIA defendants insist that no pleaded facts show that they were aware that their conduct would violate a clearly established right stemming from the improper handling of alleged erroneous fraud determinations, or that such conduct could be unconstitutional. But it has been settled law for years that unemployment benefits are a property interest protected by the Due Process Clause, and that terminating such benefits without pre- or post-termination procedure is unlawful. "[D]ue process requires that a claimant whose unemployment compensation

benefits are terminated receive an opportunity to be heard." *Taylor v. Steinbacher*, No. C83-419, 1989 WL 281904 at *5 (N.D. Ohio May 22, 1989). In *Goldberg v. Kelly*, 397 U.S. 254 (1970), where plaintiffs challenged the adequacy of procedures for notice and hearing before termination of welfare benefits, the Supreme Court declared that "the hearing must be 'at a meaningful time and in a meaningful manner.'" *Id.* at 267 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The core principles of due process — its essence — is notice and an opportunity to be heard *before* a deprivation occurs. As the Court explained, "these principles require that a recipient have timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." *Id.* at 267-68. And the Court's words in *Goldberg* echo the importance of those rights here: "These rights are important in cases such as those before us, where recipients have challenged proposed terminations as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases." *Id.* at 268.

The demands of the Due Process Clause should have been plain to each of these defendants, from the simple exercise of measuring their applied robo-adjudication system (as the amended complaint describes it) against the mandate of 42 U.S.C. § 503(g). A State's recovery of any overpayment made to an individual under an unemployment benefit program "shall be made only in accordance with the same procedures relating to notice and opportunity for a hearing as apply to the recovery of overpayments of regular unemployment compensation paid by such State." *Ibid.* It follows, then, that if a claimant is not afforded *any* notice or opportunity to be heard, a clearly established right has been violated.

The plaintiffs have alleged that they were not provided with adequate notice, a factual basis for their fraud determinations, or an opportunity to be heard before an ALJ prior to termination of their benefits. They allege they were informed of the determination when it was too late, and that their efforts to present their cases were ignored. The amended complaint also alleges these State defendants had actual knowledge of a breakdown in the proper workings of their departments but did nothing to remedy it. The continued deployment of the defective "robo-adjudication" system deprived claimants of nearly all process they were entitled to under state and federal law.

The plaintiffs have pleaded around the qualified immunity defense at this stage of the case.

## C. Jurisdiction

### 1. Subject-matter Jurisdiction

The State defendants challenge subject-matter jurisdiction, arguing that the plaintiffs do not have standing under Article III of the Constitution, but the issue does not deserve extensive review because the plaintiffs have plainly satisfied its requirements. Standing is required in order to confer subject matter jurisdiction upon federal courts under Article III. It is "the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The Supreme Court has stated that the standing requirement "limits federal court jurisdiction to actual controversies so that the judicial process is not transformed into 'a vehicle for the vindication of the value interests of concerned bystanders.'" *Coal Operators & Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915-16 (6th Cir. 2002) (quoting *Valley Forge Christian College v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982)). There are three constitutional requirements for standing. *See Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000); City of Cleveland v. Ohio, 508 F.3d 827, 835 (6th Cir. 2007). "To establish Article III standing, a litigant must show

(1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) that the injury will likely be redressed by a favorable decision." *Barnes v. City of Cincinnati*, 401 F.3d 729, 739 (6th Cir. 2005) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

In addition to the constitutional requirements, a plaintiff must also satisfy three prudential standing requirements. *See City of Cleveland*, 508 F.3d at 835. First, a plaintiff must "assert his own legal rights and interests, and cannot rest his claim for relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499 (citations omitted). Second, a plaintiff's claim must be more than a "generalized grievance" that is pervasively shared by a large class of citizens. Third, in statutory cases, the plaintiff's claim must fall within the "zone of interests" regulated by the statute in question. *Ibid.* "These additional restrictions enforce the principle that, 'as a prudential matter, the plaintiff must be a proper proponent, and the action a proper vehicle, to vindicate the rights asserted.'" *Ibid.* (quoting *Pestrak v. Ohio Elections Comm'n*, 926 F.2d 573, 576 (6th Cir. 1991)).

For the same reasons discussed by the Court in *Zynda v. Arwood*, it is apparent that the plaintiffs in this case have standing to sue under Article III. *See Zynda*, 175 F. Supp. 3d at 803. The plaintiffs here alleged that they have been subject to the false fraud determinations discussed earlier. "A litigant can suffer an injury-in-fact from the denial of due process regardless of the effect that more process would have on the outcome of the particular determination at issue." *Ibid.* (citing *Goldberg v. Kelly*, 397 U.S. 254, 256 n.2 (1970)). The State defendants' argument that the plaintiffs have not identified a causal connection between their conduct and the plaintiffs' injury is unpersuasive. The State defendants are agents of the State; the amended complaint alleges that they implemented the programs that caused injury to the plaintiffs. Taking these allegations as true, the

State defendants' actions are fairly traceable to the plaintiffs' alleged injuries.  The same can be said for the other defendants.

## 2.  Personal Jurisdiction

SAS employee Andrew Phillips argues that he did not have the requisite minimum contacts with this forum, and therefore the Court cannot exercise personal jurisdiction over him.  He also points out that he has never been served with process in this case.  The Court agrees that both grounds support a dismissal of defendant Phillips for want of personal jurisdiction.

As an initial matter, contrary to the plaintiffs' position, defendant Phillips did not waive his right to assert personal jurisdiction in his motion.  The pending motion to dismiss is his first Rule 12(b) motion, and he has not otherwise filed a responsive pleading in this case.

It does not appear that service of process has been effectuated on defendant Phillips.  SAS was served process on March 6, 2017, but defendant Phillips was not added as a party to this suit until the plaintiffs filed their amended complaint on July 7, 2017.  A summons was issued then, but because no record of service upon Phillips can be found, and more than 90 days have elapsed, the Court "must dismiss the action against him without prejudice."  Fed. R. Civ. P. 4(m).

Service upon SAS does not satisfy the requirement to serve process on an individual defendant.  The Sixth Circuit has explained that when agents of a corporation are sued in their individual capacity, they must be accorded proper service separate from the service effectuated on the corporation.  *See King v. Taylor*, 694 F.3d 650, 655 (6th Cir. 2012).  It is not enough to serve process on the corporation if the agent is sued individually, "for without proper service of process . . . a court may not exercise personal jurisdiction over a named defendant."  *Ibid.*  The complaint

states that defendant Phillips was a Project Manager for SAS and is sued in his individual capacity. But because he has not been served with process, all counts against him will be dismissed.

### D.  State Law Claims

The SAS, FAST, and CSG defendants also argue that the state law claims against them — based on theories of negligence, breach of warranty, and civil conspiracy — must be dismissed as a matter of law. Those claims (save the conspiracy claim) attempt to stake out causes of action under Michigan's product liability jurisprudence.

### 1.  Negligence Claims

Michigan law recognizes claims for defective products under several theories: (1) negligent design; (2) negligent manufacture; (3) failure to warn; and (4) breach of an express or implied warranty. *See Sedgwick Ins. v. F.A.B.E. Custom Downstream Sys., Inc.*, 81 F. Supp. 3d 582, 590 (E.D. Mich. 2015) (citations omitted). The plaintiffs attempt to include most of those theories, raising five state law claims against SAS Institute and FAST Enterprises: negligent production (Count 1); breach of implied warranty (Count 2); gross negligence/actual knowledge (Count 3); breach of express warranty (Count 4); and failure to warn (Count 5). There also is a negligence claim against CSG (Count 6).

The defendants' arguments, taken together, posit that they owed no duty to the plaintiffs under products liability or negligence law because there was no legal relationship with the plaintiffs that triggered a duty, but if there was, the duty cannot extend to economic loss claims. As a corollary, they contend that the plaintiffs have not alleged that the defendants' conduct proximately caused their claimed injuries.

Counts 1 through 3, and 5 and 6, posit that the defendants carelessly designed and maintained a defective automated fraud detection system that yielded inaccurate results, which falsely accused them of fraud, leading to dire economic consequences, coupled with stress and suffering. These claims, particularly the claim for negligent "production," incorporate the separate theories under Michigan law based on manufacturing defect, design defect, and failure to warn. *See* Mich. Comp. Laws § 600.2945(i) (defining "production" as "manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, inspection, testing, listing, certifying, warning, instructing, marketing, selling, advertising, packaging, or labeling"). A common thread among those legal theories is the need to establish that a defendant owed a legal duty to the injured person. *See Hammons v. Icon Health and Fitness*, 616 F. Supp. 2d 674, 679, 682-83 (E.D. Mich. 2009 (collecting cases). In *Glittenberg v. Doughboy Recreational Industries*, for example, the Michigan Supreme Court reiterated that "[m]anufacturers have a duty to warn purchasers or users of dangers associated with the intended use or reasonably foreseeable misuse of their products." 441 Mich. 379, 387, 491 N.W.2d 208, 211 (1992). The court traced the contours of that duty to the principles laid down in section 388 of the Restatement (Second) of Torts, which states:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied . . . .

Restatement (Second) of Torts § 388 (1965). Plainly, liability for a defective product can be imposed not only for injuries suffered by users of the defective chattel, but also by "those whom the supplier should expect . . . to be endangered by its probable use." *Ibid.* Whether an injured bystander falls within that scope generally is determined by foreseeability, augmented by policy

considerations. *See Halbrook v. Honda Motor Co., Ltd.*, 224 Mich. App. 437, 441, 569 N.W.2d 836, 839 (1997) (citing *Moning v. Alfono*, 400 Mich. 425, 254 N.W.2d 759 (1977)); *see also Colangelo v. Tau Kappa Epsilon Fraternity*, 205 Mich. App. 129, 132, 517 N.W.2d 289, 291 (1994).

The plaintiffs have alleged that the defendants entered into agreements with the UIA to design and maintain a fraud detection system that ultimately misidentified them as fraudsters, and adjudicated them as such without recourse. Certainly, those seeking unemployment benefits could be expected to be injured by such a system, since they were the intended target of the systems which the defendants produced under their contracts.

The defendants also contend, however, that they cannot be held liable for the plaintiffs' economic losses under these theories, and noneconomic loss is not recoverable absent physical injury. The Court agrees.

Although no physical "impact" is required, emotional distress damages may not be recovered in a tort claim unless "a definite and objective physical injury is produced as a result of emotional distress proximately caused by defendant's negligent conduct." *Daley v. LaCroix*, 384 Mich. 4, 12, 179 N.W.2d 390, 395 (1970). And for the negligent deprivation or destruction of property, damages are measured by the market value of the property before and after the injury, or the cost to repair. *Price v. High Pointe Oil Co.*, 493 Mich. 238, 244, 828 N.W.2d 660, 664 (2013) (citing *O'Donnell v. Oliver Iron Mining Co.*, 262 Mich. 470, 247 N.W. 720 (1933). Emotional distress damages are not allowed.

The plaintiffs allege damages consisting of the loss of their benefits, the fines levied, the seizure of their property, and the economic consequences that followed. They have not alleged that any of them suffered "a definite and objective *physical* injury." They point to a section of

Michigan's products liability statute that defines noneconomic loss to include " pain, suffering, inconvenience, physical impairment, disfigurement, mental anguish, emotional distress, . . . injury to reputation, humiliation, or other nonpecuniary damages." Mich. Comp. Laws § 600.2945(f). But that does not change the rule that a condition for recovering those damages is a physical injury.

Because the plaintiffs have not alleged damages for which the SAS, FAST, and CSG defendants can be held accountable under a products liability or negligence theory of recovery, Counts 1, 3, 5 and 6 will be dismissed.

### 2. Breach of Warranty

The plaintiffs have not alleged facts to support the idea that they were beneficiaries of any warranties, either implied or express. With respect to the former, the plaintiffs allege that the defendants knew or had reason to know the particular purposes for which the software systems were to be used and that *purchasers and users* would rely on the defendants' skill or judgment in furnishing goods suitable for such purposes and uses. Amended Compl. ¶ 104 (emphasis added). They allege the MiDAS and EFDS programs were not fit for the particular purposes for which they were intended and for which they were used. *Id.* ¶ 105. But they do not allege any facts that indicate they were purchasers or users of the programs. They also do not allege any facts establishing privity with the defendants.

On the express warranty claim, the amended complaint alleges that the defendants made representations or statements that the product was free from defects and/or fit for its intended purpose. Amended Compl. ¶ 112. Nowhere in the amended complaint do the plaintiffs allege that the representations were made to them or a suitable proxy. No plausible basis for relief can be inferred even under a very generous reading of the three-sentence count.

Counts 2 and 4 also will be dismissed.

### 3. Civil Conspiracy

The complaint does not clearly indicate whether the plaintiffs allege civil conspiracy under state or federal law. To show a civil conspiracy to violate 42 U.S.C. § 1983, a plaintiff must demonstrate that (1) the defendants entered into an agreement to violate the plaintiff's rights; (2) the defendants shared a general objective to deprive the plaintiff of his rights; and (3) an overt act was committed in furtherance of the conspiracy to deprive the plaintiff of his civil rights that caused injury to the plaintiff. *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003). However, "conspiracy claims must be pled with some degree of specificity and . . . vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." *Gutierrez v. Lynch*, 826 F.2d 1534, 1539 (6th Cir. 1987). Therefore, when proceeding under 42 U.S.C. § 1983 for civil conspiracy, a plaintiff must make some allegation of coordinated actions between the alleged conspirators. *See Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir.1999); *Collyer v. Darling*, 98 F.3d 211, 229 (6th Cir. 1996). Conclusory, vague accusations that do not describe some "meeting of the minds" cannot state a claim for relief under 42 U.S.C. § 1983. *See Naguib v. Ill. Dep't of Prof'l Regulation*, 986 F. Supp. 1082, 1092 (N.D. Ill. 1997); *Pollack v. Nash*, 58 F. Supp. 2d 294, 299–300 (S.D.N.Y.1999).

Under Michigan law, a civil conspiracy is "a combination of two or more persons, [who] by some concerted action, [agree] to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by unlawful means." *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 194 Mich. App. 300, 313, 486 N.W.2d 351 (1992); *see also Ahlers v. Schebil*, 188 F.3d 365, 374 (6th Cir. 1999); *Fenestra Inc. v. Gulf American Land Corp.*, 377 Mich. 565, 593, 141 N.W.2d 36, 48 (1966).

Although civil conspiracy is a free-standing claim, it "may not exist in the air; rather, it is necessary to prove a separate, actionable tort." *Early Detection Ctr., PC v. New York Life Ins. Co.*, 157 Mich. App. 618, 632, 403 N.W.2d 830, 836 (1986); *see also Dauenhauer v. Bank of New York Mellon*, 562 F. App'x 473, 483 (6th Cir. 2014); *Collins v. Wickersham*, 862 F. Supp. 2d 649, 660 (E.D. Mich. 2012).

Therefore, to survive the motion to dismiss, the pleaded facts must show "that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Memphis, Tennessee Area Local, Am. Postal Workers Union, AFL–CIO v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985)).

The plaintiffs have not adequately pleaded facts to give rise to a claim for civil conspiracy. In its entirety, Count 13 of the amended complaint states:

199. There was an agreement between Defendants to curtail or eliminate the traditional procedural guarantees for an unemployment fraud determination through the design, implementation, administration, configuration and/or maintenance of automated system.

200. Each Defendant, individually or through its agents, agreed with at least one other Defendant or an unnamed co-conspirator, to accomplish this objective.

201. Each Defendant has constructive knowledge of the law.

202. Each Defendant, individually or through its agents, committed at least one overt act in the design, implementation, configuration, administration and maintenance of the automated system.

203. Each Defendant, individually or through its agents, engaged in a civil conspiracy that deprived Plaintiffs of their rights under the law.

The amended complaint does not plead sufficient facts under either section 1983 or Michigan law to survive dismissal.  Civil conspiracy requires some degree of specificity in demonstrating that the defendants entered into an unlawful agreement and committed an overt act in furtherance of the conspiracy.  There are no specifics here, only vague and conclusory allegations.  That is not enough. *Gutierrez*, 826 F.2d at 1539.

The amended complaint does not describe in any detail when or how a "meeting of the minds" took place among the 22 defendants or what actions they took in furtherance of the conspiracy.  The plaintiffs seem to argue the amended complaint alleges that the defendants contracted to perform certain services, which suffices to show an unlawful agreement existed to eliminate procedural guarantees, and in performing these obligations, the defendants committed at least one overt act.  However, without more detail, the "defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy." *Twombly*, 550 U.S. at 566-67 (internal quotation marks and citations omitted).  The lack of specificity with respect to each defendant and the actions they undertook dooms this count.

### III.  Conclusion

There is no basis to dismiss the amended complaint for failure to join a necessary or indispensable party.  The plaintiffs have not pleaded viable federal claims against the individual employees of defendants SAS, FAST, and CSG.  However, they have alleged sufficient facts to support a claim of state action against those companies, and have stated viable claims for deprivation of their rights to procedural due process, equal protection, and freedom from unreasonable seizures of property, except as to UIA employee defendant Clayton Tierney.  They have not stated a claim for denial of substantive due process, and there is no private right of action under 26 U.S.C. § 6402.

The plaintiffs concede that their claim for unlawful taking of property under the Fifth Amendment is not ripe for adjudication. The plaintiffs have not established personal jurisdiction over defendant Andrew Phillips, but they have shown that they have standing to sue and the Court has subject matter jurisdiction over the surviving claims. The remaining defendants are not entitled to qualified immunity. And the plaintiffs have not stated viable claims based on state law.

Accordingly, it is **ORDERED** that the motions to dismiss by defendants CSG [dkt. #55], FAST [dkt. #58], SAS [dkt. 61], and the UIA employee defendants [dkt. #104] are **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Counts 1 through 6, 9, 10, 12, and 13 of the amended complaint are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the amended complaint is **DISMISSED WITH PREJUDICE IN ITS ENTIRETY** as to defendants Jeremy Gragg, Jennifer Tuvell, Kristen Araki-Tokushige, Mike Patterson, Allison Forgie-McClurg, Richard Staten, Rebecca Rosier, Dana Rowe, Tim Palmer, Steve Goodhall, Paul Pluta, and Clayton Tierney, only.

It is further **ORDERED** that the amended complaint is **DISMISSED WITHOUT PREJUDICE IN ITS ENTIRETY** as to defendant Andrew Phillips, only.

It is further **ORDERED** that counsel for the parties appear for a case management conference on **April 3, 2018 at 3:00 p.m.**

<div style="margin-left:40%">

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

</div>

Dated:   March 2, 2018

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 2, 2018.

s/Deborah Tofil
DEBORAH TOFIL