## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PATTI JO CAHOO, KRISTEN
MENDYK, and KHADIJA COLE,
HYON PAK, and MICHELLE
DAVISON,

                Plaintiffs,

    vs.

SAS INSTITUTE INC., et al.,

                Defendants.

Case No. 2:17-cv-10657
Hon. David A. Lawson
Mag. R. Steven Whalen

---

### SAS INSTITUTE INC.'S RENEWED MOTION TO DEEM ADMITTED SAS'S FIRST REQUESTS FOR ADMISSION TO PLAINTIFFS

Defendant SAS Institute Inc. moves the Court under Federal Rule of Civil Procedure 36(a)(6) for an order deeming SAS's First Requests for Admission to Plaintiffs, requests numbered 1, 3-6, 8-26, 29-32, and 40-42 admitted or, in the alternative, compelling Plaintiffs to serve sufficient answers to those requests.

In accordance with Local Rule 7.1, undersigned counsel for SAS sought a conference with Plaintiffs' counsel in August and September 2019, and then filed an earlier version of this motion shortly before the close of class discovery, then set for October 22, 2019. (Doc. 222.) After an in-person meet-and-confer in October 2019,

and in light of the Court's decision to grant Plaintiffs' request to extend the scheduling order dates, SAS withdrew the motion without prejudice. (Doc. 233.)

Following another five months of discovery, including over 20 days of depositions and the production of over 1 million emails, counsel for SAS again asked Plaintiffs to meet and confer on their responses to SAS's RFAs. During a telephone conference, SAS explained the nature of the motion and its legal basis and requested but did not obtain concurrence in the relief sought.

Dated: April 21, 2020                    Respectfully submitted,

                              By: /s/Stephanie A. Douglas
                                  Stephanie A. Douglas (P70272)
                                  Susan M. McKeever (P73533)
                                  Bush Seyferth PLLC
                                  100 W. Big Beaver Road, Suite 400
                                  Troy, MI 48084
                                  T: (248) 822-7800; F: (248) 822-7852
                                  douglas@bsplaw.com
                                  mckeever@bsplaw.com
                                  *Counsel for SAS Institute Inc.*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PATTI JO CAHOO, KRISTEN
MENDYK, and KHADIJA COLE,
HYON PAK, and MICHELLE
DAVISON,

Plaintiffs,

vs.

SAS INSTITUTE INC., et al.,

Defendants.

Case No. 2:17-cv-10657
Hon. David A. Lawson
Mag. R. Steven Whalen

---

## BRIEF IN SUPPORT OF SAS INSTITUTE INC.'S
## RENEWED MOTION TO DEEM ADMITTED
## SAS'S FIRST REQUESTS FOR ADMISSION TO PLAINTIFFS

# Table of Contents

CONCISE STATEMENT OF ISSUE PRESENTED..............................................iii

CONTROLLING OR MOST APPROPRIATE AUTHORITY .............................. iv

INDEX OF AUTHORITIES.....................................................................................v

I.      BACKGROUND ...........................................................................................1

   A.   SAS obtained and provided evidence to Plaintiffs demonstrating its lack of
        involvement, and served RFAs.........................................................................2

   B.   The deposition of Clay Tierney, former head of the Agency's technology
        initiative, responsible for the Agency's implementation of both MiDAS and
        EFDS...................................................................................................................4

II.     ARGUMENT...............................................................................................10

   A.   Plaintiffs' inadequate responses to RFAs 1, 3-6, 8-26, 29-32, and 40-42 fail
        to comport with Rule 36. ...............................................................................11

      1.   RFAs 1, 3-4: SAS did not implement MiDAS. ............................................. 11

      2.   RFAs 5-6: Requests regarding timing. ........................................................... 16

      3.   RFAs 8-26, 29-30: EFDS did not do the things of which Plaintiffs
           complain.......................................................................................................... 18

      4.   RFAs 31, 32, 40-42: Plaintiffs have no evidence that any SAS employee
           knew of any "invalid or false" fraud determinations. .................................. 21

   B.   Plaintiffs' objections should be deemed waived, and SAS's requests 1, 3-6,
        8-26, 29-32, and 40-42 deemed admitted.....................................................23

III.    Conclusion ..................................................................................................25

## <u>CONCISE STATEMENT OF ISSUE PRESENTED</u>

Should the Court deem admitted SAS's First Requests for Admission, numbers 1, 3-6, 8-26, 29-32, and 40-42, where Plaintiffs' responses to those requests do not comply with Rule 36, their objections based on vagueness are specious, their reliance on ongoing discovery fails to identify what contrary evidence they expect to uncover, significant time has passed, millions of documents have been produced, dozens of depositions have taken place, and no outstanding discovery will change the facts?

SAS answers:              Yes.

This Court should answer:       Yes.

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>

Fed. R. Civ. P. 36

*Asea, Inc. v. Southern Pac. Transp. Co.*, 669 F.2d 1242 (9th Cir. 1981).

*DGD Processing Solutions v. MD Financial*, No. 14-CV-13740 (E.D. Mich., Sep. 18, 2015)

*McCarthy v. Ameritech Pub., Inc.*, 763 F.3d 488 (6th Cir. 2014).

*Siser N. Am., Inc. v. Herika G. Inc.,* 325 F.R.D. 200 (E.D. Mich. 2018)

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*Aprile Horse Transp., Inc. v. Prestige Delivery Sys., Inc.*,
   2015 WL 4068457 (W.D. Ky. July 2, 2015) ...................................................... 15
*Asea, Inc. v. Southern Pac. Transp. Co.*,
   669 F.2d 1242 (9th Cir. 1981) ................................................................... 4, 11, 24
*Drutis v. Rand McNally & Co.*,
   236 F.R.D. 325 (E.D. Ky. 2006) ........................................................................ 16
*Equal Empl. Opportunity Commn. v. Baby Products Co., Inc.*,
   89 F.R.D. 129 (E.D. Mich. 1981) ........................................................................ 2
*McCarthy v. Ameritech Pub., Inc.*,
   763 F.3d 488 (6th Cir. 2014) ......................................................................... 4, 12
*Nurse Notes, Inc. v. All State Ins. Co.*,
   2011 WL 2173934 (E.D. Mich. June 2, 2011) ................................................... 24
*Nurse Notes, Inc. v. All State Ins. Co.*,
   2011 WL 3862402 (E.D. Mich. Aug. 31, 2011) ................................................. 24
*S.A. Healy Co./Lodigiani USA v. United States*,
   37 Fed. Cl. 204 (1997*)* ...................................................................................... 14
*Siser N. Am., Inc. v. Herika G. Inc.*,
   325 F.R.D. 200 (E.D. Mich. 2018) ............................................................. Passim

**Rules**

Fed. R. Civ. P. 11 ................................................................................................. 20
Fed. R. Civ. P. 36 ........................................................................................... Passim

## I.   __BACKGROUND__

Three years ago, Plaintiffs filed this suit claiming that the Michigan Unemployment Insurance Agency (the "UIA" or "Agency") used software called MiDAS to automate certain processes, which had the effect of depriving some claimants of property without adequate procedural process. (Doc. 43, ¶ 1.)

The facts developed in discovery have confirmed that MiDAS was developed under a contract between the State of Michigan and co-defendant FAST Enterprises, LLC. SAS licensed and configured *different* software for the State's use—software the State called EFDS. EFDS is not MiDAS. EFDS does different things than MiDAS. EFDS did not "go live" for the UIA's use until June 2015, just months before the UIA turned *off* the automation of fraud determinations that Plaintiffs say caused them injury. And neither EFDS, nor SAS, had *anything* to do with Plaintiffs or their claimed injuries.

SAS served RFAs on Plaintiffs more than a year ago, asking them to admit simple and irrefutable facts that will clarify the issues, facilitate summary judgment and class certification, and narrow the issues for trial. Plaintiffs' responses were a mishmash of objections, obfuscations, and statements that "discovery is ongoing." *See* Plaintiffs' Responses to SAS's First RFAs, Ex. A.

There have since been fifteen *additional* months of discovery (the discovery deadline has been extended four times); over 20 days of depositions; responses to

more than 50 sets of discovery and 10 subpoenas; and production and review of millions of pages of documents. After all of this, Plaintiffs have no more evidence supporting their claims against SAS than they did when SAS filed its Rule 11 motion at the outset of this litigation. *See* SAS's Motion for Sanctions (Doc. 107) (identifying public documents demonstrating no claim against SAS). Rule 36 serves "vital interests in the conduct of litigation," eliminating issues for which there can be no reasonable dispute. *Equal Empl. Opportunity Commn. v. Baby Products Co., Inc.*, 89 F.R.D. 129, 130 (E.D. Mich. 1981). Plaintiffs' responses violate the letter and the spirit of Rule 36. They should be deemed to admit the requests or, if not, required to supplement their responses to comply with the rules.

### A. SAS obtained and provided evidence to Plaintiffs demonstrating its lack of involvement, and served RFAs.

Plaintiffs have been provided the facts showing SAS's lack of involvement multiple times, starting back in 2017. *See* generally S. Douglas Declaration, Ex B; Partial Merits Chronology, Ex. B-1. SAS offered to make its witnesses and change-management systems available. *See* S. Douglas Declaration, Ex. B., at ¶ 15 and Exs. B-5 and B-6; Partial Merits Chronology, Ex. B-1 (April 1, 2019; August 7-14, 2019; February 24-26, 2020). SAS also produced over 56,000 pages of documents and 40 native Excel files, and provided responses to 13 interrogatories and 19 requests for production. *See* S. Douglas Declaration ¶ 14; SAS's Responses to Plaintiffs' Discovery, Ex. B-6. SAS then obtained exculpatory admissions and

discovery responses from the State defendants. *See* Partial Merits Chronology, Ex. B-1 (7/29-7/31/2019). The Agency has also produced millions of pages of documents, including the MiDAS project SharePoint site, and emails among and between involved state employees and contractors. *See* S. Douglas Declaration ¶ 16; Partial Merits Chronology, Ex. B-1 (4/1/2020 explaining prior Agency productions). And the parties have participated in more than 20 depositions. *See* S. Douglas Declaration ¶ 17; Partial Merits Chronology, Ex. B-1 (Table of Contents).

Seeking to narrow the disputes, SAS served Plaintiffs with RFAs in December 2018. *See* Plaintiffs' Responses to SAS's RFAs, Ex. A. Among those, SAS asks Plaintiffs to admit, generally: (1) that SAS did not implement MiDAS, (2) that the software SAS licensed to the state, EFDS, was not operational until June 11, 2015; (3) that SAS and EFDS did not do certain things; and (4) that Plaintiffs have no evidence that any SAS employee had knowledge of any invalid or false fraud determinations. Plaintiffs responded with unfounded objections and evasion.

In light of the advanced state of discovery, SAS has asked Plaintiffs to supplement their responses and to meet and confer to narrow any disputes. Plaintiffs have characterized SAS's efforts as not productive, falsely impugned counsel's honesty, and refused to admit what the evidence shows. *See* Collected Correspondence, Ex. B-5.

3

**B.     The deposition of Clay Tierney, former head of the Agency's technology initiative, responsible for the Agency's implementation of both MiDAS and EFDS**

On February 11, 2020, the parties concluded a 4-day merits deposition of Clayton Tierney, who oversaw the UIA's technology and data team for more than 10 years. Mr. Tierney addressed each of the RFAs at issue and further confirmed the lack of factual dispute with regard to the matters inquired into in SAS's RFAs.

Mr. Tierney "interface[d] between the business people of the UIA and the tech people at the DTMB [(Department of Technology, Management and Budget)]." Tierney 2020 Deposition ("TD"), Ex. B-7, at 546:15-547:4; 547:11-21 (his team "translate[d] . . . business requirements into technical needs and test[ed] the technical solutions to those business needs"). He oversaw implementation of "MiDAS and EFDS"—"two different computer systems." TD at 548:13-17.

MiDAS was a product of the UIA's System Modernization Project, which began around 2010 with requirements gathering, continued through design and implementation, and went live with claimant-side functionality on October 1, 2013. *See generally* TD at 548:19-550:2; Exhibit B-3, Summary of Subset of Evidence Distinguishing EFDS and MiDAS Functionality.

EFDS was the product of a different project—the Integrity Initiative Project. "[O]n a separate but at times overlapping time frame" than the MiDAS project, and by statutory mandate, the State undertook the Integrity Initiative project to

4

implement data analytics software across multiple agencies. TD at 550:7-18. This initiative had separate requirements, and a separate RFP, evaluation committee, DTMB buyer, contract, design, user guide, development cycle, UIA user-acceptance test, approval, release, and change-tracking system than MiDAS. *See, e.g.,* TD at 550:19-555:12; 643:4-9; Dep. Ex. 229 (RFP); Dep. Ex. 230 (Contract (Doc. 61-2)).

For the Integrity Initiative, the State solicited proposals for a "commercial off-the-shelf software data analytics product" that could be configured to analyze data from multiple sources. TD at 611:23-614:22 (discussing Dep. Ex. 229 (RFP)). The winning bidder for what the State would call the Enterprise Fraud Detection Software (EFDS) would license and configure software to run on the State's hardware and analyze the State's data. TD at 615:25-617:25. The RFP included technical requirements (how the software would be run on the State's systems), and functional requirements (what the State wanted the software to do). TD at 618:17-619:4. The State also wanted a project manager with information technology (IT) and project management experience, but did not require unemployment experience. TD at 619:1-620:4.

Effective December 21, 2012, the State contracted for a master license of SAS's data analytics software, and for SAS to configure it in two phases—first for DHS's Food Assistance Programs (FAP), and then for the UIA. TD at 620:5-622:9; 637:3-638:21 (discussing SAS Contract). The UIA did not delegate to SAS its

mandate of "collecting taxes from employers and disbursing UI benefits to eligible claimants." TD at 614:23-615:13. And SAS employees were State contractors, not State employees. TD at 636:21-637:15. SAS designated a project manager to track requirements, resources, staffing, budget, and time. TD at 628:16-630:1. The State provided its own project managers, and designated "executive subject matter experts" to provide requirements, and to review, accept, and sign-off on SAS's deliverables. TD at 630:2-631:8; 623:6-14 ("The requirements would come from the business users, UIA, and how to implement those decisions would come from the developer, SAS."). SAS's deliverables required State approval. TD at 633:4-634:24. After the project was implemented, the State would support the software it licensed from SAS. TD at 631:9-20. The software relied, in part, on data the Agency collected using the MiDAS software. TD at 624:21-625:3. Under the contract, the State owned the project documentation and all project data, and had the right to "use the alerts that the EFDS software produced for any purposes." TD at 634:25-636:20.

The UIA used the EFDS software to prioritize the Agency's resources in conducting federally mandated fraud investigations. TD at 567:20-568:8; 569:5-12; 579:10-580:9; 585:12-20; 592:20-594:16 (discussing federal requirement for quarterly cross-matches and model cross-match code); 609:16-24 (discussing Department of Labor ETA Handbook 301, Dep. Ex. 68, which "recognizes that agency's [sic] can use cross-match programs to identify cases for investigation");

609:25-612:9 (discussing DOL Monitoring report, Dep. Ex. 71, under which "the agency [was] still permitted to start an investigation based on the 13-week spreading of wages" and was still permitted to "take appropriate action," including an adjudication of misrepresentation, without a claimant response). The UIA defined criteria it deemed suspicious, "from a user perspective," and SAS configured its data analytics software to "capture instances of that." TD at 623:15-624:1. The requirements call for software to perform predictive analysis and data analytics to "flag" or "identify suspicious activity for the agency's use in investigating potential fraud," TD at 625:14-626:2, but say nothing about adjudication, communication, denying or terminating benefits, assessing restitution or penalties, collecting wages or intercepting taxes, or handling mail, phone calls, or appeals, TD at 626:4-627:15.

The EFDS graphical user interface (GUI) guide and design document confirm that the "software provides alerts and search functionality . . . [t]hat's all." TD at 639:14-640:9; Dep. Exs. 243; 244. For unemployment benefits, the EFDS software provided four types of alerts. TD at 640:10-641:2. Release 1 included "work and earn" and "fictitious business" claimant alerts, and Release 2.3 added "incarcerated claimant" and "ID theft alerts." TD at 644:24-645:7.  The EFDS "work and earn" alerts were "more robust and considered more data than the remuneration issues that the UIA flagged without the EFDS software." TD at 812:22-813:9. In the EFDS software, UIA fraud investigators could review alerts or alert details, and could use

a "social network" tool. TD at 641:3-25; 642:9-643:3. Investigators could otherwise "disposition" alerts to six statuses—watch, send new case to MIDAS, send update to MIDAS, close case in EFDS, reopen, and add comment. 642:4-8; 645:8-12.

SAS employees did not "change the MIDAS software," TD at 650:2-9, and EFDS did not "bec[o]me a part of the MiDAS system," TD at 625:5-13. SAS employees did not work on teams that designed, built, or supported MIDAS, and played no role in decisions about what to "auto-adjudicate," MIDAS-related project documents or training, or the UIA's processes. TD at 582:22-585:11; 585:21-612:24 (discussing lack of role); 591:21-24 (SAS employees not "involved in the decision regarding what the UIA chose to auto-adjudicate"); 813:11-814:4. Neither SAS employees nor its software communicated with UIA claimants, decided claimant's entitlement to benefits, or directed the Agency's questions to claimants (or even had reason to know those questions). TD at 595:1- 596:12; 662:16-667:19. And "SAS's software had nothing to do with the forms the UIA sent to claimants, . . . any claimant's claims before [EFDS] went live [June 11, 2015], … [or] how the MIDAS system followed the UIA's business rules, decision trees, and policies." TD at 670:17-671:19. Instead, SAS employees simply configured SAS's software to analyze the State's data, and fulfilled the UIA's request that the EFDS software be configured to send prioritized alerts to a file for the UIA's investigation—according to logic provided by the UIA team. *Id*; TD at 645:20-650:1; 652:5-18.

The number of EFDS alerts sent to a file represented just a small fraction of the alerts the UIA investigated without EFDS. TD at 814:7-21. After delays, the EFDS configuration project for the UIA kicked off on October 22, 2013; went live on June 11, 2015; had three deployments of Release 2 in August 2015, November 2015, and May of 2016; and had final acceptance on June 27, 2016. TD at 556:12-582:21 (timing demonstrated by Dep. Exs. 77-85, 231-238). Before "June 11th, 2015, MiDAS had not received any files from the EFDS system." TD at 572:3-18. And as of August 28, 2015, the UIA turned off auto adjudication in the MIDAS system for all fraud issues; after that, "staff was involved in every determination of fraud." TD at 601:11-605:14. During the brief window when the UIA was receiving files from EFDS, and had not yet turned off all auto-adjudication functionality for fraud determinations in MiDAS, EFDS wrote just 12 prioritized alerts to each weekly file. *See* TD at 650:17-651:11 (EFDS wrote 12 alerts to each weekly file for release 1); 811:24-812:21 (Releases 2.1 and 2.2 "did not include any additional release types for claims processing."). For Release 2.3—released after the UIA stopped auto-adjudicating—EFDS sent one-to-five alerts per week, for each of four alert types. TD at 651:12-25. Some alerts sent by EFDS may have been closed as duplicative of existing investigations. TD at 652:1-4.

In short, neither SAS employees nor SAS's software did any of the things Plaintiffs allege caused them harm. See TD at 652:23-659:2 (testifying that neither

SAS employees nor the EFDS software did the things alleged in First Amended Complaint, Paragraphs 8(a)-(m), 77, 89, 90); TD at 659:7-669:9 (admitting the truth of SAS's RFAs to Plaintiffs, Nos 1-11, 14-26, 29-34, 40-42). Having overseen the software projects that led to MiDAS and EFDS, Mr. Tierney believed in the fall of 2015—when similar litigation was first filed against the UIA—that "EFDS was not in place or used as part of the determinations." TD at 669:10-670:11. He holds the same opinion with regard to this case. TD at 814:23-815:11.

## II.   <u>ARGUMENT</u>

Under Rule 36, if a party does not admit a matter, "the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it." Fed. R. Civ. P. 36(a)(4). Denials "must fairly respond to the substance of the matter; and when good faith requires that a party qualify an answer or deny only a part of a matter, the answer must specify the part admitted and qualify or deny the rest." *Id.* "The answering party may assert lack of knowledge or information as a reason for failing to admit or deny only if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny." *Id.*

A response that does not comply with Rule 36(a) may be deemed admitted. *Siser N. Am., Inc. v. Herika G. Inc.*, 325 F.R.D. 200, 209 (E.D. Mich. 2018). "[A]n evasive denial, one that does 'specifically deny the matter,' or a response that does

not set forth 'in detail' the reasons why the answering party cannot truthfully admit or deny the matter, may be deemed an admission." *Asea, Inc. v. Southern Pac. Transp. Co.*, 669 F.2d 1242, 1245 (9th Cir. 1981). Boilerplate objections are legally meaningless and amount to a waiver of an objection. *Siser,* 325 F.R.D. at 209-210.

A.      **Plaintiffs' inadequate responses to RFAs 1, 3-6, 8-26, 29-32, and 40-42 fail to comport with Rule 36.**

The RFAs at issue ask Plaintiffs to admit, generally: (1) that SAS did not design or implement MiDAS (RFAs 1, 3-4); (2) that the timing of EFDS's implementation was such that it could not have been involved in the named Plaintiffs or class's claimed injuries (RFAs 5 and 6); (3) that EFDS did not perform the functions alleged in the Complaint (RFAs 8-26 and 29-30); and (4) that Plaintiffs have no evidence that any SAS employee knew of any "invalid or false" fraud determinations (RFAs 31-32, 40-42). See Plaintiffs' Answers to SAS's First RFAs (Dep. Ex. 245), Ex. 1. Plaintiffs' responses fail to comport with Rule 36.

1.      *RFAs 1, 3-4: SAS did not implement MiDAS.*

The core of Plaintiffs' claims is their allegation that the UIA used an "application which was designed, created, implemented, installed and/or maintained by the entity Defendants and their agents ... known as MiDAS." (Compl. ¶¶ 48-49; 51-53, 55 (specific allegations).) *See also* Doc. 124, Opinion and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss at 2-7 (summarizing allegations regarding MiDAS). Plaintiffs allege that "[b]etween October 2013 and

August 2015, the fraud determination was entirely automated and made by MiDAS without the benefit of any investigatory review, or human input or evaluation of any kind." (¶ 64).

SAS has repeatedly explained, and discovery has confirmed, that SAS did not design, create, control, configure, or maintain either MiDAS or MiWAM (MiDAS's public-facing portal). SAS's involvement in unemployment benefits in Michigan was to configure its off-the-shelf data analytics software to prioritize and flag potential fraud for further UIA investigation, in a system the State called EFDS.

SAS's Requests numbers 1, 3, and 4 use the precise language in Plaintiffs' own Complaint to ask Plaintiffs to admit that SAS did not develop MiDAS, but rather developed EFDS. Plaintiffs' evasive responses disregard the evidence and obfuscate the merits. Enforcement of Plaintiffs' Rule 36 obligations are vital: "An improper denial causes no less damage than an evasive answer, and the Federal Rules of Civil Procedure deter both with comparable force." *McCarthy v. Ameritech Pub., Inc.*, 763 F.3d 488, 494 (6th Cir. 2014).

---

**Request No. 1:** *Admit that SAS did not design, create, implement, configure, control, or maintain MiDAS.*
**Response:** Objection, this request is unduly vague in what Defendant SAS intends to mean by "design, create, implement, configure, control, or maintain." To the extent not objectionable Plaintiffs lack sufficient knowledge or information to conclusively admit or deny this request. Moreover, Defendant SAS has refused to provide substantive information concerning its work outside the context of formal discovery. The scope of work that Defendant SAS was contracted to perform and its relationship to, role within, and integration with the MiDAS system is the

---

subject of discovery in this case and discovery is ongoing. However, based on Plaintiffs' information thus far, EFDS played a pivotal role in the design, creation, implementation, configuring, controlling, and/or maintaining MiDAS so to that extent it is denied.

*Request 3: Admit that SAS did not design, create, implement, configure, control, or maintain MiWAM.*
**Response:** Objection, this request is unduly vague in what Defendant SAS intends to mean by "design, create, implement, configure, control, or maintain." To the extent not objectionable Plaintiffs lack sufficient knowledge or information to conclusively admit or deny this request since after reasonable inquiry, the information that is known or can be readily obtained outside of formal discovery is insufficient to enable it to admit or deny. Moreover, Defendant SAS has refused to provide substantive information concerning its work outside the context of formal discovery. The scope of work that Defendant SAS was contracted to perform and its relationship to, role within, and integration with the MiWAM system is the subject of discovery in this case and discovery is ongoing.

*Request 4: Admit that you have no evidence that SAS did anything other than design, create, implement, and configure EFDS.*
**Response:** Objection, this request is unduly vague in what Defendant SAS intends to mean by "design, create, implement, configure, control, or maintain." To the extent not objectionable, Plaintiffs lack sufficient knowledge or information to conclusively admit or deny this request, since after reasonable inquiry, the information that is known or can be readily obtained outside of formal discovery is insufficient to enable it to admit or deny. Moreover, Defendant SAS has refused to provide substantive information concerning its work outside the context of formal discovery. The scope of work that Defendant SAS was contracted to perform and its relationship to, role within, and integration with the state's automated UIA system is the subject of discovery in this case and discovery is ongoing.

(Ex. 1, Plaintiffs' Answers to SAS's First RFAs). Plaintiffs' responses do not comply with Rule 36.

*First*, none of these requests is vague. A request is unduly vague when its meaning is so unclear as to prevent the party from responding to alternate meanings,

or from stipulating to any other meaning to which it could admit or deny. *S.A. Healy Co./Lodigiani USA v. United States,* 37 Fed. Cl. 204, 206 (1997*)* ("epistemological doubts speak highly of requested party's philosophical sophistication, but poorly of its respect for Rule 36(a)"). Plaintiffs make no attempt to respond to reasonable alternate meanings or to stipulate to a meaning they can admit or deny. And Plaintiffs' objection to the term "design, create, implement, configure, control, or maintain" is especially improper—this language is from Plaintiffs' own Complaint and is the foundation for their claims against SAS. (Doc. 43, Compl., at PgID 753-754, 763, 770, ¶¶ 12, 13, 48, 91, 92.)  A court "should not permit a responding party to undermine the efficacy of Rule 36 by creating disingenuous, hair-splitting distinctions whose unarticulated goal is unfairly to burden the opposing party," nor "permit a responding party to frustrate the rule by initially providing inadequate responses, forcing the requesting party to file a motion and costly memoranda, and only then coming forward with 'amended answers' that easily could have been supplied in the first instance." *S.A. Healy,* 37 Fed. Cl. at 207 (quotations omitted).

*Second*, Plaintiffs cannot credibly argue that they *still* lack sufficient knowledge or information to conclusively admit or deny this request. Abundant public information and discovery confirm that SAS's contract was for EFDS, not MiDAS. *See, e.g.*, Compl., Doc. 43, PgId 753-754, Paras 12-13; SAS's Motion for Sanctions at 5-9 (Doc. 107; and exhibits at Doc. 107-5, 107-6, 107-9, and 107-19

14

through 107-24); Partial Merits Chronology, Ex. B-1; Summary of Subset of Evidence that SAS Built EFDS, Not MiDAS, Ex. B-2. Mr. Tierney recently explained the meaning of that evidence, and confirmed the truth of these requests. See TD at 659:7-661:1; Section I (B) (summarizing Tierney testimony). When a party "gains knowledge allowing it to admit or deny [a] request, it must do so." *Aprile Horse Transp., Inc. v. Prestige Delivery Sys., Inc.*, 5:13-CV-15-GNS-LLK, 2015 WL 4068457, at *3 (W.D. Ky. July 2, 2015).

In *DGD Processing Solutions v. MD Financial*, No. 14-cv-13740, Doc. 47 (E.D. Mich. Sep. 18, 2015), this Court overruled objections to an RFA where that party purported to need more time for discovery. There, the responder asserted that requester's motion was premature because at the time of the request, the responder had not yet received substantial discovery. The Court rejected this argument, given the advanced stage of the litigation. *Id.* at * 6. Here, like in *DGD*, Plaintiffs' lack-of-information objections should be overruled. SAS, its co-defendants, and the non-party UIA have produced millions of pages and spreadsheets; the UIA has produced claimant files and witness testimony about them; and dozens of depositions have been taken.  SAS has also responded to every discovery request served, offered to meet and confer to resolve any outstanding disputes, and elicited testimony proving the truth of SAS's requests.

*Third*, Plaintiffs' statement that "based on Plaintiffs' information thus far,

EFDS played a pivotal role in the design, creation, implementation, configuring, controlling, and/or maintaining MiDAS, so to that extent it is denied" is nonsensical. EFDS is a software program. That program did not design or build MiDAS. And as for SAS, Mr. Tierney disproved any implication that any SAS employee played a pivotal role in MiDAS. *See* TD at 660:2-7; 546:16-612:22 (SAS employees did not participate in requirements, design, implementation, or maintenance of MiDAS).

Under Rule 36, the "answering party may assert lack of knowledge or information as a reason for failing to admit or deny only if the party states that it has made reasonable inquiry and that the information *it knows or can readily obtain is insufficient to enable it to admit or deny*." Fed. R. Civ. P. 36(a)(4) (emphasis added). Plaintiffs cannot ignore the discovery so as to refuse to answer these requests. *See Drutis v. Rand McNally & Co.*, 236 F.R.D. 325, 331 (E.D. Ky. 2006) (compelling plaintiffs to supplement their RFA answers after consulting with their own experts, because "answering party must conduct a reasonable inquiry and answer a RFA if the information is readily obtainable, even though the answering party has no personal knowledge of the facts.").

### 2.    *RFAs 5-6: Requests regarding timing.*

Plaintiffs allege that between October 2013 and August 2015, the UIA's fraud determinations were "entirely automated and made by MiDAS without the benefit of any investigatory review, or human input or evaluation of any kind." Compl., ¶

64. Public reports from the UIA and other documents produced in this case establish that while MiDAS went online for the UIA's claimant-side benefits processing in October 2013, EFDS did not go live for the UIA's investigation of potential fraud until June 11, 2015, just two months before the UIA turned off auto- adjudication for all fraud determinations.

SAS's Requests Nos. 5-6 are directed to this timing.

> **Request 5:** *Admit that, according to the State of Michigan Department of Licensing and Regulatory Affairs, Unemployment Insurance Agency Integrated System Project Quarterly Report – September 2015, the first release of EFDS for the UIA was deployed on June 11, 2015.*

> **Request 6:** *Admit that, aside from any testimony of the Agency's 30(b)(6) witnesses on November 8, 2018, you have no evidence that the first release of EFDS for the UIA was deployed earlier than June 11, 2015.*[1]

Plaintiffs object on vagueness grounds to terms like "first release of EFDS for the UIA was deployed" and "evidence," and otherwise state that they lack sufficient information to admit or deny and that discovery is ongoing.

Both Sharon Moffett-Massey, the former UIA Director, and Mr. Tierney

---

[1]RFA No. 6 asks about Plaintiffs' evidence of the EFDS start date *aside from* testimony on November 8, 2018. This takes into account two custodian-of-records depositions, in which Mr. Tierney and Mr. Henige testified from memory that EFDS went live earlier than June 11, 2015. *See* Doc. 151 at 2. The EFDS release schedule was not a noticed topic, and Mr. Tierney testified that he was not asked to (and did not) prepare to answer it. At his later deposition, where he reviewed the documentary evidence, he confirmed he has no doubt that EFDS's "[f]irst release was June 11, 2015," and that any testimony by him or Mr. Henige otherwise was "mistaken." TD at 581:25-582:21.

testified at length about the timing of the EFDS configuration for the UIA. *See* Moffett-Massey at 171:20-23 (EFDS not in place when MiDAS went live); 331:13-342:23 (explaining that Dep. Exs. 77-85 show EFDS did not go live for UIA's use until June 11, 2015); 350:19-351:15 (DOL's 2015 report does not involve EFDS, which "wasn't up and running"); 356:15-358:2 (OAG April 2016 Audit does not criticize SAS or EFDS); TD at 556:12-582:21 (Dep Exs. 77-85, 231-238 show EFDS kick-off on October 22, 2013; Release 1 on June 11, 2015; Release 2 deployments in August 2015, November 2015, and May of 2016; and final acceptance on June 27, 2016); *see also* Summary of Subset of EFDS Timing-Related Evidence, Ex. B-4. Plaintiffs have no basis for refusing to admit these requests.

### 3. *RFAs 8-26, 29-30: EFDS did not do the things of which Plaintiffs complain.*

Plaintiffs' denial of due process claim rests on allegations that "one or more of Defendants" engaged in certain "wrongful practices." *See* Compl. ¶ 8(a)-(m). SAS thus asked Plaintiffs to admit that the EFDS software did not do certain tasks:

| |
|---|
| ***Request 8:*** *Admit that EFDS did not deny unemployment insurance claimants' claim for benefits.* |
| ***Request 9:*** *Admit that EFDS did not terminate unemployment insurance claimants' rights to receive benefits.* |
| ***Request 10:*** *Admit that EFDS did not interfere with claimants' rights to challenge any decision or determination of the Agency.* |
| ***Request 11:*** *Admit that EFDS did not communicate with unemployment insurance claimants.* |

18

**Request 12:** Admit that EFDS did not create or send questionnaires (including "fraud questionnaires") to unemployment insurance claimants.

**Request 13:** Admit that EFDS did not make fraud determinations.

**Request 14:** Admit that EFDS did not make "robo-adjudications of fraud."

**Request 15:** Admit that EFDS did not create or send determination notices to unemployment insurance claimants.

**Request 16:** Admit that EFDS did not disqualify claimants from receiving unemployment benefits.

**Request 17:** Admit that EFDS did not assess penalties to unemployment insurance claimants.

**Request 18:** Admit that EFDS did not instruct Agency employees to advise unemployment insurance claimants that they had no right to appeal.

**Request 19:** Admit that EFDS did not seize unemployment insurance claimants' federal tax refunds.

**Request 20:** Admit that EFDS did not impose payment plans for unemployment insurance claimants.

**Request 21:** Admit that EFDS did not impose restitution or penalties for unemployment insurance claimants.

**Request 22:** Admit that EFDS did not create or send "Restitution (List of Overpayment)" notifications to unemployment insurance claimants

**Request 23:** Admit that EFDS did not initiate or otherwise pursue criminal prosecution for unemployment insurance claimants.

**Request 24:** Admit that EFDS did not pursue penalties and restitution from unemployment insurance claimants.

**Request 25:** Admit that EFDS did not oppose unemployment insurance claimants' attempts to discharge fraud-based debts in bankruptcy.

**Request 26:** Admit that EFDS did not send "secret letters" to administrative law judges (ALJs) assigned to hear post-deprivation appeals.

| |
|---|
| ***Request 29:*** Admit that EFDS did not assess punitive damages to unemployment insurance claimants. |
| ***Request 30:*** Admit that EFDS did not adjudicate fraud. |

Plaintiffs' respond that they "lack sufficient knowledge or information"; "discovery is ongoing"; and to the extent that "*it appears that* EFDS was part of and contributed to the system that" performed the action at issue, the requests are denied.

Plaintiffs' claimed lack of information is neither accurate nor valid. Plaintiffs have sued SAS for these very allegations. They had an obligation *before filing* to ensure they "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). Plaintiffs identify none of these allegations as requiring additional investigation, and no discovery supports the allegations against SAS. Putting the matters beyond dispute, after reviewing EFDS project documents, Mr. Tierney—who managed the software development projects at issue—admitted the truth of these requests. TD at 662:23-667:21. Tierney also agreed that Plaintiffs' allegations of wrongdoing, as against SAS, are untrue. TD at 652:23-659:2. The evidence in discovery is in accord. *See, e.g.*, Summary of Subset of Evidence Distinguishing EFDS and MiDAS Functionality, Ex. B-3. Finally, Plaintiffs' statement that "it appears" EFDS was "part of" a system that did these things is non-responsive. SAS asks Plaintiffs to admit the EFDS software did not do these things,

not whether they believe they have some theory of liability against SAS even though EFDS did not do these things.

> ### 4. *RFAs 31, 32, 40-42: Plaintiffs have no evidence that any SAS employee knew of any "invalid or false" fraud determinations.*

Because Plaintiffs seek punitive damages for wanton and willful misconduct, SAS asked Plaintiffs to admit they have no evidence that the EFDS software was defective or that SAS had knowledge of any allegedly false fraud determinations.

| |
|---|
| ***Request 31:*** *Admit that you have no evidence that the EFDS software was defectively designed, implemented, or maintained.* |
| ***Request 32:*** *Admit that you have no evidence that the EFDS software had a 93% margin of error in flagging claims for investigation.* |
| ***Request 40:*** *Admit that you have no evidence that SAS had knowledge that any fraud determination made by the Agency was "invalid and false."* |
| ***Request 41:*** *Admit that you have no evidence that SAS had knowledge of the overall accuracy of fraud determinations made by the Agency, with or without the MiDAS system.* |
| ***Request 42:*** *Admit that you have no evidence that SAS had knowledge of "defective and unconstitutional attributes" of the Agency's fraud detection procedure.* |

Plaintiffs responded again that "evidence" is vague and discovery is ongoing, and stated that "a 93% false positive rate" is "res ipsa loquitur," and to have "no knowledge that any fraud determination was invalid and false . . . would require a willful ignorance that is tantamount to knowledge."

Plaintiffs' "[in]sufficient information" objection is invalid, especially after

Mr. Tierney testified about SAS's contract and the role of EFDS, and admitted these requests. *See* TD at 612:23-659:2; 667:22-668:6 (Requests 31 and 32 true); 668:21-669:9 (40, 41, 42 true); 554:16-556:11, 559:18-20 (discussing pre-production testing); 561:8-562:24 (discussing pre-production user acceptance test for Release 1 EFDS complete June 4, 2015). EFDS was not part of the MIDAS system. TD at 663:22-664:8. The Attorney General review that purportedly found a 93% error rate, "did not involve cases that were flagged for the agency's investigation by the EFDS software." TD at 657:8-658:6. The 93% statistic, whatever its source, is not evidence that EFDS was defective. The unrebutted evidence is, instead, the UIA and DMTB's final system acceptance letter (Dep. Ex. 236), "formally approv[ing] and accept[ing]" the EFDS software. *See also* TD at 633:4-634:23 (discussing contract approval process, and State's rights to reject software); Contract (Doc. 61-2) at 96-97, Sections 2.253, 2.255, 2.256. Mr. Tierney also explained that EFDS prioritized alerts initiated just a small fraction of the UIA's investigations, 814:7-21—just 12 per week from June 11, 2015 to August 28, 2015, when the UIA turned off MiDAS's auto-adjudication functionality. *See* 650:17-651:11 (alerts per release); 556:12-582:21 (schedule).

Plaintiffs' *res ipsa loquitur* argument is both wrong and non-responsive. Any alleged errors in MiDAS's or UIA's fraud determinations are not evidence of errors in EFDS's data analytics. *See e.g.*, TD at 591:21-24 (SAS not involved in what to

auto adjudicate); 626:7-11 (RFP contains nothing about adjudication); 645:11-646:22 (EFDS "disposition" does not mean determination); 654:4-13 (neither SAS employees nor EFDS made any adjudications of fraud); 658:7-659:2 (neither EFDS nor SAS employees administered benefits or made fraud determinations); 663:22-664:8 (determinations sent using the MiDAS system); 664:10-16 (SAS employees and EFDS did not make robo-adjudications); 682:7-683:8, 700:9-18 (discussing adjudication in context of MiDAS).

And Plaintiffs' statement that "it appears" EFDS was "part of" a system that allegedly produced high error rates of fraud adjudications is not just without foundation, it is also non-responsive. SAS asks Plaintiffs to admit that they have no evidence of certain things, not whether Plaintiffs believe they can articulate some theory of liability against SAS even without such evidence.

### B.   Plaintiffs' objections should be deemed waived, and SAS's requests 1, 3-6, 8-26, 29-32, and 40-42 deemed admitted.

Where the Court finds an answer does not comply with the rules, it has the discretion to "order either that the matter is admitted or that an amended answer be served." Fed. R. Civ. P. 36(a)(6). Plaintiffs' obstruction here calls for the former.

Ordering a matter admitted is the appropriate remedy when a party intentionally disregards the obligations imposed by Rule 36(a). *Siser*, 325 F.R.D. at 209. In *Siser,* this Court deemed requests admitted where the responding party's answers were "egregiously evasive, irresponsible, and contrary to the letter and spirit

of the discovery rules." *Id*. at 202. The Court found particularly problematic that the responses "objected to or denied at least some of the requests to admit that should have been answered in the affirmative," *id*. at 205, and the responding party "failed to request to withdraw their [deemed] admissions" after it "became evident during the hearing that their answers . . . were legally unsound." *Id.* at 209. See also *Nurse Notes, Inc. v. All State Ins. Co.,* No. 10-CV-14481, 2011 WL 2173934, at *5 (E.D. Mich. June 2, 2011) (requests deemed admitted where the responding party listed boilerplate objections unsupported by authority), *aff'd,* 2011 WL 3862402 (E.D. Mich. Aug. 31, 2011).

Public information shows Plaintiffs' objections were untenable when made. And now, after substantial discovery, their lack-of-evidence objections are demonstrably false, and tantamount to no response at all. *See Asea*, 669 F.2d at 1245, 1247 (rejecting failure to admit or deny if sufficient information is "readily obtainable" and "evasive denial … may be deemed an admission").

Plaintiffs have kept SAS in this case for more than 3 years, with not a shred of evidence that SAS—or the software it licensed for the Agency's use—did any of the things alleged in their Complaint that deprived them of property without due process, or the things listed in SAS's requests for admission. Plaintiffs use boilerplate objections, declare their own language to be "unduly vague," and abdicate their duty to supplement. It is as if Plaintiffs allege the sky is red, refuse to

look up to see a blue sky, and then refuse to admit the sky is blue for lack of evidence. Their ongoing refusal to review the evidence they have frustrates the discovery process and is impermissible under the federal rules.

## III.   <u>Conclusion</u>

SAS asks the Court to deem SAS's RFAs Nos. 1, 3-6, 8-26, 29-32, and 40-42 admitted, or, in the alternative, to require Plaintiffs to serve amended answers, and to award other relief as the Court deems appropriate.

Dated: April 21, 2020                    Respectfully submitted,

By: /s/Stephanie A. Douglas
    Stephanie A. Douglas (P70272)
    Susan M. McKeever (P73533)
    Bush Seyferth PLLC
    100 W. Big Beaver Road, Suite 400
    Troy, MI 48084
    T: (248) 822-7800; F: (248) 822-7852
    douglas@bsplaw.com;
    *Counsel for SAS Institute Inc.*