Exhibit B3

# Exhibit 3: Summary of Subset of Evidence Distinguishing MiDAS and EFDS functionality.

## Contents

1) 02/17/2012 RFP for Enterprise Fraud Detection Software Project (Dep. Ex. 229) (SAS000860-1030) ............................................................................................................. 1

2) 12/12/2012 SAS's Contract with DTMB ("analyzes data patterns"; interfaces with MiDAS workflow functionality) (Dep. Ex. 230) (Dkt. 61-2) ................................................ 1

3) 04/04/2013 MiDAS Investigations Implementation Specification (Dep. Ex. 93) (describing MIDAS investigations functionality) ........................................................................ 2

4) 04/09/2013 MiDAS Nonmonetary Determinations Implementation Specification, FAST Enterprises (Dep. Ex. 220) (UIA_000674827-892) (MiDAS project) ................... 3

5) 05/15/2013 MiDAS Implementation Specification Evaluation: Benefits (Dep. Ex. 94) (describing monetary and non-monetary determinations, and benefit overpayment collections as part of MiDAS): ................................................................................ 5

6) 06/18/2013 UIA MiDAS – Adjudication in MiDAS, Center for Learning & Development (Dep. Ex. 120) ............................................................................................... 10

7) 06/18/2013 UIA MiDAS – Collections, Center for Learning & Development (Dep. Ex. 124) ......... 12

8) 12/04/2013 2014 MiDAS Staffing Plan Version 0.1 (Dep. Ex. 95) (CSG00020723-30) (Mentioning Fast and CSG employees, no SAS employees). ......................................... 13

9) 09/25/2014 LARA UIA Final Summary and Recommendations, Benefits Business Process Review (Dep. Ex. 96) (CSG00000178-248) (discussing functions of MiDAS) ................................ 14

10) 9/11/2015 Email S. Moffett-Massey to DOL (Dep. Ex. 163) (UIA-001486299-303) (discussing Agency's consideration of DOL's 301 Handbook discussion of auto-adjudication during "design, development, and implementation of the MiDAS system") ........... 15

11) 11/13/2015 DOL Monitoring Report Michigan Talent Investment Agency (Dep. Ex. 180) (UIA_000992148-164) ................................................................................................ 15

12) 6/21/2016 EFDS GUI User Guide (Dep. Ex. 243) (SAS01757-1827) ................................ 17

13) 06/22/2016 Enterprise Fraud Detection System (EFDS) Design Document, SAS Solutions on Demand (Dep. Ex. 244) (SAS001828-2003) ............................................... 18

14) 6/28/2016 EFDS–UIA Project Closure Report (Dep. Ex. 238) (SAS000813-825) ........................... 24

15) 11/08/2018 Clayton Tierney Custodian-of-Records Deposition ..................................... 25

16) 11/08/2018 John Henige Custodian-of-Records Deposition ......................................... 25

17) 02/27/2019 Plaintiff Cahoo, Mendyk & Cole's response to SAS's 12/21/2018 RFPs (Pak and Davison produced documents, but did not respond) ............................................. 26

18) 07/29/2019 Moffett Massey's Response to SAS's RFAs ................................................ 27

19) 07/30/2019 Blundell's Response to SAS's RFAs ......................................................... 30

20) 11/20/2019 Blundell's Response to Plaintiffs' Second set of Interrogatories (Dep. Ex. 89) ......... 32

21)   12/19/2019 Moffett-Massey Deposition ........................................................................... 33

22)   12/20/2019 Blundell Deposition ..................................................................................... 34

23)   01/08-13/2020 Kratz Deposition (2 days) ...................................................................... 34

24)   1/23/2020 Mitchell Deposition ...................................................................................... 35

25)   01/27-28/2020 Geskey Deposition ................................................................................ 35

26)   2/5-11/2020 Tierney Deposition (4 days) ...................................................................... 36

1) **02/17/2012 RFP for Enterprise Fraud Detection Software Project (Dep. Ex. 229) (SAS000860-1030)**

@73+ Functional Requirements; TD @619:1-4 ("what the State was asking SAS to configure its software to do").

2) **12/12/2012 SAS's Contract with DTMB ("analyzes data patterns"; interfaces with MiDAS workflow functionality) (Dep. Ex. 230) (Dkt. 61-2)**

@9-10 Scope of Work & Deliverables; TD @ 621:3-12 (Contract terms track RFP); 615:25-617:3 (discussing RFP scope of work and deliverables).

> ### _1.100 Scope of Work and Deliverables_
>
> **1.101 IN SCOPE**
> This contract is for the installation and configuration of a COTS software data analytics product which analyzes data for patterns that might reveal an organized attempt to defraud the Michigan Unemployment Insurance Agency (UIA) and the DHS Food Assistance Program (FAP). The State requires a data analytics product which allows staff to query an aggregate dataset populated from multiple disparate agency data sources stored in the DTMB Data Warehouse to conduct real-time ad hoc analysis. The tools must utilize techniques that allow information to be filtered and sorted in varying levels of detail. The technology must allow end-users to conduct analysis without programming and with no advanced knowledge of the underlying data sources and structures.
>
> **As this is a Statewide Contract, it is anticipated that additional State agencies and program areas (as well as MiDEAL participants) may utilize the fraud detection software and services in the future. This**

@38 Integrations (MiDAS); TD @624:5-625:13 (EFDS not part of MiDAS; Claims handling not part of EFDS).

@52+ Functional Requirements; TD @625:14-628:15 (discuss flagging and analyzing, not auto adjudication, adjudication, communication, granting or denying benefits, terminating benefits, assessing restitution or penalties, collecting wages or intercepting tax returns, handling appeals or mail or phone calls).

@125 Appendix G, Master License Agreement; TD @638:10-21.

**3)  04/04/2013 MiDAS Investigations Implementation Specification (Dep. Ex. 93) (describing MIDAS investigations functionality)**



Cover:

The FastUI product is owned by Fast Enterprises, LLC.
FastUI is a trademark of Fast Enterprises, LLC.
This document is the property of the UIA-IS Project (DTMB/UIA).

@1:

**1 Introduction**

The purpose of this document is to provide the concepts and configuration details of FastUI Discovery and Case modules to meet the investigative needs of the project.

**2 FastUI Core Functionality**

This section summarizes the high level Business Activities that are inherent within FastUI. For specific details on how these activities will be implemented or configured in MIDAS, see Section 5.

@5:

Exhibit 3. Summary of Subset of Evidence Distinguishing MiDAS and EFDS functionality. (10527979-14).DOCX

**4)    04/09/2013 MiDAS Nonmonetary Determinations Implementation Specification, FAST Enterprises (Dep. Ex. 220) (UIA_000674827-892) (MiDAS project)**



@Cover:

The FastUI product is owned by Fast Enterprises, LLC.

FastUI is a trademark of Fast Enterprises, LLC.

This document is the property of the UIA-IS Project (DTMB/UIA).

@1

2 FastUI Core Functionality .......................................................................................... 5

2.1 Cases .................................................................................................................... 5

2.2 Issue Creation ...................................................................................................... 6

2.3 Issue Assignment:  Pulling Work ......................................................................... 7

2.4 Issue Assignment:  Pushing Work ....................................................................... 7

2.5 Fact Finding ......................................................................................................... 8

2.6 Determinations/Re-Determinations ................................................................... 8

2.7 Protests and Appeals .......................................................................................... 8

@3

5 MiDAS Configurations ........................................................................................................... 14

5.1 Configure Case Categories ................................................................................................ 14

5.2 Configure Case Types ....................................................................................................... 15

5.2.1 Multi-Claimant Issue Cases ........................................................................................ 15

5.3 Configure Issue Case Stages ............................................................................................. 16

5.4 Configure Fact Finding Question Documents ................................................................... 25

5.4.1 Maintaining Issue and Fact Finding Codes ................................................................ 39

5.4.2 System/Auto Adjudication ......................................................................................... 40

5.4.3 Staff Adjudication ...................................................................................................... 41

5.4.4 Generating Fact Finding and Reasonable Attempt ................................................... 41

5.4.5 Issue and Adjustment Summaries ............................................................................. 42

5.5 Configure Protest and Appeals ........................................................................................ 43

5.6 Configure Advocacy .......................................................................................................... 44

5.7 Configure Letters .............................................................................................................. 45

5.8 Configure Reports ............................................................................................................. 46

5.9 Configure Activities .......................................................................................................... 47

5.10 Configure Work Items ..................................................................................................... 47

5.11 Configure Indicators ....................................................................................................... 47

5.12 Configure Cases .............................................................................................................. 48

5.13 Configure Imaging .......................................................................................................... 48

5.14 Configure e-Services Function/Requests ........................................................................ 48

6 Requirement Explanation .................................................................................................... 50

@4

**5)** **05/15/2013 MiDAS Implementation Specification Evaluation: Benefits (Dep. Ex. 94)  (describing monetary and non-monetary determinations, and benefit overpayment collections as part of MiDAS):**



MIDAS IMPLEMENTATION SPECIFICATION
EVALUATION: BENEFITS

@Cover

# TABLE OF CONTENTS

1. Project Summary.................................................................................................................... 5
  1.1 Objective........................................................................................................................... 5
  1.2 Methodology..................................................................................................................... 6
  1.3 Risk Levels......................................................................................................................... 6
2. Claims/Monetary Determinations........................................................................................ 7
  2.1 Implementation Specification........................................................................................... 8
  2.2 Functional Requirements.................................................................................................. 8
    2.2.1 Claims/Monetary Determinations Open Items............................................................ 8
    2.2.2 Claims/Monetary Determinations Requirements Status........................................... 10
  2.3 Risks and Recommendations........................................................................................... 10
3. Non-Monetary Determinations........................................................................................... 13
  3.1 Implementation Specifications........................................................................................ 14
  3.2 Functional Requirements................................................................................................ 14
    3.2.1 Non-Monetary Determination Requirements Status................................................ 16
  3.3 Risks and Recommendations........................................................................................... 16
4. Certifications...................................................................................................................... 18
  4.1 Implementation Specifications........................................................................................ 19
  4.2 Functional Requirements................................................................................................ 19
    4.2.1 Certifications Requirements Status........................................................................... 20
  4.3 Risks and Recommendations........................................................................................... 20
5. Benefit Overpayment Collections....................................................................................... 21
  5.1 Implementation Specifications........................................................................................ 21
  5.2 Functional Requirements................................................................................................ 22
    5.2.1 Benefit Overpayment Collections Open Items........................................................... 22
    5.2.2 Benefit Overpayment Collections Requirement Status.............................................. 23
  5.3 Risks and Recommendations........................................................................................... 23
6. Investigations..................................................................................................................... 24
  6.1 Implementation Specifications........................................................................................ 24
  6.2 Functional Requirements................................................................................................ 25
    6.2.1 Investigations Open Items........................................................................................ 25
    6.2.2 Investigations Requirements Status.......................................................................... 26
  6.3 Risks and Recommendations........................................................................................... 26

@4

                                    MiDAS Implementation Specification Evaluation

## 1.  PROJECT SUMMARY

This report reflects the Project Control Office's (PCO) continuing review of the Michigan Integrated Data Automated System's (MIDAS) implementation specification design, specifically the development of the State's Unemployment Insurance (UI) benefit system. The predefined project timeline for the definition phase is complete. However, definition meetings are continuing to resolve open items. The remaining open items comprise 36% of the undefined business requirements across the functional areas. Currently, the project has now entered the testing phase as testing began on April 2, 2013. The benefit system remains scheduled for rollout on October 1, 2013.

The six benefit functional areas that were evaluated and the latest version of each implementation specification are listed in the table below.

| Functional Area | Current Version | Released |
|---|---|---|
| Claims/Monetary Determinations | 4.1.0 | April 1, 2013 |
| Non-Monetary Determinations | 4.1.0 | April 9, 2013 |
| Certifications | 4.1.0 | April 1, 2013 |
| Investigations – Benefit Payment Control | 4.0.0 | April 4, 2013 |
| Benefit Overpayment Collections | 4.1.0 | April 8, 2013 |
| Support | 4.1.0 | April 5, 2013 |

@6

# 3.    NON-MONETARY DETERMINATIONS

The Non-monetary Determinations functional area is responsible for the following high-level unemployment insurance functions:

➢ Adjudication of issues identified from other system processes such as claims, certifications, investigations activities, along with issues detected outside of system processes (manually added issues)

➢ Development of fact finding questions and determination logic

➢ System will include functionality for auto adjudication of issues if possible

➢ Allow staff assisted adjudication of issues if the claimant and/or employer responses cause an impasse

➢ Issuance of non-monetary determinations and redeterminations

➢ Adjustments to UI claims or certification including adjustment to monetary determinations as required

➢ Identification, maintenance and tracking of protests and appeals

➢ Maintenance of advocacy program services

➢ Redetermination of Charges (ROC)

New system or business process features include the following:

➢ Additional issues have been included for auto adjudication

➢ Ability for claimants and employer to file a protest or appeal online via MiWAM

➢ Integration of the Michigan Administrative Hearings System (MAHS) via an interface to track and maintain non-monetary issues in the court system

➢ Auto redetermination of charges where applicable

@15

## 6.  INVESTIGATIONS

The investigations functional area is responsible for the following high-level unemployment insurance functions:

➤ Housing fraud case and fraud tracking

➤ Cross-match discovery including wage and death cross-match

➤ Profiling and re-employment services

➤ Housing BAM and BTQ cases

New system or business process features include the following:

➤ UIA staff will no longer need to send files back and forth via e-mail and manually upload these files regarding profiling services with the Workforce Development Agency (WDA). WDA staff will have access to MiDAS and will directly enter updates into MiDAS eliminating the need for manual intervention

➤ The BAM and BTQ Cases are completed and tracked largely on paper currently.  In MiDAS the cases will be created, worked and completed within the system

➤ Functionality currently found in the FACTS, CAM, and Profiling Access systems will be integrated into MiDAS

➤ Additional Case Stage logic has been introduced in an effort to better track Fraud Investigations and prosecution status. Investigators will now need to stage these cases to certain stages based on the current action being taken with respect to that case

@26:

@29:

## 7.  SUPPORT

➤ Letters: Development of letters will be completed by each of the functional areas assigned to the letter. Support is responsible for letter management.

➤ Workflow: Includes the assignment and management of tasks across MiDAS.  The creation of work items, cases, collections, etc. is the responsibility of each of the functional teams.

➤ Security: Application security controls access that users have to system functions.

➤ E-Services: Support is responsible for a pre-defined set of functions within MiWAM.  All other functionality will be covered by their designated MiDAS functional areas.

New system or business process features include the following:

➤ Tasks will be generated from MiDAS and will no longer be generated in the Automated Work Distribution System (AWDS).  AWDS will be phased out after the full implementation of MiDAS. The enhanced assignment functionality in MiDAS allows the agency to revisit the work flow process and the units they will be assigned to

➤ Many letters currently require staff to manually key parts of the letter as well as in some instances perform calculations for values to be entered into the letters.  With the additional automation from MiDAS the time spent preparing outgoing correspondence should be significantly reduced.

**6)   06/18/2013 UIA MiDAS – Adjudication in MiDAS, Center for Learning & Development (Dep. Ex. 120)**



State of Michigan
Unemployment Insurance Agency

Adjudication in MiDAS

@Cover:

Exhibit 3. Summary of Subset of Evidence Distinguishing MiDAS and EFDS functionality. (10527979-14).DOCX

## Table of Contents

**SECTION 1.**
NONMONETARY ADJUDICATION OVERVIEW

Introduction to Adjudication............ .........8
Adjudication Highlights........................ 9
Viewing Nonmonetary Issues......... 10
Viewing Extension Programs ......... ...... 12
Viewing the Determination  ............ 14
Viewing the Determination Letter.........15
Viewing Adjustments........................ .......19
Viewing Converted Data....................22

**SECTION 2.**
OPENING ISSUES

Testing Your Knowledge ................. 25
Understanding Opening Issues ...... ....27
Selecting the Employer.......................34
Adding Other Interested Parties...........36
Primary and Secondary Issues...........43
Opening Issues Checklist....................45
Confirmation of Comprehension..... ......46

**SECTION 3.**
GENERATING FACT-FINDING AND
REASONABLE ATTEMPTS

Fact-Finding .......................................48
Reasonable Attempts...................... .....54
Check for Understanding...................56

**SECTION 4.**
CLOSING NONMONETARY ISSUES

Manually Closing Issues ................. ......58
Overriding System Adjudication...........65
Integrated Case Notes........................72
Closing Issues with Misrep....................76
Deleting and Changing Issues..............77

**SECTION 5.**
MULTI-CLAIMS IN MiDAS

Multi Claims..........................................82

@5

## Table of Contents

**SECTION 6.**
STAGING IN MiDAS

Staging................................................86
Manual Staging........................... 87
Check for Understanding............. 92

**SECTION 7.**
PROTEST AND APPEALS

Protest and Appeals ...................94
Protest and Appeals MiWAM.........95
Redetermination of Charges...........96

**SECTION 8.**
MiWAM ADJUDICATION

Fact-Finding in MiWAM...................98
Viewing Fact-Finding
Questionnaire.............................99
Nonmonetary Request in MiWAM..104
Summary.................................105

@6

## Summary

Effectively processing nonmonetary determinations using MiDAS requires knowledge and skill in reviewing information and entering it into MiDAS. This module has been developed to give the participant an understanding how a nonmonetary determination will be processed manually and automatically using MiDAS.

The objectives of the module, listed below, were to teach how to issue and close nonmonetary determinations using MiDAS and also how to open and close issues using MiDAS.

- Become familiar with the features of MiDAS.

- Understand what issues can be auto adjudicated or manually closed in MiDAS.

- Understand how to issue a nonmonetary determination using MiDAS.

- Understand how to open an issue using MiDAS.

@105

**7)   06/18/2013 UIA MiDAS – Collections, Center for Learning & Development (Dep. Ex. 124)**



State of Michigan
Unemployment Insurance Agency

Collections

@Cover

Exhibit 3. Summary of Subset of Evidence Distinguishing MiDAS and EFDS functionality. (10527979-14).DOCX

**CLD MiDAS**

*Training*

Table of Contents;

| | | |
|---|---|---|
| Section 1.................. | Overpayment & Collections overview.............................. | 4 |
| | Collections Function in MiDAS  ......... ........................... | 5 |
| | Check For Understanding ................ ........................... | 7 |
| Section 2.................. | The Overpayment Indicator ........................................... | 8 |
| | Viewing the Indicator  ................................................11 | |
| Section 3.................. | Overpayment on the Collection Springboard.............. | 13 |
| | The Collection Sub-Tab............................................... | 15 |
| | The Bankruptcy Sub Tab.................. ..................... | 16 |
| | The Garnishment Sub-Tab...................................... | 15 |
| | Check for Understanding........................................... | 18 |
| Section 4.................. | The Collection Springboard....................................... | 19 |
| | Forecasting Penalty and Interest.................................... | 24 |
| Section 5 ................. | Check for Understanding........................................... | 25 |
| | Bill Items........................................................... | 26 |
| Section 6.................. | Payment Plans........................................................ | 29 |
| Section 7.................. | Stages ................................................................ | 34 |
| | The Stages Sub-Tab................................................ | 35 |
| | Moving through the Stages........................................ | 36 |
| | Understanding the Minimum Monthly Payment Amounts..... | 37 |
| Section 8.................. | Bankruptcies......................................................... | 38 |
| | Viewing Bankruptcies in MiDAS................................... | 39 |
| | Adding a Bankruptcy................................................ | 40 |
| Section 9 Garnishments | Garnishments Understanding the Garnishment................. | 42 |
| | Adding a Garnishment............................................. | 43 |
| Section 10.................. | Other Collection Items................................................ | 44 |
| | Viewing the History Sub-Tab........................................ | 46 |

@2

**8)   12/04/2013 2014 MiDAS Staffing Plan Version 0.1 (Dep. Ex. 95) (CSG00020723-30) (Mentioning Fast and CSG employees, no SAS employees).**

Exhibit 3. Summary of Subset of Evidence Distinguishing MiDAS and EFDS functionality. (10527979-14).DOCX

**9)** **09/25/2014 LARA UIA Final Summary and Recommendations, Benefits Business Process Review (Dep. Ex. 96) (CSG00000178-248) (discussing functions of MiDAS)**



FINAL SUMMARY AND RECOMMENDATIONS

BENEFITS BUSINESS PROCESS REVIEW

VERSION 1.0
STATUS: SUBMITTED
SEPTEMBER 25, 2014

@Cover

| 4. | MiDAS Task Analysis | 13 |
|----|---------------------|----|
| 4.1 | Claims | 13 |
| 4.2 | Monetary Determination | 14 |
| 4.3 | Certifications | 15 |
| 4.4 | Nonmonetary Determination | 15 |
| 4.5 | Appeals | 16 |
| 4.6 | Integrity | 17 |
| 4.7 | New Correspondence | 18 |

@2

# 1.  EXECUTIVE SUMMARY

The Michigan Unemployment Insurance Agency (UIA or Agency) began the modernization of the technical and software infrastructure for its unemployment insurance (UI) program in 2010. Approximately two years later, in August 2012, the tax portion of the new Michigan Integrated Data Automated System (MiDAS) was placed into production and the Agency immediately transformed many of the processes through which UI Tax and related work were conducted. The Unemployment Insurance Agency (UIA) achieved a fully integrated tax and benefit system when the benefits portion of MiDAS went into production a little more than a year later on October 1, 2013.

@4

Following benefits implementation, the growth in the combined task inventory outpaced the completion of tasks. The staff of the Unemployment Insurance Technology and Data Control (UITDC) unit, Department of Technology, Management and Budget (DTMB), and MiDAS vendor FAST Enterprises began to evaluate methods of decreasing the task inventory in January 2014 with a focus specifically on work items. In addition, a select Project Control Office (PCO) team was tasked with initiating a Benefits Backlog Review to assist in the evaluation of potential ways to reduce the task inventory and improve efficiency in processing the work.

**10)    9/11/2015 Email S. Moffett-Massey to DOL (Dep. Ex. 163) (UIA-001486299-303) (discussing Agency's consideration of DOL's 301 Handbook discussion of auto-adjudication during "design, development, and implementation of the MiDAS system")**

**11)    11/13/2015 DOL Monitoring Report Michigan Talent Investment Agency (Dep. Ex. 180) (UIA_000992148-164)**

CONFIDENTIAL - SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

U.S. Department of Labor



Employment and Training Administration
**REGION V**
John C. Kluczynski Building
230 South Dearborn Street, 6th Floor
Chicago, IL  60604-1505

*http://www.doleta.gov/regions/reg05*

November 13, 2015

Ms. Stephanie Comai, Director
Michigan Talent Investment Agency (MTIA)
Ottawa Building – 4th Floor
611 West Ottawa Street
Lansing, MI 48909

Letter

Dear Director Comai:



Cover

UIA_000992149
UIA_000992148

## EXECUTIVE SUMMARY

The US Department of Labor Employment and Training Administration (ETA) conducted a review of Michigan's Unemployment Insurance (UI) claims taking and adjudication process in response to complaints received by ETA. The review was conducted in Detroit, Michigan on August 4-5, 2015. The purpose of the review was to observe and review the new UI benefits system (MiDAS) implemented by Michigan's Unemployment Insurance Agency (UIA) in the fall of 2013 and related business processes. The UIA's methods of administration, primarily those related to adjudications and, specifically, adjudications of potential fraud issues were a key focus of the review.

@1

**BACKGROUND**

States are required to use methods of administration that are reasonably calculated to ensure full payment of unemployment compensation when due, in accordance with Section 303(a)(1) of the Social Security Act. As a result of several factors, namely our inquiry into the UIA's nonmonetary determination workload reporting, a complaint letter received from the Michigan Unemployment Insurance Project, and media attention suggesting claimants may have been incorrectly determined to commit fraud, ETA determined there was a need to more thoroughly review how the UIA, with its new system (MiDAS), is ensuring that payment when due requirements are being met.

In the fall of 2013, the Michigan Unemployment Insurance Agency (UIA) implemented a claims processing system (MiDAS) designed to automate UI claims activities to the greatest extent possible and provide enhanced services to its customers. The UIA's new system was designed, in part, in response to a March 2011 report by the Michigan Office of the Auditor General that indicated the state needed to improve its effectiveness in carrying out its responsibilities related to preventing, detecting, and recovering UI benefit overpayments. The UIA secured services

@3-4

from CSG Government Solutions to assist in identifying and implementing solutions to address the audit findings and improve the quality of the UIA services. In doing so, other states were contacted to leverage state best practices for integrity-related activities.

Misrepresentation Cases:

- The MiDAS auto-adjudication feature has been disabled for misrepresentation cases; going forward all misrepresentation cases will be reviewed by the UIA staff.

## 12)   6/21/2016 EFDS GUI User Guide (Dep. Ex. 243) (SAS01757-1827)

3.4.2 Tax Networks.................................................................................................. 33

6  User Interface: UIA Claims Domain ........................................................................ 41
    6.1 Alerts Window ................................................................................................. 41
        6.1.1 Alert List ................................................................................................. 41
        6.1.2 Filters Panel............................................................................................ 43
        6.1.3 Alert Disposition Menu .......................................................................... 46
        6.1.4 UIA Claims Roles.................................................................................... 49
    6.2 Details Window ............................................................................................... 50
        6.2.1 Details Tab.............................................................................................. 50
        6.2.2 Related Information Panel ....................................................................... 52
        6.2.3 Entity Profile Panel................................................................................. 57
    6.3 SAS Social Network Analysis Tab ................................................................... 58
        6.3.1 Social Network Diagram ......................................................................... 59
        6.3.2 Claims Networks ..................................................................................... 59

@ii

Appendix A:   Terms, Definitions, and Acronyms ........................................................ 64

### 1.3  Project Description

This project consists of the onsite installation and configuration of the SAS Fraud Framework for Government, to analyze data for patterns that might reveal an organized attempt to defraud the Michigan Unemployment Insurance Agency (UIA). The stated objective by the State of Michigan is the ability to query an aggregate data set that is populated from multiple, disparate agency data sources stored in the DTMB Data Warehouse, to conduct real-time ad hoc analysis. The project consists of two (2) phases, with an expected duration of 18 months after SAS receives clean data.

@1

Table 3 identifies the alert series that appear in the State of Michigan Unemployment Insurance Graphical User Interface in Release 2.3.

**@6**

**Table 3: Analytic Domains**

| UIA Claims | • Work and Earn<br>• Fictitious Business<br>• Incarcerated Claimant<br>• ID Theft |
|---|---|

## 6 User Interface: UIA Claims Domain

The user interface contains three (3) main sections:

1. **Alerts Window** (Section 6.1)
2. **Details Window** (Section 6.2)
3. **SAS Social Network Analysis Tab** (Section 6.3)

The **Alerts Window** displays alerts and associated alert level information within a specific alert series, and allows users to search and filter this information. The **Details Window** displays tables and graphs that contain detailed information on all the claims and associated employers in the alert. The **SAS Social Network Analysis Tab** is also accessed via the **Details Window**. The **SAS Social Network Analysis Diagram** features networks which represent the relationship of entities in the currently selected alert.

Users can easily switch from the **Details Window** back to the **Alerts Window** by clicking the **Back to Alerts** button on the menu toolbar.

**@41**

## 13) 06/22/2016 Enterprise Fraud Detection System (EFDS) Design Document, SAS Solutions on Demand (Dep. Ex. 244) (SAS001828-2003)

2   Graphical User Interface Design..........................................................................................2
2.1 Overview.........................................................................................................................2
2.1.1 Technology...............................................................................................................2
2.2 Logging On......................................................................................................................2
2.3 Interface Components Overview.....................................................................................3
2.3.1 Alerts Window..........................................................................................................3
2.3.2 Details Window.........................................................................................................4
2.3.3 SAS® Social Network Analysis Tab............................................................................5
2.4 Alert Series......................................................................................................................6

**@ii**

4.1 UIA Claims Series Details...............................................................................................61
4.1.1 Release 1 Alert Types.............................................................................................61
4.1.2 Release 2.3 Alert Types.........................................................................................61
4.1.3 Release 1 Manual Dispositions.............................................................................61
4.1.4 Release 2.1 Manual Dispositions..........................................................................64
4.1.5 Automatic Dispositions.........................................................................................64
4.1.6 UIA Claims Roles...................................................................................................65
4.1.7 Alert Workflow......................................................................................................66

**@iii**

5.1 Awareness of MiDAS.....................................................................................................92
5.1.1 Steps 1 and 2: Reading MiDAS Data.....................................................................92
5.1.2 Steps 3 and 4: Reading MiDAS Cases and Creating the EFDS Interfacing File ......92
5.1.3 Steps 5 and 6: Sending the Interfacing Files for MiDAS Consumption...................96

**@iv**

6   Web Report Studio (WRS) Reports ...................................................................................................... 97
  6.1 Tax Reports .......... 97
  6.2 Claims Reports ......... 97
    6.2.1 Employer Affiliation .......... 97
    6.2.2 Fraud Ring Report .......... 97
    6.2.3 Owner Filing as Claimant ......... 106
    6.2.4 Recently Liable Employers .......... 109
    6.2.5 Repeated Involvement on UIA Claims Certifications .......... 112
    6.2.6 Separating Employer Not in Base Period .......... 113
    6.2.7 Significant Distance Claims Report .......... 116
    6.2.8 SOM Internal Fraud .......... 117
    6.2.9 Staff Involvement for High Number of Claims .......... 118
    6.2.10   Staff Involvement in Wage Records .......... 119
    6.2.11   User ID Pattern .......... 120

Appendix B:   MiDAS Interfacing Logic ..................................................... 130
  7.3 Release 1 Interfacing Logic .......... 130
    7.3.1 SUTA .......... 130
    7.3.2 Working and Collecting .......... 131
    7.3.3 Fictitious Business .......... 133
  7.4 Release 2.1 Interfacing Logic .......... 133
    7.4.1 SUTA .......... 134
    7.4.2 Working and Collecting .......... 135
  7.5 Release 2.2 Interfacing Logic .......... 136
    7.5.1 SUTA .......... 136
    7.5.2 Under-Reported Alert Types .......... 137
  7.6 Release 2.3 Interfacing Logic .......... 138
    7.6.1 SUTA and Prohibited Transfers .......... 141
    7.6.2 Working and Collecting .......... 142
    7.6.3 Unregistered Employer .......... 143
    7.6.4 Incarcerated Claimant .......... 144

Appendix C:   MiDAS Closure Logic .......... 146
  7.7 Release 1 Closure Logic .......... 146
  7.8 Release 1 Check For Outcomes .......... 146
    7.8.1 Good Lead – Open Case .......... 146
    7.8.2 Good Lead – Closed Case .......... 147
  7.9 Release 2.3 Closure Logic .......... 147
  7.10  Release 2.3 Check For Outcomes .......... 147

Appendix D:   MiDAS Interfacing File Specifications .......... 149
  7.11  Release 1 Interfacing File Specifications .......... 149
  7.12  Release 2.3 Interfacing File Specifications .......... 150

Table 61: New Case Thresholds – Release 1 .......... 93
Table 62: New Case Thresholds – Release 2 .......... 94

@ix

## 1.1   Purpose of this Document

This document contains the design specifications for the Enterprise Fraud Detection System (EFDS) for the Unemployment Insurance Agency (UIA) of the State of Michigan (SOM), and includes details on the Graphical User Interface (GUI), the types of alerts generated, and the list of standard and custom reports provided.

@1

## 1.3   Project Description

This project consisted of the onsite installation and configuration of the SAS Fraud Framework for Government, to analyze data for patterns that might reveal an organized attempt to defraud the State of Michigan Unemployment Insurance Agency (UIA). The stated objective by the State of Michigan is the ability to query an aggregate data set that is populated from multiple, disparate agency data sources in addition to UIA's MiDAS database, to generate Fraud alerts and reports. The project consisted of four deployments, with an overall project duration from project kick-off of 30 months.

## 2.1  Overview

The SAS Social Network Analysis GUI surfaces alerts to the end users to support investigations in determining waste, abuse, and/or fraud for different SOM UIA subject areas. The interface surfaces supporting information for alerts, including scores, metrics, graphs, and other information to provide investigators with a holistic view of alerted entities.

The GUI has the following features:

- A logon window, to restrict access to authorized personnel only
- A search facility
- Access to **Alert Lists**
- Details on individual alerts

**Alert Lists** and their supporting screens are secured using SAS Metadata Groups. Users can be included in one, many, or no groups to provide the most flexibility for security. The GUI for the project contains different presentations based on the user's role. Users have access only to data they are authorized to view.

@2

# 4   UIA Claims Series

## 4.1   UIA Claims Series Details

The following sections explain the details of the UIA Claims series.

### 4.1.1 Release 1 Alert Types

- Work and Earn
- Fictitious Business

### 4.1.2 Release 2.3 Alert Types

- Work and Earn
- Fictitious Business
- Incarcerated Claimant (Requirement 2.13)
- ID Theft (Requirements 2.1, 2.2, 2.4, 2.9, 2.14, 2.20, 2.21, 3.1, 3.3)

@61

### 4.1.5 Automatic Dispositions

The automatic disposition options for the UIA Claims series are:

- **Automatically Send New Case to MiDAS**
- **Automatically Send Update to MiDAS**
  - A subset of EFDS Claims alerts will be automatically sent to MiDAS for case creation and to update existing cases. These alerts will enter the EFDS GUI with a Disposition Status of Sent New Case to MiDAS and a MiDAS Case Sub-status of New Case or Update.
- **Automatically Close from MiDAS**
  - All alerts generated are vetted against MiDAS case data according to logic provided by the UIA team (Appendix B: MiDAS Interfacing Logic). This logic includes instructions on when to automatically close alerts in the GUI, rather than sending them to the MiDAS case management system (Section 5.1.2.4). These alerts have the disposition status Closed.
  - When logic indicates that alerts should be sent to MiDAS, a different auto closure process is initiated (Section 5.1.2.5). All EFDS alerts with disposition status Sent New Case to MiDAS or Update Sent to MiDAS are compared to the associated MiDAS cases. Closures in MiDAS trigger

@64

the automatic closure of the corresponding EFDS alerts. These alerts have the disposition status Closed.

- Alert Type
  - For Release 1:
    - o Work and Earn
    - o Fictitious Business
  - For Release 2.3:
    - o Work and Earn
    - o Fictitious Business
    - o Incarcerated Claimant
    - o ID Theft
- Score

@69

  - Risk score assigned to this alert for the purposes of ranking and prioritization

- Disposition Status
  - o New
  - o Sent New Case to MiDAS
  - o Sent Update to MiDAS
  - o Watching

@70

  - o Closed

Figure 76: Process Overview



@92

## 5.1   Awareness of MiDAS

### 5.1.1   Steps 1 and 2: Reading MiDAS Data

SAS expects the UIA team to refresh the Conversion datamart with the latest MiDAS data every Sunday. Each Monday, starting at 12 PM, the SAS schedule then pulls the latest data and runs the analytic processes.

This process will result in new alerts being created, existing alerts being updated, and/or alerts being automatically closed out due to new information. All alerts in the EFDS GUI with a disposition status of Sent New Case to MiDAS or Update Sent to Midas will be maintained regardless of the analytic process.

### 5.1.2   Steps 3 and 4: Reading MiDAS Cases and Creating the EFDS Interfacing File

All alerts generated in the EFDS GUI with disposition status New will be vetted against MiDAS case data, using logic provided by the UIA team (see Appendix B:), to determine the following for each alert:

- If a new MiDAS case needs to be created.
- (For Tax alerts only) If there is pending MiDAS data.  If so, the alert will remain in status New and be reevaluated in the next analytic run.
- If an existing MiDAS case needs to be updated.
- (For Tax alerts only) If a New EFDS alert is a duplicate of an existing MiDAS case.  If so, EFDS alert information will be included in the next interfacing file.
- If a matched MiDAS case meets the criteria for alert closure.

Table 61: New Case Thresholds – Release 1

@93

| Alert Type | Default Number to Send |
|---|---|
| Work and Earn | 10 |
| Fictitious Business | 2 |

Table 62: New Case Thresholds – Release 2

@94-95

| Alert Type | MiDAS Case Type | Default Number to Send |
|---|---|---|
| Work and Earn | NMISSU | 5<br>In order to avoid the creation of cases that UIA is aware of but has yet to distribute, EFDS will delay sending any non-mons for the last two completed quarters. |
| Work and Earn | FRDTIP | 0 |
| Fictitious Business | | 1 |
| Under-Reported – SUW Cross Match | | 1 alert per week |
| Under-Reported – Proof of Wage | | 1 alert per week |
| Under-Reported – Wage Discrepancy | | 1 alert per week |
| Under-Reported – Tax | | 1 alert per week |

| Alert Type | MiDAS Case Type | Default Number to Send |
|---|---|---|
| Under-Reported – High First Quarter | | 1 alert per week |
| Unregistered Employer – WCA | | 5 |
| Unregistered Employer – WDA | | |
| ID Theft | | 2 |
| Incarcerated Claimant | | 4 |

### 5.1.3  Steps 5 and 6: Sending the Interfacing Files for MiDAS Consumption

Per UIA request, all interfacing files will be concatenated into a single file and pushed to the UIA production mailbox (/UAEFDS?EFDSINP@UAMID) at the end of the Claims process (typically each Tuesday morning). This single file will contain the automatically generated content from the Tax and Claims processes and any content manually generated since the send from the previous week.  Details on the file layout and specifications can be found in Appendix D. Once in possession of the interfacing file, the UIA team will process the contents in the production environment. EFDS Alert IDs will be available via the fstrData field for all created, updated, and duplicate cases once Conversion has been refreshed. This will facilitate the alert closure process for the following week as outlined above.

*Note:*  During Release 1 UAT we realized that users were manually dispositioning the same alerts more than once, causing duplicate records in the interfacing files.  To address this, starting in Release 2, SAS only included the most recent action for each alert in the weekly interfacing file.

@96

# 6  Web Report Studio (WRS) Reports

The outputs of additional analysis on potential fraud behavior were used to generate reports in SAS Web Report Studio (WRS).

@97

## Appendix B:  MiDAS Interfacing Logic

### 7.3  Release 1 Interfacing Logic

The following logic was provided by the UIA team to facilitate integration between the EFDS GUI and MiDAS Case Management in Release 1.

@130

**14)  6/28/2016 EFDS–UIA Project Closure Report (Dep. Ex. 238) (SAS000813-825)**

### State of Michigan
### Enterprise Fraud Detection System – Unemployment Insurance Agency
### Project Closure Report

#### A.  General Information

| Project ID/Acronym: | EFDS | Creation Date: | June 15, 2016 |
|---|---|---|---|
| Controlling Agency: | TED/TIA/DTMB/UIA | Modification Date: | |
| Prepared by: | Tim Palmer | Authorized by: | |
| Prime Contractor: | SAS Institute | Date Awarded: | December, 2012 |

@1

#### 9.   Customer Feedback

The end users of the data created with the UIA EFDS will primarily be the Fraud unit and the SUTA unit.  In addition, staff from UITDC and DTMB were highly involved in review and feedback. Throughout the course of the project, input and feedback was solicited from the customer.  Some of the specific instances of this are listed below:

1.  Initial Design Sessions (two; one before Release #1 development, and one before Release #2 development
2.  Session with users during development that included feedback on;
    a.  Alerts –
        i.  Business Rules
        ii.  Maximum number of alerts to be generated per month/quarter
        iii.  Thresholds for calculating alert scores
        iv.  MiDAS case creation and update rules
    b.  Reports –
        i.  Business rules
        ii.  Information to be displayed
        iii.  Frequency reports are to be generated
    c.  Graphical User Interface (GUI)
        i.  Filtering options
        ii.  Information to be displayed
        iii.  Quick Links

@11

**15)  11/08/2018 Clayton Tierney Custodian-of-Records Deposition**

- The FAST contract for MiDAS "encompassed the entire universe of what's done by UI. All of [the Agency's] activities are happening for the most part within the MiDAS system." (Tierney @134:24-135:3).

- EFDS was "very specific looking for integrity issues on employers or claimants." (Tierney @135:4-5).

- The "only thing" the Agency used EFDS "for was to develop leads towards potential fraud in UI." (Tierney @135:5-8).

- EFDS was designed to run claim and employer information "through algorithms designed to look for potential fraud activity," (Tierney @128:11-21), to "score" claims on a scale of "how likely it is that fraud may have been committed." (Tierney @132:13-17).

- MiDAS would "then generate work items," which would be "ship[ped] . . . to the investigator or the claims examiner, depending on which type of lead it was." (Tierney @128:17-18, 132:18-24).

- The EFDS was just one source of leads that the Agency would investigate for fraud. The Agency also ran other computer cross-matches that could "create a hit" "based on federal requirements" (Tierney @129:8-19).

- The score generated by EFDS was "not an automatic adjudication of fraud. . . Ever." (Tierney @132:18-133:3).

- EFDS did not "adjudicate fraud." (Tierney @128:12-21).

**16)  11/08/2018 John Henige Custodian-of-Records Deposition**

- SAS's programmers "delivered" and had control over the EFDS code. (Henige @23:21-24:15).

- The Agency (perhaps with CSG) developed the requirements for the EFDS project, which were included in a request for proposal for work that was awarded to SAS.  (Henige @12:1-18).

- "EFDS was built to analyze employer data and claimant data . . . [to] run analytics on it and basically send a file back to MiDAS saying we believe these are [the top] leads based on our analytics." (Henige @15:23-16:3; see also 15:16-16:14; 17:9-24).

- The Agency defined the minimum score that would be flagged for investigation (Henige @26:21-25), and defined number of leads it would accept of each type, depending on "how many the business units wanted."  (Henige @25:6-9; see also 16:15-24; 18:22-23, 25:10-26:3).

- EFDS data analytics ran "weekly."  (Henige @19:5-20:5).

- Mr. Henige recalled the "max" number of leads the UIA received from EFDS each week was "close to a hundred"—but that was only during "spike[s]" after a "huge influx" of employer quarterly reports. (Henige @32:19-33:12).

**17)   02/27/2019 Plaintiff Cahoo, Mendyk & Cole's response to SAS's 12/21/2018 RFPs (Pak and Davison produced documents, but did not respond)**

**REQUEST NO. 11:**      Please produce, for each named Plaintiff, all documents supporting the claim that EFDS was involved in that Plaintiff's fraud determination or redetermination.

**RESPONSE:**

11.  Plaintiffs have no documents in their possession responsive to request number. These can only be obtained in discovery and Plaintiffs have not received any discovery responses to date.

## 18)    07/29/2019 Moffett Massey's Response to SAS's RFAs

| | | | | |
|---|---|---|---|---|
| Moffett-Massey | SAS First RFA's | 4 | Admit that the EFDS software conformed to SAS's contract with the State, including its functional requirements. | Defendant Moffett-Massey neither admits nor denies this request as she lacks personal knowledge and the technical background to determine if the EFDS software properly conformed to the contract specifications including the functional requirements. Moffett-Massey was not involved in negotiating the SAS contract and does not possess the knowledge to determine what functionality was agreed to. **Moffett-Massey admits that based on her limited knowledge, the EFDS software was to interface with systems of other state departments and recognize leads of potential fraud. Those leads were then turned over to Unemployment Insurance Agency staff to determine if they were viable and warranted further investigation**. But, Moffett-Massey has no knowledge whether that was the extent of the software's functional requirements. Based upon her reasonable inquiry, Moffett-Massey would direct SAS to the Unemployment Insurance Agency's technical team that worked with the EFDS software. |
| Moffett-Massey | SAS First RFA's | 8 | Admit that the **State did not use the EFDS software to adjudicate fraud, terminate benefits, garnish wages, or seize tax refunds from any Plaintiff.** | Based on her limited knowledge of the EFDS software, Defendant Moffett-Massey **admits** this request. |
| Moffett-Massey | SAS First RFA's | 9 | Admit that during the relevant time period, the State used MiDAS to automate certain tasks in the Agency's administration of unemployment benefits, including:<br><br>(a) communication with claimants;<br><br>(b) finding of facts;<br><br>(c) determinations of misrepresentation or fraud; | Defendant Moffett-Massey neither admits nor denies this request in its entirety. Based upon a reasonable inquiry Moffett-Massey responds to each subpart as follows:<br><br>(a) Deny that all communication with claimants was automated. Admit that **depending on the issue involved and circumstances, MiDAS was the source of processing most communications sent to a claimant;** however, MiDAS did not and does not make calls to the claimants.<br><br>(b)Moffett-Massey does not know what is meant by "findings of fact." Assuming SAS is referring to factfinding documents submitted to |

| | | | (d) assessment of restitution and penalties; | a claimant to obtain information, Moffett-Massey denies that all factfinding was automated. Admit that once an issue was opened, **certain factfinding inquiries were generated and mailed out of the MiDAS system**. However, in some cases, supplemental factfinding was individualized and prepared by Unemployment Insurance Agency staff to fit the specific circumstance involved. MiDAS would then generate and print the documents. |
|---|---|---|---|---|
| | | | (e) denial or termination of unemployment benefits; and | |
| | | | (f) collection of restitution and penalties. | |

(c) Deny that all determinations of misrepresentation or fraud were automated. **Admit that determinations of misrepresentation or fraud were MiDAS generated after a crossmatch** revealed quarterly wages and the claimant failed to respond to factfinding (and a 48-hour call when made) or both the employer and claimant failed to respond to the factfinding inquiry. In all other instances, determinations of misrepresentation or fraud were made by Unemployment Insurance **Agency staff with the MiDAS system generating and printing the final determination/redetermination** to be sent to the claimant.

(d)Deny that the assessment of restitution and penalties was automated. Admit that after Unemployment Insurance Agency staff calculated the time period involved, **MiDAS performed the math and then generated, printed, and mailed out the list of overpayments** and penalties due and owing.

(e) Neither admit nor deny in the manner stated. If the question refers to a denial of the claim for benefits because the claimant has insufficient wages or has filed two claims in the same benefit year, then Moffett-Massey admits that a claim denial letter was generated and processed by the MiDAS system. But in other instances, Unemployment Insurance Agency staff may be involved before the claim for benefits is denied. Also, if "terminations of unemployment benefits" refers to a finding of

| | | | | ineligibility or disqualification, then depending on the issue, certain aspects of that process was generated by MiDAS, such as the initial factfinding inquiry and the issuance fraud determinations or redeterminations where a crossmatch resulted in wages and the claimant failed to respond to a factfinding request.<br><br>(f) **Admit that the entire collection process is generated by MiDAS provided** that the collection meets **certain criteria** set out by the Unemployment Insurance Agency, including a threshold dollar amount. If the collection fails to meet the necessary criteria, then Moffett-Massey denies that the process is MiDAS generated because staff may be involved to manually request certain collection action. |
|---|---|---|---|---|
| Moffett-Massey | SAS First RFA's | 10 | Admit that the **State has not used the EFDS software to communicate** with unemployment insurance claimants. | Based on her limited knowledge of the EFDS software, Defendant Moffett-Massey **admits** this request. |
| Moffett-Massey | SAS First RFA's | 12 | Admit that the **State has not used the EFDS software to adjudicate misrepresentation or fraud** in connection with claims for unemployment insurance benefits. | Based on her limited knowledge of the EFDS software, Defendant Moffett-Massey **admits** that the software was not used to adjudicate misrepresentation or fraud. However, an EFDS lead may have been a source of information that was used in the intentional misrepresentation adjudication process. |
| Moffett-Massey | SAS First RFA's | 14 | Admit that the State has not used the EFDS software to **deny or terminate unemployment benefits** in connection with claims for unemployment insurance benefits. | Defendant Moffett-Massey neither admits nor denies this request in the manner and form presented. Moffett-Massey **admits** based on her limited knowledge, that the EFDS software was not used to outright deny a claim for benefits. However, based on her limited knowledge of the EFDS software, if EFDS provided a lead that resulted in an investigation and a finding of ineligibility or disqualification, then such action could result in a termination of unemployment benefits if the claimant was still collecting benefits. |

| Moffett-Massey | SAS First RFA's | 15 | Admit that the **State has not used the EFDS software to collect restitution or penalties** in connection with claims for unemployment insurance benefits. | Based on her limited knowledge of the EFDS software, Defendant Moffett-Massey **admits** this request. |
|---|---|---|---|---|
| Moffett-Massey | SAS First RFA's | 16 | Admit that the **State has not used the EFDS software to intercept federal or state tax refunds** of unemployment claimants. | Based on her limited knowledge of the EFDS software, Defendant Moffett-Massey **admits** this request. |

## 19)   07/30/2019 Blundell's Response to SAS's RFAs

| Blundell | SAS First RFA's | 6 | Admit that the **State used the EFDS software to flag instances of potential fraud for investigation** by the Agency. | Defendant Blundell neither admits nor denies that the State used the EFDS software to "flag" instances of potential fraud. Based upon **Defendant Blundell's understanding, if EFDS discovered a crossmatch, which is a match between a claimant receiving benefits and a report that the claimant had wages during the same time period, it would create a nonmonetary case for investigation so the Agency can determine whether a claimant was eligible for benefits and whether they engaged in fraud.** Defendant Blundell is unaware of EFDS's involvement with any fraud adjudication but admits **she has not seen EFDS create a fraud case**. |
|---|---|---|---|---|
| Blundell | SAS First RFA's | 8 | Admit that the State did not use the EFDS software to adjudicate fraud, terminate benefits, garnish wages, or seize tax refunds from any Plaintiff. | **Defendant Blundell admits that the EFDS software did not adjudicate fraud, terminate benefits, or garnish wages regarding Plaintiffs.** Defendant Blundell neither admits nor denies whether the EFDS software was used to seize Plaintiffs' tax refunds due to lack of knowledge and directs SAS to the response set forth by Defendant Moffett-Massey. |
| Blundell | SAS First RFA's | 9 | Admit that during the relevant time period, the **State used MiDAS to automate certain tasks** in the Agency's administration of unemployment benefits, including: | Defendant Blundell neither admits nor denies this request in its entirety. Further, Defendant Blundell objects to the use of the word automated as it is vague and overlybroad. However, without waiving said objection and in the spirit of discovery, following reasonable |

Case 2:17-cv-10657-DML-RSW   ECF No. 268-6, PageID.6286   Filed 04/21/20   Page 34 of 41

Exhibit 3. Summary of Subset of Evidence Distinguishing MiDAS and EFDS functionality. (10527979-14).DOCX

| | | | (a) communication with claimants; <br> (b) finding of facts; <br> (c) determinations of misrepresentation or fraud; <br> (d) assessment of restitution and penalties; <br> (e) denial or termination of unemployment benefits; and <br> (f) collection of restitution and penalties. | inquiry Blundell responds to each subpart as follows: <br> (**a) Defendant Blundell denies that all communication was automated. Any phone communication with a claimant is conducted by staff. Further, while MiDAS is the source for processing most communication to a claimant, such as fact-finding forms, letters, determinations and redeterminations, it is based upon on specific activity occurring on the file or at the direction of staff.** <br> (b) Defendant Blundell does not know what particular document or communication is being referred to as "findings of fact." Assuming Plaintiffs are referring to fact-finding forms which contain a series of questions on an issue sent to the claimants and employers as part of an investigation, Defendant Blundell admits the **MiDAS system can generate and mail the initial, basic fact-finding forms**. However, any supplemental fact-finding would be individualized and prepared by staff to fit the specific circumstance involved. **Even if prepared by staff, MiDAS would be used to generate and print the documentation.** <br> (c) Defendant Blundell denies that all determinations of misrepresentation or fraud were automated. **Defendant Blundell admits that determinations of misrepresentation or fraud were automated in some limited circumstances**. However, in all other instances, determinations of misrepresentation or fraud were made by Unemployment Insurance Agency staff with the MiDAS system generating the final determination/ redetermination to be sent to the claimant. <br> (d) Defendant Blundell denies that the assessment of restitution and penalties was automated. Defendant Blundell admits that **after Unemployment Insurance Agency staff calculated the time period involved, MiDAS performed the math and generated and mailed out the list of overpayments** and penalties due and owing. <br> (e) Defendant Blundell neither admits nor denies in the manner stated. Blundell admits that if a claim is denied after application because the claimant has insufficient wages or |

Exhibit 3. Summary of Subset of Evidence Distinguishing MiDAS and EFDS functionality. (10527979-14).DOCX

| | | | | |
|---|---|---|---|---|
| | | | | has filed two claims in the same benefit year, **MiDAS would generate and mail a claim denial letter**. If a claimant is already receiving benefits, to terminate receipt the Agency would have to issue a determination or redetermination regarding a claimant's ineligibility or disqualification subsequent to investigation. Please refer to answer to subparagraphs (b) and (c).<br>(f) Defendant Blundell neither admits nor denies this subparagraph due to lack of knowledge. Upon reasonable inquiry, Defendant Blundell refers SAS to the response set forth by Defendant Moffett-Massey. |
| Blundell | SAS First RFA's | 12 | Admit that the State has not used the EFDS software to adjudicate misrepresentation or fraud in connection with claims for unemployment insurance benefits. | Defendant Blundell **admits that the EFDS software did not adjudicate misrepresentation or fraud.** However, EFDS may have been an information source that was used in the Agency's adjudication of fraud. |

**20) 11/20/2019 Blundell's Response to Plaintiffs' Second set of Interrogatories (Dep. Ex. 89)**

**INTERROGATORY NO. 14.** Please provide the name of each person making an unemployment insurance claim that you admit was flagged using EFDS software for filing a potentially fraudulent unemployment insurance claim, or for filing an unemployment insurance claim that potentially warranted further investigation by the Michigan Unemployment Insurance Agency, from August 1, 2014 until January 31, 2018.

EXHIBIT NO.

Case 2:17-cv-10657-DML-RSW   ECF No. 268-6, PageID.6288   Filed 04/21/20   Page 36 of 41

Exhibit 3. Summary of Subset of Evidence Distinguishing MiDAS and EFDS functionality. (10527979-14).DOCX

**ANSWER:** Defendant Blundell objects to this interrogatory, as it is overly broad and unduly burdensome. As indicated in a previous interrogatory response, I am only able to determine the source of an investigation by looking at the source entered on the non-monetary issue and fraud issue in MiDAS. There may exist some other technical ways to determine if this occurred, but I do not possess that knowledge.


**21)   12/19/2019 Moffett-Massey Deposition**

- EFDS generated leads for investigators to investigate both for employers and claimants. (Moffett-Massey @345:4-6).

- EFDS was one source of leads; others included tips, employer protests, agency staff, MiDAS. (Moffett-Massey @345:7-19; 39:23-40:13 (MiDAS), 53:7-55:1 (employer protest, agency staff)).

- EFDS looked for fraud, notified the agency, and "it was assigned to staff to do further investigation for potential fraud." (Moffett-Massey @172:11-16).

  o EFDS "produced a lead. After that, staff did the investigation." (Moffett-Massey @175:7-13).

  o An EFDS "lead came in and it was assigned to staff and staff proceeded to investigate that lead." (Moffett-Massey @178:16-25).

  o "leads that came from the EFDS were given to staff or assigned to staff." (Moffett-Massey @179:17-20).

- The DOL's 2015 report (Exhibit 71) reviewed the MiDAS system; the review did not involve EFDS; none of the 6 findings relate to EFDS;

and none of the 4 areas of concern relate to EFDS. (Moffett-Massey @350:19-351:15 ("it wasn't up and running at the time of this")).

- The OAG April 2016 Audit (Exhibit 66) did not include a review of EFDS; none of the 8 findings involve EFDS; SAS did not have anything to do with the findings; nothing in the document criticizes EFDS or SAS; nothing in the document requires SAS action. (Moffett-Massey @356:15-358:2).

## 22)  12/20/2019 Blundell Deposition

- Describes that "leads" for Agency investigations come from "employer protests"; "Discovery, which is MiDAS"; "Agency findings from the staff"; automatically based on claimant responses; tip hotlines; and EFDS.  (Blundell @245:1-23; 184:3-11 ("Discovery" means "within MiDAS")).

- Describes "source" for an investigation– "whether it's an employer protest, agency finding, [or] EFDS";  For a case flagged for investigation by EFDS, "[t]here's a box right next to the issue ID date" that "says Source, and it would say EFDS."  (Blundell @153:9-154:25).

## 23)  01/08-13/2020 Kratz Deposition (2 days)

- Agrees that "no one from SAS supervised" or "worked on" her adjudication team."  (Kratz @530:16-24).

- Did not use EFDS.  "The only instructions" she ever had if the source of a case was EFDS were that "those were not our cases and to refer them back to the fraud unit.  So there was no training except, do not touch."  (Kratz @454:10-20).

- No evidence that UIA used EFDS as a tool to issue determinations, notices to claimants, garnish wages, seize taxes, deny benefits, terminate benefits, communicate with claimants. (Kratz @539:11-540:11).

**24)   1/23/2020 Mitchell Deposition**

- Plaintiffs' counsel confirms that the process that "went back six years to review potential fraud claims" was within MiDAS. (Mitchell @90:9-15).

- Plaintiffs' counsel represents that automated collections was "in MiDAS" (Mitchell @115:18-22).

- Plaintiffs' counsel suggests there were "issues with the fraud determinations in MIDAS" and that the complaint in this action put her on notice of those "problems." (Mitchell @118:8-119:11).

- No facts that would lead her to believe SAS involved in any way in the processing or unemployment claims, or had any authority to make determinations or adjudications, or were ever involved in garnishing wages, or intercepting taxes, or communicating with claimants, or handling appeals, or supervising UIA personnel.  (Mitchell @56:9-58:18).

**25)   01/27-28/2020 Geskey Deposition**

- Software the agency used for auto-adjudication was MiDAS. (Geskey @224:2-225:15 (confirming the definition of auto adjudication, including as "a term that was used internally at the agency relating to MiDAS"); 235:4-10 (FAST's counsel asking about "2013 to 2015 when auto adjudication was occurring using – in the MiDAS system"); 244:18-21 ("the auto adjudication function of MiDAS"); 257:14-16 (Plaintiffs' counsel: "Q: There's no dispute that MiDAS was auto adjudicating claims as it was designed to do, correct? A: Yeah, I believe that's true."); 289:25-290:2 (Plaintiffs' counsel asking whether "the auto adjudication performed by MiDAS on fraud claims was meeting the [UIA's] quality standards").

- MiDAS benefits system "went live to the general public" on October 1, 2013. (Geskey @310:25-311:5).

- From October 1, 2013, all forms and letters sent to claimants were sent though MiDAS software.  (Geskey @487:10-24).

Case 2:17-cv-10657-DML-RSW   ECF No. 268-6, PageID.6291   Filed 04/21/20   Page 39 of 41

Exhibit 3. Summary of Subset of Evidence Distinguishing MiDAS and EFDS functionality. (10527979-14).DOCX

- EFDS not discussed in November 2015 DOL Report (Geskey @452:21-23).

- EFDS not discussed in April 2016 OAG Report (Geskey @452:24-453:1)

- Not aware of any changes to EFDS as a result of DOL or OAG reports. (Geskey @453:2-4).

- Does not understand Zynda review to have had anything to do w/ EFDS. (Geskey @459:22-24).

- Except as specifically stated, did not intend to provide testimony regarding SAS or EFDS. (Geskey @459:14-21)

**26)   2/5-11/2020 Tierney Deposition (4 days)**

- He oversaw implementation of "MiDAS and EFDS"-"two different computer systems." (TD @548:13-17).

- Agrees neither SAS employees nor SAS's EFDS software did any of the things Plaintiffs allege caused them harm. (TD @ 652:23-659:2 (testifying that allegations in First Amended Complaint, Paragraphs 8(a)-(m), 77, 89, 90 are not true as to SAS); 659:7-669:9 (admitting the truth of SAS's RFAs to Plaintiffs, Nos 1-11, 14-26, 29-34, 40-42)).

  o Having overseen the software projects that led to MiDAS and EFDS, Mr. Tierney formed the opinion in fall of 2015-when similar litigation was pending against the UIA-that "EFDS was not in place or used as part of the determinations." (TD @669:10-670:11).

  o He holds the same opinion with regard to this case. (TD @814:23-815:11).

- EFDS RFP (Dep. Ex. 229): For the Integrity Initiative, the State solicited proposals for a "commercial off-the-shelf software data analytics product" that could be configured to analyze data from multiple sources. (TD @ 613:2-614:22).

- o The winning bidder for what the State would call the Enterprise Fraud Detection Software (EFDS) would license and configure software to run on the State's hardware and analyze the State's data. (TD @615:25-617:25).

- o The RFP included technical requirements (for running software on the State's systems), and functional requirements (what the State wanted the software to do). (TD @ 618:17-619:4).

- o The State also wanted a project manager with information technology (IT) and project management experience, but did not require unemployment experience. (TD @ 619:1-620:4).

- The UIA used the EFDS software to prioritize the Agency's resources in conducting federally mandated fraud investigations. (TD @ 567:20-568:8; 569:5-12; 579:10-580:9; 585:12-20; 592:20-594:16 (discussing federal requirement for quarterly cross-matches and model cross-match code, and UIA's need to prioritize "four to five thousand cases" quarterly));

  - o @609:16-24 (discussing Department of Labor ETA Handbook 301, Dep. Ex. 68, which "recognizes that agency's [sic] can use cross-match programs to identify cases for investigation");

  - o @609:25-612:9 (discussing DOL Monitoring report, Dep. Ex. 71, under which "the agency [was] still permitted to start an investigation based on the 13-week spreading of wages" and was still permitted to "take appropriate action," including an adjudication of misrepresentation, without a claimant response).

  - o @437:8-437 ("The EFDS system was used to identify patterns of activity that appeared to be generated by invalid claims. Something similar to a high number of claims from the same household . . . street. . . IP address, that type of thing.")

- The EFDS requirements call for predictive analysis and data analytics to "flag" or "identify suspicious activity for the agency's use in investigating potential fraud," (TD @ 625:14-626:2), but say nothing about adjudication, communication, denying or terminating benefits,

assessing restitution or penalties, collecting wages or intercepting taxes, or handling mail, phone calls, or appeals, (626:4-627:15).

- o The UIA defined criteria it deemed suspicious, "from a user perspective," and SAS employees configured SAS's data analytics software to "capture instances of that."  (TD @ 623:15-624:1).

- The EFDS graphical user interface ("GUI") guide (Dep. Ex. 243) and Design Document (Dep. Ex. 244) confirm that the "software provides alerts and search functionality . . . [t]hat's all." (TD @ 639:14-640:9; Dep. Exs. 243; 244).

- SAS employees configured SAS's data analytics software to analyze the State's data, and fulfilled the UIA's request that the EFDS software be configured to send prioritized alerts to a file for the UIA's investigation—according to logic provided by the UIA team.  (TD @ 645:20-650:1; 652:5-18).

- "SAS's software had nothing to do with the forms the UIA sent to claimants, . . . any claimant's claims before [EFDS] went live [June 11, 2015], … [or] how the MIDAS system followed the UIA's business rules, decision trees, and policies." (TD @ 670:17-671:19).