# EXHIBIT A

Page 1

1  IN THE DISTRICT COURT OF THE UNITED STATES
2  FOR THE EASTERN DISTRICT OF MICHIGAN
3  SOUTHERN DIVISION
4
5  PATTI JO CAHOO, KRISTEN MENDYK,
6  and KHADIJA COLE, HYON PAK, and
7  MICHELLE DAVISON, individually and
8  on behalf of similarly situated
9  persons,
10          Plaintiffs,
11      vs.      Case No. 17-10657
12               Hon. David M. Lawson
13  SAS INSTITUTE, INC., FAST ENTERPRISES,
14  L.L.C., CSG GOVERNMENT SOLUTIONS,
15  STEVE GESKEY, in his individual capacity,
16  SHEMIN BLUDELL, in her individual capacity,
17  DORRIS MITCHELL, in her individual capacity,
18  DEBRA SINGLETON, in her individual capacity,
19  JULIE A. McMURTRY, in her individual capacity,
20  SHARON MOFFET-MASSEY, in her individual capacity,
21          Defendants.
22  _____
23      Videotaped Deposition of Sharon A. Moffett-Massey
24          December 19, 2019
25          Bloomfield Hills, MI

Page 2

1      The Videotaped Deposition of SHARON A.
2   MOFFETT-MASSEY,
3       Taken at 1760 South Telegraph Road, Suite 300,
4       Bloomfield Hills, Michigan,
5       Commencing at 9:19 a.m.,
6       Thursday, December 19, 2019,
7       Before Randee E. Sharfman, CSR-1392.
8
9  APPEARANCES:
10
11 TONY PARIS
12 JOHN C. PHILO
13 Sugar Law Center
14 4605 Cass Avenue
15 Second Floor
16 Detroit, Michigan  48201
17 313.993.4505
18 tparis@sugarlaw.org
19 jphilo@sugarlaw.org
20     Appearing on behalf of the Plaintiffs.
21
22
23
24
25

Page 3

1  KEVIN S. ERNST
2  HANNAH FIELSTRA
3  Ernst, Charara & Lovell
4  546 Griswold, Suite 4100
5  Detroit, Michigan  48226
6  313.965.5555
7  kevin@ecllawfirm.com
8  hannah@ecllawfirm.com
9      Appearing on behalf of the Plaintiffs.
10
11 STEPHANIE A. DOUGLAS
12 Bush Seyferth, P.L.L.C.
13 3001 West Big Beaver Road
14 Suite 600
15 Troy, Michigan  48084
16 248.822.7806
17 douglas@bsplaw.com
18     Appearing on behalf of Defendant SAS Institute, Inc.
19
20
21
22
23
24
25

Page 4

1  ERIK F. STIDHAM
2  Holland & Hart, L.L.P.
3  800 West Main Street
4  Suite 1750
5  Boise, Idaho  83701
6  208.342.5000
7  efstidham@hollandhart.com
8      Appearing on behalf of Defendant Fast Enterprises,
9      L.L.C.
10
11 STEPHEN J. ROSENFELD
12 McDonald Hopkins, L.L.C.
13 300 North LaSalle Street
14 Suite 1400
15 Chicago, Illinois  60654
16 312.280.0111
17 srosenfeld@mcdonaldhopkins.com
18     Appearing on behalf of Defendant CSG Government
19     Solutions.
20
21
22
23
24
25

Page 5

1  JENNIFER D. ARMSTRONG
2  McDonald Hopkins, L.L.C.
3  600 Superior Avenue East
4  Suite 2100
5  Cleveland, Ohio  44114
6  216.905.4564
7  jarmstrong@mcdonaldhopkins.com
8    Appearing on behalf of Defendant CSG Government
9    Solutions.
10
11 KIMBERLY PENDRICK
12 State of Michigan
13 3030 West Grand Boulevard
14 Suite 9-600
15 Detroit, Michigan  48202
16 313.456.2200
17 pendrickk@.michigan.gov
18   Appearing on behalf of Defendants Steve Geskey,
19   Shemin Blundell, Doris Mitchell, and Debra Singleton.
20
21
22
23
24
25

Page 6

1  CHRISTOPHER W. BRAVERMAN
2  State of Michigan
3  Department of Attorney General
4  525 West Ottawa Street
5  Fifth Floor
6  Lansing, Michigan  48933
7  517.335.7641
8  braverman@michigan.gov
9    Appearing on behalf of Defendant Julie A. McMurtry.
10
11 DEBBIE K. TAYLOR
12 State of Michigan
13 Department of Attorney General
14 3030 West Grand Boulevard
15 Suite 9-600
16 Detroit, Michigan  48202
17 313.456.2200
18 taylord@michigan.gov
19   Appearing on behalf of Defendant Sharon Moffett-
20   Massey.
21
22 ALSO PRESENT:
23 Neal Durkin - Video Technician
24 Shemin Blundell
25

Page 7

1                TABLE OF CONTENTS
2
3  WITNESS                              PAGE
4  SHARON A. MOFFETT-MASSEY
5
6  EXAMINATION
7  BY MR. STIDHAM:                      11
8  EXAMINATION
9  BY MR. ROSENFELD:                    38
10 EXAMINATION
11 BY MR. ERNST:                        43
12 EXAMINATION
13 BY MS. PENDRICK:                     319
14 EXAMINATION
15 BY MS. DOUGLAS:                      330
16 EXAMINATION
17 BY MR. BRAVERMAN:                    362
18 REEXAMINATION
19 BY MR. STIDHAM:                      366
20 REEXAMINATION
21 BY MR. ROSENFELD:                    375
22
23
24
25

Page 8

1                   EXHIBITS
2
3  EXHIBIT                              PAGE
4  (Exhibits retained.)
5
6  DEPOSITION EXHIBIT 61                60
7  DEPOSITION EXHIBIT 62                74
8  DEPOSITION EXHIBIT 63                136
9  DEPOSITION EXHIBIT 64                136
10 DEPOSITION EXHIBIT 65                136
11 DEPOSITION EXHIBIT 66                158
12 DEPOSITION EXHIBIT 67                173
13 DEPOSITION EXHIBIT 68                181
14 DEPOSITION EXHIBIT 69                183
15 DEPOSITION EXHIBIT 70                186
16 DEPOSITION EXHIBIT 71                188
17 DEPOSITION EXHIBIT 72                208
18 DEPOSITION EXHIBIT 73                208
19 DEPOSITION EXHIBIT 74                208
20 DEPOSITION EXHIBIT 75                208
21 DEPOSITION EXHIBIT 76                228
22 DEPOSITION EXHIBIT 77                330
23 DEPOSITION EXHIBIT 78                330
24 DEPOSITION EXHIBIT 79                330
25 DEPOSITION EXHIBIT 80                330

Page 9

| | | |
|---|---|---|
| 1 | DEPOSITION EXHIBIT 81 | 330 |
| 2 | DEPOSITION EXHIBIT 82 | 330 |
| 3 | DEPOSITION EXHIBIT 83 | 330 |
| 4 | DEPOSITION EXHIBIT 84 | 330 |
| 5 | DEPOSITION EXHIBIT 85 | 330 |

Page 10

1  Bloomfield Hills, Michigan
2  Thursday, December 19, 2019
3  9:19 a.m.
4
5         VIDEO TECHNICIAN: we are on the record.
6  This is the video deposition of Sharon Moffett-Massey,
7  being taken in Bloomfield Hills, Michigan. Today is
8  December the 19th, 2019. The approximate time is 9:19
9  a.m.
10        Would the attorneys please introduce
11 themselves and who they represent, and the court
12 reporter please swear in the witness.
13        MR. ERNST: Kevin Ernst for plaintiff.
14        MS. FIELSTRA: Hannah Fielstra on behalf of
15 plaintiffs.
16        MR. PHILO: John Philo and Tony Paris on
17 behalf of plaintiffs from Sugar Law Center.
18        MS. DOUGLAS: Stephanie Douglas on behalf
19 of SAS Institute, Inc.
20        MR. BRAVERMAN: Assistant Attorney General
21 Chris Braverman on behalf of Defendant Julie McMurtry.
22        MS. PENDRICK: Assistant Attorney General
23 Kim Pendrick on behalf of defendants Geskey, Blundell,
24 Mitchell, and Singleton; and also with us for the
25 deposition today is Shemin Blundell.

Page 11

1         MS. TAYLOR: Assistant Attorney General
2  Debbie Taylor representing the witness Sharon
3  Moffett-Massey.
4         MR. STIDHAM: Erik Stidham of Holland &
5  Hart on behalf of defendant Fast Enterprises.
6         MR. ROSENFELD: Stephen Rosenfeld and
7  Jennifer Armstrong on behalf of CSG Government
8  Solutions.
9            SHARON MOFFETT-MASSEY,
10 was thereupon called as a witness herein, and after
11 having first been duly sworn to testify to the truth,
12 the whole truth and nothing but the truth, was
13 examined and testified as follows:
14        MR. STIDHAM: Ms. Moffett-Massey, my name
15 is Erik Stidham and I represent Fast Enterprises.
16              EXAMINATION
17 BY MR. STIDHAM:
18 Q. Would you state your full name for the record, if you
19    would.
20 A. Sharon Ann Moffett-Massey.
21 Q. Ms. Moffett-Massey, I do understand and appreciate
22    that you've made it here even though you've got a bit
23    of a cold that's affecting your voice.
24        So of course you ever need to take a break
25    for any reason, get a drink of water, whatever, just

Page 12

1     tell us and we'll accommodate that.
2  A. Thank you.
3  Q. Or just need to take a break because your voice is
4     getting tired, just tell us, all right?
5  A. All right. Thank you.
6  Q. Have you ever been deposed before?
7  A. My apologies.
8  Q. Have you ever been deposed before?
9  A. No, I have not.
10 Q. So let me give you just a couple of ground rules --
11 A. Okay.
12 Q. -- that will make today hopefully move more smoothly.
13        First, even though you're being -- she's
14    transcribing -- you're being transcribed and the video
15    is going, so it's important that you answer in
16    sentences or words rather than gestures; do you
17    understand that?
18 A. That is correct.
19 Q. Also, I have a very bad habit of pausing in the middle
20    of my questions, so just do your best to let me get
21    the entire question out before you respond; is that
22    fair?
23 A. Yes.
24 Q. That's important because if we talk over one another,
25    it'll be impossible for the court reporter to

Page 13

1  effectively get everything down; do you understand
2  that?
3  A. Yes, I do.
4  Q. Okay. Also, if I ask you a question and if for any
5     reason you don't understand it, please just tell me
6     and I'll do my best to rephrase the question; is that
7     fair?
8  A. Yes.
9  Q. Okay. Likewise, if I ask a question and you respond
10    to it, I'll assume you understood the question; is
11    that fair?
12 A. Yes.
13 Q. Okay. Again, if you need to take a break to
14    accommodate anything, it's not an endurance contest,
15    so just tell us and we'll do that, okay?
16 A. Sure.
17 Q. First off, Ms. Moffett-Massey, can you give me an
18    overview of your educational background?
19 A. Beginning with elementary school, or are we talking
20    post secondary?
21 Q. Unless it's something that you're really, really proud
22    about in elementary, we can start with -- just when
23    did you graduate high school and where was that?
24 A. High school was Muskegon Catholic Central, that would
25    be in Muskegon, Michigan, and that graduation date was

Page 14

1  June of 1984. I went on to Muskegon Community
2  College, and graduated in 1986; that was a two-year
3  college with my associate's degree.
4      From there I went on to Michigan State
5  University, and graduated in 1988, June of 1988. I
6  had one year of law school at Cooley Law School, I did
7  not graduate; I pursued my career with the State of
8  Michigan.
9  Q. Can I ask what your degree at Michigan State was in?
10 A. Social science.
11 Q. Social science?
12 A. Political science.
13 Q. Thank you. Kind of similarly, can you give me an
14    overview of your work experience after that year at
15    Cooley?
16 A. I worked one year with the accident fund, which is
17    workers' comp insurance.
18 Q. That's an entity within the State; is that correct?
19 A. That was not. The accident fund, it was not and then
20    it was, so let me explain.
21 Q. Sure.
22 A. Initially it was not a state agency or part of the
23    state government. It was assumed by state government
24    by Governor Blanchard.
25        At that time employees of the accident fund

Page 15

1  was given a choice to stay with private company or
2  move on with the state when the state assumed it.
3      After about a period of a year, the state
4  was going to move it back into the private industry,
5  and you then were given a choice to interview for
6  state jobs to become a permanent state employee, at
7  which time I did, and that was approximately 1989.
8  Q. Okay.
9  A. I did that, I was hired on with the State of Michigan
10    unemployment insurance agency as a claims examiner for
11    the Flint branch office.
12 Q. If I can just interrupt you there. So 1989, it sounds
13    like you start with the Michigan unemployment UIA,
14    correct?
15 A. Correct.
16 Q. Your first job was as a claims examiner?
17 A. Uh-huh. Yes, it was a claims examiner, and it was
18    Michigan Employment Security Commission at that time.
19    The agency has gone through several name changes.
20 Q. But it's the same agency that we now call UIA; is that
21    fair?
22 A. That is correct.
23 Q. Can you explain to me what your duties were as a
24    claims examiner when you first started out?
25 A. For the most part, processing claims. I was trained

Page 16

1  in all aspects of claims.
2       MR. ERNST: I'm sorry, can you keep your
3  voice up.
4       THE WITNESS: I was trained in all aspects
5  of claims from intake, which is taking the claim over
6  the counter, to adjudicating that claim. So that
7  would have been fact finding, taking statements from
8  claimant, the unemployed worker and the employer, and
9  rebuttals if necessary.
10      After about maybe six months to a year on
11 the job, I was also assigned to peer hearings for
12 cases that I had written as well on behalf of the
13 agency.
14 BY MR. STIDHAM:
15 Q. And you used the term "adjudication" when you were
16    describing your duties as a claims examiner.
17       Can you explain to me what you mean by
18    adjudication in this context of unemployment claims?
19 A. Adjudicating the claim went from taking the statement
20    from the claimant and/or sending out questions to the
21    employer.
22       Typically you have the claimant in front of
23    you, and we did face-to-face interviews with them,
24    sit-down interviews with them to find out why they
25    were unemployed. Whether it was voluntarily leaving

Page 17

1  or dismissal from, you know, their position.
2       After receiving all of the information, all
3  of the fact finding, if you will, information back
4  from the claimant, information back from the employer,
5  based on guidelines and policy procedure and the MESC
6  Act, a decision is made and the citing of the fact
7  that was used to support that decision.
8  Q. You say "that decision," is that what I've also heard
9     referred to as a notice of determination?
10 A. That would be correct.
11 Q. Just so you and I are clear when we're communicating,
12    if I use the term "adjudication" in the context of
13    unemployment claims, I'm intending to refer to this
14    initial notice of determination; is that acceptable
15    for us as far as we're communicating?
16 A. Yes.
17 Q. If for some reason I misuse the term or I'm getting
18    the process confused, which trust me I will, just
19    clarify.
20       But I wanted to make it clear that when I'm
21    using adjudication, when you and I talk we use
22    adjudication to refer to that initial determination
23    relating to unemployment insurance, that that's how
24    I'm intending to use it; is that fair?
25 A. Yes.

Page 18

1  Q. How long did you work as a claims examiner in that
2     role, I should say?
3  A. Roughly about five years.
4  Q. Okay. What was your next position within the agency?
5  A. I took a limited term position as a supervisor,
6     adjudication supervisor, and that was in the Detroit
7     area, the Oakman branch office.
8  Q. Okay. How did -- how did your responsibilities change
9     in that position?
10 A. As an adjudication supervisor I oversaw the work of
11    claims examiners who was doing the same job that I was
12    doing, which was adjudicating claims.
13 Q. How long did you work in that role as adjudication
14    supervisor?
15 A. About six to nine months. The agency was going
16    through a retirement phase where I guess, I would say,
17    bonus type of a retirement where we were losing a lot
18    of branch managers as well as regional directors
19    during this time.
20       So I interviewed for a position as a branch
21    manager, and was offered that position and I became
22    the Freemont branch manager.
23 Q. Okay. How long were you in the role of branch
24    manager?
25 A. Roughly about two years.

Page 19

1  Q. Two years. Can you explain to me what your duties
2     were as a branch manager?
3  A. I oversaw all operations for that branch office from
4     the rent payment to the stopped up toilets to the
5     staffing, administrating unemployment. So the staff
6     in its entirety as well as the operations of the
7     office itself.
8  Q. Okay. Just so we can put a time frame in here, what's
9     this period that you worked as a branch manager? I
10    want to make sure I'm tracking.
11 A. That would have been about 1999 to about 2001.
12 Q. Okay. In 2001 did your role change?
13 A. It did.
14 Q. What happened?
15 A. We were transitioning from the local branch offices to
16    what are now called contact centers, but at the time
17    they were referred to as call centers. State was also
18    going through another retirement phase, so we were
19    losing more regional directors and branch managers at
20    that time.
21       So in my position as Freemont branch
22    manager, which it had changed from a 14 level to a 15
23    level at this point because of the volume of work that
24    we were accomplishing, I was asked by the regional
25    director to oversee the Grand Rapids branch office

Page 20

1  because that branch manager was retiring earlier, and
2  then most of the managers, which I did.
3       I was also a part of the building
4  facilities committee which basically decided where
5  these call centers would be placed in the cities that
6  they were placed in and looked at the buildings and
7  things like that.
8       I was responsible in my role as a 15 level
9  branch manager to transition all staff on the West
10 side of the state into the Grand Rapids call center,
11 which was known as the remote issue call center or
12 RICC.
13 Q. Okay.
14 A. After about a year or so getting everyone in,
15    interviews were held for the actual RICC director,
16    which I interviewed for and was selected, which
17    brought me to a 17 state division administrator.
18 Q. Okay.
19 A. Working title as RICC director.
20 Q. I just need an overview, ma'am.
21       So what were your duties as a RICC
22    director?
23 A. Overseeing the entire operations of that call center.
24 Q. Okay. Great. How long were you in that role?
25 A. A little over ten years or so.

```
                                                       Page 21
 1  Q.  So just to make sure we're tracking our time period
 2      again, what's that ten-year period, to the best of
 3      your recollection?
 4  A.  2001 to about 2012.
 5  Q.  Okay.  Sounds like you had a change of position in
 6      2012; is that correct?
 7  A.  In some cases my position was the same, but I was
 8      working out of class as a 18 at one point for about
 9      six months.
10          The customer service director became the
11      acting agency director, and I was selected to fill
12      that role, after which time I reverted back to my 17,
13      once working out of class.
14          Then as a 17 I was selected for special
15      projects while still maintaining my 17; so I was on
16      different special projects.
17          After the last project with the tax office,
18      I believe I was appointed as chief of staff for the
19      agency.
20  Q.  Okay.  When did you get appointed chief of staff for
21      the agency?
22          By agency, we're referring to UIA, correct?
23  A.  Correct, the unemployment insurance agency.  That
24      would have been about 2013 to -- almost a year, 2014.
25  Q.  Okay.  And what, again at a high level, were your

                                                       Page 22
 1      duties as chief of staff for the agency in that 2013
 2      to 2014 time period?
 3  A.  My main role was to work with staff.  We were
 4      transitioning to a new system.  Hearing from staff,
 5      how can we make things better and make the transition
 6      better for them more smoothly.
 7          We had also come off a reduction in force,
 8      so there were a lot of staff that were still very
 9      concerned.  They lost coworkers, they were picking up
10      more assignments, more workflow with less staff.
11          So there was a lot of resentment, a lot of
12      hurt feelings, and trying to bridge that gap while
13      also trying to, of course, take care of the day-to-day
14      workflow, processing claims, collecting taxes.
15          MR. STIDHAM:  Can we go off the record for
16      just a second.
17          VIDEO TECHNICIAN:  We are off the record.
18      The time is 9:37 a.m.
19          (Off the record at 9:37 a.m.)
20          (Back on the record at 9:38 a.m.)
21          VIDEO TECHNICIAN:  We are back on the
22      record.  The time is 9:38 a.m.
23  BY MR. STIDHAM:
24  Q.  All right.  So, Ms. Moffett-Massey, before we took a
25      little break for technical difficulties, we were just

                                                       Page 23
 1      getting an overview of your work experience, and you
 2      were -- you spoke about the work you did as chief of
 3      staff at the agency.
 4          What was that time period again that you
 5      were functioning as chief of staff for UIA?
 6  A.  I believe that was 2013, 2013 to 2014, approximately.
 7      I'm not quite sure the month, but it was about a year.
 8  Q.  Okay.  What was your next position after the chief of
 9      staff position?
10  A.  I was selected for the agency director position, 2014,
11      April of 2014.
12  Q.  So in April of 2014, you're appointed to be and take
13      the position of director of UIA?
14  A.  That is correct.
15  Q.  How long were you in that role?
16  A.  Till January 2017.
17  Q.  What role did you take in January of 2017, what new
18      role did you take?
19  A.  I was reassigned to the workforce side of the house,
20      still under talent investment agency but workforce
21      side assisting Michigan Works agency with talent
22      efforts.
23  Q.  Going back to your time as the director of the agency
24      in that 2014 to end of 2016 time frame, okay?
25  A.  Yes.

                                                       Page 24
 1  Q.  What were your duties as director of the UIA?
 2  A.  Overseeing all operations for the agency, ensuring
 3      that claims were being processed and taxes were being
 4      collected from employers.
 5  Q.  Okay.  Ma'am, do you understand that you've been sued
 6      individually in this case?
 7  A.  I do understand that.
 8  Q.  Do you have kind of a general familiarity with the
 9      complaint?
10  A.  Yes, I do.
11  Q.  As I indicated at the outset, I represent Fast
12      Enterprises; do you understand that?
13  A.  Yes.
14  Q.  Do you understand that Fast Enterprises is a company
15      that provides software to government agencies, and in
16      this case help to provide software relating to the
17      MiDAS project?
18  A.  Yes.
19  Q.  Do you understand that there's allegations in this
20      complaint that Fast performed certain functions,
21      discretionary functions, and made discretionary
22      decisions on behalf of the state?
23  A.  I do understand that.
24  Q.  Is it fair to say that those assertions are
25      inaccurate, and that Fast only took actions at the
```

Page 25

1  direction of the state?
2      MR. ERNST: Objection, form.
3  A. I agree that the state made the ultimate decision as
4     far as the direction that Fast took with whatever task
5     that we were asking Fast to do on the agency's behalf.
6  BY MR. STIDHAM:
7  Q. I appreciate that. And again if I ask a question that
8     is not just worded in a way that you understand it
9     or -- and plenty of time I just ask a bad question,
10    tell me to retry and ask it again, okay?
11 A. Okay.
12 Q. All right. So along those same lines, do you
13    understand that Fast's obligations were defined by a
14    contract that it had with UIA?
15     MR. ERNST: Object to form.
16 A. I would agree with that.
17 BY MR. STIDHAM:
18 Q. I'll represent to you that Fast is unaware of any
19    contention by the State that Fast did not properly
20    perform its contractual duties.
21       Are you aware of any contention by the
22    State that Fast didn't meet its contractual
23    obligations?
24 A. I'm not aware of that.
25 Q. And that's certainly not a position you took when you

Page 26

1     were head of UIA, that Fast had somehow not met its
2     obligations to the State; is that fair?
3  A. That is fair.
4  Q. Also, there are certain issues that have been
5     identified in this complaint. One of them relates to
6     the decision by the agency to make certain
7     determinations if no response is given by a claimant
8     when an inquiry for additional information is made;
9     are you aware of those allegations?
10 A. Yes.
11 Q. Okay. Is it fair to say Fast did not play any role
12    or -- Strike that.
13       Is it fair to say Fast did not make any
14    decisions as part of the MiDAS project regarding how
15    much notice should be provided to claimants?
16     MR. ERNST: Objection to form.
17 A. I cannot say in the initial stages of when MiDAS was
18    brought on board and the parameters or the rules set
19    around what the system could or could not do. I was
20    not the agency director at that time, nor was I part
21    of any of the work groups that gave input on what
22    MiDAS could or could not do.
23       I can only tell you after the fact, I was
24    aware that, you know, that was basically agency gave
25    information to Fast for programming purposes, and

Page 27

1     those programs were -- or the software was written in
2     accordance to what the agency gave Fast directions on.
3  BY MR. STIDHAM:
4  Q. I appreciate that, ma'am.
5  A. Okay.
6  Q. Again, if I ask any questions and you need to clarify
7     time frames and the role you were in at the relevant
8     time, that's extremely helpful; so thank you for doing
9     that.
10 A. Sure.
11 Q. But just to understand your last answer but maybe to
12    can clarify it a little bit, is it your understanding
13    that any of the notice -- the notice period that was
14    used by MiDAS, that was a notice period that was
15    defined by somebody at the State, not by Fast?
16 A. I would agree with that.
17 Q. Is it fair to say what would happen if a claimant did
18    not respond to notice that was sent out for additional
19    information, so what would happen after that, was
20    determined by the State, not by Fast; is that fair?
21 A. Yes.
22 Q. Okay. Is it also fair to say that any penalties that
23    were assessed regarding determinations of fraud or
24    even potential determinations of fraud once the MiDAS
25    project was in place, those were all decisions made by

Page 28

1     the State, not by Fast?
2  A. I would say yes. Those penalties would be in line
3     with what our law and procedure says, and that would
4     have been the direction that the agency had given to
5     Fast for programming purposes.
6  Q. Thank you. Then also is it fair to say that none of
7     the Fast employees were involved in actually
8     processing individual's claims?
9  A. Absolutely not.
10 Q. Right. In fact, that would have been considered a
11    violation of the contract if Fast employees were
12    actually doing the work of making determinations
13    regarding employee -- excuse me -- regarding
14    claimants; isn't that fair?
15 A. That's correct, and we'd be in violation of DOL. Work
16    can be performed by civil servants only.
17 Q. So is it fair to say that any decision, to your
18    knowledge, that was made regarding any claimant after
19    the MiDAS program was in place, those were state
20    decisions, not decisions by Fast?
21     MR. ERNST: Objection to form.
22 A. I would agree.
23 BY MR. STIDHAM:
24 Q. At some point in time there was a decision to stop
25    what's been referred to as the auto adjudication

Page 29

1 function of the MiDAS software; do you recall that?
2 A. Yes.
3 Q. Okay. Just so we're talking about the same thing, we
4 talk about the auto adjudication function. What I'm
5 referring to is the aspect of the program that would
6 proceed with issuing an initial notice of
7 determination if certain criteria were met?
8 A. Correct.
9 Q. Okay. So again, at some point that was turned off
10 while you were director, correct?
11 A. That is correct. The restitution fraud portions of
12 the program, correct.
13 Q. Did Fast -- did Fast -- to your mind, did Fast
14 properly comply with all state direction or agency
15 direction to basically turn off that function of the
16 software?
17 A. Yes.
18 Q. There's also been some allegations in this lawsuit
19 relating to the content of notice letters, actually
20 what was written and the verbiage that was in those
21 notice letters?
22 A. Yes.
23 Q. To your knowledge, did Fast -- excuse me.
24      To your knowledge, the content of any
25 notice letter that was sent out from UIA while the

Page 30

1 MiDAS program was in place, is it fair to say the
2 content of those letters was defined by the State, not
3 by Fast?
4 A. That would be fair to say, yes.
5 Q. In fact, isn't it fair to say the content of those
6 letters would be defined by the State, not by any
7 contractor, whether it be Fast or CSG or SAS?
8 A. Yes.
9 Q. Is it similarly fair to say that any determinations
10 regarding a claimant's eligibility for claims, any
11 determination relating to fraud, any determination
12 regarding benefits while the MiDAS program was in
13 place, those were all state determinations, they were
14 not determinations by any of the contractors, whether
15 that be Fast Enterprises, CSG, or SAS?
16 A. Correct.
17 Q. Isn't it fair to say those were determinations by the
18 agency -- similarly, those determinations regarding
19 claimant's benefits or potential fraud, those were
20 determinations by the agency, not by any of the
21 individuals acting in their individual capacity that
22 have been sued in this lawsuit; is that fair?
23 A. Can you please repeat that?
24 Q. Sure. You understand that in addition to you, other
25 individuals have been sued in this lawsuit?

Page 31

1 A. That is correct.
2 Q. So isn't it fair to say that any determination
3 regarding any claimants once the MiDAS project were in
4 place, those were determinations by the agency, not by
5 anyone acting in their individual nonemployee
6 position?
7      MR. ERNST: Objection to form.
8 A. Correct.
9 BY MR. STIDHAM:
10 Q. There's also been some discussion in this case -- or
11 some references in the complaint I guess I should say,
12 that certain claimants were given information that was
13 incorrect regarding their ability to appeal, or their
14 ability to appeal determinations after certain
15 deadlines had passed.
16      Is it fair to say, to your knowledge, Fast
17 and the other contractor defendants, SAS and CSG, did
18 not play any role whatsoever in advising claimants
19 regarding their rights to appeal, or deadlines
20 relating to appeal?
21      MR. ERNST: Objection to form.
22 A. That would be fair to say.
23 BY MR. STIDHAM:
24 Q. It's not just something the contractors did?
25 A. No, it was not.

Page 32

1      MR. STIDHAM: Just out of a courtesy to
2 your attorney, I think we're having some technical
3 difficulties. You want to take a little break,
4 Debbie, just for that?
5      MS. TAYLOR: If we could.
6      MR. STIDHAM: Sure.
7      VIDEO TECHNICIAN: We are off the record.
8 The time is 9:52 a.m.
9      (Off the record at 9:52 a.m.)
10      (Back on the record at 10:07 a.m.)
11      VIDEO TECHNICIAN: We are back on the
12 record. The time is 10:07 a.m.
13 BY MR. STIDHAM:
14 Q. Thank you, Ms. Massey. We were talking about, before
15 we got on the record, certain allegations that had
16 been made in this complaint against Fast and the other
17 contractors.
18      Let me ask you this. Is it fair to say
19 that none of the contractor defendants -- Fast, CSG,
20 or SAS -- played any role or had any responsibility
21 for relating to a garnishing or collecting federal tax
22 returns or state tax refunds that were claimed by
23 claimants of the UIA?
24      MR. ERNST: Objection to form.
25 A. Correct.

Page 33

1  BY MR. STIDHAM:
2  Q. So any of these allegations in the complaint regarding
3     garnishment or seizure of federal taxes, is it fair to
4     say it's your position that it's improper to make
5     those allegations against Fast Enterprises and the
6     other contractor defendants?
7        MR. ERNST: Objection to form.
8  A. Yes.
9  BY MR. STIDHAM:
10 Q. There's also some allegations in the complaint that
11    relate to income spreading, how that was used in
12    determining whether certain claimants should be
13    flagged for potential fraud; are you aware of that?
14 A. I am aware of the income spreading.
15 Q. Income spreading. Is it fair to say that Fast was not
16    involved in making any decisions about whether income
17    spreading was a concept that should be used in making
18    determinations relating to claimants?
19       MR. ERNST: Objection to form.
20 A. I would agree.
21 BY MR. STIDHAM:
22 Q. Fast just didn't have any role at all whatsoever
23    relating to this concept of income spreading; is that
24    fair?
25 A. I would agree with that.

Page 34

1  Q. Is it also fair relating to the other defendants, CSG
2     and Fast, that those defendants didn't have any role
3     relating to this issue of income spreading that is
4     alleged in the complaint?
5  A. To my knowledge, no.
6        MR. ERNST: Form.
7  BY MR. STIDHAM:
8  Q. I didn't ask that question very well.
9        Did the other contractor defendants, CSG or
10    Fast, have any role in relating to this issue of
11    income spreading?
12 A. To my knowledge, no.
13 Q. Sorry to reask, I just had asked the question as a
14    negative, so it got confusing.
15 A. Okay.
16 Q. Did Fast have any role whatsoever relating to the
17    appeals process that claimants had available to them
18    once the MiDAS project was in place?
19 A. No.
20 Q. Similar question as it relates to the other contractor
21    defendants.
22       Did SAS or CSG have any role at all
23    relating to the appeal process, processes, that would
24    be available to claimants after the MiDAS project was
25    in place?

Page 35

1  A. No. The appeal process was the same as it was prior
2     to the MiDAS. The only aspect would have been to help
3     us improve upon that through process improvement.
4  Q. Okay. That would be -- that would be just improving
5     the process, correct?
6  A. Correct.
7  Q. Okay. But actually, making the -- actually, being
8     involved in an appeal that a claimant brought, that's
9     not something any of the contractor defendants would
10    be involved in, correct?
11 A. Absolutely not.
12 Q. I asked that as a negative again.
13 A. I know.
14 Q. Were the contractor defendants involved in any way in
15    the appeals process that was available to claimants
16    once the MiDAS project was in place?
17       MR. ERNST: Objection to form.
18 A. No, they were not.
19 BY MR. STIDHAM:
20 Q. To your knowledge, are you aware of anything that Fast
21    or any of its employees did that you consider improper
22    as it relates to work on the MiDAS project?
23       MR. ERNST: Objection to form.
24 A. No.
25 BY MR. STIDHAM:

Page 36

1  Q. Same question as to the other contractor defendants.
2     Are you aware of anything that either CSG, its
3     employees, or SAS or its employees did that you
4     consider was improper relating to the MiDAS project?
5        MR. ERNST: Objection, form.
6  A. No.
7  BY MR. STIDHAM:
8  Q. I'm not -- are you aware that there's been some
9     motions filed and motions to dismiss filed in this
10    case?
11 A. Yes, but I can't tell you I followed what was
12    dismissed was still on and any settlements, because I
13    was reassigned after even the settlement was in place
14    and in motion, so I was reassigned.
15 Q. I meant in this lawsuit, the lawsuit that's filed
16    against you and Fast.
17 A. Yes, I am.
18 Q. Okay. Not any claimant appeals.
19 A. Okay.
20 Q. I was switching to our lawsuit that we're here for
21    today.
22       So do you understand that there's really
23    one cause of action left in this case, and that
24    relates to allegations of violations of due process;
25    are you aware of that?

Page 37

1  A. Yes, I am.
2  Q. Is Fast -- is it true that Fast -- let me ask it this
3     way.
4         Did Fast play any role whatsoever from your
5     perspective in making decisions relating to what due
6     process should be afforded to claimants?
7  A. No.
8  Q. Okay. What about as it relates to the other
9     contractor defendants, did SAS or CSG play any role
10    whatsoever in determining what due process should be
11    provided to claimants?
12 A. No.
13 Q. From your perspective is there anything that any of
14    the contractor defendants, Fast, CSG, and SAS did --
15    well, strike that.
16        In your opinion, did Fast, CSG, or SAS do
17    anything which you believe adversely affected the due
18    process rights of claimants?
19 A. No.
20        MR. STIDHAM: I don't have any more
21    questions at this time. By the way, thanks for your
22    patience, Ms. Moffett-Massey.
23        THE WITNESS: You're welcome.
24        MR. ROSENFELD: Good morning, Ms.
25    Moffett-Massey. As I mentioned to you off the record,

Page 38

1     my name is Steve Rosenfeld and I represent CSG
2     Government Solutions. I just have a couple, and I
3     mean very few, questions to clarify a couple things on
4     behalf of CSG.
5         THE WITNESS: Sure.
6              EXAMINATION
7  BY MR. ROSENFELD:
8  Q. Mr. Stidham asked you about contracts between Fast and
9     the State; do you recall that?
10 A. Yes, I do.
11 Q. You also understand that CSG had a contract with the
12    State?
13 A. Yes, I'm aware of that.
14 Q. Are you aware of any issues with the work that CSG did
15    at all in connection with its contract with the State?
16 A. No, I'm not aware of any issues.
17 Q. Is it your understanding that the State directed CSG
18    with respect to that contract?
19 A. Yes, I would agree with that.
20 Q. The State has duties -- and you talked about them with
21    Mr. Stidham -- the State has duties to make certain
22    determinations for claimants in the unemployment
23    realm, correct?
24 A. That is correct.
25 Q. Did the State ever delegate any of its duties to make

Page 39

1     those determinations to CSG?
2  A. No, it did not.
3  Q. Just to be clear, I think maybe you answered this, but
4     did the State ever delegate any of its duties to make
5     those determinations to Fast or SAS?
6  A. No.
7  Q. So is it true then that CSG, Fast, or SAS never had
8     any authority to make any determinations or adjudicate
9     anything having to do with claimants' benefits in the
10    unemployment context?
11        MR. ERNST: Objection to form.
12 A. I would agree with that.
13 BY MR. ROSENFELD:
14 Q. Is it also true that CSG had no authority and made no
15    decisions with respect to notice given to claimants or
16    any penalties or consequences with respect to any
17    adverse employment decisions?
18        MR. ERNST: Form.
19 A. I would agree.
20 BY MR. ROSENFELD:
21 Q. And you understand that the MiDAS system -- Strike
22    that.
23        The State made certain determinations as to
24    what it wanted the MiDAS system to flag as potentially
25    indicative of fraud, correct?

Page 40

1  A. Can you repeat that?
2  Q. Sure. You understand that the MiDAS software flagged
3     certain claimants based on certain criteria as having
4     items that were potentially indicative of fraud?
5  A. Correct, yes.
6  Q. And the basis for flagging those claimants as
7     potentially indicative of fraud was determined by the
8     State, correct?
9  A. Yes, the criteria that was used.
10 Q. Right. Then the State then directed the contractor
11    defendants to implement that criteria within the
12    software, correct?
13 A. Correct.
14 Q. Mr. Stidham asked you with regard to Fast whether any
15    Fast employees were involved in adjudicating or
16    working on individual claim files, I'm going to ask
17    you the same thing for the others.
18        So is it true that no CSG or SAS employees
19    ever worked on or had any role in adjudicating
20    individual claim files?
21 A. That is a correct statement.
22 Q. So any decision with respect to unemployment benefits
23    for an individual claimant was a decision made by the
24    State, true?
25 A. Yes.

Page 41

1  Q.  And any decision with regard to how to notify
2      claimants of certain decisions or information needed
3      by the State was dictated by state policy, true?
4  A.  Yes, that would be correct.
5  Q.  So neither Fast nor CSG nor SAS had any role in the
6      decisions with regard to notice, true?
7  A.  Correct.
8  Q.  I apologize if this question has been asked before,
9      but let me just clarify it.
10         So I just asked you about decisions with
11     regard to benefits for individual claimants.
12 A.  That is correct.
13 Q.  Then I asked you about notice given to individual
14     claimants.
15 A.  That is correct.
16 Q.  But let me just clarify.  The content of the notice
17     given to individual claimants, that was dictated by
18     state policy, true?
19 A.  Yes.
20 Q.  None of the -- none of the contractor defendants --
21     Fast, CSG, OR SAS -- had anything to do with the
22     content of that notice, true?
23         MR. ERNST:  Objection, form.
24 A.  That is true.
25 BY MR. ROSENFELD:

Page 42

1  Q.  None of the contractor defendants had anything to do
2      with the manner that that notice was given to
3      individual claimants, true?
4          MR. ERNST:  Objection, form.
5  A.  That is correct.
6  BY MR. ROSENFELD:
7  Q.  Because the manner that notice was given to individual
8      claimants was dictated by the State, true?
9  A.  That is correct.
10 Q.  And none of the individual contractor defendants had
11     anything to do with the amount of notice, meaning how
12     long that notice period was, for any individual
13     claimant, true?
14 A.  Correct.
15 Q.  Because that amount of notice was dictated by state
16     policy, true?
17 A.  That is correct.
18 Q.  And none of the contractor defendants -- not Fast, not
19     CSG, and not SAS -- had anything to do with the amount
20     of notice given to plaintiffs, true?
21 A.  True.
22 Q.  And actually, not just to plaintiffs, but to any
23     claimant?
24 A.  Correct.
25 Q.  So the specific language of all of the notices and all

Page 43

1      of the communications to claimants was reviewed and
2      approved by the State, correct?
3  A.  Yes, I would agree.
4  Q.  And none of the claimants had anything to do with the
5      specific language in those notices, true?
6          MR. ERNST:  Objection to form.
7  A.  That is true.  None of the claimants?  None of the
8      contractors.
9  BY MR. ROSENFELD:
10 Q.  Well, none of the claimants did either?
11 A.  No, they did not either.
12 Q.  None of the contractors had anything to do with the
13     specific languages in those notices, true?
14 A.  True.
15         MR. ROSENFELD:  I have no further
16     questions.
17         MR. ERNST:  I'm up?
18         MS. TAYLOR:  Do you want tea?  Are you all
19     set?
20         THE WITNESS:  Uh-huh.
21         EXAMINATION
22 BY MR. ERNST:
23 Q.  Who did approve the specific language in those
24     notices.
25 A.  That language was approved by the work groups that

Page 44

1      were put in place working with those contractors.  The
2      initial notices that, you know, how the system was
3      initially programed in MiDAS, that would have come
4      from the work group itself, it would have been signed
5      off by that work group lead, and I would say --
6  Q.  Who is that person?
7          MR. ROSENFELD:  Let her finish.
8          MS. TAYLOR:  Please.
9          THE WITNESS:  If I could continue to
10     explain.
11 BY MR. ERNST:
12 Q.  Go ahead.
13 A.  It is my knowledge at the time the main lead was Clay
14     Tierney, he was overtaking MiDAS at that time.
15         MR. ROSENFELD:  Kevin, why don't you
16     introduce yourself.
17         MR. ERNST:  I'm sorry.  This is Kevin Ernst
18     for the plaintiff asking the questions.
19 BY MR. ERNST:
20 Q.  Who was part of that -- who else was part of that work
21     group besides Mr. Tierney?
22         MR. STIDHAM:  Objection, form, vague.
23 A.  I can't give you all the names.  Like I said, I was
24     not in the role as the director, I was not a part of
25     the work group.  As a RICC director I would have

Page 45

1  received somewhat like agency updates as all staff was
2  receiving agency updates.
3       I would have to defer that to my
4  codefendant, Clay Tierney, or one of the individuals
5  that actively worked on the work groups.  They can
6  tell you who was attending regularly and who was
7  helping to make those decisions as how the system
8  should give notice.
9       But most of those notices -- I would say
10 all of those notices would have had to have been
11 within the guidelines of our current procedure in law
12 and guidance that we receive from DOL, they would have
13 to be; we can't work around that or else we're not
14 funded as an agency.
15 BY MR. ERNST:
16 Q.  So you're bound by the federal regulations from the
17     Department of Labor?
18 A.  Correct.
19          MS. TAYLOR:  Object to the form.
20          THE WITNESS:  And our MES Act of course.
21 BY MR. ERNST:
22 Q.  And you mentioned that the work group consisted of
23     state employees like Mr. Tierney and some of the
24     contractors.
25          MR. ROSENFELD:  Objection.

Page 46

1           MS. TAYLOR:  Objection, mischaracterizes
2  her testimony.  She said she wasn't there when work
3  groups were actually put together, so she doesn't have
4  any knowledge as to who was actually involved in the
5  work group.
6           MR. ROSENFELD:  Join.
7           MR. STIDHAM:  Join.
8           MR. ERNST:  Please stop coaching the
9  witness with your talking objections.
10          MS. TAYLOR:  I'm not coaching her.
11 A.  But I did say I do not know who all was on those work
12     groups.  There were many work groups for every aspect
13     that -- with every piece of the programming that was
14     put into MiDAS from the tax side to the benefit side.
15 BY MR. ERNST:
16 Q.  So you never attended any of those work groups, did
17     you?
18 A.  I was not part of the work groups.
19 Q.  So you can't say whether or not any of the private
20     contractors did play a role in crafting that language?
21          MR. STIDHAM:  Objection, vague.
22          MS. TAYLOR:  Object to form.
23          MR. STIDHAM:  Object to form, excuse me.
24 A.  The reason I would say that is only because it was
25     based on our law and procedure, and I know the

Page 47

1     contractors did not write our law and procedure; so
2     I'm answering from that standpoint only.
3  BY MR. ERNST:
4  Q.  Okay.  And who developed the flagging criteria?
5  A.  I do not know.
6  Q.  So then you don't know whether the private contractors
7      had a role in developing that flagging criteria,
8      correct?
9  A.  They would have to know the procedure and our law, as
10     well as the DOL guidance in order to develop that,
11     because it would have to be in line with not violating
12     any type of steps that are required in order to
13     adjudicate a claim that would potentially lead to
14     recitation and/or fraud.
15 Q.  Fast asked you near the beginning our -- Fast attorney
16     asked you at the beginning whether you agreed that
17     Fast provided software for government agency and
18     provided the MiDAS system for the UIA, remember that?
19          MR. STIDHAM:  Objection, mischaracterizes
20     the question.
21 A.  Yes.
22 BY MR. ERNST:
23 Q.  Your understanding was Fast was a company that
24     provided software for other states as well, correct?
25 A.  Yes.

Page 48

1  Q.  And they provided software for unemployment agencies
2      in other states, correct?
3  A.  I agree.
4  Q.  So you would agree that they would presumably have
5      expertise in the area of unemployment insurance agency
6      law?
7           MR. STIDHAM:  Object to form.
8           MS. TAYLOR:  Foundation also.
9  A.  I would not know that question.
10          MS. DOUGLAS:  For the record, do we have a
11     continuing if anyone objects, we all object?
12          MR. ERNST:  Sure, I agree to that.
13          MS. DOUGLAS:  Thank you.
14 BY MR. ERNST:
15 Q.  So would you expect that Fast would know some of the
16     federal regulations that would apply to uninsurance
17     agencies and the administration of uninsurance
18     benefits?
19          MR. ROSENFELD:  Objection, calls for
20     speculation, and form.
21          MR. STIDHAM:  And object to foundation.
22 A.  I would say only what they would be told by their
23     client in line with the needs to have that client.
24          Each state has different unemployment
25     insurance laws.  No one state laws are the same.

Page 281

1 don't know what the rationale was for doing that.
2 BY MR. ERNST:
3 Q. I'm sorry. I didn't ask you the rationale. I said
4     what were the benefits to the agency?
5 A. I don't know the benefits of that to the agency. We
6     can only be paid for one week of eligibility, a cep or
7     noncep.
8         I guess I'm not seeing it in terms of
9     monetary. I'm seeing it in terms of a quality -- a
10    claimant understanding exactly what the individual is
11    being held ineligible for when it's broken down.
12 Q. You think that that made -- when a claimant received
13    multiple determinations, that made it more clear or
14    less clear for the claimant?
15        MS. TAYLOR: Objection, form and
16    foundation.
17 A. It depends on the claimant's understanding of
18    unemployment insurance. I would guess if you see each
19    week broken down, you know, exactly each week.
20        Sometimes a period coming through, you're
21    not looking at the number of weeks that are involved.
22    It all depends on each individual person, how they
23    read it and understood it.
24 BY MR. ERNST:
25 Q. So do you think for a claimant having a file with two

Page 282

1     or three appeals as opposed to one, would be
2     beneficial to the claimant?
3         MS. TAYLOR: Objection, form and
4     foundation.
5         MR. STIDHAM: Continuing objection as to
6     relevance to this case.
7 A. I don't know. Some individuals, one is convenient,
8     some three is okay, because one I agree with, two I
9     don't. One I feel I was held ineligible and it's
10    correct, the second or third week, maybe not.
11        So it just depends on that claimant and
12    their given situation; each case is different.
13 BY MR. ERNST:
14 Q. Do you think it's more burdensome to have to file
15    three appeals than one?
16        MS. TAYLOR: Objection, asked and answered.
17        MR. ROSENFELD: Incomplete hypothetical.
18        MR. STIDHAM: Continuing objection to
19    relevance to this case, this is not a part of this
20    case.
21 A. I cant say that it is.
22        MR. ERNST: You don't understand the
23    process.
24 BY MR. ERNST:
25 Q. Go ahead.

Page 283

1         MR. STIDHAM: If you want --
2         MS. TAYLOR: She answered the question.
3     You were talking, she answered the question.
4 BY MR. ERNST:
5 Q. I'm sorry, go ahead.
6 A. I can't say that it would be.
7 Q. Did this bifurcation create efficiency in the system?
8         MS. TAYLOR: Objection, form and
9     foundation.
10        MR. STIDHAM: Objection to system.
11        MS. TAYLOR: Using the term bifurcation,
12    she's already --
13        MR. STIDHAM: You're not referring to MiDAS
14    software?
15        MR. ERNST: I'm referring to the agency in
16    general.
17        MS. PENDRICK: All of it? Anything?
18        MR. ROSENFELD: Objection to relevance.
19        MS. PENDRICK: Form.
20 A. I don't know if it created efficiency, I don't know
21    that.
22 BY MR. ERNST:
23 Q. Well, it created a big appellate backlog; you'd agree
24    with that, wouldn't you?
25        MS. TAYLOR: Objection, form, foundation,

Page 284

1     calls for speculation.
2 A. That would depend on whether an individual requested a
3     hearing.
4 BY MR. ERNST:
5 Q. Well, didn't the appellate -- didn't the number of
6     appeals go up considerably after this bifurcation
7     issue went into effect?
8         MS. TAYLOR: Objection, you asked this
9     question earlier, and she's already answered this.
10    Also form and foundation.
11 BY MR. ERNST:
12 Q. You can answer.
13 A. I don't know if their backlog went up more or -- than
14    what it was already before MiDAS. I would imagine
15    that individuals appeal, so their backlog would go up;
16    how significant, I don't know.
17 Q. Can you tell me when the auditor general's audit
18    occurred? I'm not asking when the report was issued,
19    but when the actual audit occurred.
20        MS. PENDRICK: Objection to form.
21        MS. TAYLOR: In what time period?
22 A. I don't know the exact dates of when they came in.
23 BY MR. ERNST:
24 Q. Can you approximate it for me?
25 A. I know it was going from the summer into the fall. It

Page 285

1  was either '14 or '15, I can't tell you exactly.
2  Q.  When you say '14 or '15, you mean --
3  A.  2014 or 2015.
4  Q.  It was summer or fall of 2014 or 2015?
5  A.  Uh-huh.
6  Q.  Is that a yes?
7  A.  Yes.
8       MR. STIDHAM:  Just to be fair to the
9  witness, the audit itself says that it covered the
10 period from September 30th, 2015.
11      THE WITNESS:  Okay.
12 BY MR. ERNST:
13 Q.  Did there come a time when the auto adjudication
14 function of MiDAS was disabled?
15 A.  Yes.
16 Q.  When was that?
17 A.  August of 2015.
18 Q.  Why was that?
19 A.  Well, as the director, I had heard from staff and
20 face-to-face internal town hall meetings, staff --
21 meetings with staff just to hear how things were going
22 for them and answer questions.
23      A few of them had mentioned that they had
24 seen fraud attached to eligibility issues that I had
25 not seen before, such as a registration or late

Page 286

1  filing, late recording; these are only dealing with
2  periods of ineligibility, not fraud.  I wasn't sure if
3  it was an anomaly or the scope, and I figured we
4  needed to take a look at it.
5       And in doing so -- or I asked that we have
6  a sampling of cases, which I never really received a
7  final report, but I was concerned enough to make sure
8  that things were running as we intended them to be
9  running with respect to the auto adjudication process.
10      It wasn't a matter of the fraud or the
11 restitution, but our things programed in running the
12 way that we intended them to, with them making the
13 comments that they made, because as I mentioned, I
14 wasn't sure how many or the number that was involved.
15      So hearing this, I asked Clay Tierney, I
16 remember, and Dan Simon, and I'm not sure whoever was
17 in attendance at the meeting, that this process, we
18 need to -- we need to have it stopped and take a look
19 at it more closely to see exactly what's happening.
20 Q.  So your claim is that you discontinued the auto
21 adjudication program -- or your decision to
22 discontinue it was not based on all the fraud
23 complaints that had been levied in the public and --
24 A.  Oh, that.
25      MR. ROSENFELD:  Let him finish his

Page 287

1  question.
2       THE WITNESS:  Okay.
3       MR. ERNST:  I'm done.
4       MS. TAYLOR:  Objection, form.
5       MR. ROSENFELD:  Well, why don't you restate
6  the question.
7       MR. ERNST:  She understands it.
8       MR. ROSENFELD:  Well, I don't understand
9  it.
10      MR. ERNST:  That's not my problem.
11      MS. TAYLOR:  Do you know what the question
12 is?
13      THE WITNESS:  I think you're asking --
14      MR. ROSENFELD:  No, don't ask him what he's
15 thinking.
16      MS. TAYLOR:  Do you know what his question
17 was?  Not I think, do you know?  And if not, ask him
18 to repeat it.
19      THE WITNESS:  Well, so that I can answer
20 it, could you please restate it?
21 BY MR. ERNST:
22 Q.  I said, Are you contending that your decision to
23 discontinue the MiDAS auto adjudication was not based
24 on all the fraud complaints that were levied and
25 discussed in public and elsewhere?

Page 288

1       MS. TAYLOR:  Objection, form, foundation.
2  I don't know what fraud complaints mean.
3  A.  What type of complaints, because there were complaints
4  all the time, not just -- I mean, there were
5  individuals complain because they had fraud, even
6  though fraud was committed.
7       So I guess I need you to clarify that,
8  because if that's the case, we would have stopped it
9  as soon as we started it, because no wants to have
10 fraud attached to their claim.
11 BY MR. ERNST:
12 Q.  There were complaints that there were false fraud
13 determinations, you're not aware of any of those
14 complaints?
15      MS. TAYLOR:  Objection form and foundation.
16      MR. STIDHAM:  Also mischaracterizes her
17 testimony, argumentative.
18 A.  There were complaints about fraud where individuals
19 felt they shouldn't have been assessed fraud; I was
20 aware of that.
21      There were a number of complaints which was
22 taken into consideration in addition to what staff was
23 saying.  If that answers your question.
24 BY MR. ERNST:
25 Q.  Are you testifying that you were unaware that there

Page 289

1 were widespread allegations of false fraud claims?
2 A. I did not say that.
3     MS. TAYLOR: Objection, form and
4 foundation.
5     THE WITNESS: I did not say that.
6 BY MR. ERNST:
7 Q. So you were aware of that?
8     MR. ROSENFELD: Hold on.
9 A. Yes.
10 BY MR. ERNST:
11 Q. That's the basis that you shut down the robo
12 adjudication feature of MiDAS, correct?
13     MS. TAYLOR: Objection, she's already
14 answered that.
15 A. That is not what I said.
16     MR. STIDHAM: Also objection to the term
17 robo adjudication.
18 BY MR. ERNST:
19 Q. Despite your awareness of the widespread complaints
20 about false fraud adjudications, you did not stop or
21 put a moratorium on collection activity, correct?
22     MS. TAYLOR: Form and foundation.
23 A. No. Collection, it starts after that process of
24 adjudication. Those days, once the days elapse,
25 collection begins, if the person had appealed,

Page 290

1 protested. If not in a timely fashion, that
2 collection continued.
3 BY MR. ERNST:
4 Q. But you would agree that multiple times when the
5 person missed their deadline to appeal, there were --
6 the underlying charge was a false fraud adjudication
7 because they didn't respond in time, but they didn't
8 really commit the fraud, correct?
9     MS. TAYLOR: Objection, form, foundation --
10 A. I don't know that.
11     MS. TAYLOR: Just wait, Sharon. Form,
12 foundation, and you're requesting that she speculate.
13 BY MR. ERNST:
14 Q. And despite your knowledge of the wide spread false
15 fraud adjudications, you continued to approve
16 bankruptcy adversarial complaints to prevent the
17 discharge of the debt in a bankruptcy proceeding,
18 correct?
19     MS. TAYLOR: Objection, form, foundation.
20     MR. STIDHAM: Objection, argumentative,
21 mischaracterizes prior testimony.
22     MR. ROSENFELD: Objection, relevance.
23 A. You started out the question with despite me knowing.
24 I was aware of the complaints that were -- that came
25 in so, I'm not sure why you continue to say that.

Page 291

1     But as far as the discharge of bankruptcy,
2 can you please restate the second half of that
3 question or the second portion of it?
4 BY MR. ERNST:
5 Q. Are you aware that if there's a fraud allegation
6 surrounding a debt, that you cannot discharge that
7 debt in bankruptcy? In other words, you can't get rid
8 of it?
9 A. That is correct.
10 Q. And despite your knowledge of widespread allegations
11 of false fraud adjudications, you did nothing to stop
12 those bankruptcy proceedings in which the UIA
13 prevented the discharge of the debt, correct?
14     MS. TAYLOR: Object to form.
15     MR. STIDHAM: Also vague as to time.
16 A. I didn't specifically do something to stop them. Each
17 case was taken on its own merit, and that fell under
18 Steve Geskey's preview, so he would have done his due
19 diligence with the staff involved to take a look at
20 those cases.
21     They did not come to my attention, per se,
22 nor did I do an overall moratorium, like you said, to
23 stop them. No, I did not.
24 BY MR. ERNST:
25 Q. Geskey was your subordinate, correct?

Page 292

1 A. That is correct.
2     MR. ROSENFELD: Kevin, we're at seven hours
3 now for your questioning, so I think you've reached
4 your limit with this witness.
5     MR. ERNST: Show me where there's a time
6 limit.
7     MR. ROSENFELD: Federal rule of civil
8 procedure.
9     MR. STIDHAM: Are you serious.
10     MR. ROSENFELD: You're unaware of the
11 federal rule of civil procedure?
12     MR. ERNST: I'm aware of the federal rule
13 of civil procedure, but let's see what it says,
14 because we've had multiple breaks.
15     MR. ROSENFELD: No, no, no, no, no, no, no.
16 Testifying time.
17     MR. STIDHAM: Can the videographer tell us
18 what the testifying time has been for Mr. Ernst's
19 testimony?
20     MR. ERNST: Questioning.
21     MR. STIDHAM: Questioning, thank you.
22     VIDEO TECHNICIAN: Right now it's at 7:02.
23     MR. STIDHAM: That's how it works, Kevin,
24 he's the one that keeps the numbers on the
25 questioning.

Page 381

1     CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN )
3         ) SS
4  COUNTY OF OAKLAND )
5
6     I, RANDEE SHARFMAN, certify that this
7  deposition was taken before me on the date
8  hereinbefore set forth; that the foregoing questions
9  and answers were recorded by me stenographically and
10 reduced to computer transcription; that a review of
11 the transcript by the deponent was not requested; that
12 this is a true, full and correct transcript of my
13 stenographic notes so taken; and that I am not related
14 to, nor of counsel to, either party nor interested in
15 the event of this cause.
16
17
18
19
20
21
22         RANDEE SHARFMAN, CSR-1392
23         Notary Public,
24         Oakland County, Michigan
25         My Commission expires: 3-22-21