UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATTI JO CAHOO, KRISTEN MENDYK,
KHADIJA COLE, HYON PAK, and
MICHELLE DAVISON,

               Plaintiffs,                          Case Number 17-10657

v.                                        Honorable David M. Lawson

FAST ENTERPRISES LLC, CSG GOVERNMENT
SOLUTIONS, STEPHEN GESKEY,
SHEMIN BLUNDELL, DORIS MITCHELL,
DEBRA SINGLETON, and SHARON
MOFFET-MASSEY,

               Defendants.

_____/

## OPINION AND ORDER DENYING MOTIONS BY FAST ENTERPRISES LLC AND CSG GOVERNMENT SOLUTIONS TO DISMISS FOR WANT OF SUBJECT MATTER JURISDICTION

The five named plaintiffs have commenced this putative class action to recover damages allegedly caused by the State of Michigan's Unemployment Insurance Agency's (UIA) implementation of an automated system to detect and punish individuals who submitted fraudulent unemployment insurance claims. They say that they are victims of the system's many failures: it lacked human oversight, it detected fraud by certain claimants where none existed, it provided little or no notice to the accused claimants, it failed in many instances to allow administrative appeals, and it assessed penalties and forfeitures against individuals who were blameless. Their amended complaint listed twelve counts against the companies and individuals whom they believe contributed to the State's implementation of the flawed fraud-adjudication system. The case has been whittled down through motion practice and an interlocutory appeal, and now only one

procedural due process claim remains.  The defendants have filed a second round of motions to dismiss, raising for the first time that the Court lacks subject matter jurisdiction over the dispute.

Defendants FAST Enterprises LLC and CSG Government Solutions argue that the plaintiffs cannot establish Article III standing because (1) they failed to demonstrate an injury-in-fact because their claims were not entirely adjudicated by the Michigan Integrated Data Automated System (MiDAS); (2) their alleged injuries are not fairly traceable to the corporate defendants; and (3) plaintiffs Patti Jo Cahoo, Kristen Mendyk, and Khadija Cole are precluded from bringing their claims because they failed to disclose their property interests in this cause of action during their respective bankruptcy proceedings.

The plaintiffs adequately have established standing.  Although the plaintiffs' fraud cases may not entirely have been auto-adjudicated by MiDAS, the UIA determined that each of the plaintiffs committed fraud by applying the UIA's logic trees, which mandated a finding of fraud whenever a plaintiff failed to respond to a MiDAS-issued questionnaire.  Moreover, each plaintiff sufficiently demonstrated that the UIA did not provide adequate notice of the plaintiffs' fraud determinations and subsequent efforts to collect on their debts.  And because FAST and CSG worked hand-in-hand with the UIA in developing and managing the MiDAS system (which included the deficient notice procedures), the plaintiffs' alleged injuries are fairly traceable to them.  The record requires further factual development on the accrual dates for the due process claims of plaintiffs Cahoo, Cole and Mendyk vis-à-vis their bankruptcy filings, and there is insufficient information to rule out ratification by a potential real party in interest under Federal Rule of Civil Procedure 17(a)(3).  The motions will be denied.

I.  Background

The facts of the case are well known to the parties and have been discussed in previous opinions issued by this Court and the court of appeals.  *See Cahoo v. SAS Inst. Inc.*, 322 F. Supp. 3d 772, 785-89 (E.D. Mich. 2018), *aff'd in part, rev'd in part and remanded sub nom. Cahoo v. SAS Analytics Inc.*, 912 F.3d 887 (6th Cir. 2019).  The dispute focuses on an automated fraud detection computer application that the UIA implemented sometime around 2013 known as MiDAS, which stands for the Michigan Integrated Data Automated System.  MiDAS was developed to search for discrepancies in the records of unemployment compensation recipients, automatically determine whether the claimants committed fraud, and execute collection proceedings, which included intercepting tax refunds and garnishing wages.  Auto-adjudication is a process that starts with the automated generation of a flag, then leads to the automated generation of questionnaires, then to an automated determination based on logic trees, followed by an automated generation of a notice of fraud determination, then automated collection activity.

MiDAS, by no means a marvel of artificial intelligence, operated on automated "logic trees."  It adjudicated fraud in "stages," which included "created," "opened," "pending fact finding," "determination issued," and "issue closed."  If the word "batch" appeared next to any stage, it signified that MiDAS had changed the status automatically.  A human could perform any of these stages, except for the generation of the fraud questionnaire.  But human involvement could only be established if a staff member edited the file, which could be seen in the system.

When MiDAS detected some discrepancy between employer-paid wages and employee-claimed eligibility, it automatically issued questionnaires to the claimant.  Failure to respond timely to a questionnaire (10 days for "green" claimants and 14 days for those corresponding via paper) resulted in a default determination that the claimant knowingly and intentionally

misrepresented or concealed information to receive benefits unlawfully.  When a claimant did respond to the questionnaire, MiDAS's programming, based on its logic trees, found intentional fraud whenever a claimant chose certain multiple-choice options on the form, even if she indicated that she did not intentionally provide false information.  MiDAS had no programming that permitted it to determine whether a claimant intentionally misled the UIA or concealed information.

MiDAS made an automated fraud determination, usually at night, based on the UIA's logic trees.  Staff members could also make the fraud determinations based on the same logic trees.  In either instance, the case would be staged from "pending adjudication" to "determination issued" to "issue closed," and the name of whoever made the decision would appear beside the stages on the "Nonmonetary Issue" screen.  MiDAS would then automatically issue a notice of determination.

Once a default fraud determination was made, MiDAS automatically issued three notices: a primary "Notice of Determination" (Form 1302), which explained why the UIA believed it overpaid (e.g., a claimant quitting a job voluntarily) but not its reasoning for why it believed the plaintiff's alleged misrepresentation was intentional; another "Notice of Determination" (also Form 1302), which generally informed the claimant that his or her actions misled or concealed information to obtain benefits and announced that benefits were terminated on any active claims; and a "List of Overpayments," which demanded payment of actual benefits overpaid as well as a statutory penalty for fraudulent misrepresentation of two-to-four times that amount, depending on whether the value of improper payments equaled or exceeded $500.  Confusingly, the first two notices have the same title and same form numbers, but different contents.

The primary determination notices indicated that claimants were entitled to appeal a determination of fraud to an Administrative Law Judge (ALJ) within 30 days.  But the notices did not inform claimants about their abilities to file late appeals for good cause.  And because of errors in notifying claimants, many claimants did not become aware of their assessments until after the appeal deadlines passed.

If a claimant did not appeal the determination within 30 days, MiDAS automatically issued a letter (Form 1088) demanding that the claimant pay restitution, a penalty, and accrued interest. If a claimant failed to pay the charges voluntarily, MiDAS issued tax refund intercepts to the IRS and State of Michigan.  And if intercepting a claimant's tax returns did not satisfy the claimant's debt, the UIA then garnished his or her wages.

In August 2015, the UIA deactivated MiDAS's auto-adjudication processes relating to claimant fraud.  In a lawsuit brought against UIA personnel, this Court found flaws in the State's robo-fraud-detection system and eventually approved a settlement agreement in which the State agreed, among other things, to suspend all collection activity under the automated system and to review determinations of claimant fraud that had been reached while it was using the auto-adjudication function.  *See Zynda v. Arwood*, 175 F. Supp. 3d 791 (E.D. Mich. 2016).  Later, Michigan enacted new legislation that prohibits fraud determinations based solely on computer-identified discrepancies.

The plaintiffs allege that the defendants worked together with the state to design, maintain, operate, and implement the robo-fraud-detection and adjudication system.  As a consequence of the inherent flaws built into the system, the plaintiffs contend, the defendants, operating as state actors, have taken property from them through the automated system that labeled them fraudsters,

and then assessed and collected fines and penalties, all without notice and an opportunity to be heard.

## A. FAST

FAST Enterprises, LLC, a software company, contracted with the State of Michigan on August 29, 2011, to "design, configure and implement its GenTAX commercial-off-the-shelf" software for the UIA's use in administering unemployment insurance, including fraud investigation, overpayments, collections, and tax intercepts. FAST's involvement with MiDAS was substantial. It contracted to configure "almost all aspects of" MiDAS and train UIA employees on how to use the system. It also agreed to develop the templates of all MiDAS correspondence, including questionnaires and determination notices, and ensured that the templates complied with "Federal and State law delivery requirements."

The UIA provided FAST with business rules, or logic trees, to implement in the system. The logic trees broke down the various ways one may be determined to have misrepresented material information, such as by failing timely to answer a questionnaire. Although FAST coded the software, UIA witness Clayton Tierney made clear that the functions of the software (i.e., the logic trees) were controlled exclusively by the UIA. Moreover, although FAST's contract obligated it to develop the templates for MiDAS correspondence, UIA witnesses testified that "no CSG, FAST, or SAS employees were involved in determining the content or crafting the language of those notices or questionnaires sent to claimants."

## B. CSG

The State first retained CSG, a consulting company from Chicago, to help devise a request for proposal for the development of MiDAS. Around February 2010, CSG contracted with the State to run and administer the project control office, which was responsible for overseeing the

implementation of MiDAS.  CSG's responsibilities grew and it eventually played two roles for the UIA — one as an advisor, the other as a project manager.

### 1.  Advisory Role

CSG assisted the State with improving its fraud detection and overpayment collection activities by analyzing the UIA's current practices, researching other state practices, and devising short- and long-term solutions to meet the UIA's goals.   CSG played an advisory role; the UIA had exclusive authority to set such policies and procedures and never delegated that authority to CSG.  CSG was not responsible for determining the algorithms or logic trees that the UIA intended for the MiDAS software.

In its advisory role, CSG developed the UIA's income-spreading policy — it recommended that the UIA "prorate earnings" to "establish any resulting overpayment" "[w]hen there is no employer response and [a] claimant does not provide credible earnings information."  It also recommended that the UIA "[r]everse the current Agency culture where staff is reluctant to render a fraud determination because it is viewed as too punitive on the claimant."  For example, CSG suggested that the UIA update its fraud questionnaire (Form 1070) to reduce the available answers that resulted in findings of non-fraudulent activity (like asking claimants whether overpayments resulted from a mistake).  However, CSG also recommended that the UIA clarify the wording on its questionnaire by (1) changing the title to make clear that the inquiry related to fraud; (2) explaining in bold text that the claimant's employer provided sufficient information warranting a finding of overpayment; and (3) including the potential amount of overpayment, penalties, and disqualifications based on the information available.

The UIA eventually developed a new fraud questionnaire (Form 1713), but contrary to CSG's recommendations, it did not include any new, clarifying language, nor did it provide factual

information about the fraud allegations, as the previous questionnaires did.  Rather, the new form included potentially incriminatory multiple-choice answers designed to elicit binary answers that readily could be processed by MiDAS for automated fraud determinations.  And unlike the old questionnaire, and in contrast to CSG's recommendations, the new Form 1713 did not inform claimants that failing to respond would result in a fraud determination.  CSG Fraud Audit Recommendations, ECF No. 434-1, PageID.25327 ("The form could be redesigned so that the claimant is not under the impression that completion of the form is voluntary").

CSG did not recommend that the UIA rely on purely an automated decision-making system; rather, it suggested that MiDAS develop recommended decisions subject to review by an examiner.  "If the examiner elects to render a decision that is contrary to the decision recommended by the system, the issue will be pended and routed to a manager for approval."  CSG Fraud Audit Recommendations, ECF No. 434-1, PageID.25327.

## 2. Project Management

After the UIA chose FAST to develop MiDAS, the UIA relied on CSG for on-site project management services through the Project Control Office that CSG established.  According to the contract, CSG's Project Control Office was required to "support the State — and the State's application development and implementation vendor — in meeting the timely delivery of quality information technology services for all stakeholders of the UI System Modernization Project."  It was also understood that the System Integration Project team would be "comprised of both CSG's Project Management Office and the State of Michigan [Department of Technology] and UIA Staff."  The contract made CSG "responsible for utilizing and mentoring these State staff" and maintaining "continuous liaison with . . . the State Senior Project Managers [and] Executive Sponsor."

As project manager, CSG was responsible for "performing schedule, scope and technical control tasks over all aspects of the project."  CSG agreed to provide "independent oversight, monitoring, and reporting on activities and metrics critical for on-time delivery of quality technology services that meet the needs of the UIA and DIT."  CSG also was responsible for "creating and maintaining detailed . . . [p]roject plans and schedules that support project scope, costs, milestones, and deliverables" during the project development.  UIA manager Clayton Tierney explained that CSG primarily helped ensure that the project remained on schedule and on budget, and that MiDAS implemented the UIA's requested functionality.

John Walsworth, the CEO of CSG, explained that although CSG led many administrative aspects of MiDAS, it ultimately had no decision-making power to set agency policy, establish particular algorithms or logic trees in the software, or operate the software at any time.  He also maintains that "CSG did not have any role in determining the compliance of State [unemployment insurance] policies or the MiDAS system with state or federal law;" "those decisions were made by the State."

### C.  The Plaintiffs
#### 1. Patti Jo Cahoo

Patti Jo Cahoo collected unemployment benefits from January 12 through June 29, 2013.  She chose to forego written notices on her benefit account ("going green") and directed the UIA to provide her with email alerts.  She understood that it was her obligation to check her email and the UIA's website, MiWAM, for correspondence from the UIA.

Shortly after Cahoo went "green," her former employer, Randstad Employment Solutions, protested her eligibility, alleging that she voluntarily quit.  On May 2, 2014, a UIA examiner, "robinson12," reviewed Cahoo's file and opened a fraud case.  That caused the MiDAS system to post a fraud questionnaire on Cahoo's MiWAM account and send her an email notifying her to

check her account.  Cahoo alleges that she "was unaware of the posting and did not respond."

More than one year later, the UIA using MiDAS determined that Cahoo committed fraud based on her failure to respond, and MmiDAS generated two notices of determination, both dated May 27, 2015.  Her Primary Notice of Determination explained that she "quit [her] job with Randstad Employment Solutions on January 11, 2013 due to other personal reasons," and that her "leaving was voluntary and not attributable to the employer."  Her Secondary Notice of Determination accused her of "intentionally misle[ading] and/or conceal[ing] information to obtain benefits [she] was not entitled to receive."  Attached to the secondary notice was a list of overpayments charging Cahoo $34,475.00 total: $7,095.00 in principal and $28,380.00 as a penalty.

Cahoo contends that she was also unaware of the fraud determination and did not hear about the determination until she filed for bankruptcy "months later."  But her deposition testimony contradicts that position, as she indicates that she may have had at least some notice.  She calculated in her head that she might have owed $12,000 including the 100% penalty, which she mentioned to her attorney, who suggested that she may have to seek Chapter 13 bankruptcy protection.  That prompted her to check her credit report, where she discovered the true amount owed.  She conceded that the fraud questionnaire and notices of determination were posted on her MiWAM account.  She also admitted to deleting periodically UIA notifications sent to her email address and neglecting to read UIA letters posted on her MiWAM account because she was not seeking benefits after 2013.

On September 22, 2016, Cahoo filed for Chapter 7 bankruptcy; she received a discharge on January 15, 2017.  In her bankruptcy petition, she did not list her claim in this case but included her UIA debts in her schedule of liabilities.  On January 4, 2017, the UIA filed an adversary

complaint, opposing the discharge of the UIA debt based on Cahoo's alleged fraud.  But around February 3, 2017, Cahoo received a redetermination of her fraud case following the court approved-settlement with the State in *Zynda v. Arwood*.

The UIA's designated 30(b)(6) witness, Kevin Smith, reviewed Cahoo's file and opined that UIA examiners were involved in Cahoo's fraud determination and that a UIA claims examiner took the actions that led to the determination.  However, he "didn't see [the] staging screen" for Cahoo's intentional misrepresentation case.

### 2. Kristen Mendyk

Kristen Mendyk received unemployment benefits from July 2, 2011 to March 31, 2012. She chose to receive correspondence from the UIA by mail.  Based on an employer protest, the UIA investigated her for fraud in 2012 and again in 2013.  The UIA sent her two fraud questionnaires, one on July 20, 2012 (pre-MiDAS) and the other on November 4, 2013.  The UIA sent the questionnaires to the address Mendyk provided in Saint Charles, Michigan.  But she alleges that she never received the questionnaires because she no longer lived at the address when they were sent.

Mendyk never responded to the UIA's fraud questionnaires.  In November 2013 and January 2014, the UIA adjudicated three claims of fraud against her, all opened by "wisemans 1" and adjudicated by "batch."  The fraud determinations also went to the Saint Charles, Michigan address on November 4 and 12, 2013, and January 15, 2014.  Mendyk no longer lived there at the time.

On February 25, 2014, the UIA sent a monthly delinquency statement charging Mendyk $32,748, consisting of $9,355.00 in overpayment, $22,702.00 in penalty charges, and $691.15 in interest.  MiDAS then seized Mendyk's tax returns and garnished her wages between May 2014

and July 2016, collecting a total of $5,983.71 from her.  Mendyk alleges that she did not learn about the fraud determinations until she attempted to file another claim in 2017.  But she acknowledged that she was obligated to keep her address current with the UIA and conceded that she committed the misrepresentation alleged.  But she maintained that she did not intend to misrepresent her wages, and that she mistakenly reported an incorrect amount.

The UIA eventually reconsidered Mendyk's determination in response to a Department of Labor's review of MiDAS auto-adjudications.  On October 12, 2016, a UIA employee mailed her a redetermination notice, but it was returned as undeliverable.  Between December 30, 2014, and October 12, 2016, several letters that the UIA sent to Mendyk were returned and marked "return to sender," or "not deliverable as addressed," including a 2014 letter attempting to collect $30,080 and the 2016 redetermination notice.

Mendyk filed for Chapter 13 bankruptcy on December 16, 2016, to which the UIA filed a complaint in opposition.  Although she included her UIA debts on her schedule of liabilities, she did not list the cause of action she asserts in this case.  She was represented by counsel in her bankruptcy case and discussed this action with him.  On February 28, 2017, Mendyk informed her Chapter 13 trustee of her potential due process claim, which the trustee authorized her to pursue.  However, she entered into a consent judgment with the UIA on April 12, 2017, in which she admitted to the alleged fraud and agreed to pay $6,793.70.

The UIA's designated 30(b)(6) witness, Katherine Potter, reviewed Mendyk's file and opined that a UIA examiner made Mendyk's fraud determinations.  Curiously, she did not address the fact that "batch" appears next to each stage change from "pending adjudication" to "redetermination issued" and from "redetermination issued" to "issue closed," which occurred

within the span of several seconds, and which were well beyond ordinary business hours (between 8:00 p.m. and 1:00 a.m.).

### 3. Khadija Cole

Khadija Cole received unemployment benefits from March 1 through June 28, 2014 and opted for email correspondence with the UIA.  The UIA apparently suspected that she failed to disclose vacation pay for the week of March 1, 2014, despite that she repeatedly certified that she was not receiving such pay.  The UIA sent her a fraud questionnaire on October 3, 2014.  The UIA also detected earning discrepancies for the weeks of April 5 to June 28, 2014, and on February 12, 2015, MiDAS issued another questionnaire inquiring about unreported wages.  The UIA sent the questionnaires to her MiWAM account, and she received an email to check it.

Cole never responded to the questionnaires, and on October 16, 2014 and February 26, 2015, MiDAS determined that Cole committed fraud.   MiDAS issued corresponding redetermination notices to her MiWAM account.

Both of Cole's fraud cases were opened by UIA employees, but "batch" (MiDAS) updated the stages of the cases from "pending adjudication," to "issue closed" within seconds for each case. The first case concerned vacation pay during one week in March 2014; Cole alleges that the second case was flagged improperly based on MiDAS's "income spreading" programming.  As evidence, she points to the UIA's "Notice of Redetermination" issued on February 27, 2015, which found that she received exactly $733.45 in wages every week between April 5 and June 28, 2014. MiDAS also issued a list of overpayments, stating that it overpaid exactly $362.00 each week between April 5 and June 28, 2014, and charging her $24,530, consisting of $4,706 in principal and $18,824.00 in penalty fees.

Cole insists that she never received any email, a fraud questionnaire, a fraud determination, or any notice of the fraud charges against her whatsoever.  She testified that she first learned about the fraud determination when she received a statement of debt by mail from UIA around the summer of 2016.  The UIA ultimately assessed $4,950 in principal and $19,346 in penalties.

On October 3, 2016, Cole filed for Chapter 13 bankruptcy.  In her petition, she included her UIA debts on her schedule of liabilities but did not list her cause of action in this case as an asset.  She was represented by counsel during her bankruptcy proceedings and discussed this lawsuit with him.  While her bankruptcy was pending, Cole admitted to committing fraud and entered into a consent judgment with the UIA on March 29, 2017.  Her bankruptcy proceedings appear to be ongoing.

Kevin Smith, the UIA's designated 30(b)(6) witness who testified about both Cahoo's and Cole's files, did not opine about the extent of auto-adjudication in Cole's case.

### 4. Michelle Davison

Michelle Davison received unemployment benefits from May 25 through November 23, 2013, and from March 22 through July 19, 2014.  She applied for her second round of employment benefits on March 17, 2014, alleging that she was laid off from her job.  She opted for regular mail correspondence and directed the UIA to contact her at an address on Leerda Street in Flint, Michigan.  She certified that she understood that she was responsible for reading the UIA Handbook, which set forth her obligation to update the UIA about any address changes.

Davison's former employer protested her unemployment claim around March 2014, contending that she voluntarily quit.  A UIA employee opened an investigation on October 7, 2014, and the UIA sent a fraud questionnaire to Davison's designated address the following day.

-14-

Davison testified that she no longer was living at that address, had never received the questionnaire, and was unable to respond. But her recollection was quite foggy. ("I was probably moved by then, 'cuz I – I don't remember. I don't even remember exactly when I moved out of there. I think was probably gone by then."). On October 22, 2014, the UIA mailed a notice of determination to the Flint address stating that she was ineligible for benefits. But the notice was returned as undeliverable on November 11, 2014.

On December 29, 2014, Davison called the UIA to unlock her MiWAM account, and during that call she updated her address to reflect that she lived on Saginaw Street in Flint, Michigan. But the UIA never resent the fraud questionnaire, nor did it do anything to verify that Davison received it.

On January 15, 2015, the UIA issued another fraud determination to Davison's updated address and assessed $6,222 in principal and $740 in penalties. Davison alleges that she never received any correspondence and first learned about the fraud determination from the IRS when the UIA intercepted her 2015 federal tax refund, although she does not state when that happened. She filed a late appeal of her fraud determination, after her *Zynda* review, and prevailed on May 8, 2017.

The UIA's designated 30(b)(6) witness, Jessica Hart, reviewed Davison's file and opined that a UIA examiner made Davison's fraud determinations. The term "batch" appears beside only one entry in the relevant time period, which changed the stage of Davison's case from "pending fact finding to pending adjudication." The names of UIA employees appear beside every other entry.

-15-

5. Hyon Pak

Hyon Pak received unemployment benefits from September 24, 2011 through March 3, 2012.  In September 2012, before implementing MiDAS, the UIA opened a fraud investigation and sent Pak three pre-MiDAS questionnaires by mail on September 24.  The first two concerned employer Express Services, and the third addressed Employer Eagle Industries.

He responded to all three on September 26, 2012.  On October 8, 2012, Pak received two more pre-MiDAS fraud questionnaires, one regarding Express Services, the other regarding Eagle Industries.  Believing they were duplicates, he did not respond to them.

About a year later (and after MiDAS rolled out), Pak chose to "go green" and provided the UIA with his email address.  His "Go Green" agreement stated that it was his responsibility to monitor his MiWAM account for any UIA correspondence.

About one year after Pak went "green," on December 29, 2014, the UIA posted four fraud determinations on Pak's MiWAM account, all of which involved MiDAS.  The system had gone back over two years to review Pak's September 26, 2012 responses to the UIA's questionnaires.  However, a staff member had to enter his responses into MiDAS and open the fraud issues because the old questionnaires prompted handwritten responses.  About four hours after the employee opened Pak's cases, "batch" changed the stages from "pending adjudication" to "issue closed."  The UIA issued determination notices that day, December 29, 2014.

Pak contends that he was unaware of the fraud determinations until 2016, when the UIA intercepted his federal tax refund.  But during his deposition, he conceded that the UIA sent electronic notices as he requested.  He maintained that he could not recall whether he saw the notices on his MiWAM account but conceded that someone (possibly his wife) accessed his

MiWAM account on December 29, 2014, and January 2, 2015 — the same day the UIA emailed him to check his account.

He filed an untimely appeal in 2017, but the UIA eventually reversed Pak's fraud determinations after it permitted him to appeal again.

Defendants FAST and CSG contend in their motions to dismiss that these plaintiffs have not established standing to sue them, as required by Article III of the Constitution, and therefore this Court has no jurisdiction over the case.

## II. Discussion

A defendant may move under Federal Rule of Civil Procedure 12(b)(1) to dismiss a case "for lack of subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). The issue of subject matter jurisdiction lurks in every federal case because the Constitution authorizes federal courts to decide only "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1; *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

The motion under Rule 12(b)(1) may be brought as a facial attack — that is, a challenge to the sufficiency of the complaint — or a factual attack, as here — taking in evidence beyond the pleadings. *Cartwright*, 751 F.3d at 759. For the latter, courts have "wide discretion" to consider affidavits and documents "to arrive at the factual predicate that subject-matter jurisdiction does or does not exist." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). The Court also may take judicial notice of its own records. *See* Fed. R. Evid. 201(b)(2*); United States v. Doss*, 563 F.2d 265, 269 n. 2 (6th Cir. 1977). The plaintiffs have the burden to prove the jurisdictional facts, *Cartwright*, 751 F.3d at 760, and all parties have had the opportunity to present evidence on that issue. The Court "has the power to weigh [that] evidence and determine the effect of that evidence on the court's authority to hear the case." *Id*. at 759-60. Although this

case has been pending for over three years, because subject matter jurisdiction goes to the power of the court to hear an action, a motion to dismiss for lack of subject matter jurisdiction may be filed at any time.  Fed. R. Civ. P. 12(h)(3); Fed. R. C v. P. 12(b)(1); *S.J. v. Hamilton Cty., Ohio*, 374 F.3d 416, 418 n.1(6th Cir. 2004).

To establish standing, a plaintiff must show that he or she has suffered an "injury in fact," that was caused by the defendant's conduct, and that a favorable decision will redress that injury. *Town of Chester v. Laroe Estates, Inc.*, --- U.S. ---, 137 S. Ct. 1645, 1650 (2017) (quoting *Spokeo, Inc. v. Robins*, --- U.S. ---, 136 S. Ct. 1540, 1547 (2016)).

### 1.  Injury-in-fact

The first requirement requires proof of an actual injury, that is, "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"  *Ibid.*  "A 'concrete' injury must be '*de facto*'; that is, it must actually exist."  *Ibid.*

The injury identified by the named plaintiffs is the deprivation of their property interests in unemployment benefits and exposure to violations and penalties without adequate pre- or post-deprivation process.  Relevant to this case, federal law requires that claimants be provided an "[o]pportunity for a fair hearing, before an impartial tribunal, for all individuals whose claims for unemployment compensation are denied".  42 U.S.C. § 503(a)(3); *see Goldberg v. Kelly*, 397 U.S. 254, 267-268 (1970).  Certain federal regulations and procedures must be followed before unemployment benefits can be denied.  Among them are the federal regulations that require a merit employee conduct fact finding, adjudicate issues, and determine eligibility.  *See* 42 U.S.C. 503.

FAST and CSG insist that the plaintiffs cannot demonstrate an injury-in-fact because at least four of them (Pak, Mendyk, Cahoo, and Davison) were adjudicated by human UIA examiners, not by auto-adjudication (despite the activity from "batch" in their case files), and that Cole cannot establish that the UIA auto-adjudicated her fraud claims. They accuse the plaintiffs of attempting to "redefine auto-adjudication, asserting the 'injury-in fact' is that MiDAS employs 'batch' processing to allow [the] UIA [to] automate the purely ministerial 'determination' step in the process." The defendants also call auto-adjudication a "myth," insisting that "the MiDAS software [] did not use any form [of] artificial intelligence."

The defendants miss the point; "artificial intelligence" is not the focus of the plaintiffs' grievances. *First*, the plaintiffs never argued that MiDAS relied on sophisticated, analytical software. The amended complaint does not even mention the term "artificial intelligence" at all. Rather, the plaintiffs allege that their fraud determinations were wrongfully adjudicated based on MiDAS's rigid application of the UIA's logic trees, which led to "automated" decisions. Here, UIA employees and MiDAS automatically determined that each of the named plaintiffs committed fraud because they failed to respond to their respective questionnaires — results that were compelled by applying the UIA's logic trees.

*Second*, the defendants' argument is founded on the incorrect assumption that the plaintiffs' alleged injuries revolve solely around MiDAS's automated fraud adjudications. The plaintiffs filed a broad complaint filled with allegations supporting a variety of state and federal claims, most of which have since been dismissed. To be sure, the complaint heavily emphasizes MiDAS's automated adjudications. However, concerning the plaintiffs only remaining claim — violation of procedural due process — the Court noted that they alleged more than simply having their fraud cases auto-adjudicated: "[t]he complaint alleges that the automated system afforded no pre-

deprivation process to the plaintiffs even though it was required by state law, and post-deprivation remedies were inadequate because the decision-making process lacks transparency and access to records to determine the basis for the determination  The complaint also indicates that the appeals process was fraught with impropriety."  Opinion Granting in Part Motions to Dismiss, ECF No. 124, PageID.3502.

Even if the Court accepts the defendants' arguments at face value and assumes that UIA employees were involved in the plaintiffs' fraud adjudications at every step of the way, the plaintiffs individually have still demonstrated an injury-in-fact, namely, the deprivation of their property interests in unemployment benefits without adequate pre- or post-deprivation process.

Cahoo alleges that she did not hear about her May 2015 fraud adjudication until she filed for bankruptcy "months later."  Although she received an email to check her MiWAM account, she alleges that she had no reason to do so because the generic email did not indicate that the correspondence was important in any way and she no longer was receiving unemployment benefits.

Mendyk alleges that she never received notice of the UIA's three fraud determinations because it sent the notices to an address at which she no longer resided.  She testified that she did not learn about the determinations until she attempted to file another unemployment claim.  The UIA seized her tax returns and garnished her wages between May and July 2014.  Moreover, between December 30, 2014 and October 12, 2016, many letters that the UIA sent to Mendyk were returned or designated "not deliverable as addressed," but the UIA did nothing to verify that she knew about her fraud determinations.

Cole adamantly insists that she never received any emails, fraud questionnaires, or fraud determinations.  She testified that she first learned about the fraud determination when she received

a statement of debt by mail from UIA around the summer of 2016. The record also includes evidence that the UIA flagged her claim as fraudulent based on its arbitrary income spreading policy, the brainchild of CSG.

Davison did not hear about her October 2014 fraud determination until the IRS intercepted her 2015 federal tax refund (at an unknown date) because the notices were sent to a residence where she no longer resided. Even though she updated her address in December 2014, the UIA never resent the fraud questionnaire, nor did it do anything to verify that Davison received it.

Finally, Pak was unaware of his December 2014 fraud determination until 2016, when the UIA intercepted his federal tax refund. The merits of that claim may be in doubt, as Pak conceded that the UIA sent email notices as he requested and that someone (possibly his wife) accessed his MiWAM account on December 29, 2014 and January 2, 2015 — the same day the UIA emailed him to check his account. Nonetheless, Pak and the other plaintiffs have demonstrated an injury-in-fact, at least at this threshold stage of the analysis.

## 2. Causation

To have standing to complain, the plaintiffs' injuries "ha[ve] to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560-61 (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41-42 (1976)); *see also Wittman v. Personhuballah*, --- U.S. ---, 136 S. Ct. 1732, 1736 (2016). Traceability "is not focused on whether the defendant 'caused' the plaintiff's injury in the liability sense," *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 796 (6th Cir. 2009), because "causation to support standing is not synonymous with causation sufficient to support a claim," *Parsons v. United States Dep't of Justice*, 801 F.3d 701, 715 (6th Cir. 2015). "Proximate causation is not a requirement of Article III standing, which requires only that the

plaintiff's injury be fairly traceable to the defendant's conduct." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6, (2014); *see Parsons*, 801 F.3d at 715 ("Of course, causation to support standing is not synonymous with causation sufficient to support a claim"). "In the nebulous land of 'fairly traceable,' where causation means more than speculative but less than but-for, the allegation that a defendant's conduct was a motivating factor in the third party's injurious actions satisfies the requisite standard." *Parsons*, 801 F.3d at 714 (6th Cir. 2015) (holding plaintiffs established standing over the FBI for designating their group as a gang, which motivated state authorities to violate their constitutional rights).

FAST and CSG argue that no injury can be traced to them because they never participated in, assisted, or supervised any unemployment claim adjudication or collection efforts or establish or approve any of the UIA's policies and procedures that the UIA directed be incorporated into MiDAS. The sole responsibility for the plaintiffs' woes, they say, lies with the UIA.

### a. FAST

Although the UIA unquestionably had the ultimate authority over MiDAS and the plaintiffs' fraud determinations, the record undercuts any argument that FAST in no way contributed to the alleged deprivation of the plaintiffs' property interests without due process.

FAST contracted with the State specifically to "design, configure and implement its GenTAX commercial-off-the-shelf" software for the UIA's use in administering unemployment insurance, including fraud investigation, overpayments, collections, and tax intercepts. FAST Contract, ECF No. 399-65, PageID.17798, 17800, 17802-03. It configured "almost all aspects of" MiDAS and trained UIA employees on how to use the system. *Id.* at PageID.1783. It also developed the templates of all MiDAS correspondence, including questionnaires and determination notices, which the plaintiffs allege were constitutionally deficient. And FAST did

all of this despite its understanding that its templates had to comply with Federal and State law delivery requirements.  The record supports the idea that FAST built the entire system that caused the alleged injuries at the behest of the State.

FAST seeks to shield itself from liability by hiding under the State's cloak of authority (and immunity); FAST insists that it did not cause these injuries because the State told it what to do and how to do it.  But it is well established that "the fact that a defendant was one of multiple contributors to a plaintiff's injuries does not defeat causation." *Parsons*, 801 F.3d at 714 (citing *Connecticut v. Am. Elec. Power Co., Inc.*, 582 F.3d 309, 345–47 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S. 410 (2011)).  Moreover, "[s]ince World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and [government actors] in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order." *Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010).  Here, there were many reasons to question the UIA's orders.  *See, e.g.*, Auditor General's Performance Report, ECF No. 385-4.

As the entity with the ultimate control over MiDAS, the UIA's actions in this case may have been "voluntary," but they were not "independent." *Crawford*, 868 F.3d at 457.  The plaintiffs' injuries are fairly traceable to FAST.

### b. CSG

CSG's involvement presents a closer call as it did not actually build MiDAS, but it did play advisory and administrative roles for the UIA in developing and running the system. The plaintiffs concede that CSG "may not have had ultimate authority for setting the unconstitutional policies of [the] UIA, or for approving the algorithms used to deny Plaintiffs their due process rights."  Plfs.' Response to MTDs, ECF No. 399, PageID.17452.   But they nevertheless maintain that their

injuries are fairly traceable to CSG because it "contributed to the formation of the policies and the implementation of the system" that potentially violated their rights. *Ibid.*

Merely providing advice to a third party that voluntarily injures another is constitutionally insufficient to expose one to liability, whereas actively participating in the injury is sufficient. *Crawford*, 868 F.3d at 457. Under that rationale, CSG's role as an advisor to the UIA, even though it urged the UIA to "[r]everse the current Agency culture where staff is reluctant to render a fraud determination because it is viewed as too punitive on the claimant," CSG Fraud Audit Report, ECF No. 434-1, PageID.25320, may not be sufficient to expose it to liability. In that regard, the UIA's decision to accept the advice is referable to its "voluntary choice." *Ibid.*

But CSG did not just provide advice. It migrated beyond advising when it acted as the onsite project manager for MiDAS. CSG primarily served an administrative role, ensuring that the project stayed on budget and on time. But it also "mentored" UIA staff and maintained "continuous liaison with . . . the State Senior Project Managers." CSG Contract, ECF No. 425-4, PageID.19664. And it supported FAST "in meeting the timely delivery of quality information technology services" for MiDAS's stakeholders. *Ibid.* Some of its tasks also included conducting cost-benefit analyses, developing and managing project schedules, facilitating team communications, and monitoring performance.

These actions amounted to active management and supervision by CSG. And although CSG did not run MiDAS, it monitored the system's performance and conducted cost-benefit analyses. Doing so should have alerted it to the potentially unconstitutional adjudications and collection practices, and it certainly learned about them in June 2015, when the Auditor General published its report. That may fall short of establishing proximate cause, but it satisfies the "fairly

traceable' requirement for standing.  *Allen,* 468 U.S. at 751; *Parsons*, 801 F.3d at 714 (describing

"fairly traceable" inquiry as "more than speculative but less than but-for" causation).

### C.  Bankruptcy Filings

FAST and CSG contend that plaintiffs Cahoo, Mendyk, and Cole do not own their causes

of action because they filed for bankruptcy before they commenced this case and their claims

belong to their respective bankruptcy estates.  They lack standing to sue, say the defendants,

because they are not the real parties in interest and they are judicially estopped from pursuing their

claims.

Federal Rule of Civil Procedure 17(a) provides that an action "must be prosecuted in the

name of the real party in interest."  Fed. R. Civ. P. 17(a).  However, "[t]he court may not dismiss

an action for failure to prosecute in the name of the real party in interest until, after an objection,

a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted

into the action."  Fed. R. Civ. P. 17(a)(3).

When an individual files for bankruptcy, a bankruptcy estate is created, which consists of

"all legal or equitable interests of the debtor in property as of the commencement of the case."  11

U.S.C. § 541(a)(1).  The bankruptcy estate includes all causes of action that accrued before the

bankruptcy petition was filed, even if the debtor did not disclose it.  *Auday v. Wet Seal Retail, Inc.*,

698 F.3d 902, 904 (6th Cir. 2012).  Thus, once a debtor files a bankruptcy petition, the debtor "'has

no standing to pursue' [a pre-petition cause of action] alone."  *Ibid.* (quoting *Bauer v. Commerce*

*Union Bank*, 859 F.2d 438, 440-41 (6th Cir. 1988)).

To determine whether a cause of action is pre-petition, which belongs to the estate, or post-

petition, which belongs to the debtor, the Sixth Circuit applies the approach described in *Segal v.*

*Rochelle*, 382 U.S. 375, 380 (1966).  Under *Segal*, pre-petition assets are those that are

"'sufficiently rooted in the pre-bankruptcy past' of the debtor." *Tyler v. DH Cap. Mgmt., Inc*., 736 F.3d 455, 461 (6th Cir. 2013) (quoting *Segal*, 382 U.S. at 380). "Pre-petition conduct or facts alone will not 'root' a claim in the past; there must be a pre-petition violation." *Id*. at 462. The Sixth Circuit made clear that "accrual for the purposes of § 541 is different from accrual for statute-of-limitations purposes" and that "the relevant bankruptcy-law question is when the claim is minimally actionable, not whether the claim is fully mature." *Id*. at 463, 464. Thus, "all causes of action that hypothetically could have been brought pre-petition are property of the estate." *Ibid*. (quoting *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 n. 5 (3d Cir. 2002)).

The issue ultimately boils down to when the causes of action for each plaintiff accrued relative to when they filed for bankruptcy. The plaintiffs maintain that their claims did not accrue until they spoke to their civil rights lawyers in February 2017 — after they commenced their bankruptcy proceedings — and supposedly learned for the first time that they may have been deprived of due process.

A section 1983 claim accrues "'when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred.'" *D'Amborsio v. Marino*, 747 F.3d 378, 384 (6th Cir. 2014) (quoting *Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007)). "Courts determine the accrual date of a claim by asking 'what event should have alerted the typical lay person to protect his or her rights.'" *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 461 (6th Cir. 2016) (quoting *Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir. 2005). "In procedural-due-process claims . . . , a plaintiff's injury accrues at the time that process was denied because 'the allegedly infirm process is an injury in itself.'" *Ibid.* (quoting *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 894 (6th Cir. 1991) (finding that the

plaintiff's injuries accrued when a local zoning council convened a critical session that departed from the required notice and comment procedures, even though the council had not yet reached a final decision on the plaintiff's development plans for his property)).

The factual record in this case is not developed sufficiently to determine when the plaintiffs' claims accrued. There may be circumstances with the individual plaintiffs that call into question whether they are the real party in interest — or if not, whether they have or could become so by ratification of their claims by their respective bankruptcy trustees — and whether they are judicially estopped from pressing their claims. But those are merits questions that do not undermine subject matter jurisdiction, which is the subject of the present motion. *See Primax Recoveries, Inc. v. Gunter,* 433 F.3d 515, 518–19 (6th Cir. 2006) ("'Clarity would be facilitated . . . if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.'") (quoting *Eberhart v. United States,* 546 U.S. 12, 16 (2005) (per curiam), and citing *Kontrick v. Ryan,* 540 U.S. 443, 453 (2004)).

### III.  Conclusion

The plaintiffs sufficiently have demonstrated an injury-in-fact (fraud determinations based on the rigid application of the UIA's rigid logic trees coupled with inadequate notice procedures) that is fairly traceable to FAST's and CSG's conduct. Although the defendants make colorable arguments that Cahoo and Cole are not the real parties in interest of, or are judicially estopped from bringing, their claims, the factual record is not complete to establish conclusively that their claims are pre-petition or no longer belong to them.

Accordingly, it is **ORDERED** that the motions by defendants CSG and FAST to dismiss for want of subject matter jurisdiction (ECF No. 297, 313) are **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:   December 21, 2020