UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATTI JO CAHOO, KRISTEN MENDYK,
KHADIJA COLE, HYON PAK, and
MICHELLE DAVISON,

                    Plaintiffs,                          Case Number 17-10657
v.                                                Honorable David M. Lawson

FAST ENTERPRISES LLC, CSG GOVERNMENT
SOLUTIONS, STEPHEN GESKEY,
SHEMIN BLUNDELL, DORIS MITCHELL,
DEBRA SINGLETON, and SHARON
MOFFET-MASSEY,

                    Defendants.

_____/

## <u>OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT</u>

In the remaining count of their amended complaint, the five named plaintiffs allege that the defendants deprived them of their right to due process of law when the State of Michigan's Unemployment Insurance Agency (UIA) used its Michigan Integrated Data Automated System (MiDAS) to make fraud determinations arising from their respective claims for unemployment insurance. Defendants CSG Government Solutions and FAST Enterprises, Inc. played key roles in the development and implementation of MiDAS, and the plaintiffs allege that they share responsibility for the harm caused.

The plaintiffs also sued several individual employees of the Michigan Unemployment Insurance Agency for their roles in the implementation of MiDAS and the adjudication of their fraud cases. These defendants, Sharon Moffet-Massey, Stephen Geskey, Shemin Blundell, Doris Mitchell, and Debra Singleton (the State defendants), also moved for summary judgment.

In their respective motions, CSG and FAST have moved for summary judgment arguing that (1) the plaintiffs suffered no injuries, (2) the defendants did not cause any injuries, (3) they are not state actors and cannot be sued for violating constitutional rights, and (4) three plaintiffs are not the real parties in interest and should be judicially estopped from bringing their claims because they failed to disclose in their respective bankruptcy schedules their property interests in this litigation.

CSG and FAST raised these same arguments in motions to dismiss, which they filed after the close of discovery. Those arguments, they asserted, supported their contention that the plaintiffs lacked standing to sue them under Article III of the Constitution. The Court denied their motions, *Cahoo v. FAST Enterprises LLC*, --- F. Supp. 3d ---, No. 17-10657, 2020 WL 7493103 (E.D. Mich. Dec. 21, 2020), and for the same reasons rejects those arguments in their respective summary judgment motions, although two issues require additional discussion here. In the opinion and order denying the motions to dismiss, the Court noted that although the facts supported a conclusion that the plaintiffs' injuries were fairly traceable to FAST's and CSG's conduct, the Court did not determine the question of proximate cause. *Id.* at *10-12 (noting that "causation to support standing is not synonymous with causation sufficient to support a claim") (quoting *Parsons v. United States Dep't of Justice*, 801 F.3d 701, 715 (6th Cir. 2015)). In addition, the Court determined that the factual record was not sufficient to address the effect of Cahoo's, Mendyk's, and Cole's bankruptcy filings on whether they should be estopped from asserting their present claims, *Cahoo*, 2020 WL 7493103 at 12-13. Those issues are ready for determination now.

The State defendants argue that (1) the plaintiffs suffered no injuries, (2) the defendants did not cause any injuries, (3) the defendants are entitled to qualified immunity, (4) the plaintiffs are not entitled to injunctive relief, (5) the Court should preclude the plaintiffs from obtaining

medical-related damages because they have not identified any expert witnesses, and (6) plaintiff Kristen Mendyk's claim is barred by the statute of limitations.

The plaintiffs also moved for partial summary judgment on liability, arguing that the undisputed facts demonstrate that (1) the fraud questionnaires and determinations did not provide adequate substantive notice, (2) the manner of notice — by traditional mail and email — was constitutionally deficient, (3) they were denied a fair hearing through the inadequate notice in the questionnaires and determinations, and (4) the plaintiffs' interest in the vindication of their constitutional rights outweighs the costs of imposing additional procedural safeguards on the State, and (5) defendants CSG, FAST, Geskey, and Moffet-Massey are responsible for the due process violations.

There is sufficient evidence of causation to preclude summary judgment for FAST and CSG on that ground.  The bankruptcy filings by plaintiffs Cahoo, Mendyk, and Cole will not require dismissal of their claims at this time.  The claim by plaintiff Pak against all defendants must be dismissed because the undisputed facts show that he has not suffered a constitutional injury.  The record reviewed in the light most favorable to the other plaintiffs shows that defendants Blundell, Mitchell, and Singleton did not implicitly authorize, approve, or knowingly acquiesce to developing the UIA's unconstitutional policies or forms, and therefore the amended complaint against them will be dismissed.  The record precludes summary judgment against defendants Sharon Moffet-Massey and Stephen Geskey, and they are not protected by qualified immunity. And although the forms MiDAS generated to notify claimants of possible redetermination of benefits were insufficient to inform them of fraud accusations, fact questions exist in the record as to the effects of the notice deficiencies on the plaintiffs that preclude partial summary judgment in their favor.

I.

The facts of the case have been discussed many times in the Court's previous opinions and need not be repeated here.  The most recent and relevant discussion is found in the opinion and order on the motions to dismiss for lack of standing, *Cahoo*, 2020 WL 7493103, at *1-8, and that recitation is incorporated by reference in this opinion.

The roles of the individual State defendants were not the subject of the motion to dismiss, and more needs to be said about them here.  The adoption of MiDAS was a large, comprehensive modernization project spearheaded by Clay Tierney, who was the Director of the Agency's Office of Technology and Modernization.  He no longer is a defendant in this case.  The UIA had two separate teams dedicated to fraudulent unemployment claims: the first, "nonmonetary benefits" team, headed by Susan Easton, investigated and adjudicated overpayments and fraud; the second, "restitution and collection team," headed by defendant Shemin Blundell, collected overpayments.

A.  Sharon Moffet-Massey

Defendant Sharon Moffet-Massey was appointed the director of the UIA in April 2014 and maintained that position until January 2017.  As the director, she oversaw the UIA's operations and ensured that the Agency processed unemployment claims.  She served as the director when the Auditor General audited MiDAS and when the Department of Labor (DOL) reviewed the UIA's operations; she served as the DOL's "point of contact" throughout its investigation.  The plaintiffs allege that as the head of the UIA, she pursued the allegedly defective and unconstitutional policies.

By the time Moffet-Massey assumed her position, the "benefits side" of the UIA "pretty much fully implemented" MiDAS.  She had the ultimate responsibility of approving forms,

-4-

processes, and any changes to MiDAS.  Her name appears on the form 1713 fraud questionnaires and form 1302 fraud determinations under the heading "authorized by."

Moffet-Massey received weekly or biweekly updates on the MiDAS project and had the authority to prioritize and approve any modifications or changes to the system, policies, and procedures.  However, she apparently disregarded several recommendations from defendant Steven Geskey, an attorney, to modify the UIA's practices. Geskey dep., ECF No. 473-20, PageID.35299, 35317, 35315, 35327, 35332, ("I recommended against the fraud finding decision trees" "which went unheeded;" "I began making that request earlier, and continued that request even later when those were not changed pursuant to my recommendations").  However, the record is unclear if Geskey made these recommendations to Moffet-Massey or her predecessor, Steve Arwood, or both.  Despite the negative press about MiDAS, Moffet-Massey said that she was unaware of any "issues" with the system.  Moffet-Massey dep., ECF No. 473-16, PageID.34979, 35135 ("There were times where we had a hiccup here or there, but it did what we thought it was to do.").

Moffet-Massey acknowledged that federal regulations currently prohibit the use of auto adjudication for unemployment claims, but she maintained that the practice was unprecedented at the time of MiDAS's implementation, and the UIA staff had no reason to think it was prohibited. However, she eventually directed the Agency to shut off the auto-adjudication feature around August 2015 because staff members alerted her that the system had been determining too frequently that people committed fraud.

Around 2015, the DOL began reviewing the UIA's practices, and a DOL administrator emailed Moffet-Massey in September 2015 warning that "[a]ll determinations of fraud . . . require a complete investigation of the issue(s) involved, including the opportunity to rebut [allegations]

prior to the issuance of a determination" and that "the determination may not be made by an automated system." DOL Letter dated 09/04/15, ECF No. 473-21, PageID.35404. But Moffet-Massey doubled down, contending that "Agency staff spent countless hours combing through a variety of regulatory and governance manuals, including the 301 Handbook" and determined that the regulations "fail[ed] to reveal *any* [] substantive limitation concerning when auto-adjudication is "not appropriate." Moffet-Massey Email dated 09/11/15, ECF No. 473-21, PageID.35403. The DOL administrator maintained that the system violated federal regulations. Shortly after the UIA shut off MiDAS's auto-adjudication functionalities in August 2015, the DOL produced its report formally finding that the policy violated federal regulations in November 2015.

## B. Stephen Geskey

Defendant Stephen Geskey served as the UIA's director from 2008 to 2011 while the State solicited bids for the MiDAS project and brought CSG on board as the project manager. After directing the UIA, he performed miscellaneous legal jobs until he took over the policies and procedures group, which was "imbedded within the UI project modernization team." The record is unclear on when that occurred. Geskey testified that he took the position sometime "between 2011 [and] 2012" (before MiDAS went live in October 2013) and that he had "some involvement" "in the policies and procedures [team] up to the implementation" of MiDAS. But he also testified that he became the head of the group after MiDAS's implementation in 2013, and that when he took the position, MiDAS's functions had already been "imbedded." As the director of the policy unit, Geskey was responsible for making "major policy decisions" about MiDAS, and "had some involvement" in developing the system's procedures (i.e., how "individual staff do things").

Geskey also played a role in developing, or at least approving, some of the language used on UIA forms, although the Agency's director had the ultimate say over form approval. Susan

-6-

Easton, who worked on the non-monetary team that handled the determination and fact-finding forms, testified that the non-monetary team developed the language of these forms. The team would send a draft form to Easton, who would revise it, then send it to the legal department. Once the legal department completed its review, the proposed form "went to [Geskey], the director of the [policies and procedures] units," then finally to the UIA's director. Easton could not recall whether team members, management, or Geskey ever discussed whether the forms afforded due process, and she could not recall implementing any changes to the forms from 2013 to 2017. However, Tierney testified that he and Geskey investigated an alleged "tendency to refer to all overpayments as being fraudulently collected," but they "did not find that to be the case." Tierney dep., ECF No. 473-2, PageID.33381.

Geskey confirmed that he "personally did not undertake a legal review to determine the legal sufficiency" of certain forms. Nor did he review the legality of the UIA's income spreading practice. However, he says that he made "unheeded" recommendations to the UIA director not to adopt, or at least modify, the logic trees as they related to fraud findings to ensure such determinations were based on "competent material and substantial evidence."

After the DOL reviewed MiDAS and issued its Monitoring Report, Geskey drafted the UIA's response for Moffet-Massey. The letter, which Moffet-Massey signed, stated that the UIA's "read of [federal regulations] does not reveal any substantive limitation" on the UIA's use of auto-adjudication.

From January 2016 to "maybe 2017," Geskey oversaw the bankruptcy department staff, who sent claimant files to the state attorney general's office to oppose the discharge of claimant debt and advised them on "the intersection between bankruptcy and [unemployment insurance] law." There was no policy requiring the UIA to file adversary complaints in every bankruptcy

case; rather, staff would refer matters to the attorney general's office for review and initiation of an adversary proceeding when appropriate.  Doris Mitchell, who worked in the unit, said that Geskey never issued a directive regarding the referral of files to the attorney general's office. Rather, the UIA maintained a general policy that if a bankruptcy claimant owed a debt to the Agency, the UIA would refer the claimant's file to the attorney general.

### C.  Shemin Blundell

Defendant Shemin Blundell directed the restitution and collections team, the fraud investigation unit, and managed the bankruptcy unit under Geskey for some time.  Around 2012, Blundell also served as a business analyst during the development of MiDAS and worked closely with FAST; she was on the project floor every day during the development phase.  In that role, she worked on a team that focused on "the MiDAS screen development," benefit overpayment collection functionality, "benefit timeliness quality for fraud investigation cases," and "benefit payment control."

After MiDAS went live, from about 2014 through 2016, Blundell directed the restitution and collections team, which handled the collection of restitution, discussed current practices, and made recommendations.  Blundell's work in the restitution and collection department, as the name implies, revolved around collecting overpayments after the UIA issued a fraud determination. Tierney explained that "[o]nce the adjudication had set a determination in place that there was money owed" and "once the 30-day appeal period was past and went final," the file "was scanned over to [Blundell's] team to come up with a method by which we would track those accounts [and] make sure that we were" collecting overpayments.  Tierney dep., ECF No. 473-2, PageID.33492-93.  However, Blundell was not in charge of any claim examiners.

In February 2016, Blundell became the director of the Fraud Investigation Unit until she was demoted to a local office manager in 2018.  In their amended complaint, the plaintiffs allege that, as the Fraud Unit's director, she "direct[ed] subordinates to pursue the invalid and false fraud claims against claimants despite the knowledge that the fraud claims were invalid and false."  Am. Compl., ¶¶17, 164, ECF No. 43, PageID.757, 781.  But during her deposition, Blundell testified that her work had "absolutely nothing" to do with the plaintiffs' claims, which pertain to administrative fraud determinations.  Instead, her work related to the investigation of fraud (primarily identity theft) for criminal prosecution purposes.  She explained that her employees "would have occasional cases where there was actual fraud that occurred due to overpayment, say, working while collecting.  But [for] those cases, my regulation agents would actually meet with the employer and claimant one on one, and there were cases we were taking to prosecution." Blundell dep., ECF No. 423-26, PageID.19239.

### D. Doris Mitchell

The plaintiffs alleged that defendant Doris Mitchell was head of the UIA's Friend of the Court and Bankruptcy Unit, where she directed subordinates "to oppose discharge of claimants' debt in bankruptcy proceedings" that were based on allegedly false fraud claims, despite knowing that the claims were invalid.  Am. Compl., ECF No. 43, PageID.757 at ¶ 18.

Mitchell managed the Friend of the Court unit since 2010.  In 2014, the Friend of Court unit "added the functionality of the bankruptcy process."  When that happened, Mitchell became the manager of the Friend of the Court unit and bankruptcy unit.  For bankruptcy matters, she reported to Blundell, who, in turn, reported to Geskey.

Mitchell testified that when the bankruptcy unit received a bankruptcy notice, staff entered the data to ensure that collection stops; if a bankruptcy case was dismissed, staff restarted

-9-

collection; and if a discharge were obtained, staff wrote off the discharged debt.  If they received a Chapter 7 bankruptcy notice involving fraud, the department prepared a file to send to the attorney general's office, unless the claimant had already paid the standard settlement amount acceptable to the Agency.  If they received a Chapter 13 notice, and there was a balance on the account, the matter was referred to the attorney general's office irrespective of fraud.  The file preparation in this unit was largely clerical, as staff did not review documents when preparing a file; instead, staff simply assembled files to send to the attorney general's office.

Mitchell's unit did not provide any recommendations to the attorney general's office about whether an adversary proceeding should be filed, since that decision fell within the attorney's discretion.  Mitchell had no training in assessing fraud or making fraud determinations.  The unit had no procedures to review files to determine whether the fraud finding was invalid or false.  Moreover, Mitchell lacked knowledge of the auto-adjudication of fraud determinations or any issues regarding them.

### E.  Debra Singleton

The plaintiffs allege that defendant Debra Singleton was the head of the Benefit Overpayment Collection Unit at the UIA, where she directed subordinates to pursue aggressive collection activities, despite knowing about "the over 93% margin of error rate for fraud determinations." Am. Compl., ECF No. 43, PageID.782, ¶¶ 167-68.

Singleton testified that she led the benefit overpayment collection department from 1999 until she retired in October 2018; she reported directly to Blundell from about 2014 to 2016.  In her role, she was never involved in determining whether claims were fraudulent.  Nor was her unit responsible for determining the propriety of final determinations or how much a claimant owed.  The department focused exclusively on collections.

Once MiDAS was implemented, it automatically mailed monthly notices, set up payment plans, and initiated tax intercepts — Singleton was not involved in establishing this process. Nor was she involved in any meeting regarding collection efforts under MiDAS, and she never received a booklet regarding MiDAS's collections procedures or activities. Her post-MiDAS duties primarily involved making phone calls to and receiving phone calls from claimants and verifying whether they were paying. When claimants called the collection department with questions about non-collection issues, like adjudication or appeals, Singleton's unit directed claimants to hang up and call customer service because it was the UIA's policy not to transfer calls between 800 numbers.

When initiating garnishment proceedings, the unit assessed whether the claimant was delinquent in making payments. The department then would send a letter informing the claimant of the UIA's intent to garnish their wages. Claimants then could negotiate with the department to establish a payment plan, based on their respective payment histories.

Singleton said that she had no knowledge of the alleged 93% margin of error for fraud determinations. She also lacked the power to stop collection proceedings.

II.

FAST and CSG move for summary judgment on the remaining count of the amended complaint. They each assert that none of the plaintiffs have offered sufficient evidence that these defendants caused any of their injuries, and Cahoo, Mendyk, and Cole cannot pursue their claims because those claims belong to their respective bankruptcy estates.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all

-11-

reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute. *Id.* at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Cap., Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). Instead, that party must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for" that party. *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

A.  Causation

FAST and CSG contend that the plaintiffs have not offered sufficient evidence of causation to withstand summary judgment.

Section 1983 imposes civil liability on an individual who "under color [of state law] . . . subjects, *or causes to be subjected*, any citizen of the United States . . . to the deprivation of any rights, privileges or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (emphasis added).  Generally, "[c]ommon law tort principles govern causation in the § 1983 context." *Martin v. Warren Cnty., Kentucky*, 799 F. App'x 329, 337 (6th Cir. 2020) (citing *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007); (*McKinley v. City of Mansfield*, 404 F.3d 418, 438 (6th Cir. 2005)).  Thus, the plaintiffs must show that the defendants' conduct was both a cause in fact and a proximate cause of the alleged due process violations.  *Ibid*.

"Factual causation 'is typically assessed using the 'but for' test, which requires [courts] to imagine whether the harm would have occurred if the defendant had behaved other than it did." *Ibid.*  Proximate cause is "a kind of line-drawing exercise in which [courts] ask whether there are any policy or practical reasons that militate against holding a defendant liable even though that defendant is a but-for cause of the plaintiff's injury." *Powers*, 501 F.3d. at 609 (citing Dobbs on Torts § 181).  The proximate cause inquiry is "'not about causation at all but about the appropriate scope of liability.'" *Ibid.*

"'A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" *Williams v. City of Euclid*, 2013 WL 2456373, at *2 (N.D. Ohio, Jun. 6, 2013) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).  The plaintiffs must prove causation as "to

-13-

each defendant that the plaintiff seeks to hold liable." *White v. Bell*, 656 F. App'x. 745, 747 (6th Cir. 2016). "If [a defendant] is to be held liable, it must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others, either defendants or non-defendants." *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991). However, "the fact that a defendant was one of multiple contributors to a plaintiff's injuries does not defeat causation." *Parsons*, 801 F.3d at 714; *see also Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013); *Barnum Timber Co. v. EPA*, 633 F.3d 894, 901 (9th Cir. 2011).

FAST and CSG each insists that for a private entity to be the proximate cause of constitutional injuries, where state officials committed the ultimate acts that caused the injuries, the private party must exercise "some control over state officials' decision [to commit the challenged act]." *Franklin v. Fox*, 312 F.3d 423, 446 (9th Cir. 2002) (quoting *King v. Massarweh*, 782 F.2d 825, 829 (9th Cir.1986); s*ee Lucas v. Ulliance, Inc*., 2016 WL 1259108, at *8 (E.D. Mich. Mar. 31, 2016) (private contractors did not proximately cause due process violation where it "exercised [no] influence over [State's] decision to summarily suspend" plaintiffs' medical licenses even though the contractors reported that the plaintiffs failed to comply with applicable regulations). And in the standing context, courts have found injuries not "fairly traceable" to the State where a plaintiff's injury results from a "third party's *voluntary and independent* actions or omissions." *Crawford v. United States Dep't of Treasury*, 868 F.3d 438, 455 (6th Cir. 2017) (emphasis in original) (citing *Bennett v. Spear*, 520 U.S. 154, 169 (1997)); *see Turaani v. Wray*, 440 F. Supp. 3d 733, 738 (E.D. Mich. 2020) (holding that plaintiff could not trace injury to an FBI agent where the agent convinced a gun seller to renege on his promise to sell a gun to the plaintiff

because the FBI agent merely acted to "potentially influence the voluntary and independent decisions of a third-party.").

However, the Sixth Circuit explained that the proximate cause inquiry is ultimately about foreseeability: "[e]ven if an intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, provided that the third party's actions were foreseeable." *Powers*, 501 F.3d at 609 (holding that county public defender office proximately caused a violation of the plaintiff's Fifth, Sixth, and Fourteenth Amendment rights to be free from court fees due to indigency when the public defender office failed to move for an indigency hearing, even though municipal judge had final authority over the decision); *see also Kerman v. City of New York*, 374 F.3d 93, 126-27 (2d Cir. 2004) (holding that even where it was a hospital's doctors who decided to admit the plaintiff for psychiatric observation, the police officer who took the plaintiff to the hospital was nonetheless subject to liability under section 1983 because it was foreseeable that the plaintiff would be detained at the hospital as a result of the officer's taking him there); *Warner v. Orange Cnty. Dep't of Probation*, 115 F.3d 1068, 1072-74 (2d Cir.1996) (holding that in recommending that the plaintiff be sentenced to an alcohol-treatment program that incorporated religious elements, a probation department could be held liable under section 1983 for violating the plaintiff's First Amendment rights, even though a judge made the sentencing decision).

### 1.  CSG

The plaintiffs point to five actions that they allege CSG took to cause their injuries: (1) recommending income spreading, (2) encouraging the UIA to reverse its agency culture regarding fraud, (3) suggesting changes to the fact-finding form that UIA sent to claimants, (4) establishing

a Project Management Office (PMO) to oversee the MiDAS implementation process, and (5) drafting the request for proposal (RFP) for the project.

a. Cause in Fact

The evidence against CSG satisfies the cause-in-fact inquiry.  If it were not for CSG's extensive research, work, advice, and ongoing management, the UIA would have been unable to develop MiDAS, the execution of which caused at least Cahoo and Cole "to be subjected . . . to the deprivation of" their property without due process.  42 U.S.C. § 1983.  The new system replaced a legacy system that provided adequate questionnaires and determination notices that provided specific facts and required human discretion with one that produced deficient notices and questionnaires with much less (if any) human oversight.  The record is clear that the State relied on CSG's expertise to develop the RFP, which required that MiDAS be able to "automatically adjudicate all issue types without staff intervention" and "automatically issue a non-monetary determination based on existing information when all or one party has not responded to the fact-finding questionnaires."  RFP, ECF No. 474-7 at PageID.36492.  An automatically issued fraud determination based on a failure to respond is precisely the nature of the plaintiffs' injuries.

Although CSG primarily provided administrative support after MiDAS rolled out, it "mentored" the State's staff and maintained "continuous liaison with . . . the State Senior Project Managers."  CSG Contract, ECF No. 425-4, PageID.19664.  And it supported FAST "in meeting the timely delivery of quality information technology services" for MiDAS's stakeholders.  *Ibid.* Some of its tasks also included conducting cost-benefit analyses, developing and managing project schedules, facilitating team communications, and monitoring performance.  *Id.*, at PageID.19665-66.

-16-

These actions involve active management and supervision by CSG.  Although CSG did not run MiDAS, it monitored the system's performance and conducted cost-benefit analyses.  Doing so should have alerted the defendant about the potentially unconstitutional adjudications and collection practices, and CSG certainly learned about them in June 2015, when the Auditor General published its report.

It is true that CSG recommended that the UIA clarify the wording on its questionnaire by (1) changing the title to make clear that the inquiry related to fraud; (2) explaining in bold text that the claimant's employer provided sufficient information warranting a finding of overpayment, and (3) including the potential amount of overpayment, penalties, and disqualifications based on the information available.  CSG Fraud Audit Report, ECF No. 434-1, PageID.25327.  Those recommendations were unheeded.  But CSG also recommended that the UIA "prorate earnings" to "establish any resulting overpayment" "[w]hen there is no employer response and [a] claimant does not provide credible earnings information"— a recommendation that the UIA adopted.  *Id.* at PageID.25320.  CSG further recommended that the UIA "emphasize" that "Agency policy stipulates that an Intentional Misrepresentation decision can be rendered even if the claimant fails to respond."  *Id.* at PageID.25325.  Thus, although CSG may not have had the ultimate authority over MiDAS's functionalities, it certainly was a significant and necessary actor in the system's development.  *See Parsons*, 801 F.3d at 714 ("the fact that a defendant was one of multiple contributors to a plaintiff's injuries does not defeat causation.").

The record adequately demonstrates facts that can support CSG's pivotal role in the system's development, including MiDAS's flaws that allowed many of the plaintiffs' fraud determinations absent the protections required by the Due Process Clause.

-17-

b. Proximate Cause

Relying on the district court decision in *Lucas v. Ulliance, Inc*., CSG insists that proximate cause has not been established.  In *Lucas*, the plaintiffs alleged that Michigan's Department of Licensing and Regulatory Affairs  (LARA) suspended their licenses to practice medicine without a hearing after receiving a report from a third-party private contractor that was contractually obligated to report any circumstances indicating that impaired healthcare professionals may pose a threat to public health.  *Lucas,* 2016 WL 1259108, at *1.  The plaintiffs brought section 1983 claims against the contractor, among others, alleging that the suspensions violated their due process rights.  *Id.* at *8.  The court held that the plaintiffs adequately had alleged that the contractor's report constituted a cause-in-fact of their injuries, but nonetheless dismissed the claim against Ulliance because the plaintiffs failed to allege proximate causation.  *Ibid.*  The court noted that "Plaintiffs have not alleged that . . . the Ulliance Defendants exercised any influence over Defendant Engle's decision to summarily suspend their licenses."  *Id*. at *8.  The court also held that the plaintiffs "have not alleged that the Ulliance Defendants reported noncompliance except as required to fulfill Ulliance's contractual obligations to LARA."  *Ibid.*

*Lucas* is distinguishable on its facts.  The relationship between the contractors and LARA in that case is far more distant than the relationship between the UIA and CSG.  Rather than simply reporting data based on a contractual obligation, the UIA sought out CSG, an expert in "government solutions," to survey best practices among states and provide detailed, comprehensive recommendations to build its system.  Thus, unlike the contractor in *Lucas*, the facts permit the inference that CSG "exercised [] influence over" the State's decision to "automatically adjudicate all issue types without staff intervention," determine overpayment by prorating earnings, encourage UIA employees to find fraud more frequently, and "automatically

-18-

issue a non-monetary determination based on existing information when all or one party has not responded to the fact-finding questionnaires." ECF No. 474-7, PageID.36492.

This case more resembles the Second Circuit's decision in *Warner v. Orange County Department of Probation*. In that case, a probationer brought a section 1983 action against a county probation department, alleging that its recommendation to require his attendance at Alcoholics Anonymous meetings violated the Establishment Clause of the First Amendment due to the religious content of the meetings. *Warner*, 115 F.3d at 1070. The probation department raised a similar defense as CSG, contending that it did not proximately cause the plaintiff's injuries because the sentencing judge had the ultimate authority over the decision. *Id.* at 1073. The Second Circuit rejected the argument, holding that "[g]iven the neutral advisory role of the probation officer toward the court, it is an entirely 'natural consequence[]' for a judge to adopt the [probation officer's] recommendation as to the therapy provider without making an independent investigation of the qualifications and procedures of the recommended provider. Such action by a judge is neither 'abnormal' nor 'unforeseen.'" *Ibid.* (quoting *Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553, 561 (1st Cir. 1989), and citing *Malley v. Briggs,* 475 U.S. 335, 344 n.7 (1986), *overruled on other grounds by Monell v. Dep't of Soc. Servs. v. City of New York*, 436 U.S. 658 (2018)).

CSG builds its argument on the unpublished district court decision cited above and on an out-of-circuit case that addressed a much more attenuated relationship between private conduct and the State. *See Franklin*, 312 F.3d at 446 (9th Cir. 2002) (holding that the plaintiff's daughter was not the proximate cause for eliciting a murder confession from her father (the plaintiff) because there was no showing that she had control over the investigation). Looking to published Sixth Circuit authority, however, it is evident that although the State's adjudications were "the immediate trigger" for the plaintiffs' injuries, the faulty adjudications "were foreseeable" in light

-19-

of CSG's recommendations to permit fully automatic adjudications, to encourage employees to find fraud,  and to utilize income spreading (i.e., falsified evidence) to determine overpayments. *Powers*, 501 F.3d at 609; *see* Tierney dep., ECF No. 473-2, PageID.33225 ("we were worried about the pitfalls [of the project], and . . . knew we needed professional help with the project . . . management office.").  Considering CSG's "neutral advisory role," *Warner*, 115 F.3d at 1070, toward the UIA, it was a "natural consequence" for the UIA to adopt its recommendations, *Malley*, 475 U.S. at 344 n.7.

## 2.  FAST

The plaintiffs argue that FAST is responsible for their injuries because it developed the UIA's deficient forms and built the entire MiDAS system, including all of its deficiencies like income spreading and adjudications based on nonresponses.  Like CSG, FAST maintains that it is neither the cause in fact nor the proximate cause of any injuries because the UIA is the true culprit. In addition, FAST asserts that it simply followed the UIA's directions in good faith, thereby shielding it from liability.

### a. Cause in Fact

Although the UIA unquestionably had the ultimate authority over MiDAS and the plaintiffs' fraud determinations, the record contains sufficient evidence that FAST contributed to the alleged deprivation of the plaintiffs' property interests without due process.  *See Parsons*, 801 F.3d at 714.

As an initial matter, FAST argues that it cannot be liable under section 1983 because MiDAS is not a "person" who acted under the color of state law.  42 U.S.C. § 1983.  "But this argument conveniently ignores the fact that [FAST] implemented and oversaw MiDAS . . . MiDAS did not create itself."  *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 904-05 (6th Cir. 2019).  This

argument is simply an "attempt to evade responsibility for [FAST's] actions by deflecting blame away from [itself] and onto the computerized system that [it] implemented and oversaw," *id.* at 905, which, in turn, "caus[ed the plaintiffs] to be subjected" to the deprivation of their property without due process.  42 U.S.C. § 1983.

FAST contracted with the State specifically to "design, configure and implement its GenTAX commercial-off-the-shelf" software for the UIA's use in administering unemployment insurance, including fraud investigation, overpayments, collections, and tax intercepts.  FAST Contract, ECF No. 399-65, PageID.17798, 17800, 17802-03.  It configured "almost all aspects of" MiDAS and trained UIA employees on how to use the system.  *Id.* at PageID.1783.  It also developed the templates of all MiDAS correspondence, including questionnaires and determination notices, which were constitutionally deficient. *Id.* at PageID.17803-04.

A question of fact remains about whether FAST helped develop the content of the questionnaires and fraud determinations.  *Compare* Easton dep., ECF No. 473-18, PageID.35226 (FAST employees were on the non-monetary team charged with developing the forms) *and* Tierney dep., ECF No. 471-10, PageID.31311, 31529, 31705 (FAST employees worked under Easton's team to "design and program the system," and "draft[] the language" of the UIA's forms.") *with* Blundell dep., ECF No. 297-8, PageID.11186 ("no CSG, FAST, or SAS employees were involved in determining the content or crafting the language of those notices or questionnaires sent to claimants.").  That fact question must be resolved in favor of the plaintiffs at this stage of the case.  Moreover, once MiDAS went live, FAST's role transitioned to "support and maintenance;" that is, "making sure [the system] continues to function and do what it's expected to do," per FAST's contractual warranty.  ECF No. 471-10, PageID.31362

There is sufficient evidence in the record to preclude summary judgment on the cause-in-fact issue.

### b. Proximate Cause

FAST raises a similar proximate causation argument as CSG. Its arguments are more compelling, in that the record suggests that FAST may have exercised minimal control over the UIA's decision to implement the policies designed into the system. But questions of fact preclude a finding that FAST is not the proximate cause of the injuries. The record shows that FAST played an essential role in building the system, and its employees participated in the developmental meetings with CSG and the UIA. Easton dep., ECF No. 473-18, PageID.35226 (FAST employees, who were "subject matter experts" worked on the non-monetary team tasked with developing the forms); Tierney dep., ECF No. 471-10, PageID.31311, 31529, 31705.

FAST argues that it cannot be the proximate cause because the UIA's abdication of its duty to ensure that the system comported with federal law constituted an intervening and superseding cause, citing *Lucas,* 2016 WL 1259108, at *1. But again, *Lucas* is distinguishable from the facts of this case. First, as discussed above, FAST and the UIA had a much closer working relationship than Ulliance had with LARA, which simply reported potential doctors who did not comply with pertinent regulations. Here, the UIA worked extensively with FAST to develop MiDAS and update the UIA's correspondence. Even more, the record shows that FAST agreed to share at least some of the responsibilities of ensuring that the system complied with federal and state law. FAST Contract, ECF No. 399-65, PageID.17803-04 (agreeing to develop the templates of all MiDAS correspondence, including questionnaires and determination notices and ensuring that the templates complied with "Federal and State law delivery requirements"); Tierney dep., ECF No. 471-10, PageID.31701 (FAST's "solution is designed to function in compliance with all applicable

law, rules, and regulations of our government clients, and will function in compliance with the Michigan Employment Security Act, UI administrative rules, and federal laws and regulations."); *see* FAST Response to RFP, ECF No. 440, PageID.25524 ("the proposed solution and associated hardware and software must comply with multiple State and federal policies, standards, procedures, laws, and regulations.").

FAST's involvement suggests at least some influence in developing the fraud questionnaires, determination notices, and email correspondence, and therefore the UIA's faulty adjudications certainly "were foreseeable" in light of FAST's development of a streamlined, automated system that provided little to no opportunities to be heard and intelligently respond before stripping claimants of their property rights. *See Powers*, 501 F.3d at 609.

### c. Good Faith Defense

Finally, FAST argues that even if it did factually and proximately cause the plaintiffs' injuries, it is nevertheless protected by its good faith adherence to the UIA's directives. The law does not support the application of that defense to these facts.

"[W]hile a private party acting under color of state law does not enjoy qualified immunity from suit, it is entitled to raise a good-faith defense to liability under section 1983.'" *Lee v. Ohio Educ. Ass'n*, 951 F.3d 386, 390 (6th Cir. 2020). However, the cases on which FAST relies make clear that the good faith defense is premised on a party relying on the law as it existed at the time of its actions. *Ibid.* (union was entitled to rely on then-existing state law and United States Supreme Court precedent when collecting mandatory "fair-share" fees from the plaintiff — a practice later deemed unconstitutional); *Duncan v. Peck*, 844 F.2d 1261, 1267 (6th Cir. 1988) (parties "who rely on the advice of their attorneys, and invoke presumptively reasonable statutes" had a good faith defense); *Clement v. City of Glendale*, 518 F3d 1090, 1097 (9th Cir. 2008) ("The

constitutional defect — a lack of notice to the car's owner — could not have been observed by the towing company at the time when the tow was conducted" and "[t]he responsibility to give notice falls on the police."); *Ogle v. Ohio Civil Serv. Employees Ass'n, AFSCME, Local 11*, 397 F. Supp. 3d 1076, 1091 (S.D. Ohio 2019) ("private entities that rely upon a presumptively valid state statute have protection from liability should that statute later turn out to be unconstitutional.").

Here, FAST argues that because the law at the time *did not prohibit* auto-adjudication of unemployment claims, its conduct falls under the good faith exception.  That argument does not fit within the scope of that defense.  First, Michigan law at the time actually required that "[t]he unemployment agency shall designate representatives who shall promptly examine claims and make a determination of the facts."  Mich. Comp. Laws § 421.32.  That law was in effect during MiDAS's development.  Tierney dep., ECF No. 471-10, PageID.31603.  Clearly, MiDAS is not a "designate[d] representative" charged with evaluating facts and adjudicating claims.  Moreover, federal law at the time clearly established that not only must unemployment beneficiaries be provided with an opportunity for a hearing before their benefits are terminated, *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970), but the notice of the hearing must "set forth the alleged misconduct with particularity," *In re Gault*, 387 U.S. 1, 33 (1967), and provide claimants with a "reasonable opportunity to know the claims of the opposing party and [] meet them." *Morgan v. United States*, 304 U.S. 1, 18 (1938).  As discussed in this Court's earlier decisions, the fraud questionnaires and determination notices woefully fell short of that standard.  *See, e.g.*, *Cahoo v. Fast Enters. LLC*, No. 17-10657, 2020 WL 7624613, at *11 (E.D. Mich. Dec. 22, 2020) (opinion on class certification).

FAST, in essence, seeks to shield itself from liability not by alleging that it relied on old law that has changed; rather it contends that it was not the one that caused these injuries because

the State told it what to do and how to do it.  As the Court explained in its opinion on FAST's motion to dismiss, that argument is legally insufficient.  "'[S]ince World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and [government actors] in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order.'"  *Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010) (quoting *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 n.5 (11th Cir. 2004)); *Grossman v. City of Portland*, 33 F. 3d 1200, 1209 (9th Cir. 1994) ("Section 1983 defendants are not 'immune for the results of their official conduct simply because they were enforcing policies or orders promulgated by those with superior authority'"); *Brent v. Ashley*, 247 F.3d 1294, 1305 (11th Cir. 2001) ("following orders does not immunize government agents from civil rights liability").

### 3.  Plaintiff Hyon Pak

The causation arguments by CSG and FAST must be examined in a different light for plaintiff Hyon Pak because, unlike the other plaintiffs, the record conclusively shows that he did not suffer a constitutional injury that could have been caused by any of the defendants.

Pak received unemployment benefits from September 2011 through March 2012.  When the UIA began investigating Pak, it mailed him three pre-MiDAS questionnaires in September 2012, inquiring about two of his employers.  In October 2012, Pak received two more pre-MiDAS fraud questionnaires, one for each employer.  He did not respond.  About a year later (and after MiDAS rolled out), Pak chose to "go green," that is, he elected to receive his notices through email messages, not through the United States Mail.  He provided the UIA with his email address.  About one year after "going green," the UIA posted four fraud determinations on Pak's MiWAM account, on December 29, 2014, all of which were generated by MiDAS.  The UIA eventually intercepted his tax refunds in 2016.

-25-

Pak cannot complain about the substantive adequacy of notice provided by the UIA's questionnaires.  He never received the problematic MiDAS questionnaires.  Instead, he received and responded to the old forms, which provided him with an adequate explanation of the stakes and grounds for suspicion against him.  *See, e.g.*, September 2012 Questionnaire, ECF No. 445-38, PageID.26348  (warning Pak that his "employer has provided sufficient documentation to prove an overpayment, which will result in misrepresentation (FRAUD)," and explaining that the employer notified the UIA that Pak failed to report to work).  Pak responded to the questionnaires with his written explanation.  MiDAS issued a second round of questionnaires the following month, but Pak chose not to respond, apparently believing they were duplicates.  The plaintiffs emphasize that the UIA issued the fraud determinations in 2014 — about two years after the questionnaires were sent.  But State law at the time accorded the Agency six years to issue such a determination.  Mich. Comp. Laws § 421.62 (the period is now three years).  Thus, there is no fact question that nothing about MiDAS or the defendants' involvement in its development or implementation could have caused Pak any due process injury; he received and returned the adequate questionnaires before MiDAS was even in the picture.

Pak alleges that he was unaware of the 2014 fraud determinations until 2016, when the UIA intercepted his federal tax refund.  But during his deposition, he conceded that the UIA posted the correspondence on his MiWAM account, and that someone (possibly his wife) accessed his account on December 29, 2014, and January 2, 2015 — right after the UIA emailed him instructions to check his account.  Pak dep., ECF No. 445-30, PageID.26130.  Pak offered no evidence that disputed that he received an email; he simply stated that he did not know if he did.  After drawing all reasonable inferences in Pak's favor, there is no evidence to suggest that the UIA's manner of notice or any of the defendants' actions violated Pak's due process right.  The

evidence shows without contest that (1) the UIA had no reason to suspect that Pak did not receive its correspondence (especially because he replied earlier), (2) the UIA sent an email as requested and posted the correspondence on Pak's MiWAM account, and (3) it is undisputed that either Pak or his wife checked the correspondence because someone logged on Pak's MiWAM account the day the UIA issued the determinations. *See Jones v. Flowers*, 547 U.S. 220, 229 (2006) (stating that the means of notice must be "such as one desirous of actually informing the absentee might reasonably adopt to accomplish it"); *Ming Kuo Yang v. City of Wyoming, Michigan*, 793 F.3d 599, 602 (6th Cir. 2015).

Finally, unlike for the other plaintiffs, the record conclusively shows that humans were involved in Pak's adjudication process and had evidence to work from, as opposed to simply relying on an employer's account after a claimant failed to respond. A staff member had to enter Pak's responses into MiDAS and open the fraud investigation because the old questionnaires prompted handwritten responses. Pak's claim files also reflect significant human involvement. Screenshots of Pak Cases, ECF No. 399-60 (showing that humans did everything (except stage the case) from issuing the determination and closing the case). UIA employee Mandy Brickel testified that she saw no evidence of auto-adjudication on Pak's case, and Pamela Sagady swore that she adjudicated Pak's claims "based upon the information [she] would have had at the time . . . , including the fact that he had a prior 2012 determination of fraud." Sagady Aff., ECF No. 423-41. In response, Pak offers nothing but the presence of the "batch" term in his claim files to show that he was deprived of a fair hearing. That, by itself, is not enough. Based on the evidence before the Court, no reasonable juror could conclude that Pak's right to "rudimentary" pre-deprivation process was violated. *Goldberg*, 397 U.S. at 267.

Pak's claim will be dismissed.

## B.  Bankruptcy Filings

FAST and CSG each argue that because plaintiffs Cahoo, Mendyk, and Cole all filed petitions in bankruptcy and did not list this cause of action in their asset schedules, they lack standing to sue, they are not the real parties in interest in this case, and they should be judicially estopped from bringing this action.

The plaintiffs argue that the defendants cannot raise this argument because they did not raise it in a reasonably prompt manner.  It is true that if an argument under Rule 17 is "not raised in a timely or seasonable fashion, the general rule is that the objection is deemed waived." *United Health Care Corp. v. Am. Trade Ins. Co.*, 88 F.3d 563, 569 (8th Cir. 1996); *see also Whelan v. Abell*, 953 F.2d 663, 672 (D.C. Cir. 1992) ("where a Rule 17(a) defense is made, judges abuse their discretion in allowing the plea as late as the start of the trial if the real party has been prejudiced by the defendant's laxness.").  However, CSG raised its real-property-in-interest argument as its twelfth affirmative defense in its answer to the plaintiffs' complaint. And FAST asserted the defense within the time allowed in other cases.  *See United Health Care Corp.*, 88 F.3d at 569 (one week before trial); *Whelan*, 953 F.2d at 672 (D.C. Cir. 1992) (trial already underway).  There is no waiver of this defense.

It is well-understood that when a person files for bankruptcy, "all legal or equitable interests of the debtor in property as of the commencement of the case" are considered property of the bankruptcy estate. 11 U.S.C. § 541(a)(1).  Courts have stated, therefore, that only the bankruptcy trustee has "standing" to pursue pre-petition causes of action.  *Tyler v. DH Cap. Mgmt., Inc.*, 736 F.3d 455, 461 (6th Cir. 2013) (citing *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 853 (6th Cir. 2002)).  That does not imply the absence of standing in a constitutional sense; such a plaintiff plausibly may allege that she has suffered an injury in fact, that is traceable

-28-

to the defendant's conduct, and a favorable decision would enhance the assets available to her creditors, and the possibility of a recovery in excess of her debt finding a path into her own pocket would be more than "merely speculative." *See Kardules v. City of Columbus,* 95 F.3d 1335, 1346 (6th Cir. 1996) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992)).

Nonetheless, bankruptcy debtors who file lawsuits in their own names for pre-petition claims face several obstacles. For one, because pre-petition causes of action belong to the bankruptcy trustee, the trustee is the real party in interest to bring the claim. *Auday v. Wet Seal Retail, Inc.*, 698 F.3d 902, 905 (6th Cir. 2012). For another, if the cause of action was not listed on the bankruptcy schedule of assets, the civil action may be subject to dismissal under the concept of judicial estoppel. *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 697-98 (6th Cir. 2014) (citing *Kimberlin v. Dollar Gen. Corp.*, 520 F. App'x 312, 314 (6th Cir. 2013).

It is elementary that "[a]n action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a)(1). "Under the rule, the real party in interest is the person who is entitled to enforce the right asserted under the governing substantive law." *Certain Interested Underwriters at Lloyd's, London, England v. Layne*, 26 F.3d 39, 43 (6th Cir. 1994). However, "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3). Rule 17(a)(3) is "intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made." *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 532 (6th Cir. 2002). Substitution under Rule 17 "should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or

-29-

participants." *Id.* at 534 (Gilman, J., concurring) (citing *Advanced Magnetics, Inc. v. Bayfront Partners*, Inc., 106 F.3d 11, 20 (2d Cir. 1997)).

A cause of action is pre-petition if it is "'sufficiently rooted in the pre-bankruptcy past' of the debtor." *Tyler*, 736 F.3d at 461 (quoting *Segal v. Rochelle*, 382 U.S. 375, 380 (1966)). "Pre-petition conduct or facts alone will not 'root' a claim in the past; there must be a pre-petition violation." *Id.* at 462. The Sixth Circuit made clear that although accrual analysis is generally "helpful, accrual for the purposes of § 541 is different from accrual for statute-of-limitations purposes" and that "the relevant bankruptcy-law question is when the claim is minimally actionable, not whether the claim is fully mature." *Id.* at 463, 464. Two competing points are at play here. "First, mere conduct is insufficient to root a claim in the past; a pre-petition violation is required. Second, all causes of action that could have been brought pre-petition are property of the estate, whether or not the debtors knew of the cause of action when they filed the petition." *In re Blasingame*, 986 F.3d 633, 640 (6th Cir. 2021) (citations omitted).

A section 1983 claim accrues "'when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 384 (6th Cir. 2014) (quoting *Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007)). "Courts determine the accrual date of a claim by asking 'what event should have alerted the typical lay person to protect his or her rights.'" *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 461 (6th Cir. 2016) (quoting *Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir. 2005). "In procedural-due-process claims . . . , a plaintiff's injury accrues at the time that process was denied because 'the allegedly infirm process is an injury in itself.'" *Ibid.* (quoting *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 894 (6th Cir. 1991) (finding that the plaintiff's claim accrued when a local zoning council convened a critical session that departed

-30-

from the required notice and comment procedures, even though the council had not yet reached a final decision on the plaintiff's development plans for his property)).

### 1. Cahoo

Patti Jo Cahoo contends that her due process claim in this case is post-petition because it did not "root" until February 2017 when she spoke with her civil rights attorneys.  But her own deposition testimony reveals that her claim was minimally actionable before she filed for Chapter 7 bankruptcy protection on September 22, 2016.  She included her UIA debt in her bankruptcy petition, but not her interest in this action.

Cahoo argues that she was unaware of the UIA's May 2015 fraud determinations, or at least the extent of the assessed penalties, until "months" after they were issued, when she consulted her attorney about filing for bankruptcy.  However, her deposition testimony makes clear that she was on notice of her alleged injuries — and therefore her due process claim became minimally actionable — before filing for bankruptcy.  *Am. Premier Underwriters, Inc.*, 839 F.3d at 461; *Tyler*, 736 F.3d at 464.  It is uncontested that she did not disclose her interest on her bankruptcy schedules.

Cahoo maintains nevertheless that her injuries were not rooted in her pre-bankruptcy past because (1) she did not suffer emotional distress until she discovered the lack of pre-deprivation process in 2017, and (2) she could not challenge the "wrongful deprivation component" of her due process claim until it had been reversed in 2017 following the *Zynda* review.

Although Cahoo may have suffered two distinct types of damages — one from wrongful deprivation and another from emotional distress, *see Carey v. Piphus*, 435 U.S. 247, 263 (1978) — she does not have two independent due process claims.  Although the "procedural due process clause has the dual purpose of protecting persons from the mistaken or unjustified deprivation of

-31-

life, liberty or property, and of conveying to the individual a feeling that the government has dealt with her fairly," that dual purpose is relevant only for determining damages resulting from the due process violation. *Alston v. King*, 231 F.3d 383, 386 (7th Cir. 2000). Cahoo cites no authority for the proposition that those two concepts have different accrual or rooting analyses. Instead, they both result from the same violation of due process. The discovery of the UIA's actions in 2015 made her claim "minimally actionable." *Tyler*, 736 F.3d at 463, 464 ("the relevant bankruptcy-law question is when the claim is minimally actionable, *not* whether the claim is fully mature.") (emphasis added).

Second, relying on *Heck v. Humphrey*, 512 U.S. 477, 484-485 (1994), and the *Rooker-Feldman* doctrine, Cahoo argues that the wrongful deprivation component of her due process claim was not minimally actionable at the time she filed for bankruptcy because her fraud determination had not been reversed. *Heck* has no application here. In that case, the Supreme Court delineated the procedures that prisoners must follow when asserting constitutional violations — habeas corpus or a civil rights action under 42 U.S.C. § 1983 — based on whether the claim challenges the validity of a criminal conviction. There was no conviction in this case. And the *Rooker-Feldman* doctrine, which prohibits collateral attacks on state court decisions, "has no application to judicial review of executive action, including determinations made by state administrative agency." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 644 n.3 (2002); *Rooker v. Fidelity Trust Co*., 263 U.S. 413 (1923); *Dist. Of Columbia Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983).

Cahoo, therefore, is not the real party in interest of her claim in this case. The fact that she obtained a bankruptcy discharge on January 15, 2017 makes no difference. "Even after the case is closed, the estate continues to retain its interest in unscheduled property." *Guar. Residential*

*Lending v. Homestead Mortg. Co., LLC*, 463 F. Supp. 2d 651, 661 (E.D. Mich. 2006) (quoting Collier on Bankruptcy ¶ 554.03 (15th rev. ed. 2006)).  There is no evidence that she has attempted to reopen the bankruptcy or ask the trustee to assign this cause of action to her.

Similarly, judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  This doctrine is used to "'preserve[e] the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment.'"  *Lorillard Tobacco Co. v. Chester, Willcox & Saxbe*, 546 F.3d 752, 757 (6th Cir. 2008) (quoting *Teledyne Indus., Inc. v. Nat'l Labor Rel. Bd.*, 911 F.2d 1214, 1217–18 (6th Cir.1990)).

Bankruptcy debtors must disclose to the bankruptcy court any potential cause of action as an asset in a schedule of assets and liabilities.  *See* 11 U.S.C. § 521(a)(1)(B)(i).  "This disclosure obligation is ongoing, meaning a debtor has 'an express, affirmative duty to disclose all assets, including contingent and unliquidated claims' that arise at any time during the bankruptcy proceeding."  *Davis v. Fiat Chrysler Autos. U.S., LLC*, 747 F. App'x 309, 314 (6th Cir. 2018) (quoting *White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 479 n.5 (6th Cir. 2010)).  "[T]he disclosure obligations of consumer debtors are at the very core of the bankruptcy process and meeting these obligations is part of the price debtors pay for receiving the bankruptcy discharge."  *Lewis v. Weyerhaeuser Co.*, 141 F. App'x 420, 424 (6th Cir. 2005).

In the bankruptcy context, the Sixth Circuit noted that judicial estoppel will bar a claim when "(1) a party 'assumed a position that was contrary to the one that she asserted under oath in the bankruptcy proceedings,' (2) 'the bankruptcy court adopted the contrary position either as a

-33-

preliminary matter or as part of a final disposition,' and (3) the omission 'did not result from mistake or inadvertence.'" *Davis*, 747 F. App'x at 313. (quoting *White*, 617 F.3d at 478). When a debtor fails to disclose known, potential claims in a bankruptcy proceeding, that "omission [is] equivalent to a statement that there were no such claims." *Stephenson v. Malloy*, 700 F.3d 265, 274 (6th Cir. 2012). When the debtor brings a civil claim that was not listed on her bankruptcy schedule of assets, the debtor will have "assumed a position that was contrary to the one that she asserted under oath in the bankruptcy proceedings," satisfying that element of judicial estoppel. *White*, 617 F.3d at 478.

To determine whether a debtor's failure to disclose a claim stemmed from mistake or inadvertence, the Sixth Circuit looks at whether "(1) [the debtor] lacked knowledge of the factual basis for the undisclosed claims; (2) [the debtor] had no motive for concealment; and (3) there is an absence of evidence of bad faith." *Ibid.*; *see also Williamson v. USF Holland, LLC*, 600 B.R. 606, 615-16 (E.D. Mich. 2019). To determine whether the debtor acted in bad faith, the Sixth Circuit generally "will look . . . at [the debtor's] attempts to advise the bankruptcy court of [the] omitted claim." *Ibid.*

The first factor weighs against Cahoo. She was aware of the factual basis for her undisclosed claim, evidenced by the disclosure of her debt to the UIA; she knew that the UIA accused her of fraud pre-bankruptcy. And the second factor weighs against her because "a debtor always has a motive for concealing potential causes of action in order to minimize [disclosed] income and assets." *Gaskins v. Thousand Trails, LP*, 521 F. Supp. 2d 693, 697-98 (S.D. Ohio 2007).

However, the evidence indicates that Cahoo did not display bad faith by not listing this claim in the bankruptcy court. Her relative lack of sophistication counsels against a finding that

-34-

she has attempted to deceive anyone about her due process claim, and her bankruptcy proceedings terminated two months before she filed this action, thereby preventing her from informing her trustee.  "Because the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion." *New Hampshire*, 532 U.S. at 750 (citations committed).  Moreover, the doctrine "should be applied with caution to 'avoid impinging on the truth-seeking function of the court, because the doctrine precludes a contradictory position without examining the truth of either statement." *Eubanks v. CBSK Fin. Grp., Inc*., 385 F.3d 894, 897 (6th Cir. 2004) (quoting *Teledyne Indus., Inc*., 911 F.2d at 1218).

Although Cahoo is not the real party in interest, she still may attempt to reopen her bankruptcy to ask the trustee to assign this cause of action to her.  *See Brooks v. Cent. Irrigation Supply, Inc.*, No. 10-13717, 2012 WL 6579582, at *6 (E.D. Mich. Dec. 17, 2012).  If she fails to do so before trial, however, the Court will dismiss the amended complaint as to her claims.

### 2.  Mendyk

Kristen Mendyk's due process claim also became minimally actionable before she filed for bankruptcy on December 16, 2016.  *Tyler*, 736 F.3d at 461.  She contends that she had no notice of her November 2013 and January 2014 fraud determinations, tax intercepts, or garnishments until she tried to file another unemployment claim in 2017 because she lived at a different address than the one to which the UIA sent correspondence.   Mendyk dep., ECF No. 399-35, PageID.17661.  The record does not support that argument.  First, her claim files reflect that she began checking her MiWAM account regularly since January 10, 2014, Mendyk Claim File, ECF No. ECF No. 461-15, PageID.28556-66, and she included the UIA debts on her schedule of liabilities.  Mendyk dep., ECF No. 445-32, PageID.26178.  Mendyk was clearly aware of the UIA's

-35-

actions against her before filing for bankruptcy, and her claim, therefore, was "minimally actionable." *Tyler*, 736 F.3d at 464.

However, Mendyk's attorney sought ratification from her bankruptcy trustee under Rule 17(a)(3). *See* Mendyk Trustee Ratification Email, ECF No. 399-44. "For ratification to be an option under Rule 17(a), the ratifying party usually must '(1) authorize continuation of the action and (2) agree to be bound by its result.'" *Auday v. Wetseal Retail, Inc.*, No. 10-260, 2013 WL 2457717, at *7 (E.D. Tenn. June 6, 2013) (quoting *In re Leonard*, 11–52028, 2012 WL 1565120, at *4 (Bankr. E.D. Tenn. May 2, 2012); *see also Icon Grp., Inc. v. Mahogany Run Dev. Corp.*, 829 F.2d 473, 478 (3d Cir. 1987).

The defendants maintain that the bankruptcy trustee did not effectively ratify the lawsuit because he did not fulfill these two requirements. That argument is based on an extremely narrow reading of the email exchange between Mendyk's attorney and her bankruptcy trustee. The communication states:

> **Plfs Counsel:** You previously authorized my former officer . . . to bring a claim on behalf of [Mendyk] . . . For the purposes of FRCP 17, the authorization must mention the case name and number and state that you are authorizing the continuation of the action and agree to be bound by the results. If you could respond affirmatively via email that you agree to continuation of the action and agree to be bound by the results, and type your name beneath the affirmation, that should suffice.

> **Trustee:** Yes, this reply will confirm our conversation. As [Mendyk's] Chapter 13 Trustee I have no objection to you pursuing any unemployment claims in her case against the State of Michigan. Periodic progress reports would be appreciated. Also I would recommend that you contact [Mendyk's] bankruptcy attorney [] to keep him advised of any developments.

Mendyk Trustee Ratification Email, ECF No. 399-44. Although the Trustee did not explicitly state that he agreed to be "bound the results of the action," he clearly manifested assent in writing to Mendyk's counsel's request that he both ratify the action and agree to be bound by it.

Mendyk, therefore, is the real party to pursue this claim. Likewise, judicial estoppel will not prevent her from prosecuting the action.

### 3. Cole

The evidence establishes that Khadija Cole's due process claim became minimally actionable before she filed for Chapter 13 bankruptcy on October 3, 2016. Cole insists that she never received any emails, fraud questionnaires, fraud determinations, or notice of the October 2014 and February 2015 fraud determinations against her. However, she testified that she first learned about the fraud determination when she received a statement of debt by mail from the UIA around the summer of 2016. Cole dep., ECF No. 445-29, PageID.26089. Her testimony therefore refutes her position that her claim accrued after the October 2016 bankruptcy petition. Moreover, the record reflects that someone frequently logged into her MiWAM account both before the UIA sent the first fraud questionnaire in October 2014 and after it issued the second determination notice in February 2015. Cole Claim Files, ECF No. 461-22, PageID.28678-80. She also included her UIA debts on her bankruptcy schedule of liabilities but did not list her cause of action in this case as an asset. Cole Bankruptcy Petition, ECF No. 445-46, PageID.26530.

Unlike plaintiff Cahoo, Cole did not file her bankruptcy petition under Chapter 7, which would have resulted in the bankruptcy trustee determining whether to file the present cause of action. She invoked Chapter 13. And unlike Chapter 7, "'[t]here is no specific section of Chapter 13 authorizing the debtor to commence or continue lawsuits by or against the debtor,' and, as a result, there is conflicting authority on the Chapter 13 debtor's standing to pursue litigation." Hon. William H. Brown, Lundy Carpenter, & Donna T. Snow, *Debtor's Counsel Beware: Use of the Doctrine of Judicial Estoppel in Non-bankruptcy Forums*, 75 Am. Bankr. L. J. 197, 204 n.35 (2001). The Sixth Circuit has characterized this as a "thorny" issue, which it declined to address

-37-

in *Kimberlin v. Dollar General Corporation* because the defendant in that case raised the issue in a footnote and did not brief it thoroughly.  520 F. App'x 312, 314 (6th Cir. 2013).  The court explained that the issue has caused a circuit split and decided to address the issue on judicial estoppel grounds:

> To countenance [the defendant's] two-sentence footnote as properly raising a standing argument would require this panel to resolve several thorny issues of bankruptcy law, including an apparent conflict between two code provisions, 11 U.S.C. §§ 1306 and 1327. That conflict has led courts down four different paths (each with its own set of difficulties) for allocating property between the debtor and the trustee. *See In re Jones*, 657 F.3d 921, 927–28 (9th Cir.2011*); In re Waldron*, 536 F.3d 1239, 1242–43 (11th Cir. 2008); *In re Heath*, 115 F.3d 521, 524 (7th Cir. 1997); *Sec. Bank of Marshalltown, Iowa v. Neiman*, 1 F.3d 687, 690 (8th Cir. 1993); *In re Petruccelli*, 113 B.R. 5, 15 (Bankr. S.D. Cal. 1990); David Gray Carlson, *The Chapter 13 Estate and Its Discontents*, 17 Am. Bankr. Inst. L. Rev. 233 (2009). We decline to resolve, without briefing, these difficult bankruptcy issues. The better approach, we think, is to bypass the Rule 17 aspect and resolve the judicial-estoppel issue on the parties' shared assumption that [the plaintiff] was obliged to disclose her [] claim to the bankruptcy court.

*Ibid.*  The parties have not briefed (or even identified) this issue in this case.  Taking a cue from the court of appeals, the Court will address Cole's bankruptcy filing in the context of judicial estoppel.

As with Cahoo, the first factor identified by the *White* court does not favor Cole.  *See White*, 617 F.3d at 478.  She was aware of the facts giving rise to her undisclosed claim before she filed for Chapter 13 bankruptcy petition.  Similarly, the second factor cuts against her because of the generally described motive of a bankruptcy petitioner to conceal assets.  *Gaskins*, 521 F. Supp. 2d at 697-98.  However, Cole's Chapter 13 proceeding still is ongoing.  According to the present state of the record, Cole's attorney contacted Cole's bankruptcy trustee on July 2, 2020, requesting that she ratify the action.  Cole Email to Trustee, ECF No. 474-24.  She did not reply.  Cole's attorney followed up again on July 17, 2020, but as of August 6, 2020, he had not yet heard back.  As with

Cahoo, Cole has more work to do before trial to secure ratification by her trustee to pursue this claim. However, the record does not support summary judgment against her at this time based on her bankruptcy filing.

FAST also argues that Mendyk and Cole should be judicially estopped from pursuing their due process claims because they entered into consent judgments with the UIA conceding that they owed repayment for wrongfully obtained unemployment benefits. They entered into two nearly identical consent judgments with the State, Cole admitting that she owed the State $21,569.83, and Mendyk admitting that she owed $23,304.70. As part of the agreement, the State agreed to deem the judgments "satisfied in full" upon the payment of $7,523.83 for Cole and $6,793.70 for Mendyk.

Judicial estoppel is based in essence on a party advancing inconsistent positions in separate litigation to take unfair advantage. For example, a plaintiff can be judicially estopped from asserting a claim that contradicts a prior, court-approved plea or settlement agreement. *See Mirando v. U.S. Dep't of Treasur*y, 766 F.3d 540,545-47 (6th Cir. 2014) (plaintiff was judicially estopped from bringing a tax refund claim that contradicted his prior plea agreement for income tax evasion); *Watkins v. Bailey*, 484 F. App'x 18, 21-24 (6th Cir. 2012) (judicial estoppel barred legal malpractice claim that was inconsistent with position plaintiff took in accepting court-approved settlement in underlying case).

The plaintiffs' concession that they committed fraud by obtaining benefits to which they were not entitled, however, is not inconsistent with their claim that they were denied due process in the adjudicative process. Although a fraud admission undoubtedly would have an impact on damages, it does not diminish the claim that the plaintiffs were denied due process in the

adjudicative process.  *Cf. Bouchillon v. Collins*, 907 F.2d 589, 595 n.20 (5th Cir. 1990).  Their

claims are not barred by judicial estoppel.

### III.  State Defendants

In their motion for summary judgment, the State defendants argue that the evidence now

in the record demonstrates as a matter of law that none of the plaintiffs suffered any injuries, none

of the defendants caused any of the plaintiffs' injuries, and each of these defendants are entitled to

qualified immunity on the remaining due process claim.

In the opinion denying the codefendants' motion to dismiss for lack of standing, the Court

already found that there were sufficient facts in the record to support the plaintiffs' allegations of

injury.  *Cahoo*, 2020 WL 7493103, at *9.  Although a second look at the record did not sustain

plaintiff Pak's claim of injury (discussed above), there is no need to revisit here the findings as to

the other plaintiffs.

### A.  Wrongful Conduct and Causation

None of the plaintiffs allege that any of the State defendants were involved personally in

their fraud adjudications or subsequent collections.  Instead, the plaintiffs allege that these

defendants were responsible for applying MiDAS's system of defective notices, logic trees that

led to presumptive fraud determinations, and automated collection procedures that deprived them

of the right to be informed of the accusations against them and to present their side of the story.

When an automated system is alleged to be the culprit behind a constitutional deprivation like this,

the plaintiffs' theory of liability is a viable one.  After all, as the court of appeals pointedly

observed, "MiDAS did not create itself."  *Cahoo*, 912 F.3d at 904-905.

Courts have held that when a supervisor is one or more steps removed from the offending

conduct, "the law requires more than an attenuated connection between the injury and the

-40-

supervisor's alleged wrongful conduct." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (citing *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (a plaintiff "must point to a specific action of each individual supervisor."). Supervisors cannot be held liable on a *respondeat superior* theory for claims brought under 42 U.S.C. § 1983. *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 487 (6th Cir. 2020). "[E]ach [g]overnment official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Proof of failure to act is not enough. *Peatross*, 818 F.3d at 241 (citing *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006)). "Supervisory liability requires some 'active unconstitutional behavior' on the part of the supervisor." *Ibid.* (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999); *Hays v. Jefferson Cnty.*, 668 F.2d 869, 873–74 (6th Cir. 1982).

However, "active behavior" does not mean that a supervisor must have actually committed the misconduct "or even physically be present at the time of the constitutional violation." *Ibid.* (collecting cases). "The requisite causal connection is satisfied if the [official] sets in motion a series of events that the [official] knew or should reasonably have known would cause others to deprive the plaintiff of [his] constitutional rights." *Conner v. Reinhard*, 847 F.2d 384, 396-397 (7th Cir. 1988). The plaintiffs must demonstrate that the defendants "'at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct.'" *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) (quoting *Hays*, 668 F.2d at 872). The core of the inquiry rests on whether the supervisor "either encouraged the specific incident of misconduct or in some way directly participated in it." *Ibid.*

"[A] supervisor may be liable under § 1983 if he 'abandon[s] the specific duties of his position . . . in the face of actual knowledge of a breakdown in the proper workings of the

department.'"  *Winkler v. Madison Cnty.*, 893 F.3d 877, 898 (6th Cir. 2018) (quoting *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992)).  "This liability, however, exists only where some 'execution of the supervisors' job function result[s] in [the p]laintiff's injury."  *Ibid.* (quoting *Gregory*, 444 F.3d at 752).  Put another way, the plaintiff must show that the supervisor abdicated his or her specific job responsibility, with the "*active performance* of the [supervisor's] individual job function . . . directly result[ing] in the[ ] constitutional injury."  *Gregory*, 444 F.3d at 752 (emphasis in original).  *See Taylor v. Michigan Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (prison warden can be held liable after abdicating responsibility to approve all inmate transfers to secure inmate safety, which resulted in a prisoner's rape); *Hill*, 962 F.2d at 1213 (holding a supervisor liable under § 1983 where he personally referred inmates' complaints of not getting their medication to a head nurse who he knew was altering or destroying inmates' prescriptions); *but see Winkler*, 893 F.3d at 899 (county jailer held not liable because plaintiff "failed to show that [the defendant] allowed the jail to operate with the knowledge that existing healthcare policies were exposing inmates to a substantial risk of harm.").

Under section 1983, "'[e]ach defendant's liability must be assessed individually based on his own actions.'"  *Hart v. Hillsdale Cnty., Michigan*, 973 F.3d 627, 639 (6th Cir. 2020) (quoting *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)).

### 1.  Sharon Moffet-Massey

Sharon Moffet-Massey was not in charge of the UIA when it developed and implemented MiDAS.  That responsibility fell to her predecessor, Steve Arwood.  It appears that the UIA employee who had the greatest responsibility over the project was the director of the UIA's Technology and Modernization Project, Clayton Tierney.  Tierney was dismissed from the case

because the amended complaint "merely name[d] him in the caption and allege[d] no specifics other than his role as the UIA's project manager in paragraph 19." *Cahoo*, 322 F. Supp. 3d at 797.

The Sixth Circuit found that the plaintiffs plausibly stated a due process violation claim when they alleged in their amended complaint that "Moffet-Massey 'continued to pursue the same defective' policies despite knowing about MiDAS' problems and invalid fraud determinations." *Cahoo*, 912 F.3d at 901 n.6. (quoting Am. Compl. ECF No. 43, at PageID.782, ¶ 169). After a generous discovery period, however, the plaintiffs have been unable to prove that contention in full.

In the amended complaint, the plaintiffs focused heavily on an allegation that MiDAS had a "margin of error over 93% when making the automated fraud determinations with no human involvement." Am. Compl. ¶¶ 4, 77, 121, 134, 136, 156, 159, 166, 168, ECF No. 43, at PageID.749, 749, 776, 777, 778, 780, 782. The Sixth Circuit relied on that unreasonably high error rate when finding that the plaintiffs pleaded a plausible procedural due process claim. *Cahoo*, 912 F.3d at 902 ("the current system poses a profound possibility of erroneous deprivations — the Auditor General found that MiDAS' error rate exceeded 93%."). However, the State defendants point to an email from plaintiffs' counsel sent in November 2019 in which counsel conceded that the State never produced an August 2015 Auditor General report revealing the results of a review of over 20,000 fraud adjudications as identified in their complaint. Instead, the plaintiffs based their figures on news articles from 2016 and 2017.

The plaintiffs maintain that Moffet-Massey was well aware of MiDAS's failings and continued to pursue its unconstitutional practices until explicitly told by the DOL to cease. However, the record does not support that argument. Instead, Moffet-Massey shut down MiDAS's auto-adjudication functionalities in August 2015; the earliest correspondence between the UIA and

-43-

the DOL about this issue is dated September 2015, two months before the DOL issued its monitoring report.  She explained that she shut the system down after employees reported that MiDAS attached "fraud to eligibility issues [she] had not seen before, such as a registration or late filing," which generally pertain to overpayment determinations but not fraud.  Moffet-Massey dep., ECF No. 473-16, PageID.35103-04.  And although Geskey testified that many of his warnings about the UIA's business rules went "unheeded," Geskey dep., ECF No. 473-20, PageID.35299, 35317, it appears that Moffet-Massey eventually listened and exercised her authority to end auto-adjudications.  The plaintiffs have not offered any evidence to contradict these assertions.

The plaintiffs maintain that Moffet-Massey should have acted earlier due to negative press about the system.  However, they do not cite the sources on which they rely.  The only relevant news articles in the record are those in plaintiffs' counsel's email to defense counsel, which are dated 2016 and 2017 — well after the relevant adjudications here.  Emails Between Counsel, ECF No. 473-21; *see United States v. Washington*, 887 F. Supp. 2d 1077, 1095 (D. Mont. 2012) ("it is perilous and unreasonable for any person to rely on press accounts given the risk of inaccuracy and overstatement.").

When it comes to the plaintiffs' claims based on auto-adjudication, the record shows that Moffet-Massey assumed her role as the director of the UIA after MiDAS had already been implemented and took action to stop its automated fraud determinations when the problems began to resurface.  That does not constitute the "active behavior" necessary to expose a supervisor to liability under section 1983.  *Peatross*, 818 F.3d at 241.

A fact question remains, however, about Moffet-Massey's role approving the deficient questionnaires, determinations letters, and logic trees (for example, determining fraud based on a

-44-

lack of response).  Geskey testified that he repeatedly recommended against the fraud finding decision trees to no avail.  Geskey dep., ECF No. 473-20, PageID.35299, 35317, 35315, 35327, 35332 ("I recommended against the fraud finding decision trees" "which went unheeded;" "I began making that request earlier, and continued that request even later when those were not changed pursuant to my recommendations").  He insisted that fraud determinations must be based on "competent material and substantial evidence."  *Id.* at PageID.35332.  The record does not show that Moffet-Massey did anything to address this problem.  Because she was aware of the policy permitting the UIA commonly to adjudicate issues based on nothing but a failure to respond to allegations, Moffet-Massey dep., ECF No. 473-16, PageID.35025, it is reasonable to infer that she approved the policy and thereby abdicated her duty "with active performance" to ensure that the UIA's process conformed with federal and State law.  *Gregory*, 444 F.3d at 752.

The record also permits an inference that she actively approved the substance of the fraud determinations and questionnaires.  Moffet-Massey testified that the UIA was aware as early as 2013 or 2014 that the forms might be deficient, before she became director in April 2014.  Moffet-Massey dep., ECF No. 473-16, PageID.34984-85.  And once she became director, it does not appear that she took any action to modify the content of those notices.  Her name appears on the form 1713 fraud questionnaires and form 1302 fraud determinations under the heading, "authorized by."

Thus, although Moffet-Massey apparently took steps to address the auto-adjudication feature, the record allows an inference that she actively encouraged, authorized, or acquiesced to the rote application of logic trees and use of substantively deficient questionnaires and fraud determination notices.  Those are the systemic faults that the plaintiffs allege trenched upon their

procedural due process rights.  Defendant Moffet-Massey is not entitled to a summary judgment of dismissal as a matter of law.

### 2. Stephen Geskey

The court of appeals found that the plaintiffs stated a plausible claim against defendant Geskey when they alleged that he was "a policy-making supervisor" who "'ordered state attorneys general . . . to conduct business as usual' and to 'continue to contest claimants' protests and appeals and continue with collection activities' even though he knew the fraud claims were false." *Cahoo*, 912 F.3d at 901 n.6. (quoting Am. Compl. ECF No. 43, at PageID.781, ¶ 162).  Once again, though, the plaintiffs have failed to prove this allegation.  Instead, they now argue that Geskey, as a lawyer with "penultimate authority to approve forms," "never undertook any review of the legal sufficiency of the forms.  He was also aware of the practice of determining fraud based on no response from the claimants but did nothing beyond making the above-referenced recommendation to Ms. Moffet-Massey." Plfs.' Mot. Summ. J., ECF No. 433, PageID.24908.  The plaintiffs believe that argument leads to the conclusion that Geskey's "dereliction of duty set in motion a series of events that he knew or should reasonably have known would cause others to deprive claimants of their constitutional rights." *Ibid.*  The plaintiffs also argue that Geskey drafted Moffet-Massey's September 2015 response to the DOL administrator's warning about auto-adjudications, in which she maintained that a review of pertinent regulations "fail[ed] to reveal *any* [] substantive limitation concerning when auto-adjudication is 'not appropriate.'"  Plfs.' Resp. to State Defs.' Mot. Summ. J., ECF No. 473, PageID.33192-93 (citing Moffet-Massey Email dated 09/11/15, ECF No. 473-21, PageID.35403).

The law does not support the plaintiffs' theory of Geskey's liability for MiDAS's logic tree configuration.  A supervisor cannot be found to have abdicated his duty when he exercised his

limited, non-decision-making authority to try to ameliorate an ongoing problem.  The plaintiffs have not explained what else Geskey could have done — or was supposed to do under law — besides making informed recommendations to the person in charge.  Geskey cannot be held responsible for the faulty logic trees when he was the one raising concerns about them.  Nor can the act of drafting an email on behalf of Moffet-Massey explaining the UIA's reading of applicable regulations constitute an abdication by Geskey of any duty, much less unlawful conduct that caused the plaintiffs' injuries.  This is especially true where the email was dated September 2015, after the plaintiffs had been accused of fraud.

Moreover, the record does not establish any unlawful conduct by Geskey in his oversight role of the bankruptcy department. There is no proof of a policy requiring the UIA to file adversary complaints in every bankruptcy case; rather, the record indicates that staff would refer matters to the attorney general's office for review and initiation of an adversary proceeding when appropriate. Geskey dep., ECF No. 473-20, PageID.35329-30. Doris Mitchell, who worked in the unit, said Geskey never issued a directive regarding the referral of files to the attorney general's office. Mitchell dep., ECF No. 473-22, PageID.3544.  The plaintiffs have offered no contrary evidence on that point.  Instead, it appears that the UIA maintained a general policy that if a bankruptcy claimant owed a debt to the Agency, the UIA would refer the claimant's file to the attorney general without any specific directives.  *Id.* at PageID.35415.

However, there are fact questions about Geskey's role in approving the deficient questionnaires and fraud determination notices.  Geskey testified that he became the director of the policies and procedures group shortly after MiDAS rolled out. Geskey dep., ECF No. 473-20, PageID.35263.  But he also testified that he took the position sometime "between 2011 [and] 2012" (before MiDAS went live in October 2013) and that he had "some involvement" "in the policies

-47-

and procedures [group] up to the implementation" of MiDAS. *Ibid.* As the director of the policies group, he played a role in developing, or at least approving, some language used on UIA forms, although the Agency's director had the ultimate say in form approval. *Id.* at PageID.35282. Geskey confirmed that he "personally did not undertake a legal review to determine the legal sufficiency" of certain forms. *Id.* at 35331.

Since Geskey was the director of the policies and procedures group "up to the implementation" of MiDAS, it is fair to infer that he should have reviewed the forms and noticed that they were almost completely devoid of substantive notice (particularly the questionnaire). And even if he did not direct the policies group during MiDAS's development, he nevertheless directed the group for years after MiDAS's implementation and apparently found no fault with the notices that deprived claimants of their ability to confront the UIA's suspicions intelligently.

Geskey's involvement in creating or approving the defective forms precludes summary judgment for him as a matter of law. Fact questions also exist on causation. Although the plaintiffs contend for the most part that they did not receive some of the questionnaires and determination notices, ironically the defendants have cited evidence that in fact the plaintiffs accessed their MiWAM accounts and likely saw them. Defendant Geskey is not entitled to a summary judgment of dismissal as a matter of law.

### 3. Shemin Blundell

The Sixth Circuit found that the plaintiffs adequately pleaded a viable claim against defendant Blundell by alleging that she "continued to instruct her subordinates, including the claims examiners, to pursue invalid fraud charges." *Cahoo*, 912 F.3d at 901 n.6. (quoting Am. Compl. ECF No. 43, at PageID.781, ¶ 164). However, it appears that the plaintiffs have abandoned this argument. In their response to the motion for summary judgment, the plaintiffs allege only

that (1) before MiDAS rolled out, Blundell directed a team "whose role was to discuss and make recommendations regarding overpayment collections and restitution as it related to the MiDAS system implementation by Defendant FAST," and (2) that "she worked closely with FAST and was on the project floor every day during the development phase."  ECF No. 473, PageID.33193.

However, the amended complaint is entirely devoid of any allegations that Blundell made recommendations about overpayment collections and restitution.  Moreover, the plaintiffs fail to provide any proof of these alleged recommendations, and they do not state with any particularity what those recommendations were.  Moreover, Blundell's testimony made clear that she was not involved in the administrative fraud determinations handled by the benefit overpayment collection group; rather, she was involved with the investigation of fraud for criminal prosecution purposes.  None of the plaintiffs were criminally prosecuted for their alleged fraud.

The plaintiffs' allegations against Blundell are exclusively bound to her role as supervisor of the fraud investigation unit.  However, the plaintiffs have not offered any evidence that Blundell personally took any action to develop or implement MiDAS despite its known defects, that she developed its inadequate forms, or that she in any way "abandon[ed] the specific duties of [her] position . . . in the face of actual knowledge of a breakdown in the proper workings of the department."  *Winkler*, 893 F.3d at 898.  Summary judgment will be granted for defendant Blundell.

### 4. Doris Mitchell

The court of appeals also found sufficient the plaintiffs' allegation that defendant Mitchell "'instructed various attorneys general to continue to oppose claimants' attempts to discharge fraud-based debt in bankruptcy proceedings by filing adversary proceedings, even when it was obvious

that the underlying judgment . . . was based on an invalid fraud determination.'" *Cahoo*, 912 F.3d at 901 n.6. (quoting Am. Compl. ECF No. 43, at PageID.781, ¶ 163).

In their response to the State defendants' motion for summary judgment, the plaintiffs maintain that Mitchell, in her role as the manager of the Friend of Court and bankruptcy unit, "directed subordinates to send files to the Attorney General's office to discharge of claimants' debt [sic] in bankruptcy proceedings that were based on allegedly false fraud claims despite issues with MiDAS fraud auto-adjudications coming to light, and knowing that the Attorney General's office would oppose the discharge of the claimants' debts." ECF No. 473, PageID.33193. However, the plaintiffs cite no evidence in the record to support that argument.

Mitchell testified that file preparation in her unit was largely clerical, as staff did not review documents when preparing a file. Instead, staff simply assembled files to be sent to the attorney general's office. Mitchell dep., ECF No. 473-22, PageID.35419. She testified that the unit did not provide any recommendations to the attorney general's office about whether an adversary proceeding should be filed, since that decision falls within the attorney's discretion. *Id.* at PageID.35417. The plaintiffs have offered no evidence to contradict that testimony. Nor have the plaintiffs cited any evidence indicating that Mitchell was aware of a system breakdown, *see id.* at PageID.35429-34, 35439, or that she actively participated in developing the UIA's forms or building the system that deprived the plaintiffs of their property without adequate pre-deprivation process. The plaintiffs' claims against Mitchell fail as a matter of law and will be dismissed.

### 5. Debra Singleton

The court of appeals found that the plaintiffs stated a plausible claim against defendant Singleton when they alleged that she "'continued to direct subordinates to pursue aggressive collection activities . . . includ[ing] tax refund intercepts and wage garnishments' even though

[s]he knew the 'vast majority' of fraud adjudications were invalid." *Cahoo*, 912 F.3d at 901 n.6. (quoting Am. Compl. ECF No. 43, at PageID.780-81, ¶ 167-68).

In their response to the State defendants' motion for summary judgment, the plaintiffs similarly allege that Singleton, as the manager of the benefit overpayment collection unit, "pursued aggressive collection activities, even after problems with the MiDAS system became well known" and that she directed claimants to hang up and call customer service when they called to ask about non-collection matters. ECF No. 473, PageID.33192. Beyond the hang-up policy, however, they have not pointed to any evidence in the record that supports that conclusory argument. For instance, they cite no evidence establishing that Singleton knew about the widespread problems with MiDAS and chose to ignore them. They have not contradicted her testimony that she had no knowledge of the alleged 93% margin of error for fraud determinations and did not know about the problems with MiDAS until 2017. *See* Singleton dep., ECF No. 473-23, PageID.35464, 35483.

Singleton's admission in her deposition that her unit directed claimants to hang up and call customer service because it was the UIA's policy not to transfer calls between 1-800 numbers is not relevant to this case. As inane and frustrating as that policy may have been, it does not play into any of the core complaints lodged by the plaintiffs in support of their due process claim. None of the plaintiffs complained of being hung-up on by the UIA. Nor is it clear how such a practice would violate their procedural due process rights.

The plaintiffs have not met their burden of coming forth with evidence showing that Singleton actively participated in the deprivation of their property without due process. Instead, they improperly seek to hold her liable based on her supervisory title, which is not permissible under section 1983. *Peatross*, 818 F.3d at 241; *Iqbal*, 556 U.S. at 676-77. Summary judgment will be granted for defendant Singleton.

-51-

### B.  Qualified Immunity

On interlocutory appeal, the court of appeals held that the plaintiffs pleaded around the State defendants' qualified immunity defense.  They renew that defense in their summary judgment motion.

The doctrine of qualified immunity insulates state actors from liability so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Once the qualified immunity defense is raised, "the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established."  *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)).

"A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "[B]ecause 'immunity protects all but the plainly incompetent or those who knowingly violate the law,' this court must not 'define clearly established law at a high level of generality.'"  *Tlapanco v. Elges*, 969 F.3d 638, 649 (6th Cir. 2020) (quoting *Kisela v. Hughes*, --- U.S. ---, 138 S. Ct. 1148, 1152 (2018)).  "Nonetheless, 'an official can be on notice that his conduct violates established law even in novel factual situations.'"  *Cahoo*, 912 F.3d at 898 (quoting *Littlejohn v. Myers*, 684 F. App'x 563, 569 (6th Cir. 2017) (quoting *Hope v. Pelzer*, 536 U.S. 730, 731 (2002))).  The touchstone of the "clearly established" inquiry is "fair warning."  *Baynes*, 799 F.3d at 612–13 (quoting *Hope*, 536 U.S. at 741).  Accordingly, there need not "be 'a case directly on point, but existing precedent must have placed the constitutional question beyond debate.'"  *Morgan v. Fairfield Cnty., Ohio*, 903 F.3d 553, 564 (6th Cir. 2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S.

731, 741 (2011)).  In other words, "[q]ualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).

"To determine whether a constitutional right is clearly established, [courts] must look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the] circuit, and finally to decisions of other circuits." *Cahoo*, 912 F.3d 887 (quoting *Crawford v. Geiger*, 656 F. App'x 190, 198 (6th Cir. 2016), and *Brown v. Lewis*, 779 F.3d 401, 418-19 (6th Cir. 2015)).  "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Ibid.* (quoting *Seales v. City of Detroit, Mich.*, 724 F. App'x 356, 359 (6th Cir. 2018), and *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)).

The State defendants resurrect their argument that they did not violate any clearly established rights because the plaintiffs "have cited no statutory support or authority that existed prior to the State's implementation of the MiDAS system that would have alerted the State Defendants that auto-adjudication would violate a clearly established right."  State Defs.' Mot. Summ. J., ECF No. 423, PageID.18349.  This argument ignores that the due process violations alleged by the plaintiffs include more than "auto-adjudications."  The plaintiffs attack the defective notices that MiDAS generated — notices that defendants Moffet-Massey and Geskey were responsible for crafting — the presumptive logic tree fraud determinations, and the automatic fraud findings that resulted from a failure to respond to the questionnaires.  Those functionalities were administered by these defendants.

The right to notice and an opportunity to be heard before the state deprives a person of property is so clearly established as to be beyond debate.  And it is equally clear that those

-53-

fundaments of procedural due process are required where the state seeks to terminate benefits. *Goldberg*, 397 U.S. at 267.  As discussed in the earlier opinions in this case, the Due Process Clause protects "'certain substantive rights — life, liberty, and property'" from loss "'except pursuant to constitutionally adequate procedures.'" *Chandler v. Vill. of Chagrin Falls*, 296 F. App'x 463, 468 (6th Cir. 2008) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).  The core guarantees of due process are notice and the opportunity to be heard.  *Goldberg*, 397 U.S. at 267.  "The hearing must be 'at a meaningful time and in a meaningful manner.'"  *Ibid*. (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  The "recipient [must] have timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." *Id*. at 267-68.  "'[T]he root requirement' of the Due Process Clause [is] 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" *Cleveland Bd. of Educ.*, 470 U.S. at 541 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)).

Those basics are replicated in the applicable federal statutes governing unemployment compensation systems administered by the states with federal funds.  Like other state agencies that administer unemployment benefits, the UIA receives federal funds through the DOL in support of its program.  Those federal grants are conditioned on Michigan providing minimum due process requirements to its beneficiaries, including the "[o]pportunity for a fair hearing, before an impartial tribunal, for all individuals whose claims for unemployment compensation are denied." 42 U.S.C. § 503(a)(3).

Courts balance three factors when determining whether an individual received sufficient process:

-54-

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (citing *Goldberg*, 397 U.S. at 263-71). Usually, the "'Constitution requires some kind of a hearing before the State deprives a person of liberty or property.'" *Cahoo*, 912 F.3d at 902 (quoting *Zinermon v. Burch*, 494 U.S. 113, 127 (1990)).

The notice must be "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," and "must afford a reasonable time for those interested to make their appearance." *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 314 (1950). "Notice, to comply with due process requirements, . . . must set forth the alleged misconduct with particularity." *In re Gault*, 387 U.S. at 33. "The need for more specific notice is particularly critical when the regulations provide in lieu of an adversary hearing the opportunity to submit information in opposition to suspension." *Transco Sec. Inc. v. Freeman*, 639 F.2d 318, 323-324 (6th Cir. 1981). The government's notice must be "through means that 'one desirous of actually informing the absentee might reasonably adopt.'" *Ming Kuo Yang*, 793 F.3d at 602 (quoting *Mullane*, 339 U.S. at 315).

In *Carey v. Piphus*, the Supreme Court recognized that "the procedural due process clause has the dual purpose of protecting persons from the mistaken or unjustified deprivation of life, liberty, or property, and of conveying to the individual a feeling that the government has dealt with her fairly." *Alston v. King*, 231 F.3d 383, 386 (7th Cir. 2000) (citing *Carey*, 435 U.S. at 261-62). It follows that there are two types of injuries cognizable under the procedural component of the

-55-

Due Process Clause: one occurs from the wrongful taking of property; the other occurs from being denied fair treatment by the government, even if the deprivation was not wrongful, as individuals can suffer emotional distress due to their unfair treatment. *Carey*, 435 U.S. at 262-64; *Wright v. O'Day*, 706 F.3d 769, 771-72 (6th Cir. 2013); *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1352 (6th Cir. 1992).

The plaintiffs in this case challenge not only the manner that the UIA officials chose to deliver the notices to claimants, but also the adequacy of the notice's contents. They contend that the fraud questionnaires and the determination letters did not explain why the UIA suspected them of committing fraud, and that deficiency deprived them of their ability to make an informed response.

### 1. Fraud Questionnaires

Once MiDAS flagged a claim for overpayment, it automatically issued questionnaires to employers and claimants. A claimant's failure to respond timely to a questionnaire resulted in a default determination that the claimant committed fraud.

Although a suspicion of fraud triggered the questionnaires, the basis for that suspicion was not communicated to the claimant. The questionnaire provided almost no notice whatsoever of the alleged misconduct, or that the failure to respond would result in a fraud determination. The typical questionnaire stated:

> A question of eligibility and/or qualification has been raised on this claim. Please respond to the questions on the reverse side of this form . . . Failure to respond to this request for information will result in issuance of a determination based on available information . . . if it is determined that you intentionally made a false statement, misrepresented the facts, or concealed material information to obtain benefits, then the penalty provisions of Sections 54 and 62(b) of the Michigan Unemployment Security Act will be applied and you would be subject to [various penalties, including the seizure of benefits, fines of two-to-four times the amount of overpayment, or potential criminal prosecution].

-56-

Fraud Questionnaire, ECF No. 399-29, PageID.17634.

There is no question that this questionnaire woefully falls short of "sett[ing] forth the alleged misconduct with particularity," *In re Gault*, 387 U.S. at 33, or providing claimants a "reasonable opportunity to know the claims of the opposing party and [] meet them," *Morgan*, 304 U.S. at 18.  The notice refers generally to a "question of eligibility" and mentions that UIA may determine that a claimant committed fraud based on its "available information."  But the questionnaire does not state what that information is, thereby limiting the "opportunity to present [] objections" intelligently.  *Mullane*, 339 U.S. at 314; *see Transco Sec., Inc.*, 639 F.2d at 323-24 (conclusory allegations like "billing irregularities," "misrepresented the caliber of employees," and "lack of integrity" held insufficient to notify plaintiff of grounds for loss of government contract for alleged malfeasance).

This omission is an obvious flaw in this context because, for many of these claimants, the stakes are enormous.  *See Mathews*, 424 U.S. at 335.  Qualified recipients — who by definition are unemployed — often experience a "brutal need" for benefits, which "provide[] the means to obtain essential food, clothing, housing, and medical care."  *Goldberg*, 397 U.S. at 261, 264. "[T]he termination of aid . . . may deprive an eligible recipient of the very means by which to live." *Id.* at 264.  On the other hand, the UIA gains little, if anything, from excluding its grounds for suspicion on its fraud questionnaires.  "The state cannot be said to have an interest in depriving unwitting claimants of benefits to which they may be entitled," *Cosby v. Ward*, 843 F.2d 967, 984 (7th Cir. 1988), or falsely accusing honest people of fraud.

Moreover, the costs of providing constitutionally adequate notice of the claimants' alleged misconduct is low.  The State simply would have to modify its pre-written questionnaires to

indicate a basic reason for the UIA's suspicion.  *See* Easton dep., ECF No. 473-18, PageID.35224-26 (describing the process of modifying forms).

The State defendants argue that the UIA's forms must have provided adequate notice because each plaintiff testified that "there was nothing confusing about the Agency forms," State Defs.' Mot. Summ. J., ECF No. 423, PageID.18335, and the April 2016 Michigan Auditor General's report stated that "[m]ost UIA form letters sent to claimants were clear and comprehensive." 2016 Auditor General Report, ECF No. 423-24, PageID.19176.  This argument misrepresents the record.  The plaintiffs' testimony stands for the unremarkable proposition that they understood what the forms said — not that they understood why the UIA suspected that they committed fraud before they received their fraud determination.  And the State defendants took the Auditor General's statement out of context.  The Auditor General found that most of the UIA's forms were clear when considering all communications between the UIA and claimants.  2016 Auditor General Report, ECF No. 423-24, PageID.19176.  But the report identified a "material condition related to obtaining the necessary information for accurately adjudicating select claims and providing claimants with the reasons supporting UIA's (re)determinations." *Ibid.*  A "material condition" is a "matter that, in the auditor's judgment, is more severe than a reportable condition and could impair the ability of management to operate a program in an effective and efficient manner."  *Id.* at PageID.19213.  In stark contrast to what the State defendants allege, the report makes clear that the "UIA needs to provide claimants with the facts and rationale for claims identified as including potentially false or misleading information."  *Id.* at PageID.19178; *see also* 2015 DOL report (Finding 5: the "UIA's Notices of Determinations/Redeterminations and Information Request sent to claimants/employers do not always provide a clear statement of the

issue(s), which is not a method of administration to ensure payment when due in accordance with [the SSA, 42 U.S.C. § 503(a)(1)]."

The questionnaires did not provide adequate notice of the plaintiffs' alleged misconduct and prevented them from intelligently objecting to the possibility of losing their benefits and fraud accusations. The right to such notice was clearly established at the time.

### 2. Fraud Determination Notices

The fraud determination notices likewise failed to notify the plaintiffs adequately of the grounds for the adverse proceedings against them. Once a default fraud determination was made, MiDAS automatically issued three notices together: (1) a Primary Notice of Determination (stating why the UIA believed it overpaid); (2) a Secondary Notice of Determination (informing the claimant of the UIA's fraud determination); and (3) a List of Overpayments, which demanded payment of actual benefits as well as a statutory penalty for committing fraud.

The UIA's explanations for fraud findings in the Secondary Determination Notices were just as opaque as the questionnaires:

> Your actions indicate you intentionally misled and/or concealed information to obtain benefits you were not entitled to receive.

Secondary Determination Notice, *id.* at PageID.28593. The fraud determination forms merely list the UIA's conclusion without any allegations for a claimant to intelligently dispute; that was insufficient notice. *Mullane*, 339 U.S. at 314; *see Transco Sec., Inc.*, 639 F.2d at 323-24. The Primary Determination Notices provided an adequate description for why the UIA believed it overpaid claimants. *E.g.*, Primary Determination Notice, ECF No. 461-18, PageID.28597 ("You quit your job with RANDSTAND EMPLOYMENT SOLUTIONS LP on January 11, 2013 due to other personal reasons. Your leaving was voluntary and not attributable to the employer. You are

disqualified for benefits under the MES Act, Sec. 201(a) . . .  Claimant is disqualified until

completion of a $ 4,344.00 earnings rework requirement which has been satisfied.").  But that

communication came too late.  By the time the UIA issued the determination notices, it had already

terminated the claimants' rights to benefits, demanded repayment, and determined that the

claimants were subject to penalties.  The State defendants cannot rely on post-deprivation process

to remedy the lack of pre-deprivation notice.

The State defendants insist that each plaintiff nevertheless had the opportunity to

participate in a full evidentiary hearing before the UIA deprived any of them of property, which,

they say, cured any deficiency in earlier notices.   But the Sixth Circuit rejected this exact argument

by the same defendants:

> The Individual Agency Defendants argue that Plaintiffs failed to allege a plausible
> due process claim because Agency procedures provided for a pre-deprivation
> hearing if claimants elected to appeal a fraud determination. The Court is
> unpersuaded by this argument. Plaintiffs allege that the Agency terminated a
> claimant's right to benefits before any appeal hearing took place; they allege the
> Agency terminated a claimant's right to benefits immediately once MiDAS made a
> positive fraud determination. While claimants had the opportunity to appeal a fraud
> determination, "postdeprivation remedies alone will not satisfy due process if the
> deprivation resulted from conduct pursuant to an 'established state procedure,'
> rather than random and unauthorized conduct."

*Cahoo*, 912 F.3d at 902 (citing *Valentino*, 756 F.3d at 905 (quoting *Logan*, 455 U.S. at 435–36,

(1982)); *see also Cosby*, 843 F.2d at 984.

The State defendants also contend that the Michigan Court of Appeals already determined

that MiDAS's forms comported with due process in *Department of Licensing & Regulatory Affairs*

*v. Lucente*, ---N.W.2d --- (Mich. Ct. App.  Oct. 15, 2019).  But the main focus of the court's

decision in that case was an administrative law ruling about the statutory time limits for recouping

benefits under two different sections of the MESA.  And the notice forms the court reviewed for

-60-

constitutional adequacy were the pre-MiDAS forms (dated 2010), not the ones challenged in this lawsuit.

*  *  *  *  *

The plaintiffs' right to adequate notice was clearly established, and the notices for which defendants Moffet-Massey and Geskey were responsible were clearly inadequate.  In the earlier appeal of this case, the court of appeals rejected the State defendants' argument that the plaintiffs must point to a case that applies these fundamental and well-established principles to a state adjudicative system that employs some level of technology.

> The Court rejects the Individual Agency Defendants' assertion that Plaintiffs' due process rights were not clearly established.  The Individual Agency Defendants contend that Plaintiffs' due process rights were not clearly established because Plaintiffs failed to locate a case holding that a governmental official violates individuals' due process rights by "not ceasing to use the computerized system that its employing agency contracted for, based on reports of performance issues of the system. . . ." (Defs.' Br. At 38.)  The Individual Agency Defendants' argument is based on a fundamental misunderstanding of the doctrine of qualified immunity.  Contrary to the Individual Agency Defendants' contention, "an official can be on notice that his conduct violates established law even in novel factual situations." *Littlejohn*, 684 F. App'x at 569 (citing *Hope*, 536 U.S. at 731).  The operative inquiry is not whether a previous court faced perfectly analogous facts — it is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Baynes*, 799 F.3d at 610 (quoting *Saucier*, 533 U.S. at 202).  In this case, any reasonable official would have known that depriving Plaintiffs of their protected property interests in the manner alleged violated their due process rights.

> If this Court accepted the Individual Agency Defendants' argument that Plaintiffs must identify cases with virtually identical facts to defeat a qualified immunity defense, this Court would enable state actors to violate citizens' constitutional rights with impunity simply by employing new technologies.  This would give state actors a roadmap for evasion and effectively insulate them from any liability — they would use new technologies to carry out unconstitutional conduct, and avoid liability based on qualified immunity, even when the underlying conduct is clearly unconstitutional.  The Court rejects the Individual Agency Defendants' invitation to allow state actors to evade liability by utilizing new technologies to effectuate unconstitutional conduct.

-61-

The Individual Agency Defendants attempt to hide behind MiDAS.  They claim that MiDAS — not the Individual Agency Defendants — caused the unconstitutional deprivations that Plaintiffs allege.  On one level, this argument superficially appears to be correct — MiDAS rendered the false fraud determinations, not the Individual Agency Defendants.  But this argument conveniently ignores the fact that the Individual Agency Defendants implemented and oversaw MiDAS, and prescribed its operation.  MiDAS did not create itself.  And it did not enforce the false fraud determinations that it automatically rendered — the Individual Agency Defendants did.  The Court rejects the Individual Agency Defendants' attempt to evade responsibility for their actions by deflecting blame away from themselves and onto the computerized system that they implemented and oversaw, and whose invalid fraud determinations they knowingly enforced.

*Cahoo*, 912 F.3d at 904-905.  That reasoning still applies.  Qualified immunity will not shield defendants Moffet-Massey and Geskey from liability.

## C.  Statute of Limitations

The State defendants also argue that Krysten Mendyk's claims are barred by the statute of limitations.

Section 1983 does not provide a statute of limitations.  Instead, the appropriate statute of limitations to be applied in all section 1983 actions is the state statute of limitations governing actions for personal injury in the forum state.  *McCune v. City of Grand Rapids,* 842 F.2d 903, 905-06 (6th Cir. 1988) (citing *Wilson v. Garcia,* 471 U.S. 261, 276-280 (1985)).  Michigan's three-year statute of limitations for personal injury claims, Mich. Comp. Laws Ann. § 600.5805(8), "governs section 1983 actions when the cause of action arises in Michigan," *McCune,* 842 F.2d at 905-06.

The statute of limitations begins to run when the cause of action accrues, which, in a section 1983 action, "is a question of federal law." *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (2007) (citing *Kuhnle Bros., Inc. v. Cnty. of Geauga*, 103 F.3d 516, 519 (6th Cir. 1997)).  "[I]t is the standard rule that accrual occurs when the plaintiff has a complete and

present cause of action . . . that is, when the plaintiff can file suit and obtain relief." *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (citing *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of California*, 522 U.S. 192, 201 (1997) (quotation marks and citations omitted)).

The Sixth Circuit recognizes the "discovery rule," which states that a cause of action accrues when the "plaintiffs knew of or should have known of the injury which forms the basis of their claims." *Ruff v. Runyon*, 258 F.3d 498, 500 (6th Cir. 2001) (citing *Friedman v. Estate of Presser*, 929 F.2d 1151, 1159 (6th Cir. 1991)). "This inquiry focuses on the harm incurred, rather than the plaintiff's knowledge of the underlying facts which gave rise to the harm." *Ibid*.

The State defendants argue that Mendyk had reason to know about her claim between November and January 2014. They contend that her claim is barred because she did not file suit until over three years later, on March 2, 2017. The UIA issued three fraud determinations against Mendyk, two in November 2013 and one in January 2014. They were mailed to the residence address on file, where Mendyk's ex-husband lived. Mendyk testified that she was not living with him at that address; she moved out in 2011. However, she returned to the address from March to June 2014, then left again. Mendyk's claim files reflect that she began checking her MiWAM account regularly since January 10, 2014. That evidence supports an inference that Mendyk learned about the fraud determinations sometime before March 2014. Mendyk even acknowledged that it is "fair to say [she] could have received" the fraud determinations. Mendyk dep., ECF No. 423-3, PageID.18424. However, that inference is not conclusive, and the Court must draw such inferences at this stage of the case in favor of the non-moving party. *Alexander*, 576 F.3d at 557. Although the defendants' statute-of-limitations argument remains a viable trial defense, it does not compel dismissal at the summary judgment stage of the case.

D.  Emotional Distress Damages

Lastly, the State defendants argue that the Court should bar the plaintiffs from asserting medically related damages at trial because they have not identified any expert witnesses that could support such claims.  Plaintiff Cahoo alleges increased depression and weight gain.  Cole testified that she suffered depression and breakdowns, and that her fibromyalgia was exacerbated.  Davison testified that she experienced depression, anxiety, and exacerbated sarcoidosis.  And Mendyk alleges that she experienced stress and depression.  Plaintiffs' counsel apparently identified expert witnesses who could support those damage claims but later withdrew them.

Neither the Supreme Court nor the Sixth Circuit require expert testimony to demonstrate emotional distress injuries.  *Carey*, 435 U.S. at 264 n.20 (stating that emotional distress injuries, which "include mental suffering or emotional anguish," although "essentially subjective," "may be evidenced by one's conduct and observed by others. Juries must be guided by appropriate instructions, and an award of damages must be supported by competent evidence concerning the injury."); *Turic v. Holland Hosp. Inc.,* 85 F.3d 1211, 1215 (6th Cir. 1996) ("A plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden [to prove that a defendant's unconstitutional actions caused emotional distress].");  *Moorer v. Baptist Health Care Sys*., 398 F.3d 469, 485 (6th Cir.2005) ("emotional injury may be proved without medical support").  "Although medical evidence is not necessary in order for a plaintiff to be compensated for emotional distress, 'damages for mental and emotional distress will not be presumed and must be proven by competent evidence.'" *Betts v. Costco Wholesale Corp*., 558 F.3d 461, 472 (6th Cir. 2009) (quoting *Turic*, 85 F.3d at 1215).  Competent evidence, however, may come from lay witnesses.

IV.  Plaintiffs' Motion for Partial Summary Judgment

The plaintiffs contend that they are entitled to partial summary judgment on liability because the undisputed facts demonstrate that the fraud questionnaires and determinations were so deficient that they failed to convey the constitutionally required notice and opportunity for the plaintiffs to contest the fraud accusations made against them.  They also contend that the record shows without question that defendants CSG, FAST, Geskey, and Moffet-Massey are responsible for the due process violations.  As discussed above, the plaintiffs make some compelling points about the deficiencies in the notices that the UIA furnished through MiDAS.  But fact questions abound as to how those faults affected the individual plaintiffs.

Plaintiff Cahoo collected unemployment benefits from January through June 2013.  After her employer protested her unemployment eligibility, the UIA began investigating her for fraud in May 2014.  More than one year later, the UIA determined that Cahoo committed fraud based on her failure to respond to a questionnaire, and the UIA issued two notices of determination, both dated May 27, 2015.  However, the evidence is equivocal on the effect the notices had on her. Cahoo's claim file reflects that someone checked her MiWAM account 22 times between the day the first questionnaire was sent in May 2014 and when the fraud determinations were issued in May 2015.  When asked, she testified that she likely saw the documents.  Cahoo dep., ECF No. 445-28, PageID.26070-71.  But Cahoo never stated explicitly that she read the questionnaire or the determination letters or that she was misled by them.  *Id.* at PageID.26071 ("I may not have read it. I honestly don't know.").  Although the fraud questionnaires and determination notices inherently lacked adequate grounds to accord pre-deprivation process, questions of fact remain about whether Cahoo's due process right was violated on this ground.

-65-

Kristen Mendyk received unemployment benefits from July 2011 to March 2012.  After her employer protested her unemployment eligibility, the UIA determined that Mendyk committed fraud based on her failure to respond to its questionnaires, and it mailed three fraud determinations against her: two in November 2013 and one in January 2014.  As with plaintiff Cahoo, questions of fact remain about if and when Mendyk received the UIA's deficient questionnaires and determinations.  She maintains that she does not know if she ever received any of the questionnaires but believes that she likely did not because she had moved from the address she provided the UIA.  However, her claim files reflect that she began checking her MiWAM account regularly since January 10, 2014, just before the UIA issued her third determination notice.  Although the record supports an inference that Mendyk saw the questionnaires and determinations on MiDAS, a contrary inference also is justified, which must be drawn in favor of the non-moving party.  *Alexander*, 576 F.3d at 557.

Plaintiff Cole received unemployment benefits from March through June 2014 and opted for email correspondence with the UIA.  The UIA investigated her for two activities.  The first involved vacation pay earned in March 2014; the second involved earning discrepancies from April to June 2014.  The UIA issued questionnaires in October 2014 and February 2015, respectively.  Cole never responded, and the UIA determined that she committed fraud in both cases.  However, she cannot say unequivocally that she received the UIA's deficient questionnaires and determinations.  The record reflects only that someone frequently logged into her MiWAM account, including before the UIA sent the first fraud questionnaire in October 2014 and after it issued the second determination notice in February 2015.

Michelle Davison, who opted for mail correspondence, received unemployment benefits from May 2013 through November 2013, and from March 2014 through July 2014.  Davison's

former employer protested her eligibility around March 2014.  In October 2014, the UIA mailed Davison a questionnaire to her stated address, to which she never responded.  The UIA issued a primary overpayment determination shortly after, but that was returned as undeliverable in November 2014.  Davison then called the UIA in December 2014 and updated her address to reflect that she was working with a homeless shelter.  About two weeks later, the UIA issued a fraud determination to Davison's updated address in January 2015.  As with the other plaintiffs, questions of fact remain about when Davison received the UIA's deficient questionnaires and determinations.  She did not testify that she read and was confused by the notices.  However, her claim files indicate that someone frequently checked her MiWAM account before and after MiDAS posted the October 2014 questionnaire and January 2015 fraud determinations.

These fact questions preclude partial summary judgment on liability in favor of the plaintiffs against any of the defendants.

## V.  Conclusion

Fact questions preclude summary judgment in favor of defendants CSG Government Solutions, FAST Enterprises, Inc., Sharon Moffet-Massey, and Stephen Geskey against plaintiffs Patti Jo Cahoo, Kristen Mendyk, Khadija Cola, or Michelle Davison.  Plaintiff Hyon Pak has not presented sufficient evidence to establish that he suffered a constitutional injury caused by any of the defendants, and the amended complaint will be dismissed as to him against all defendants.  The plaintiffs have not offered sufficient evidence to establish the liability of defendants Shemin Blundell, Doris Mitchell, and Debra Singleton.  Fact questions preclude partial summary judgment in favor of the remaining plaintiffs.

Accordingly, it is **ORDERED** that the motions by defendants CSG and FAST for summary judgment (ECF No. 425, 429, 445) are **GRANTED IN PART AND DENIED IN PART**.  The

amended complaint is **DISMISSED WITH PREJUDICE** as to plaintiff Hyon Pak, only.  The motions are **DENIED** in all other respects.

It is further **ORDERED** that the motions for summary judgment by defendants Sharon Moffet-Massey, Stephen Geskey, Shemin Blundell, Doris Mitchell, and Debra Singleton (ECF No. 423, 430) are **GRANTED IN PART AND DENIED IN PART**.  The amended complaint is **DISMISSED WITH PREJUDICE** as to plaintiff Hyon Pak, only, against all defendants, and as to defendants Shemin Blundell, Doris Mitchell, and Debra Singleton as to all plaintiffs.  The motions are **DENIED** in all other respects.

It is further **ORDERED** that the plaintiffs' motion for partial summary judgment (ECF No. 433) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:  March 25, 2021

-68-