UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATTI JO CAHOO, KRISTEN MENDYK,
KHADIJA COLE, and MICHELLE DAVISON,

        Plaintiffs,

v.

FAST ENTERPRISES LLC, CSG GOVERNMENT
SOLUTIONS, STEPHEN GESKEY, and SHARON
MOFFET-MASSEY,

        Defendants.
_____/

Case Number 17-10657
Honorable David M. Lawson

## OPINION AND ORDER DENYING MOTIONS FOR RECONSIDERATION

In March of last year, the Court denied motions for summary judgment by defendants Fast Enterprises LLC and CSG Government Solutions, except with respect to former plaintiff Hyon Pak. These defendants now have moved for reconsideration of that order, contending that the Court failed to address whether they can be sued as state actors under 42 U.S.C. § 1983, and FAST also asks the Court to revisit its causation ruling. The defendants are correct that the Court overlooked their state-actor argument, which had been addressed in an earlier ruling on their motions to dismiss. However, any resulting error is harmless and does not justify a different result because the record establishes that the UIA was entwined with the defendants' decision to develop an adjudication system that denied claimants due process. Fact questions also remain regarding FAST's role in developing the unconstitutionally deficient forms as well as whether and how the plaintiffs were affected by them. The motions for reconsideration will be denied.

I.

The parties are well aware of the facts of the case; they were set forth in detail in the Court's opinion on the cross motions for summary judgment, *Cahoo v. Fast Enterprises LLC*, 528 F. Supp.

3d 719 (E.D. Mich. 2021), the opinion denying motions to dismiss, 508 F. Supp. 3d 162 (2020), and the opinion denying the motion to certify a class, 508 F. Supp. 3d 138 (E.D. Mich. 2020). Put briefly, on March 2, 2017 the plaintiffs filed a putative class action complaint for damages allegedly caused by the Michigan Unemployment Insurance Agency (UIA)'s implementation of an automated system called the Michigan Integrated Data Automated System (MiDAS), which was used to make fraud determinations and to detect and punish individuals who submitted fraudulent unemployment insurance claims. The case was brought against the UIA and some of its employees, and two contractors, defendants CSG Government Solutions and FAST Enterprises LLC, and their employees, who played key roles in the development and implementation of MiDAS.

The defendants moved to dismiss the complaint, and the Court dismissed several individual defendants and several counts, leaving intact the plaintiffs' due process, equal protection, and Fourth Amendment claims against certain defendants. The State defendants appealed the decision arguing qualified immunity, and the Sixth Circuit affirmed the Court's decision with respect to the plaintiffs' due process claims only. *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 907-08 (6th Cir. 2019). The parties then agreed to dismiss the equal protection and Fourth Amendment claims against all defendants.

The parties engaged in another round of motion practice. On April 24, 2020, the plaintiffs moved for class certification; the Court denied the motion. ECF Nos. 278, 497. CSG and FAST moved to dismiss the complaint, raising jurisdiction and real-party-in interest arguments, ECF No. 297, 313; the Court denied those motions. ECF No. 495. All parties also filed motions for summary judgment, which the Court denied except as to certain individual State defendants, who

were dismissed from the lawsuit.  528 F. Supp. 3d 719.  As a result of these and other decisions, only one procedural due process claim remains against CSG and FAST and two UIA supervisors.

In the opinion denying the motions to dismiss, the Court determined that CSG and FAST were state actors for the purposes of the plaintiffs' section 1983 claims.  *Cahoo v. SAS Inst. Inc.*, 322 F. Supp. 3d 772, 792-94 (E.D. Mich. 2018), *aff'd in part, rev'd in part and remanded sub nom. Cahoo v. SAS Analytics Inc.*, 912 F.3d 887 (6th Cir. 2019).  FAST and CSG raised the issue again post-discovery in their motions for summary judgment, but the Court did not address that question again in its opinion on those motions.  Additionally, with respect to FAST, the Court found that a "question of fact remains about whether FAST helped develop the content of the questionnaires and fraud determinations," thereby precluding summary judgment on the claims against it.  528 F. Supp. 3d at 737.

FAST and CSG filed the present motions for reconsideration of the Court's summary judgment opinion and order.  Two weeks later, the State defendants filed a notice of appeal, but that notice does not affect FAST's and CSG's present motions.

II.

The orders denying FAST's and CSG's motions for summary judgment are non-final orders.  The Court may grant reconsideration of non-final orders only if

> (A)  The court made a mistake, correcting the mistake changes the outcome of the prior decision, and the mistake was based on the record and law before the court at the time of its prior decision;
>
> (B)  An intervening change in controlling law warrants a different outcome; or
>
> (C)  New facts warrant a different outcome and the new facts could not have been discovered with reasonable diligence before the prior decision.

E.D. Mich. LR 7.1(h)(2).  Only the grounds listed in subparagraph (A) are in play here.

A.

CSG argues that the Court erred by not addressing its argument that it is not a state actor that it raised for the first time after discovery closed in its summary judgment motion. It contends that the "joint action" tests require a showing of a civil conspiracy, which never occurred, and that the plaintiffs essentially abandoned their original theory that CSG was entwined with the State. FAST presents similar arguments in its reconsideration motion.

The plaintiffs' claims against these defendants are based on 42 U.S.C. § 1983. For liability to attach under section 1983, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). That is because, with one exception, the Constitution protects citizens from infringement of their rights by the government, not by private parties. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156 (1978) (recognizing that "most rights secured by the Constitution are protected only against infringement by governments") (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349 (1974); *Civil Rights Cases*, 109 U.S. 3, 17-18 (1883)).

Although the Supreme Court has acknowledged that its "cases deciding when private action might be deemed that of the state have not been a model of consistency," *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 632 (1991) (O'Connor, J., dissenting), the exceptions tend to fall into two broad categories: the "public function exception," and the "entanglement exception." *See Chemerinsky, Constitutional Law* at 552 (3d ed. 2009).

The Sixth Circuit has interpreted the public function category narrowly, noting only functions like holding elections, exercising eminent domain, and operating a company-owned town meet this test. *Chapman v. Higbee Co.*, 319 F.3d 825, 833-34 (6th Cir. 2003) (*en banc*). That category plays no role here.

The entanglement category includes cases describing "state compulsion" of a private person's conduct, and cases where a "nexus" is found between private conduct and the state, such that it "is entwined with governmental policies or when government is entwined in [its] management or control." *Chapman*, 319 F.3d at 834 (quoting *Brentwood Acad.*, 531 U.S. at 295). Private parties are deemed to be state actors when the state has affirmatively authorized, encouraged, or facilitated the private unconstitutional conduct, or otherwise permitted a private actor to "exercise[] power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (finding private physician under contract with state to provide medical services to prison inmates was a state actor) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). In fact, "[i]t is well settled that private parties that perform fundamentally public functions, or who jointly participate with a state to engage in concerted activity, are regarded as acting 'under the color of state law' for the purposes of § 1983." *United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 478 (6th Cir. 2014) (quoting *Bartell v. Lohiser*, 215 F.3d 550, 556 (6th Cir. 2000)).

Within the entanglement exception, state action by private parties has been found when the executive or judicial arm of state government has provided assistance in perpetrating unconstitutional conduct. *See, e.g., Shelley v. Kraemer*, 334 U.S. 1 (1948) (state action found where private party resorted to state courts to enforce discriminatory private deed restrictions); *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961) (state action found based on the symbiotic relationship between restaurant and publicly-run parking facility leasing property to the restaurant); *North Ga. Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601 (1975) finding the use of state courts and bailiffs to enforce creditor's remedies lacking in procedural due process); *Fuentes v. Shevin*, 407 U.S. 67 (1972) (same); *Sniadach v. Family Finance Corp.*, 395 U.S. 337 (1969)

(same). However, neither authorization of private conduct by law, *Flagg Bros.*, 436 U.S. at 164-65, nor restriction by licensure or regulation alone, *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972), will be sufficient to constitute state action. Instead, the Supreme Court has held that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (finding no state action in decisions of physicians and administrators of privately owned and operated nursing home to transfer Medicaid patients); *see also Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982) (finding no state action in employment discharge decisions of privately owned and operated school receiving nearly all revenue from state contracts). Perhaps most significant here, a private corporation whose business depends primarily on public contracts with the state does not become a state actor simply because of its "significant or even total engagement in performing public contracts." *Id*. at 840-41.

The defendants are correct that the Court did not address at summary judgment their arguments that they cannot be held liable as state actors under Section 1983. However, it was not a winning argument.

1. CSG

CSG's argument that it is not a state actor under section 1983 relies on a narrow and inaccurate reading of the various state-actor tests. It argues, essentially, that the entanglement test requires a showing of either conspiracy or entwinement, and that the plaintiffs have abandoned the latter theory. But the law is not so exacting. "The cases establish no clear standard" or "'readily applicable formulae'" for identifying a "'sufficiently close nexus'" between the state and private conduct. *Lansing v. City of Memphis*, 202 F.3d 821, 830 (6th Cir. 2000) (quoting *Burton v.*

*Wilmington Parking Authority*, 365 U.S. 715, 726 (1961)). Rather, a finding of state action "can be determined only in the framework of the peculiar facts or circumstances present." *Ibid.* In examining the facts, the Court must look not at "whether the state actor . . . was entwined generally with the private entity," *M.S. by Covington v. Hamilton Cty. Dep't of Educ.*, 756 F. App'x 510, 515 (6th Cir. 2018), but at whether "there is a sufficiently close nexus between the state and the *challenged action*" specifically, *Marie v. Am. Red Cross*, 771 F.3d 344, 363 (6th Cir. 2014) (quoting *Wilcher v. City of Akron*, 498 F.3d 516, 520 (6th Cir. 2007)).

That was the analysis applied when the Court found at the motion to dismiss stage that CSG could be considered a state actor:

> *First*, there is no question that the administration of unemployment benefits is a power traditionally exclusively reserved to the State. *Second*, CSG's contract suggests the State authorized CSG's allegedly unconstitutional conduct. The plaintiffs cite terms of CSG's contract to describe the managerial authority delegated to it by the State. Among the deliverables outlined in the contract, CSG's Project Management Office was required to "support the State — and the State's application development and implementation vendor — in meeting the timely delivery of quality information technology services for all stakeholders of the UI System Modernization project." It was also understood that the System Integration Project team would be comprised of both CSG's Project Management Office and the State of Michigan DIT and UIA staff. "[CSG] is responsible for utilizing and mentoring these State staff." These terms support the plaintiffs' allegations that CSG, acting in concert with the State, was "entwined" with the UIA in administering and maintaining the robo-fraud-adjudication system that deprived the plaintiffs of their constitutional rights.

*Cahoo*, 322 F. Supp. 3d at 793.

This reasoning remains valid, even after discovery. CSG argues otherwise, citing deposition testimony indicating that the UIA retained the exclusive responsibility for determining the business rules that MiDAS and human adjudicators applied, John Walsworth Dep., ECF No. 425-2, PageID.19524, and that CSG's managerial role was procedural, not substantive, Clay Tierney Dep., ECF No. 474-2, PageID.35826-27. Nevertheless, the fact remains that Clay Tierney,

-7-

a state employee and Director of the Agency's Office of Technology and Modernization, served as "the dotted line supervisor" of CSG employees on the project, *id.* at PageID.36736, to whom the State delegated the responsibility of keeping the project on task and working with state employees in UIA's Detroit office, *id.* at PageID.35646 ("There's a lot of administration to a large project like this, and it was not something that we did everyday"); CSG Cont., ECF No. 425-4, PageID.19665. The state worked hand in hand with CSG to develop and implement the robo-fraud-adjudication system. CSG Contract, ECF No. 425-4, PageID.19664-65; Tierney Dep., ECF No. 474-2, PageID.35827-28. CSG's ultimate function was "help administer and organize what the agency has decided it wants or needs in functionality." Tierney Dep., ECF No. 474-2, PageID.35673; *see also* Project Summ., ECF No. 474-5, PageID.36462 (stating that CSG senior project manager was "[r]esponsible for overseeing all aspects of the UIA-IVR project"). Its employees were co-located with state employees, used state email addresses, and worked on and led teams comprised of both CSG and UIA staff. Tierney Dep., ECF No. 474-20, PageID. 35708, 36731-32, 36738. CSG's arguments therefore do not contradict the Court's finding that CSG was entwined with the State.

There also is no merit in CSG's argument that the plaintiffs abandoned their original entwinement theory. The plaintiffs raised that exact theory in their response in opposition to CSG's motion for summary judgment. Plfs.' Response to CSG's Mot. Summ. J., ECF No. 474, PageID.35592-95 ("The State was not only 'entwined' with CSG's management and control, CSG employees were the virtual employees of the State . . . ."); *see also* Resp. to FAST Mot. Summ. J., ECF No. 471, PageID.31023. CSG also mistakenly believes that the plaintiffs must establish a civil conspiracy to show state action. A civil conspiracy is a sufficient means of showing entwinement, but it is not a necessary condition. *See Weser v. Goodson*, 965 F.3d 507, 516 (6th

Cir. 2020) ("A plaintiff may [] allege that a private party has engaged in a conspiracy *or* concerted action with other state actors.") (emphasis added); *Memphis, Tennessee Area Loc., Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004) (suggesting that allegations of conspiracy are only relevant if the other state-action tests do not apply). The plaintiffs adduced facts that tend to show concerted action by demonstrating that CSG "works so closely with state agencies that it is difficult to delineate between them," to the point that "the government is 'entwined in [the private entity's] management or control.'" *See Marie*, 771 F.3d at 364 (quoting *Vistein v. Am. Registry of Radiologic Technologists*, 342 F. App'x 113, 128 (6th Cir. 2009)). This nexus between the state and the challenged action far exceeds "mere cooperation," contract, authorization, restriction, or funding, and it is enough to demonstrate that CSG is a state actor that may be subject to suit under section 1983. *See ibid.* (quoting *Lansing*, 202 F.3d at 831); *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992).

### 2. FAST

FAST also argues that the discovery demonstrates it is not a state actor under any of the applicable tests. It insists that it merely provided software for the State under its contractual obligations and that State officials do not work for or control it. The record, however, tells a different story.

*First,* as with CSG, there is no question that the administration of unemployment benefits is a power traditionally reserved to the State. *Second*, FAST's contract suggests that it was "entwined" with the State and played a significant role in developing its MiDAS system. UIA manager Tierney described FAST's contract as encompassing "all of the claims activities" and "the universe of what's done by UI." Tierney Dep., ECF No. 474-20, PageID.36752. FAST contracted with the State to "design, configure and implement" its commercial software for the

UIA's use in administering unemployment insurance, including fraud investigation, overpayments, collections, tax intercepts, and "decision support". FAST Cont., ECF No. 399-65, PageID.17800, 17802-03. It was contractually responsible for configuring the system and for training UIA employees on how to use it. *Id.* at PageID.17803. It also agreed to develop the templates of all MiDAS correspondence, including questionnaires and determination notices, and ensured that the templates complied with "Federal and State law delivery requirements." *Id.* at PageID.17803-04; *see also* Tierney Dep., ECF No. 474-2, PageID.36109. *Third*, the record suggests that the State was heavily involved in FAST's "management or control." *See Chapman*, 319 F.3d at 834. FAST employees reported to the UIA, worked alongside UIA employees, used state email addresses, and continuously sought approval from UIA managers for the work performed on the project. Tierney Deps., ECF No. 474-2, PageID.35704, 35707-08, 35712; ECF No. 474-20, PageID.36731-32, 36736, 36750. Again, UIA manager Tierney was "the dotted line supervisor" to FAST personnel. *Ibid.*

The record contains conflicting evidence about FAST's role in developing the content of the forms. Tierney testified that some FAST employees worked with State employees to "design and program the system" and "draft[] the language" of the UIA's forms. Tierney Dep., ECF No. 474-2, PageID.35719-20, 35791, 35937, 36113. However, FAST's contract obligated it with developing the templates (not the content) for MiDAS correspondence, and UIA witnesses Shemin Blundell and Sharon Moffet-Massey testified that "no CSG, FAST, or SAS employees were involved in determining the content or crafting the language of those notices or questionnaires sent to claimants." Shemin Blundell Dep., ECF No. 297-8, PageID.11186; *see also* Sharon Moffet-Massey Dep., ECF No. 297-7, PageID.11171.

But the factual inferences are drawn in favor of the plaintiffs as the nonmoving parties. *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). And even if FAST lacked final authority over key aspects of the project, the record establishes a "nexus" between FAST's conduct developing MiDAS and its forms and the State's implementation of MiDAS such that FAST is "entwined" with the State. *Chapman*, 319 F.3d at 834; *West*, 487 U.S. at 49.

B.

FAST also asks the Court to revisit its argument that it did not cause any of the plaintiffs' injuries because (1) the remaining plaintiffs did not receive the deficient notices or questionnaires FAST allegedly designed; and (2) the UIA found fraud based on non-responses to questionnaires before its involvement with FAST. It raised substantially the same arguments in its prior motions. Now, it contends that the Court's ruling is erroneous because it is based on the incorrect premise that the questionnaires and content of the notices provide the basis for the plaintiffs' claims.

It is true that the Court found that "[a] question of fact remains about whether FAST helped develop the content of the questionnaires and fraud determinations" that the Court found constitutionally deficient. *Cahoo*, 528 F. Supp. 3d at 737. It is also true that the remaining plaintiffs alleged that they had not read or received those notices. *Cahoo*, 508 F. Supp. 3d at 150-53 (observing that plaintiffs Patti Jo Cahoo, Kristen Mendyk, Khadija Cole, and Michelle Davison alleged that they did not see or receive the questionnaires or determinations and therefore failed to respond). But as the Court observed in its opinion addressing the parties' cross motions for summary judgment, the record is unclear "as to how [the deficiencies in the notices] affected the individual plaintiffs." *Cahoo*, 528 F. Supp. 3d at 762. Each of the remaining claimant's claim files showed that individuals checked their MiWAM accounts around the times the notices were

sent. *Id.* at 762-63 ("Cahoo's claim file reflects that someone checked her MiWAM account 22 times between the day the first questionnaire was sent . . . and when the fraud determinations were issued"; Mendyk's "claim files reflect that she began checking her MiWAM account regularly since January 10, 2014, just before the UIA issued her third determination notice"; Cole's claim files "reflect[] that someone frequently logged into her MiWAM account, including before the UIA sent the first fraud questionnaire . . . and after it issued the second determination notice"; and Davison's "claim files indicate that someone frequently checked her MiWAM account before and after MiDAS posted the . . . questionnaire and . . . determinations"). The record, therefore, allows a fair inference that the plaintiffs were influenced by the contents of the notices even though they had no current recollection of receiving them. Without more evidence establishing whether and how the plaintiffs were impacted by the deficient questionnaires and notices, the Court correctly denied FAST summary judgment.

It is also true that the UIA developed its policy of determining fraud based on a claimant's failure to respond before it began working with FAST. MiDAS 2011 Intentional Misrepresentation Guidelines, ECF No. 445-54, PageID.26689, 26698. But the fact remains that FAST had a role in instituting and maintaining this potentially problematic policy. *Cahoo*, 528 F. Supp. 3d at 737 ("Moreover, once MiDAS went live, FAST's role transitioned to 'support and maintenance;' that is, 'making sure [the system] continues to function and do what it's expected to do,' per FAST's contractual warranty.") (citing FAST Cont., ECF No. 471-10, PageID.31362). Therefore, there is no basis to reconsider FAST's causation argument.

III.

Defendants CSG and FAST have not shown that there is a proper basis to reconsider the opinion and order denying their motions for summary judgment.

Accordingly, it is **ORDERED** that the motions for reconsideration (ECF No. 535, 536, 537) are **DENIED**.

s/David M. Lawson  
DAVID M. LAWSON  
United States District Judge

Date:   January 18, 2022