# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: June 15, 2023

Mr. David M. Blanchard
Law Offices
101 N. Main Street
Suite 555
Ann Arbor, MI 48104

Mr. Kevin S. Ernst
Ms. Hannah Fielstra
Ernst Charara & Lovell
645 Griswold
Suite 4100
Detroit, MI 48226

Mr. Jason D. Hawkins
Office of the Attorney General
of Michigan
P.O. Box 30736
Lansing, MI 48909

Ms. Frances Jane Hollander
Starr, Butler, Alexopoulos & Stoner
20700 Civic Center Drive
Suite 290
48076
Southfield, MI 48076

Mr. Walter J. Piszczatowski
Hertz Schram
1760 S. Telegraph Road
Suite 300
Bloomfield Hills, MI 48302

Mr. Stephen J. Rosenfeld
McDonald Hopkins
300 N. LaSalle Street
Suite 1400
Chicago, IL 60654

Ms. Rebecca M. Smith
Office of the Attorney General
of Michigan
P.O. Box 30755
Lansing, MI 48909

Mr. Erik F. Stidham
Holland & Hart
800 W. Main Street
Suite 1750
Boise, ID 83702

Ms. Debbie K. Taylor
Office of the Attorney General
of Michigan
3030 W. Grand Boulevard
Suite 10-200
Ste 9-600
Detroit, MI 48202

           Re:  Case Nos. 21-1407/21-2672, *Patti Cahoo, et al v. SAS Analytics Inc., et al*
                Originating Case No. : 2:17-cv-10657

Dear Counsel,

    The court today announced its decision in the above-styled cases.

    Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                Yours very truly,

                Deborah S. Hunt, Clerk

                Cathryn Lovely
                Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0125p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

PATTI JO CAHOO, KRISTIN MENDYK, and KHADIJA COLE, individuals and on behalf of others similarly situated; HYON PAK; MICHELLE DAVISON,

          *Plaintiffs-Appellees* (21-1407),

    *v.*

SAS INSTITUTE, INC. fka SAS Analytics Inc.,

          *Defendant*,

FAST ENTERPRISES, LLC; CSG GOVERNMENT SOLUTIONS,

          *Defendants-Appellees* (21-2672),

STEVEN GESKEY; SHARON MOFFETT-MASSEY,

          *Defendants-Appellants* (21-1407),

          *Defendants-Appellees* (21-2672),

SUZETTE MARIE HEATHCOTE,

          *Proposed Intervenor-Appellant* (21-2672).

> Nos. 21-1407/2672

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:17-cv-10657—David M. Lawson, District Judge.

Case 21-1407 Argued:  April 26, 2023

Decided and Filed:  June 15, 2023

Before:  SUTTON, Chief Judge; BATCHELDER and MURPHY, Circuit Judges.

---

### COUNSEL

**ARGUED:**  Jason Hawkins, Debbie K. Taylor, Kimberly K. Pendrick, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Steven Geskey and Sharon Moffett-Massey.  Kevin S. Ernst, ERNST CHARAR & LOVELL, PLC, Detroit, Michigan, for Patti Jo Cahoo, Kristin Mendyk, Khadija Cole, Hyon Pak, and Michelle Davison.  **ON BRIEF:** Jason Hawkins, Debbie K. Taylor, Kimberly K. Pendrick, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Steven Geskey and Sharon Moffett-Massey. Kevin S. Ernst, Hannah R. Fielstra, ERNST CHARAR & LOVELL, PLC, Detroit, Michigan, for Patti Jo Cahoo, Kristin Mendyk, Khadija Cole, Hyon Pak, and Michelle Davison.  David M. Blanchard, BLANCHARD & WALKER PLLC, Ann Arbor, Michigan, for Suzette Marie Heathcote.  Stephen J. Rosenfeld, MCDONALD HOPKINS LLC, Chicago, Illinois, for CSG Government Solutions.  Erik F. Stidham, HOLLAND & HART LLP, Boise, Idaho, Walter J. Piszczatowski, HERTZ SCHRAM PC, Bloomfield Hills, Michigan, for Fast Enterprises, LLC.

SUTTON, C.J., delivered the opinion of the court in which MURPHY, J., joined in full. BATCHELDER, J. (pp. 19–38), delivered a separate opinion concurring in part and dissenting in part.

---

### OPINION

---

SUTTON, Chief Judge.  The modernization of Michigan's process for identifying fraud in unemployment benefits, according to four residents of the State, came with a cost:  It undermined their due process rights.  The four residents all obtained unemployment benefits, and the State's new software for identifying unemployment fraud targeted them but did not immediately deprive them of any benefits.  They sued two Unemployment Insurance Agency supervisors, among many others.  In the first stage of this case, the complaint and proffered class action covered claims in which the State terminated welfare payments without adequate notice and a hearing.  But at this stage in the case, after the denial of a motion to certify a class and with just four plaintiffs remaining, the lawsuit covers only claims in which the State offers several procedural protections *before* any elimination of benefits.  Because the remaining plaintiffs have failed to show that these procedures violate any clearly established law, the supervisors are entitled to judgment as a matter of law.  Suzette Heathcote separately appeals the denial of her

motion to intervene in the case.  Because the district court did not abuse its discretion in finding her motion untimely, we affirm that order.

I.

According to the district court and the relevant statute, this is what happened.  *Cahoo v. Fast Enters. LLC*, 528 F. Supp. 3d 719, 728 (E.D. Mich. 2021) (incorporating by reference *Cahoo v. Fast Enters. LLC*, 508 F. Supp. 3d 162 (E.D. Mich. 2020)).  Out-of-work residents of Michigan may claim unemployment benefits if they meet certain eligibility criteria.  Mich. Comp. Laws § 421.28.  The State's Unemployment Insurance Agency oversees the benefits system.  *Cahoo*, 528 F. Supp. 3d at 726–27; *Cahoo*, 508 F. Supp. 3d at 166.

In 2011, with the help of private contractors, the Agency began to develop software to administer the unemployment system.  *Cahoo*, 508 F. Supp. 3d at 168.  The Agency sought to equip the software to auto-adjudicate as many parts of the claims process as possible.  *See id.* at 167.  Clayton Tierney, the director of the office of technology and modernization, "spearheaded" the project.  *Cahoo*, 528 F. Supp. 3d at 728.  Agency staff broke into teams, many of which fell under Tierney's oversight, to tackle different parts of the modernization effort.  *Id.*; *cf. id.* at 749. The non-monetary team was particularly prolific.  *See id.* at 728–30.  Headed by Susan Easton, it drafted many of the forms that the software would automatically send to claimants over the life cycle of a claim.  *Id.*  These included a fact-finding questionnaire to send to claimants after the software flagged their claims for fraud, *id.* at 729; *Cahoo*, 508 F. Supp. 3d at 167, and notices of determination alerting claimants to fraud findings and outlining their right to appeal those findings, *Cahoo*, 528 F. Supp. 3d at 729; *Cahoo*, 508 F. Supp. 3d at 167–68.

The Agency programmed software that used logic trees to help process cases and identify fraud.  *Cahoo*, 508 F. Supp. 3d at 167.  A claimant's failure to return the fact-finding questionnaire, for example, led to a fraud finding, as did the claimant's selection of certain multiple-choice responses.  *Id.*

With these and other developments in place, the Michigan Integrated Data Automated System—MiDAS for short—opened for claimants in October 2013.  *Cahoo*, 528 F. Supp. 3d at 729.  Sometime around MiDAS's launch, Stephen Geskey took over as director of the policies

and procedures group.  *Id.*  Sharon Moffett-Massey assumed the Agency director role in April 2014.  *Id.* at 728.

In August 2015, problems arose with some features of the system, prompting the Agency to turn off the auto-adjudication feature for fraud claims.  *Id.* at 729.  Later, the U.S. Department of Labor and Michigan Auditor General identified issues with MiDAS, ranging from the questionable legality of auto-adjudication as a way to identify fraud to the merits of the logic-tree fraud recommendations to the vagueness of the fraud notices.  *Id.* at 728–29.

All of this led to today's case—or at least to today's chapter of the case.  Patti Cahoo, Kristin Mendyk, Khadija Cole, and Michelle Davison (Cahoo for all) live in Michigan, they obtained unemployment benefits, and sometime after they stopped receiving those benefits, the Agency flagged their claims for fraud.  *Cahoo*, 508 F. Supp. 3d at 170–73.

True to form, the Agency sent each plaintiff a fact-finding questionnaire with a multiple-choice question and an opportunity to provide additional information.  *Id.* at 169–73.  Then the Agency sent each plaintiff notices of determination.  *Id.* at 170–73.  These notices outlined the fraud finding, the reason why the plaintiff lacked eligibility during the benefits period, the relevant benefits period and employer, and a 30-day window to appeal the fraud finding.  *Cahoo*, 528 F. Supp. 3d at 758–59.

Under state law, each claimant had the right to a multi-level appeal process with respect to this fraud finding.  She could request a redetermination from the Agency.  Mich. Comp. Laws § 421.32a (2011).  Then she could appeal that redetermination to an administrative law judge.  *Id.* § 421.33(1).  Then she could request a rehearing from that administrative law judge.  *Id.*  Then she could file an appeal in the Michigan compensation appellate commission.  *Id.* §§ 421.33(2), 421.34.  And then she could seek judicial review of the commission's decision in state court.  *Id.* § 421.38.

If the Agency did not receive a request for redetermination within 30 days, the fraud finding became final, ending eligibility for benefits and imposing restitution and penalties. *Cahoo*, 528 F. Supp. 3d at 730; *e.g.*, R.423-16 at 29 ("If a protest is not received within 30 days, a decision will become final and restitution may be due and owing.").  But none of the plaintiffs

suffered any immediate monetary consequences.  *See Cahoo*, 508 F. Supp. 3d at 170–73.  The deprivation occurred months or years later through collection efforts when the State denied the plaintiffs new benefits, intercepted their tax refunds, or garnished their wages.  *See id.*

The plaintiffs filed a putative class action against three government contractors and nineteen Agency staffers, raising claims under the Fourth, Fifth, and Fourteenth Amendments, 26 U.S.C. § 6402(f), and Michigan tort law.  Extensive motions practice "whittled down" the plaintiffs, defendants, and claims.  *Id.* at 166.  Any retelling of that story in full would require many pages and the incorporation of many prior opinions.  *E.g.*, *Cahoo*, 528 F. Supp. 3d at 728 (incorporating its prior opinion by reference).  The key points for present purposes are these.  The Agency defendants filed a motion to dismiss, which the district court denied.  *Cahoo v. SAS Inst. Inc.*, 322 F. Supp. 3d 772, 807 (E.D. Mich. 2018).  We affirmed in part and reversed in part, leaving one procedural due process claim standing.  *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 907 (6th Cir. 2019).  At that stage, we determined that the plaintiffs' due process rights clearly existed because they had alleged a deprivation of their property interests without adequate notice and without an opportunity for a pre-deprivation hearing.  *Id.* at 903–05.

After considerable discovery, the Agency defendants moved for summary judgment based on qualified immunity.  *Cahoo*, 528 F. Supp. 3d at 727.  The court granted the Agency defendants' motion in part, dismissing several of them.  *Id.* at 763.  But it declined to grant qualified immunity to Agency supervisors Sharon Moffett-Massey and Stephen Geskey for their involvement with MiDAS's questionnaires and notice forms.  *Id.* at 749–52, 754–60.  The district court reasoned that the questionnaires were constitutionally deficient because they did not set forth the alleged wrongdoing with specificity.  *Id.* at 757.  As for the notices of determination, the district court found that those *did* provide "an adequate description for why the [Agency] believed it overpaid claimants."  *Id.* at 758.  But "that communication came too late" because the Agency "had already" deprived the plaintiffs of their property rights by terminating the right to benefits, demanding restitution, and applying penalties.  *Id.* at 759.  That left genuine issues of material fact, the court concluded, as to Moffett-Massey's and Geskey's role in developing these documents that precluded granting summary judgment on supervisory liability.  *Id.* at 749–52.  The two supervisors appealed.

Meanwhile, another would-be plaintiff tried to join the lawsuit.  *Cahoo v. Fast Enters. LLC*, 536 F. Supp. 3d 146, 150 (E.D. Mich. 2021).  Like Cahoo, Suzette Heathcote applied for and received unemployment benefits, then later received a fraud finding.  *Id.* at 153.  Nearly four years after this lawsuit began—and one month after the district court denied class certification—Heathcote moved to intervene, seeking to raise individual claims and to bring a renewed class certification motion as class representative.  *See id.*  The district court denied that motion along with Heathcote's motion to reconsider.  *Id.* at 161.  Heathcote appealed.

## II.

### A.

Moffett-Massey and Geskey seek qualified immunity from the claimants' due process claims.  Two questions shape the appeal.  Did Moffett-Massey and Geskey violate the claimants' constitutional rights?  If so, did they trespass on clearly established law?  *See Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).  We "review de novo" each "legal question."  *Jarvela v. Washtenaw County*, 40 F.4th 761, 764 (6th Cir. 2022).  And we may review these questions in any order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

This appeal comes to us at the summary judgment stage after considerable discovery. With the benefit of discovery comes a burden.  The plaintiffs now must identify evidence in the record to substantiate each claim in their complaint.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  In a qualified immunity case like this one, that means the plaintiffs bear the burden of identifying record evidence showing a violation of their clearly established rights. *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 608–09 (6th Cir. 2015).  The plaintiffs, in other words, must substantiate their theories on both qualified immunity prongs with record support. Instead of merely showing that each claim alleged in the complaint satisfies these two prongs, as we decided the last time we looked at the case, they must point to record-based evidence backing each theory.

We need not decide today whether the questionnaires and notices violated the Due Process Clause or whether a reasonable jury could find that Moffett-Massey and Geskey directed the development of them.  Either way, the plaintiffs' due process claims do not clear step two of

the qualified-immunity test.  Consider several key developments since our prior opinion.  At the motion to dismiss stage, we assessed a broadly framed, putative class action complaint.  *Cahoo*, 912 F.3d at 892 n.1.  Focusing on the complaint's allegation that MiDAS failed to provide claimants with pre-deprivation notice or process before automatically shutting off unemployment benefits, garnishing wages, and seizing tax refunds, we held that the claimants had alleged a clearly established right to pre-deprivation notice and a hearing.  *Id.* at 903–04.

That conclusion stemmed from several Supreme Court cases about the midstream termination of welfare benefit payments and the like.  *See Goldberg v. Kelly*, 397 U.S. 254, 264 (1970) (requiring a hearing before terminating welfare payments); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542–43 (1985) (requiring a hearing before firing a public employee for cause); *cf. Sniadach v. Fam. Fin. Corp. of Bay View*, 395 U.S. 337, 342 (1969) (requiring notice and a hearing before garnishing wages).  In the face of these precedents, we ruled that the novel characteristics of MiDAS—a computer prompted, as opposed to individual prompted, sudden termination of benefits—did not alter the inquiry.  *Cahoo*, 912 F.3d at 904.

Our holding also hinged on the case's procedural posture.  Courts, we pointed out, sometimes benefit from waiting to resolve qualified immunity until summary judgment—with the benefit of discovery—rather than settling the issue immediately through a motion to dismiss. *Id.* at 899, 907.  Patience can be especially prudent in the due process context, where courts employ a three-part, broadly framed balancing test.  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  Discovery sometimes yields new insights about the public and private interests at stake, impacting the qualified immunity inquiry.

All things considered, we concluded in the first appeal that "any reasonable official would have known that depriving Plaintiffs of their protected property interests in the manner alleged violated their due process rights."  *Cahoo*, 912 F.3d at 904.  At the same time, we warned Cahoo that she would "need to substantiate [her] allegations to survive a motion for summary judgment."  *Id.* at 901.  We have no second thoughts about these conclusions.

But several features of the case have evolved over the intervening years and a "generous discovery period."  *Cahoo*, 528 F. Supp. 3d at 749.  The district court denied class certification,

stripping claimants of their broad class claims and leaving four fact-specific individual claims. *Id.* at 763.  The district court then dismissed all of the Agency defendants save two:  Moffett-Massey and Geskey.  *Id.*  (The claims against two of the private defendants remain pending.)  The district court then confined the challenged features of MiDAS to these two Agency defendants to just two—the fraud questionnaires and notices—and took the auto-adjudication and delivery-of-notice claims off the table for purposes of this appeal.  *Id.* at 757–60.

Discovery also has changed the nature of the due process claim as to the remaining four plaintiffs.  What was once a termination-of-benefits case has evolved into what is a collection-of-paid-benefits case.  As to the remaining four plaintiffs, discovery has clarified that these forms and appeal rights implicate pre-deprivation protections, not post-deprivation protections.  We now know that MiDAS did not immediately deprive these plaintiffs of their property rights.  No plaintiff lost ongoing benefit payments due to MiDAS.  *See Cahoo*, 508 F. Supp. 3d at 170–73.  Each of them instead received a fraud finding for a benefits period that had already ended, and the attendant property deprivation—the denial of new benefits, the garnishment of wages, or the confiscation of tax refunds—occurred months or years down the line, all implicating other procedural protections in place under Michigan law.  *See id.*; Mich. Comp. Laws §§ 421.32a (2011), 421.33, 421.34, 421.38 (setting out a multi-stage appeal process).

We now know that MiDAS provided the four specific plaintiffs with some notice and an opportunity for a hearing before any of those later property deprivations occurred.  It sent fact-finding questionnaires and two notices of determination to each plaintiff.  *See Cahoo*, 508 F. Supp. 3d at 170–73.  The questionnaires stated that claimants could submit information on top of answering the multiple-choice question.  *See* R.423-16 at 27 ("You may provide a statement and evidence . . . .").  The two notices detailed the challenged benefits period, relevant employer, fraud finding, and applicable statute.  As the district court put it, these notices "provided an adequate description" of the alleged wrongdoing.  *Cahoo*, 528 F. Supp. 3d at 758.  The notices also specified the process for protesting the determination, which included seeking a redetermination and a 30-day period before the finding became final.  And if the Agency issued a redetermination, the accompanying notice of redetermination instructed claimants that they could seek a hearing before an administrative law judge, from which they had a right to appeal to the

compensation appellate commission, Mich. Comp. Laws § 421.33(2), and then to a state court of general jurisdiction, *id.* § 421.38.

Now that we know MiDAS did not immediately terminate *these plaintiffs'* ongoing benefit payments without pre-deprivation process, cases like *Goldberg* and our prior opinion do not tell us what to do with the remaining claims in the case.  What was once relatively easy to answer no longer is.  In today's distinct setting, we must keep in mind that due process's "flexible and fact intensive" nature makes it "less likely it will be clearly violated in a case without similar facts." *Cunningham v. Blackwell*, 41 F.4th 530, 540 (6th Cir. 2022).  That is the case here.  The content of the two notices, the opportunity for a hearing, and the months- or years-long delay before these plaintiffs faced a deprivation distinguish this case from existing due process precedent.  No case put Moffett-Massey and Geskey on notice that these pre-deprivation forms and appeal procedures for these plaintiffs in this context did not stack up. Quite a few cases suggested the contrary.  *See Rosen v. Goetz*, 410 F.3d 919, 931 (6th Cir. 2005) (per curiam) (finding notice sufficient even though information came in two separate letters); *Shoemaker v. City of Howell*, 795 F.3d 553, 560 (6th Cir. 2015) (finding notice sufficient when it listed the relevant ordinance and nature of the violation); *DePiero v. City of Macedonia*, 180 F.3d 770, 787–88 (6th Cir. 1999) (reasoning inadequacy of notice was counterbalanced by opportunity to attend hearing prior to deprivation of liberty); *Herrada v. City of Detroit*, 275 F.3d 553, 557 (6th Cir. 2001) (finding notices did not violate due process even though they "might have contained false and misleading information" because they stated a hearing was available and provided a phone number to call for more information).

In resisting this conclusion, Cahoo begins in an understandable place:  Hasn't the Sixth Circuit already identified the clearly established law for this case and haven't we already determined that she meets it?  As support, she points to the district court's opinion, which reasoned similarly:

> The State defendants insist that each plaintiff nevertheless had the opportunity to participate in a full evidentiary hearing before the [Agency] deprived any of them of property, which, they say, cured any deficiency in earlier notices.  But the Sixth Circuit rejected this exact argument by the same defendants:

> The Individual Agency Defendants argue that Plaintiffs failed to allege a plausible due process claim because Agency procedures provided for a pre-deprivation hearing if claimants elected to appeal a fraud determination.  The Court is unpersuaded by this argument.  Plaintiffs allege that the Agency terminated a claimant's right to benefits before any appeal hearing took place; they allege the Agency terminated a claimant's right to benefits immediately once MiDAS made a positive fraud determination.  While claimants had the opportunity to appeal a fraud determination, "postdeprivation remedies alone will not satisfy due process if the deprivation resulted from conduct pursuant to an 'established state procedure,' rather than random and unauthorized conduct."

*Cahoo*, 528 F. Supp. 3d at 759 (quoting *Cahoo*, 912 F.3d at 902–03).

We embrace the premise but not the conclusion.  Yes, our prior decision shows that a claim would go to a jury on the theory that the State terminated benefits without any of these procedures.  But at this point the fraud determinations created collection issues for prior payments, not a termination of current benefits.  Another feature of the district court's opinion shows as much.  The court acknowledges that the primary notice of determination would satisfy due process had it been sent prior to the deprivation:

> The Primary Determination Notices provided an adequate description for why the [Agency] believed it overpaid claimants. . . .  But that communication came too late.  By the time the [Agency] issued the determination notices, it had already terminated the claimants' rights to benefits, demanded repayment, and determined that the claimants were subject to penalties.  The State defendants cannot rely on post-deprivation process to remedy the lack of pre-deprivation notice.

*Id.* at 758–59.  For each of these four plaintiffs, as the evidence obtained in discovery now shows, the Agency sent the notices of determination prior to any deprivation.

Cahoo insists that the property deprivation occurred as soon as the Agency issued the notices of determination, because the notices purported to strip eligibility for future benefits, imposed restitution, and assessed penalties.  But the notices themselves foreclose this argument.  They provide a 30-day period to protest the determination, only after which did the "decision [become] final and restitution [become] due and owing."  R.423-16 at 38; *cf. Cahoo*, 528 F. Supp. 3d at 730 (recognizing the 30-day period).  After that, as noted, each beneficiary had

several layers of administrative and court review available to them.  Nor is there any support for the argument that the deprivation of property occurred earlier.  In the context of receiving unemployment benefit payments, plaintiffs offer no case—or any clearly established law—showing that the deprivation occurs before the actual deprivation—a minimum of 30 days later by law and in this case months and years later.

Cahoo claims that *Hope v. Pelzer* solves these problems.  That case recognized that a novel violation can be "so obvious" that it nevertheless oversteps clearly established law, it is true.  536 U.S. 730, 741 (2002).  And we relied on *Hope* in our prior opinion, it is true too.  *Cahoo*, 912 F.3d at 904.  But because our prior opinion focused on the alleged midstream deprivation of property rights without pre-deprivation notice and a hearing, cases like *Goldberg* naturally extended to the novel MiDAS setting.  Those cases, in other words, gave Agency supervisors "fair warning" that the midstream deprivation of benefits without process "violated the Constitution."  *Hope*, 536 U.S. at 741.  In today's setting, however, Cahoo did not identify any case in her appellee brief that fairly extends to this situation.  *Goldberg*'s holding does not "obvious[ly]" cover after-the-fact fraud findings accompanied by notices of determination and multiple levels of appeal *before* any immediate consequences for property rights.

At argument, Cahoo's counsel proffered two more cases, neither of which we relied on in our prior opinion and neither of which changes things.  *Cosby v. Ward*, 843 F.2d 967 (7th Cir. 1988); *Transco Sec., Inc v. Freeman*, 639 F.2d 318 (6th Cir. 1981).  Take *Cosby* first.  This out-of-circuit case considered notices of interviews with claims adjudicators.  843 F.2d at 983.  The state agency sent these notices to claimants of supplemental unemployment benefits who had performed inadequate work searches.  *Id.* at 983–84.  But because the notices did not tell claimants that the issue stemmed from their work searches or that they had violated a rule for receiving benefits, the court found them constitutionally inadequate.  *Id.*  That's a distant cry from this case, in which the notices flagged the fraud issue, benefits period, employer, relevant statute, and gave "an adequate description" of the purported wrongdoing.  *Cahoo*, 528 F. Supp. 3d at 758.  Unlike the *Cosby* claimants who were immediately denied benefits, moreover, these plaintiffs did not face any immediate deprivation of their property interests when the Agency sent the fraud notices.

*Transco Security* does not close these gaps.  The Government Services Administration suspended a government contractor from doing business with the government due to fraud. 639 F.2d at 320.  The notice of suspension did not suffice, we reasoned, because it did not specify which of the company's numerous government contracts contained the alleged errors. *Id.* at 323.  That makes *Transco Security* twice removed from this case, in which the notices had no immediate impact on the plaintiffs' receipt of benefits and outlined the specific benefits period and employer.

Cahoo worries that our holding paves the way for state officials to skirt liability simply by using "new technologies to carry out unconstitutional conduct," *Cahoo*, 912 F.3d at 904, or by changing the language on notices.  The short answer is that we would handle this case the same way even if Agency personnel (rather than MiDAS) drove the process at every turn. Technology has nothing to do with it now that we know that the only claims left in the case involve individuals with state-law rights to challenge the Agency's fraud finding *before any* deprivation occurred.  The entire process, including above all the delayed deprivations in this instance, distinguishes the plaintiffs' claims from due process precedent.  Any other approach creates notice problems in the other direction.  Qualified immunity carefully balances between the "vindication of citizens' constitutional rights" and "officials' effective performance of their duties," a balance maintained only by giving officials fair notice of the wrongfulness of their conduct. *Davis v. Scherer*, 468 U.S. 183, 195 (1984).

Cahoo next points to state and federal laws requiring agency representatives to examine claims.  *E.g.*, Mich. Comp. Laws § 421.32(a) (2013).  She argues that these laws made the illegality of auto-adjudication apparent.  True or not, this argument fails to respond to the only features of MiDAS at issue in this appeal:  the questionnaires and notices.  The district court, as noted, did not hold Moffett-Massey or Geskey responsible for any deficiencies related to auto-adjudication.

What of the plaintiffs' argument that they did not receive the questionnaires and notices? The Agency emailed generic notifications to Cahoo's and Cole's last-known email addresses that instructed them to check their online accounts, where the full notices were posted.  And the Agency mailed the forms to Mendyk's and Davison's last-known addresses; some of the notices

were returned as undeliverable.  As to the former, Cahoo does not point to any case clearly determining that the generic email notifications directing claimants to their accounts failed to pass constitutional muster.  And common sense suggests that the Agency's email practices may have been prudent.  Think of a healthcare provider's email notifications to a patient, which generically provide that new information has been posted on the patient's account (without saying what information) in order to protect patient privacy.

As to the latter, Cahoo provides no case clearly establishing that mailing a notice to a claimant's last-known address violates due process.  *Cf. Jones v. Flowers*, 547 U.S. 220, 235–36 (2006) (finding no duty for agency to investigate an individual's new address before mailing notice of a tax sale of a property).  Her argument that it was unreasonable for the Agency not to follow up on mail returned as undeliverable fares better under existing precedent.  *See id.* at 229–30 (requiring agency to take reasonable further action when a notice of a tax sale sent by certified mail was returned as undeliverable).

But all of the plaintiffs' arguments about the Agency's manner of delivering the questionnaires and notices—detailed in the last few paragraphs—are beside the point for another reason, arguably the most critical reason.  Recall that the Agency defendants moved for summary judgment based on qualified immunity as to the plaintiff's due process claims.  Neither the Agency defendants—nor the plaintiffs in response to the motion for summary judgment—put forward any evidence linking Moffett-Massey or Geskey to the plaintiff's allegations about the delivery of the notices.  As a result, the district court did not hold Moffett-Massey or Geskey responsible (or find a lingering question of material fact) as to how MiDAS delivered notices or how the Agency handled undeliverable mail.  We cannot deny them qualified immunity based on actions that they did not take.  *See Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006).  Section 1983 prohibits supervisory liability in this setting.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

In response to our colleague's dissent, we offer the following thoughts.  *First*, while we agree that the MiDAS program is difficult to defend as a matter of policy, we do not think that reality changes the clearly established inquiry.  Start with our agreement.  The MiDAS program's imperfections indeed are many.  Take a few examples.  It does not make sense to

empower a computer program to make fraud findings, even for internal purposes, that require assessing a claimant's intent.  Nor does it make sense to engage in income spreading, the practice our colleague lays out in detail in her separate writing.  And it does not make sense to impose compound interest and excessive penalties on claimants who, having lost their jobs, already face financial distress.  That explains why we embrace our court's initial clearly established ruling.  Had this program been used to deprive these individuals of benefits without any process, we would rule the same way again.  But in the aftermath of discovery, the remaining claims deal solely with situations in which the program created an internal fraud red flag but did not deprive benefits at that point or at any point without additional process, notice, and opportunities for appeal.

Now that the district court has declined to certify a class, each plaintiff's individual due process claim must stand on its own.  *See Cahoo v. Fast Enters. LLC*, 508 F. Supp. 3d 138, 162 (E.D. Mich. 2020) (denying class certification).  Today's claims rest on theories that we did not consider the last time around.  The district court concluded that not one of the remaining four plaintiffs immediately lost her ongoing benefits, immediately had her wages garnished, or immediately had her tax refunds intercepted.  *See Cahoo*, 508 F. Supp. 3d at 170–73.  And it concluded that any deprivation would occur only after the 30-day period to appeal expired. *Cahoo*, 528 F. Supp. 3d at 730.  Our precedents apply distinct requirements on pre-deprivation process and post-deprivation process.  *See Cahoo*, 912 F.3d at 902–03 (delineating between pre- and post-deprivation process).  Hence the prior opinion's explanation that precedent patently required "an individual [to] be given an opportunity for a hearing *before* he is deprived of any significant property interest," *id.* at 903 (quotation omitted), remains true but irrelevant to the remaining claims in the case.

Yes, MiDAS's logic trees spawned internal, interim fraud findings that marked individuals for further review.  But that internal step did not deprive a claimant of property.  As noted, those property deprivations came months or years later, following notices of deprivation and a multi-level appeal process.  The missing link, then, is a case that clearly established the inadequacy of the questionnaires, notices of determination, and appeal processes available in the run-up to the property deprivation.  To this day, the plaintiffs have not provided that case.  What

precedent there was would not have clearly alerted Moffett-Massey and Geskey to the constitutional inadequacies of the questionnaires and notices as to these plaintiffs and these property deprivations. *See Rosen*, 410 F.3d at 931; *Shoemaker*, 795 F.3d at 560; *DePiero*, 180 F.3d at 788; *Herrada*, 275 F.3d at 557.

*Second*, while we cannot disagree with our colleague's assessment of many other defects in the MiDAS system, we must note that neither party presented evidence linking Moffett-Massey and Geskey to these defects at summary judgment and accordingly the district court did not hold Moffett-Massey and Geskey responsible for them (or find that questions of material fact existed for them). Hence concerns about the delivery of the notices or the staffing of the phone lines may bring shame to the Agency. But they do not bear on the appeal. Because supervisory liability does not exist under section 1983 and because the district court found material questions of fact to exist only as to Moffett-Massey's and Geskey's involvement in the questionnaires and notices, we cannot grant relief on any other basis. To deny them qualified immunity based on wrongdoing for which they had no responsibility would run contrary to our precedent. *E.g.*, *Gregory*, 444 F.3d at 751–52.

All in all, while we share our colleague's concerns about the MiDAS system, we respectfully disagree with her conclusion as to the clearly established prong in this appeal.

## B.

*Mandatory intervention.* That brings us to Heathcote's separate appeal. A collection of multi-factor tests governs motions to intervene as of right under Civil Rule 24(a)(2). *United States v. Tennessee*, 260 F.3d 587, 591–92 (6th Cir. 2001). Courts consider (1) timeliness, (2) the movant's legal interest in the case, (3) impairment of that interest absent intervention, and (4) if the parties adequately represent it. *Id.* Timeliness is a "threshold issue." *Blount-Hill v. Zelman*, 636 F.3d 278, 284 (6th Cir. 2011) (quotation omitted). It splits into five component parts: (1) the stage of the litigation, (2) the intervenor's purpose, (3) the length of time that the intervenor knew about her interest, (4) prejudice to the original parties, and (5) unusual circumstances. *Id.* The multi-factor tests generate multiple standards of review as well. The

district court's timeliness analysis enjoys deferential abuse-of-discretion review, while the rest of it gets a fresh look. *Stupak-Thrall v. Glickman*, 226 F.3d 467, 471 (6th Cir. 2000).

The district court found Heathcote's motion untimely, a finding well within its discretion. Heathcote hopes to act as a class representative to vindicate class claims and to pursue her own individual claims.  Her attorney conceded at the motion hearing that he had represented Heathcote in the auto-adjudication period, meaning Heathcote and her attorney knew about her due process claim before Cahoo filed this lawsuit.  That means Heathcote waited four years to act.  She offers no satisfactory reason for this delay.  Her counsel explained that he was "willing to sit back" and let others "pursue this on behalf of the tens of thousands of people."  R.551 at 20.  But we have rejected such a "wait-and-see" approach before.  *Stotts v. Memphis Fire Dep't*, 679 F.2d 579, 584 n.3 (6th Cir. 1982).  And while Heathcote "wait[ed] in the wings," *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1811 (2018), the parties litigated motions to dismiss, undertook an interlocutory appeal, completed discovery, moved (unsuccessfully) for class certification, and briefed cross-motions for summary judgment.  Adding Heathcote to the mix now would require re-traveling these same roads and re-reaching these same milestones, all while adding considerable delay and cost to the litigation.

Put in terms of the five-factor test, the stage of the litigation was advanced.  *See Stupak-Thrall*, 226 F.3d at 474–75; *Blount-Hill*, 636 F.3d at 285.  Heathcote's purposes for intervening were not "legitimate," *Linton ex rel. Arnold v. Comm'r of Health & Env't*, 973 F.2d 1311, 1318 (6th Cir. 1992), and they do not "excuse[]" the "lack of an earlier motion," *Stupak-Thrall*, 226 F.3d at 479 n.15.  The length of time between Heathcote's motion and her knowledge of her interest was vast.  *Cf. China Agritech*, 138 S. Ct. at 1810–11 (instructing would-be class representatives not to wait to file).  This delay, in turn, unduly prejudices the original parties by requiring them to re-litigate key stages of this case.  *See Bradley v. Milliken*, 828 F.2d 1186, 1194 (6th Cir. 1987) (noting an intervenor's plan "to have the court reconsider its prior rulings" exacerbates prejudice).  No unusual circumstances support intervention.  All told, the district court did not abuse its discretion in holding that Heathcote filed this motion too late.

Heathcote raises several counterarguments.

Her main argument turns on *American Pipe & Construction Co. v. Utah*, in which the Court held that the filing of a class action tolls the statute of limitations for the putative class members. 414 U.S. 538, 552–53 (1974). As a result, Heathcote maintains, motions to intervene filed after the denial of class certification necessarily satisfy the timeliness inquiry. But this argument conflates two distinct doctrines about time: tolling and timeliness. *See id.* at 552 n.22 (declining to reach the separate question of the denial of intervention); *Lindblom v. Santander Consumer USA, Inc.*, 771 F. App'x 454, 455 (9th Cir. 2019) (finding *American Pipe* "irrelevant" to intervention). *American Pipe* tolling sounds in efficiency. 414 U.S. at 551. Just because a litigant has complied with a statute of limitations does not mean she has satisfied the distinct imperatives of Rule 24's timeliness requirements. *E.g.*, *Blount-Hill*, 636 F.3d at 284–86.

Multiple cases, she says, support her interpretation of *American Pipe*. But none binds this court. And none says anything about motions to intervene filed four years after the complaint—and filed *after* the denial of class certification to boot. *Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.* (*In re Allstate Corp. Sec. Litig.*), 966 F.3d 595, 614–16 (7th Cir. 2020); *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 393 (2d Cir. 2021); *Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 475 (E.D. Pa. 2021); *Byrd v. Progressive Direct Ins. Co.*, No. 3:20-cv-119, 2021 WL 1225961, at *6 (W.D. Ky. Mar. 31, 2021).

Also unhelpful is *Potter v. Commissioner of Social Security*, 9 F.4th 369 (6th Cir. 2021). It applied *American Pipe*'s tolling principle to individual claims after the administrative denial of class certification—at least two degrees of separation from today's case. *Id.* at 371–72, 380.

Heathcote insists that "the district court's ultimate decision on the legality of Defendants' conduct could have *stare decisis* effect on a future individual action." Appellant's Br. 23. But this concern did not arise recently. It arose when Cahoo filed the lawsuit, pointing against timeliness, not towards it. *See Stotts*, 679 F.2d at 583.

Heathcote maintains that she could not have known about her class-representative interest until after the denial of class certification. Only then, she says, did the inadequacy of the existing class representatives become clear. But it's far from apparent that Heathcote could vindicate her class-representative interest through intervention at this point. The district court denied class

certification for reasons on top of inadequacy; it also identified flaws with preponderance and superiority.  Heathcote touts herself as an adequate class representative but cannot explain how her renewed class certification motion would fix these other problems embedded in this "fact-intensive" due process claim.  *Cahoo*, 536 F. Supp. 3d at 158; *see Stupak-Thrall*, 226 F.3d at 476.

    *Permissive intervention.*  Heathcote in the alternative sought permission to intervene under Civil Rule 24(b).  Like their mandatory counterparts, permissive intervention motions also must be timely filed.  Fed. R. Civ. P. 24(b)(1); *NAACP v. New York*, 413 U.S. 345, 365–66 (1973).  That Heathcote filed her mandatory intervention motion too late bodes poorly for, indeed halts, her permissive intervention motion.  *Stupak-Thrall*, 226 F.3d at 479.

III.

    We reverse the district court's denial of qualified immunity as to Moffett-Massey and Geskey.  We affirm the district court's denial of Heathcote's motions to intervene and to reconsider.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

ALICE M. BATCHELDER, CIRCUIT JUDGE, concurring in part and dissenting in part. The majority decides two separate appeals in this opinion.  I concur in the latter, an appeal from a collateral judgment denying a motion to intervene.  Maj. Op. § II.B.  But I cannot concur in the first appeal, which is an interlocutory appeal from the district court's determination that genuine disputes of material fact preclude Moffett-Massey's and Geskey's claims of qualified immunity. Maj. Op. § II.A.  I would affirm the district court's denial of qualified immunity.

Just to be clear, despite the language in its opinion, the district court did not make any findings of fact or hold the current defendants, Moffett-Massey and Geskey, liable on any of the plaintiffs' claims—nor did it absolve them of liability on any claims.  The district court merely denied qualified immunity and set the case for trial by a jury.  That is, *if* the jury were to find that the form letters do not state the fraud accusation with particularity (or the means of delivery was not reasonably calculated to reach the recipients, or the hearing process did not provide them a reasonable opportunity to defend themselves) *and if* the jury were to find Moffett-Massey and Geskey were directly responsible for those failings (or for refusing to correct them), then the jury *could* find them liable.  Or the jury might not.  The point is that the plaintiffs have a story to tell—and evidence to present—to a jury and that is all the district court held.

We often say that "[q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law."  *Jackson v. City of Cleveland*, 64 F.4th 736, 750 (6th Cir. 2023) (quotation marks omitted) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).  This "is a rigorous standard" to be sure.  *Guertin v. Michigan*, 924 F.3d 309, 311 (6th Cir. 2019) (Sutton, J., concurring in the denial of rehearing en banc); *accord Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (calling it a "demanding standard").  But, as the district court suggested, Moffett-Massey and Geskey appear to argue their incompetence as an excuse, while a jury could find that the totality of their actions demonstrates their knowing violation of the law.  Either way, qualified immunity was not intended for defendants like these.

The short story is this.  The plaintiffs received unemployment benefits.  Months or years later, MiDAS auto-adjudicated them guilty of fraud and imposed staggering penalties.  The plaintiffs and thousands like them were unaware of the adjudication and penalties until afterward and, for many, not until the Agency seized their tax refunds and garnished their wages—sending already vulnerable people into renewed or further financial distress, including bankruptcy. Agency Director Moffett-Massey and her favored advisor, Geskey, were the masters of the entire MiDAS program.  The plaintiffs contend that Moffett-Massey and Geskey, in conjunction with certain others, deprived them of their right to due process by adjudicating them guilty and imposing penalties without providing proper notice or an opportunity to defend themselves.

Four statements of clearly established law are relevant to these due-process claims.  One, because the plaintiffs were not required to exhaust their administrative remedies (i.e., to appeal the Determination) or suffer the actual loss of their property, their injury (the deprivation) occurred when the Agency rendered the Determination in the three-letter combo.  Two, *pre*-deprivation due process was required in this scenario, meaning notice and a hearing *before* the Determination; *post*-deprivation process was insufficient and irrelevant as a matter of law. Three, the pre-deprivation notice and process had to be constitutionally satisfactory—i.e., the means of delivery had to be reasonably calculated to reach the recipients, the content of the notice had to state the accusation and grounds for it with particularity, and the hearing had to provide a reasonable time and opportunity to oppose the accusation.  Four, the state defendants had to be directly or actually responsible for the due process violations, or for refusing to remedy those violations.

As the district court determined based on its thorough assessment of the evidence, there are material questions for decision by a jury, such as: *whether* the means and manner of delivering the Questionnaire was reasonably calculated to ensure that the plaintiffs would receive it; *whether* the content of the Questionnaire was sufficient for the plaintiffs to realize that they were accused of fraud, know the bases for that accusation, and prepare the evidence necessary to oppose or refute that accusation; *whether* the Questionnaire's scheme (including the multiple-choice questions for auto-adjudication, the caveat in the instructions that permitted the recipient to submit additional information, the 10-day response deadline, etc.) comports with due process;

and *whether* Moffett-Massey and Geskey were directly responsible for the Questionnaire.  There are other genuinely disputed issues, to be sure, but these are enough—in my view and the district court's—to show that the record contains evidence by which a jury could reasonably find that Moffett-Massey and Geskey, via MiDAS, violated the plaintiffs' clearly established rights to due process.

## I.

Since its filing in March 2017, this case has generated over a dozen written opinions by the district court (and one prior opinion by this court), exploring and discussing the underlying events, the legal claims and defenses, and a legion of associated factual, legal, and technical issues.  Each of the district court's opinions is thorough, detailed, and clear.  More to the point, these opinions demonstrate the court's meticulous review of the record and its full understanding of the claims, issues, and law.  Everything in the summary that follows is attributable to the district court's impressive and commendable efforts in managing and documenting this case to date.

In October 2013, Michigan's Unemployment Insurance Agency (the "Agency") started using the MiDAS software to run its entire fraud-investigation process automatically, without any Agency employee involvement.  A fraud investigation typically began in one of two ways: a former employer objected to the unemployment claim (which objection the Agency accepted without question) or MiDAS flagged a suspect based on a database comparison of benefits to quarterly taxable income, which MiDAS averaged (prorated) over the 13 weeks of the quarter. For example, if Mary Doe received unemployment benefits in January, but later earned $1,300 at a new job in March, MiDAS would take Doe's total First Quarter income of $1,300, divide it by 13 weeks, treat that as if she earned $100 each and every week in the Quarter, including the weeks in January when she was receiving unemployment benefits, and assume that the January unemployment benefits were improper (due to the prorated $100 per week), and possibly attributable to fraud.[1]

---

[1]This is what happened to Suzette Marie Heathcote, the attempted intervenor in the other appeal here, No. 21-2672.

To initiate the fraud investigation, MiDAS would automatically send a form letter (or an email, or place a notice in the related Agency account) to the recipient/suspect.  We, like the district court, refer to this first form letter as "the Questionnaire," which was actually titled "Request for Information Relative to Possible Ineligibility or Disqualification."  Pause to recognize that, at this point, many recipients were no longer receiving benefits and had not been for months or years, so it is doubtful that a form letter about "Ineligibility" or "Disqualification" from a program for which the recipient was no longer a participant would be of significant interest or concern.

More importantly, the Questionnaire did not announce that it concerned a fraud investigation—in fact, that form letter does not contain the word "fraud" anywhere in it.  Instead, it opens with the statement: "A question of eligibility and/or qualification has been raised on this claim.  Please respond to the questions on the reverse side of this form."  Those two questions are:

> Did you intentionally provide false information to obtain benefits that you were not entitled to receive?
>
> Yes       No
>
> Why do you believe you were entitled to benefits?
>
> 1. I needed the money
>
> 2. I had not received payment when I reported for benefits
>
> 3. I reported the net dollar amount instead of the gross dollar amount paid
>
> 4. I did not understand how to report my earnings or separation reason
>
> 5. I thought my employer reported my earnings for me
>
> 6. Someone else certified (reported) for me
>
> 7. Someone else filed my claim for me
>
> 8. Other

The recipient's answers to these questions—actually just the second question—triggered MiDAS's so called "logic tree."  The first question was virtually irrelevant; a "No" answer was

ignored.[2]   The recipient's choice on the second question was determinative.  But recognize that—as answers to the specific question asked—those eight options make no sense.  The "real" question to these "answers" would be: Why did you (lie and) understate your income?[3]  The only "answer" that let the recipient out of the MiDAS auto-adjudication system was number 8, "Other."  If the recipient chose 2, 3, 4, or 5, then MiDAS determined that benefits were improper and necessitated repayment, albeit by mistake, not fraud.  But if the recipient chose numbers 1, 6, or 7 (or did not respond within ten days), then MiDAS automatically adjudicated the recipient guilty of fraud.   According to a subsequent U.S. Department of Labor (DOL) investigation, "most" of the MiDAS auto-adjudications of fraud were due to the recipient/suspect's failure to respond to the letter.

At the end of the list (after option number 8), the form had a blank space of about 1⅜ inches, beneath which was this paragraph, with its permissive opening sentence:

> You may provide a statement and evidence regarding this issue before a (re)determination is made on this matter.  You must provide a response to the questions above and if you failed to previously report this information, explain why.  This form must be received by the Agency within 10 calendar days of the mail date shown on [the reverse side].  Submit copies (not the originals) of any records which you believe support your position, such as pay stubs, layoff slip, federal income tax form, W-2, etc.  If you require additional space, attach additional page(s). . . .

Many things about this putative offer of an opportunity to respond are questionable, but I will point out two.  One, because the MiDAS software auto-adjudicated the decision based on the option chosen in the second question, any additional explanation or information was ignored unless the recipient chose Option 8.  And two, the response deadline of "must be received by the Agency within 10 calendar days of the mail date shown" includes any postal mail delivery time,

---

[2]"When a claimant did respond to the [Q]uestionnaire, MiDAS's programming, based on its logic trees, found intentional fraud whenever a claimant chose certain multiple-choice options on the form, even if she indicated [in question one] that she did not intentionally provide false information."  *Cahoo v. FAST Enterprises LLC*, 508 F. Supp. 3d 162, 167 (E.D. Mich. 2020).  Thus, MiDAS's programming ignored a "No" answer in question one.

[3]As the plaintiffs point out in their brief, the Questionnaire "contained no multiple-choice option that would allow a claimant to select an answer indicating that they believed they were entitled to benefits because they were qualified for the benefits."  Ape. Br. at 28.  And Clay Tierney, the Agency Project Manager who created the MiDAS system, testified at his deposition that the Agency presumed an overpayment, and likely fraud, before sending that letter.

thereby shortening the 10 days by two or more days, and it necessarily includes at least one weekend.

The next stage of the process was the Determination notification, which MiDAS sent automatically, and which actually comprised three separate letters sent in three separate envelopes.  Although none of these three letters referred to the other letters in any way, they are all form letters, in 10-point font, with the same Agency title block, mailed to the same recipient address, on the same mailing date, and listing the same nine-digit CLM code in the information block.  The first letter, titled "Notice of Determination," informed the recipient of its finding ("Your actions indicate you intentionally misled and/or concealed information to obtain benefits you were not entitled to receive.") and its punishment: that she was "disqualified for benefits," that "[r]estitution [wa]s due," and that she was "required to pay the penalty assessed."  The second letter, also titled "Notice of Determination" but using a different "case number," informed the recipient of a different finding (e.g., "You quit your job with [employer] on [date] due to other personal reasons.  Your leaving was voluntary and not attributable to the employer.") and stated an overlapping punishment: that she was disqualified for benefits until she has satisfied a certain dollar amount of "rework requirements."  And the third letter, titled "Restitution," which has the same case number as the second letter, informed the recipient of the amount due in repayment and penalty (e.g., "Claimant must pay to the Agency in cash, by check, money order, EFT via MiWAM or deduction from benefits, restitution in the amount of $35,475 [i.e., $7,095 in principal and $28,380 in penalty] . . . . Interest accrues at the rate of 1% per month (computed on a daily basis).").  The letter also says: "[s]hould your disqualification or ineligibility be *reversed*, restitution shall cease."

To sum this up, if the claimant did not answer the Questionnaire within 10 days or answered by choosing options 1, 6, or 7, then MiDAS automatically adjudicated that claimant guilty of fraud and imposed severe penalties (recovery of benefits, a penalty of four times the benefits,[4] and interest at 1% per month compounded daily).  So, returning to hypothetical Mary Doe, suppose she received $400 in unemployment that MiDAS deemed fraudulent four years

---

[4]According to Geskey, this penalty (four times or 400% of the benefits) was the highest penalty of any State in the country.  Most States had a fraud penalty of 10 to 15% of the benefits.

later: MiDAS would assess her $3,232, based on repayment of the $400, a penalty of $1,600 (i.e., $400 x four), and interest of $1,232 (i.e., 1% monthly, compounded daily for four years). Being unemployed in Michigan was awfully expensive.[5]  If the recipient did not pay as demanded, MiDAS initiated collection through interception of federal and state income tax refunds and wage garnishment.

As bad as this was in concept, it was even worse in practice.  The Agency started using MiDAS in 2013, but the MiDAS database search, comparing benefits to taxable income, looked backward at every recipient for the prior six years.  So, the compound interest was brutal, but also many recipients were no longer claiming or receiving unemployment at the time of the MiDAS Questionnaire and Determination.  Unemployment was a distant (bad) memory to these people, who likely had no concern for any Agency form letters.  Meanwhile, the Agency made no effort to establish the correct or current address for these suspects.  No human involvement meant that MiDAS just automatically printed the old address from its database onto the form letters.[6]

According to the record, many letters were never even mailed and merely accumulated at the Agency.  Thousands of letters were returned as undeliverable.  And, presumably, even more were simply discarded and never read.  There was no Agency follow up on the undeliverable returned letters or any effort to determine whether any letters were actually received.  And the letters had an additional latent defect.  The Determination letters—purportedly alerting the recipient of the adjudication and the right to appeal—listed a phone number with instructions to call that number for more information.  In a subsequent audit, the Michigan Auditor General (MAG) determined that over 90% of the calls to that number were never answered, including the

---

[5]According to the DOL investigation, most of these recovery actions were for over $10,000.  Many were over $50,000.  And some were over $180,000.  And, as would be expected, many of these people ended up in bankruptcy.  Three of the four plaintiffs here ended up in bankruptcy, which was its own separate issue in the district court.

[6]Alternatively, MiDAS sent an email to the recipient/suspect at the email address that MiDAS had on record.  That email instructed the recipients/suspects to check their Agency account for a new notice.  The email did not reveal that the notice concerned a fraud investigation or the potential consequences.  And, given that the recipient was no longer participating in the unemployment program, and had not been for months or years, one might reasonably question whether a nondescript, generic email about their dormant Agency account would be of interest or concern.

last 50,000 calls leading up to that audit.  It was also reported that, of the 22,427 fraud auto-adjudications that the MAG selected for review, 93% involved no fraud.  That number has since been called in to question, but in its opinion ruling on class certification, the district court cited evidence provided by the State of Michigan that MiDAS was involved in 67,740 adjudications of fraud; and the plaintiffs argued that at least 50% of those were faulty and involved no fraud.

Meanwhile, if a recipient/suspect *did* actually receive the Determination letters, understand them, and request an appeal, the appeal was assigned for a hearing before an ALJ.  But no Agency information was available because MiDAS was not accessible and there were no paper copies of any of the materials.  So, the recipient/suspect/appellant had no information about the fraud determination and arrived at the hearing with no knowledge or preparation as to what accusations to dispute or disprove.  At some point, the Agency began to send *ex parte* communications to the ALJs, stating the reasons for MiDAS's fraud determination.  When certain ALJ's expressed concern over that practice, the Agency removed them from hearing the fraud appeals.

During its brief use of MiDAS, the Agency's operating fund increased by $152 million.

The Agency discontinued MiDAS in August 2015, purportedly due to the discovery of false-positive fraud determinations.  The Agency denies that it was because the DOL had just learned the Agency was using an automated system and—warning that auto-adjudication of fraud claims violates due process and federal law—began a DOL investigation.[7]  The Agency (namely Moffett-Massey and Geskey) denied that auto-adjudication was illegal, but they discontinued it.  Three months later, the DOL reported that the MiDAS auto-adjudication violated federal law:

> On November 13, 2015, the United States Department of Labor issued a Monitoring Report of the [Agency]'s adjudication practices.  It found that the [Agency]'s practices violated section 303 of the Social Security Act, 42 U.S.C. § 503(a), in six ways, [including that the form letter] . . . questionnaires and fraud

---

[7]Also, the *Zynda* lawsuit was filed in April 2015.  This precursor lawsuit led to a settlement agreement that the Agency would no longer use MiDAS.  *Zynda v. Arwood*, 175 F. Supp. 3d 791 (E.D. Mich. 2016) (denying motion to dismiss).

determination notices did not clearly state the issue or reason for the [Agency]'s suspicion. . . .

*Cahoo v. Fast Enterprises LLC*, 508 F. Supp. 3d 138, 149 (E.D. Mich. 2020).

As mentioned, the two State-employee defendants in this appeal are Sharon Moffett-Massey and Stephen Geskey. Moffet-Massey was the Agency's Director from April 2014 to January 2017, during which time she oversaw the entire Agency operation, including the MiDAS auto-notification and auto-adjudication system, the Questionnaire and Determination forms used in it, the decision tree, and the appeal process. She approved of it wholeheartedly, championed it (and herself) in the press, disregarded internal warnings and the eventual negative press about MiDAS, and insisted that auto-adjudication was legal and legitimate. Even when the DOL told her it was inappropriate, she argued that no federal rule or regulation said so. Geskey was the Agency's Director from 2008 to 2011, and then the head of the Agency's Policies and Procedures Group, which reviewed and approved aspects of MiDAS, including the Questionnaire and Determination form letters. Basically, Geskey's role was as lawyer/advisor to Moffett-Massey and the Agency. Even though he had advised Moffett-Massey to abolish the logic tree, which she refused to do, he joined her argument (and drafted the letter for her signature) against the DOL, claiming that no federal rule or regulation prohibited auto-notification or auto-adjudication.

## II.

For various reasons, the Agency suspected that each of the four plaintiffs in this case had committed fraud. These accusations or suspicions triggered MiDAS to send Questionnaires, but because the plaintiffs did not actually receive them or appreciate their significance, none of these plaintiffs responded. Consequently, MiDAS sent each a Determination, auto-adjudicating them guilty of fraud, disqualifying them from eligibility for future benefits, and setting out their individual monetary liability based on restitution of past benefits and the 400% penalty, which ranged from $6,962 to $34,475, plus interest, for the four of them. Because they did not receive or appreciate the significance of the Determination, none of these current plaintiffs sued back then for declaratory or injunctive relief based on the current due process claim. Nor did any of them pursue the administrative appeal, the availability of which expired after 30 days.

Cahoo first discovered her $34,475 liability when she found it listed on her credit report as she was preparing to file for bankruptcy. Mendyk first discovered her $32,758 liability when she attempted to file another claim for uninsurance benefits three years later, which was after the Agency had seized her tax refunds and garnished her wages. Cole first learned of her $24,530 liability when she received a statement of debt from the State, about 18 months after the Determination. And Davison first learned of her $6,962 liability when the Agency intercepted her federal tax refund about 18 months after the Determination. Cahoo, Mendyk, and Cole eventually declared bankruptcy and obtained a discharge of their debts from the bankruptcy court.

In 2017, these four plaintiffs filed this lawsuit in federal court, which included, among its several claims, a claim brought under 42 U.S.C. § 1983 that Moffett-Massey and Geskey, acting by and through MiDAS, deprived them of their constitutional right to due process by adjudicating them guilty and imposing penalties without providing proper notice or an opportunity to defend themselves.[8] The plaintiffs also sought to prosecute this lawsuit as a class action, which the district court denied. In its opinion denying class certification, the district court explained that "[t]he plaintiffs argue that the manner of the notice was constitutionally deficient, but they also insist that the substance was deficient as well." *Cahoo*, 508 F. Supp. 3d at 161. The court found that class certification was improper because "the manner of notice and the [Agency]'s failure to provide a meaningful hearing and impartial process are fact-intensive inquiries . . . [and] the resolution of those issues would depend on whether the individuals received actual notice." *Id.* at 162.

Then, Moffett-Massey and Geskey moved for summary judgment based on qualified immunity, which the district court denied, ordering that a jury would decide the plaintiffs' claims at trial. The court did not hold Moffett-Massey and Geskey responsible for—or absolve them of responsibility for—anything at that stage. Meanwhile, the plaintiffs had moved for partial

---

[8]The district court explained that "the complaint alleges that the automated system afforded no pre-deprivation process to the plaintiffs even though [such process] was required by state law, and post-deprivation remedies were inadequate because the decision-making process lacks transparency and access to records to determine the basis for the determination[.] The complaint also indicates that the appeals process was fraught with impropriety." *Cahoo v. FAST Enterprises LLC*, 508 F. Supp. 3d 162, 176 (E.D. Mich. 2020) (citation omitted).

summary judgment, arguing, among other things, that: "(1) the fraud questionnaires and determinations did not provide adequate substantive notice, (2) the manner of notice—by traditional mail and email—was constitutionally deficient, [and] (3) they were denied a fair hearing through the inadequate notice in the questionnaires and determinations." *Cahoo*, 528 F. Supp. 3d at 727. But the court denied that motion because "fact questions preclude partial summary judgment on liability in favor of the plaintiffs against any of the defendants." *Id.* at 763.

Moffett-Massey and Gesky appealed. Because the denial of summary judgment is not a final decision under 28 U.S.C. § 1291, it is ordinarily not immediately appealable. But the "denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of [] § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Thus, we have a certain, limited jurisdiction over interlocutory appeals from the district court's denial of qualified immunity.

### III.

"Our jurisdiction in this interlocutory appeal extends only to questions of law, which we review de novo. The legal question here is whether [the defendants] w[ere] entitled to qualified immunity, on the facts as we must construe them in this appeal." *Jarvela v. Washtenaw Cnty.*, 40 F.4th 761, 764 (6th Cir. 2022) (citation omitted). We construe them by "tak[ing] the district court's view of the facts in the light most favorable to [the plaintiffs]." *Id.* at 763 (citation omitted).[9] And when the district court determines that material questions of fact preclude qualified immunity, as it did here, the defendants must "concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Bey v. Falk*, 946 F.3d 304, 312 (6th Cir. 2019)

---

[9]"At the summary judgment stage, the [district] court determines whether there are genuine disputes of material fact that should go to a jury; it does not find facts." *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 381 (6th Cir. 2017) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *see also Upshaw v. Ford Motor Co.*, 576 F.3d 576, 592 (6th Cir. 2009) ("In considering a motion for summary judgment, the [district court]'s function is limited to determining whether sufficient evidence has been presented to make the issue a proper jury question, and not to judge the evidence and make findings of fact." (quotation marks and citation omitted)); *Harris v. Welch*, 979 F.2d 850 (6th Cir. 1992) ("Thus, the inquiry performed is the threshold inquiry of determining whether there is the need for trial—whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." (quotation and editorial marks omitted)).

(citation omitted); *see also Bunkley v. City of Detroit*, 902 F.3d 552, 559-61 (6th Cir. 2018). That is, in an interlocutory appeal from the denial of qualified immunity, the plaintiffs win any material fact dispute.

Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A plaintiff who brings a § 1983 action against such an official bears the burden of overcoming the qualified immunity defense. *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021). At the summary judgment stage, the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established. *Id.* (citing *Wesby*, 138 S. Ct. at 589).

"A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (quotation marks, editorial marks, and citation omitted). Because "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), there need not be "a case directly on point," so long as "existing precedent [has] placed the statutory or constitutional question beyond debate," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citation omitted). The "unlawfulness can be 'clearly established' from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs." *Vanderhoef v. Dixon*, 938 F.3d 271, 278–79 (6th Cir. 2019) (quotation marks and citation omitted).

The district court framed the question in terms of three due process violations: (1) "the defective notices that MiDAS generated—notices that defendants Moffet-Massey and Geskey were responsible for crafting"; (2) "the presumptive logic tree fraud determinations"; and (3) "the automatic fraud findings that resulted from a failure to respond to the questionnaires." *Cahoo*, 528 F. Supp. 3d at 755. But the right in question is the same for all three violations: the right to notice of and an opportunity to defend against Agency accusations that would lead to an adjudication of guilt and imposition of punishment, namely the disqualification from the

unemployment program and the monetary liability for restitution of past benefits, severe penalties, and interest.

"A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 143 S. Ct. 955, 961 (2023) (citation omitted). The first element is easily satisfied here. As for the disqualification, the plaintiffs have a protected property interest in their access to the State's unemployment benefits program. *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 900 (6th Cir. 2019) ("Recipients of unemployment compensation have constitutionally-protected property interests in unemployment benefits.") (citing cases). And as for the monetary liability, the plaintiffs have a protected property interest in their own money, as they undoubtedly "have a legitimate claim of entitlement to it." *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). And the Agency's penalties deprived the plaintiffs of those interests.

The question here concerns the process. Specifically, whether the right to adequate notice and opportunity to defend was so clearly established under existing law that "a reasonable official would understand that what he [wa]s doing violate[d] that right." *See Baynes*, 799 F.3d at 610. And the notice and process of concern in this analysis is limited to the Questionnaire because everything in and after the Determination was *post*-deprivation and, therefore, irrelevant.

The plaintiffs were not required to exhaust their state administrative remedies. *Patsy v. Bd. of Regents*, 457 U.S. 496, 500 (1982) ("[W]e have on numerous occasions rejected the argument that a § 1983 action should be dismissed where the plaintiff has not exhausted state administrative remedies.); *see also Pakdel v. City & Cnty. of San Francisco*, 141 S. Ct. 2226, 2230 (2021) (reciting "'the settled rule' that exhaustion of state remedies is not a prerequisite to an action under § 1983" (quotation marks and citation omitted)). Nor were the plaintiffs required to wait to suffer a tangible injury. *See Patsy*, 457 U.S. at 504 (explaining that "Congress intended [§ 1983] to throw open the doors of the United States courts to individuals *who were threatened with*, or who had suffered, the deprivation of constitutional rights, and to provide these individuals immediate access to the federal courts" (quotation marks and citation omitted; emphasis added)).

If the plaintiffs had received and understood the Determination letters, they could have filed this § 1983 action right then, seeking a declaratory judgment or injunctive relief based on this same due process claim they raise here.  The Determination was a final decision that offered an administrative appeal, with the first two letters describing a "protest" of the Determination (not a defense against the accusation or charge) and the third letter's referring to the Determination's being "reversed"; it does not refer to an accusation's being proven or disproven.

Therefore, the Determination (three-letter combo) is the Agency action that caused the plaintiffs' injuries, i.e., the deprivation of the plaintiffs' rights concerning their property interests. The Questionnaire was the first (putative) contact with the suspected claimant, it comprised the purported "notice" of the accusation and it described the "process" for defending against the accusation.  The next communication from, or contact with, the Agency was the Determination (three-letter combo), which announced that the Agency had adjudicated the claimant guilty, demanded restitution of the prior benefits, and imposed the 400% penalty.  At some point later, typically without further communication or contact, the Agency seized the claimants' money (with accumulated interest) by intercepting their tax refunds or garnishing their wages.  The effect of the disqualification and seizure of money would be relevant to questions of actual notice and consequential damages, but it does not delay or negate the deprivation of the plaintiff's rights.

Because the Determination effected the Agency's deprivation of the plaintiffs' rights, the plaintiffs could have brought a § 1983 action immediately, before pursuing any administrative appeal or waiting for tangible harm.  In fact, the statute of limitations would start upon receipt of the Determination.  Therefore, the Questionnaire comprises the totality of the *pre*-deprivation process.  The Determination's offer of an appeal falls entirely under *post*-deprivation process.

"An essential principle of due process is that a deprivation of life, liberty, or property be *preceded by* notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quotation marks and citation omitted; emphasis added).  Thus, the Supreme Court has "described the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing *before* he is

deprived of any significant property interest."  *Id.* (quotation marks, citation, and footnote omitted).

Moreover, because this entire adjudication process was a preconceived and established government procedure, the law required *pre*-deprivation due process—meaning notice and hearing *before* the Determination—whereas *post*-deprivation process was insufficient (and irrelevant) as a matter of law.  *See Silberstein v. City of Dayton*, 440 F.3d 306, 316 (6th Cir. 2006) (explaining that "[w]hen a deprivation occurs through an established state procedure, then it is both practicable and feasible for the state to provide pre-deprivation process, and the state must do so regardless of the adequacy of any post-deprivation remedy" (quotation marks and citation omitted)); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982) ( "[A]bsent the necessity of quick action by the State or the impracticality of providing any predeprivation process, a post-deprivation hearing here would be constitutionally inadequate." (quotation marks and citation omitted)); *Mitchell v. Fankhauser*, 375 F.3d 477, 481 (6th Cir. 2004) ("Postdeprivation remedies do not satisfy due process where a deprivation of property is caused by conduct pursuant to established state procedure, rather than random and unauthorized action." (quoting *Hudson v. Palmer*, 468 U.S. 517, 532 (1984))).  Nothing about the MiDAS adjudication scheme suggests that "quick action" was even intended, much less necessary, or that pre-deprivation process was impractical.

Moreover, the law required that the Questionnaire's pre-deprivation notice and process had to meet certain standards.  The notice must be "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," and it "must afford a reasonable time for those interested to make their appearance." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (citations omitted).  The manner or "means [of providing notice] must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."  *Id.* at 315; *Jones v. Flowers*, 547 U.S. 220, 229 (2006).  In substance or content, the notice "must set forth the alleged misconduct with particularity."  *Cox v. Turley*, 506 F.2d 1347, 1351 (6th Cir. 1974) (quoting *In Re Gault*, 387 U.S. 1, 33 (1967)); *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 98 (1978) ("[T]he purpose of notice is to apprise the affected individual of, and

permit adequate preparation for, an impending hearing."). "The need for more specific notice is particularly critical when the regulations provide in lieu of an adversary hearing the opportunity to submit information in opposition to [the accusation]." *Transco Sec., Inc. v. Freeman*, 639 F.2d 318, 324 (6th Cir. 1981); *accord ATL, Inc. v. United States*, 736 F.2d 677, 683 (Fed. Cir. 1984). Therefore, the content of the Questionnaire had to state the accusation of fraud and the grounds for it with particularity such that the recipient would understand it; the means of delivering the Questionnaire had to be reasonably calculated to reach the recipients ("such as one desirous of actually informing the [recipient] might reasonably adopt to accomplish it"); and the process afforded the recipient had to provide a reasonable time and opportunity to oppose the accusation, particularly because it limits the recipient's response to the submission information in lieu of an adversarial hearing.

Given those standards, the plaintiffs contend that the content of the Questionnaire does *not* provide (1) notice of the fraud accusation, (2) the grounds for that accusation, (3) the consequences of the impending Determination, (4) the information necessary to defend against or produce contra-evidence to the accusation, (5) a hearing at which to question the accusation and present a defense to the decisionmaker, or (6) a reasonable time to reply. *See Cahoo v. Fast Enterprises LLC*, 528 F. Supp. 3d 719, 757 (E.D. Mich. 2021). The defendants' contention that the content of the Questionnaire form letters does provide that information creates a fact dispute. There is no need to refer to any law to resolve that dispute; one need only read the Questionnaire.

The district court explained its assessment of the evidence:

The plaintiffs in this case challenge not only the *manner* that the [Agency] officials chose to deliver the notices to claimants, but also the adequacy of the notice's *contents*. They contend that the fraud questionnaires and the determination letters did not explain why the [Agency] suspected them of committing fraud, and that deficiency deprived them of their ability to make an informed response.

1. Fraud Questionnaires

Once MiDAS flagged a claim for overpayment, it automatically issued questionnaires to . . . claimants. A claimant's failure to respond timely to a questionnaire resulted in a default determination that the claimant committed fraud.

> Although a suspicion of fraud triggered the questionnaires, the basis for that suspicion was not communicated to the claimant.  The questionnaire provided almost no notice whatsoever of the alleged misconduct, or that the failure to respond would result in a fraud determination. . . .
>
> There is no question that this [fraud] questionnaire woefully falls short of setting forth the alleged misconduct with particularity, or providing claimants a reasonable opportunity to know the claims of the opposing party and meet them.  The notice refers generally to a 'question of eligibility' and mentions that [the Agency] may determine that a claimant committed fraud based on its 'available information.'  But the questionnaire does not state what that information is, thereby limiting the opportunity to present objections intelligently.

*Id.* at 756-57 (emphasis added; editorial marks, quotation marks, citations omitted).

As mentioned, for purposes of deciding this peculiar interlocutory, qualified-immunity appeal, we are bound to that assessment.  *See Bey*, 946 F.3d at 312; *Bunkley*, 902 F.3d at 559.  A jury might agree, or a jury might disagree (and find that the Questionnaire *did* provide sufficient notice and process), but that is a question for a jury.  Our assessment of the Questionnaire—even a strong belief that every juror would necessarily find that it provides notice and process—cannot, under existing precedent and Supreme Court guidance, trump the district court's assessment.

As for the two defendants here, Moffett-Massey and Geskey, the district court further framed the issue, set out the controlling law, and identified specific questions of fact for each of these two defendants that required determination by a jury.  In framing the issue, it said:

> None of the plaintiffs allege that any of the State defendants were involved personally in their fraud adjudications or subsequent collections.
>
> Instead, the plaintiffs allege that these defendants were responsible for applying MiDAS's system of defective notices, logic trees that led to presumptive fraud determinations, and automated collection procedures that deprived them of the right to be informed of the accusations against them and to present their side of the story.
>
> When an automated system is alleged to be the culprit behind a constitutional deprivation like this, the plaintiffs' theory of liability is a viable one.  After all, as the court of appeals pointedly observed, 'MiDAS did not create itself.'

*Cahoo*, 528 F. Supp. 3d at 748 (paragraph breaks inserted; citation omitted).

As the district court explained, "[s]upervisors cannot be held liable on a *respondeat superior* theory for claims brought under 42 U.S.C. § 1983," but must either "set[] in motion a series of events that the [supervisor] knew or should reasonably have known would cause others to deprive the plaintiff[s] of [their] constitutional rights," or "abandon the specific duties of his [or her] position in the face of actual knowledge of a breakdown in the proper workings of the department." *Id.* (quotation marks, editorial marks, and citations omitted) (citing or quoting *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 487 (6th Cir. 2020), *Conner v. Reinhard*, 847 F.2d 384, 396-397 (7th Cir. 1988), *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012), and *Winkler v. Madison Cnty.*, 893 F.3d 877, 898 (6th Cir. 2018)).

As for Moffett-Massey, the district court found that "the record allows an inference that she actively encouraged, authorized, or acquiesced to the rote application of logic trees and use of substantively deficient questionnaires and fraud determination notices." *Cahoo*, 528 F. Supp. 3d at 751. The court cited several facts from the record: (1) her advisor, Geskey, had "repeatedly recommended against the fraud finding decision trees . . . [and] insisted that fraud determinations must be based on competent material and substantial evidence"; (2) Moffett-Massey "was aware of the policy permitting the [Agency] commonly to adjudicate issues based on nothing but a failure to respond to allegations"; and (3) "[t]he record does not show that Moffett-Massey did anything to address this problem." *Id.* at 750. If the jury were to believe that evidence, it could reasonably "infer that [Moffett-Massey] approved the policy and thereby abdicated her duty with active performance to ensure that the [Agency]'s process conformed with federal and State law." *Id.*

The district court further found that "[t]he record also permits an inference that [Moffett-Massey] actively approved the substance of the fraud determinations and questionnaires." *Id.* The court pointed to: (4) Moffet-Massey's own testimony that "the [Agency] was aware . . . that the forms might be deficient[] before she became director in April 2014"; (5) but "once she became director, it does not appear that she took any action to modify the content of those notices"; and that (6) "[h]er name appears on the form[s] . . . under the heading, 'authorized by.'" *Id.* at 750-51. Thus, a jury could find that Moffett-Massey's actions and inactions directly

violated the plaintiffs' clearly established rights to due process, and she was not entitled to qualified immunity.

Moffett-Massey was the Agency Director, with full and final authority over every aspect of the Agency's operations, including MiDAS, as well as final say over the content of the Questionnaire.  The plaintiffs label it "confounding," that she would contend that she did not approve of the forms even though she was the Director and her name is at the top.  In her deposition testimony she admitted that she was aware of the substance of the forms, the use of logic trees, and the auto-adjudications.  And, despite her authority as Director, she took no action to remedy or change any of those things.  Overall, the evidence in the record allows an inference that she actively encouraged, authorized, or acquiesced to violations of their due process rights.

The theme of Moffett-Massey's deposition testimony was a Sergeant Schultz defense: "I see nothing! I hear nothing! I know nothing!"  That is, although she was the Director in charge of the entire Agency, with all the benefits and responsibilities that entails, she claims that she has done nothing wrong nor did she know of any wrongdoing.  If she testifies at trial, a jury could believe her.  Or it could believe that she was in charge and should have known—or likely did know—and therefore disbelieve her denials.  The point is, because the answer to the question of her liability would turn on her credibility, it is not a proper subject for summary judgment.

As for Geskey, the district court found questions for a jury concerning his "involvement in creating or approving the defective forms."  *Id.* at 752.  The court pointed to three record facts to support this: (1) "Geskey was the director of the policies and procedures group up to the implementation of MiDAS"; (2) "he should have reviewed the forms and noticed that they were almost completely devoid of substantive notice (particularly the questionnaire)"; and (3) despite this responsibility and authority, he "apparently found no fault with the notices that deprived claimants of their ability to confront the [Agency]'s suspicions intelligently."  *Id.* (quotation marks omitted).  The court held that these "fact questions about Geskey's role in approving the deficient questionnaires and fraud determination notices" precluded qualified immunity.  *Id.*

In this appeal, Geskey argues that the forms were already developed when he took over the Policies and Procedures Group, and that he "did not have authority to make policies of

significant import or to unilaterally make decisions of broad import . . . [or] to unilaterally change forms or implement changes." Nor did he review, develop, or approve any of the specific forms—he claims someone else did. Thus, he disputes the district court's assessment of the record concerning his role in the development and approval of the forms, which is not appropriate in this appeal.

The plaintiffs answer that, while Geskey's role may be muddled, he certainly played a role—either in advancing the problematic MiDAS program or failing to correct it. As a lawyer, former Agency Director, and then head of the Policies and Procedures Group, he was undeniably in a position of either real or advisory authority, such that he was (or should have been) aware of the problems. In his deposition, Geskey could not deny that he was employed at the Agency in a responsible role at the time, but he insisted that he neither did anything wrong nor knew of anything wrong, nor should he have known. A jury might believe him, or it might not. That is for a jury.

## IV.

Ultimately, the district court determined that the evidence could permit a jury to find that the Questionnaire and associated process did *not* provide notice and an ability to defend, and that Moffett-Massey and Geskey were directly responsible for the MiDAS adjudication program. *See Cahoo*, 528 F. Supp. 3 at 754-60. Consequently, the court denied qualified immunity.

I agree with the district court and, therefore, I would affirm. Because the majority sees it differently, I respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 21-1407/2672

PATTI JO CAHOO, KRISTIN MENDYK, and KHADIJA
COLE, individuals and on behalf of others similarly situated;
HYON PAK; MICHELLE DAVISON,

    Plaintiffs - Appellees (21-1407),

    v.

SAS INSTITUTE, INC. fka SAS Analytics, Inc.,

    Defendant,

FAST ENTERPRISES, LLC; CSG GOVERNMENT SOLUTIONS,

    Defendants - Appellees (21-2672),

STEVEN GESKEY; SHARON MOFFETT-MASSEY,

    Defendants - Appellants (21-1407),
    Defendants - Appellees (21-2672),

SUZETTE MARIE HEATHCOTE,

    Proposed Intervenor - Appellant (21-2672).

```
┌─────────────────────────────┐
│          FILED              │
│        Jun 15, 2023         │
│   DEBORAH S. HUNT, Clerk    │
└─────────────────────────────┘
```

Before:  SUTTON, Chief Judge; BATCHELDER and MURPHY, Circuit Judges.

**JUDGMENT**

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

    THIS CAUSE was heard on the record from the district court.  Case 21-1407 was argued by counsel and case 21-2672 was submitted on the briefs without oral argument.

    IN CONSIDERATION THEREOF, it is ORDERED that the district court's denial of qualified immunity to Steven Geskey and Sharon Moffett-Massey is REVERSED, and its denial of Suzette Marie Heathcote's motions to intervene and to reconsider is AFFIRMED.

                  **ENTERED BY ORDER OF THE COURT**

                  Deborah S. Hunt, Clerk